# Exhibit 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUS. LIT. SESSION
CIVIL ACTION NO.

|  |  |
|---|---|
| BRANDA PEEBLES and JOSHUA BERGER, Individually, and on BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br>        Plaintiffs,<br><br>vs.<br><br>JRK PROPERTY HOLDINGS, INC., STEVENS POND APARTMENTS PROPERTY OWNER, LLC, and ONE WEBSTER APARTMENTS PROPERTY OWNER, LLC,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

This action involves the Defendant's systemic use of an unlawful lease provision in order to force its tenants to incur costs for remedying "reasonable wear and tear" for which the tenants are not responsible under the law. In addition to the unlawful lease provisions, the Defendant systemically and unlawfully retains the security deposit monies or portions thereof of its tenants in order to remedy "reasonable wear and tear" in violation of Massachusetts law. Such practices are in violation of the Massachusetts Security Deposit Statute, G.L. c. 186, § 15B, *et seq.*, and the Massachusetts Consumer Protection Statute, G.L. c. 93A.

The Defendant's violations of law have occurred on a class-wide basis and the instant action seeks relief for the named Plaintiff as well as the putative class of Similarly Situated

Individuals who have suffered the same injury as a result of the Defendant's conduct as further described herein and who are entitled to relief pursuant to G. L. c. 93A, § 9(2).

## PARTIES

1.      Plaintiff Branda Peebles ("Ms. Peebles") is a natural person residing in Lawrence, Essex County, Massachusetts.

2.      Plaintiff Joshua Berger ("Mr. Berger") is a natural person residing at Weymouth, Norfolk County, Massachusetts.

3.      Ms. Peebles and  Mr. Berger on behalf of All Others Similarly Situated, who are those putative class individuals who have suffered a similar injury as Ms. Peebles and Mr. Berger as a result of the Defendant's unlawful conduct pursuant to G. L. c. 93A, § 9(2)(together with Ms. Peebles and Mr. Berger the "Plaintiffs").

4.      Defendant JRK Property Holdings, Inc. ("JRK"), is a foreign corporation organized under the laws of California and registered to do business in the Commonwealth of Massachusetts with a principal place of business located at 11766 Wilshire Boulevard, Los Angeles, California 90025.  See Business Entity Summary attached hereto as **Exhibit A**.

5.      Defendant Stevens Pond Apartments Property Owner, LLC, is a foreign corporation organized under the laws of Delaware and registered to do business in the Commonwealth of Massachusetts with a principal place of business located at 11766 Wilshire Boulevard, Los Angeles, California 90025.  See Business Entity Summary attached hereto as **Exhibit B**.

6.      Defendant One Webster Apartments Property Owner LLC, is a foreign corporation organized under the laws of Delaware and registered to do business in the Commonwealth of Massachusetts with a principal place of business located at 11766 Wilshire

Boulevard, Los Angeles, California 90025. <u>See</u> Business Entity Summary attached hereto as

**<u>Exhibit C</u>**.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over JRK pursuant to G. L. c. 223A, § 3.

8.      Venue is appropriate in this Court pursuant to G. L. c. 223, § 8.

## FACTS

9.      JRK, on behalf of its affiliated companies; One Webster Apartments Property

Owner LLC, Tewksbury Apartments Property Owner LLC, Stevens Pond Apartments Property

Owner LLC, Cabot Crossing Apartments Property Owner LLC, Royal Crest Apartments

Property Owner LLC, and Essex Apartments Property Owner LLC, manages and operates at

least 6 (six) residential apartment complexes in the Commonwealth of Massachusetts:

     a.      Residences at Tewksbury Commons, 7 Archstone Ave., Tewksbury, MA 10876;
     b.      Essex Apartment Homes, 1 Avalon Dr., Peabody, MA 01960;
     c.      The Residence at Stevens Pond, 1 Founders Way, Saugus, MA 01906;
     d.      One Webster Apartment Homes, 1 Webster Avenue, Chelsea, MA 02150;
     e.      Royal Crest Estates, 37 Courtney Street, Fall River, MA 02720; and
     f.      Cabot Crossing, 130 Bowden Street, Lowell, MA 01852.[1]

10.     Based upon a review of the Essex County, Middlesex County, Bristol County and

Suffolk County Registries of Deeds, as well as the Massachusetts Secretary of State's records, it

is clear that JRK manages and / or owns the above-listed apartment complexes on behalf of the

individual LLCs with which JRK has common ownership.

11.     On information and belief, JRK regularly collects the rents and security deposits

of the tenants of the above-listed properties in its capacity as property manager and / or owner of

those properties.

---

[1] For the purposes of the instant action, references to "JRK" include its affiliated companies, including but not limited to those listed in paragraph 7 of the Complaint.

12.     On August 17, 2017, Ms. Peebles and Brian Twomey entered into a one-year residential lease (the "Peebles Lease") agreement to rent an apartment at the Residence at Stevens Pond, located at 4723 Scotts Mill Court, Saugus, Massachusetts.  See Lease attached hereto as **Exhibit D**.

13.     Ms. Peebles was required to pay a $500.00 security deposit, which was paid prior to moving into the apartment.

14.     An addendum attached to the Peebles Lease (the "Addendum"), entitled "Move Out Cleaning & Replacement Charges" was signed by all parties.  See Addendum attached hereto as **Exhibit E**.

15.     The Addendum to the Peebles Lease contains the following statement:

> **Resident is <u>required</u> to have the apartment professionally cleaned and carpet cleaned upon moveout.  If the apartment is not returned to us in this condition <u>the following charges will be applied</u>.**

Id. (emphasis added).

16.     The Addendum then lists the costs for basic cleaning and maintenance for instances of normal wear and tear such as "carpet clean," "touch-up paint," and "apartment clean."  Id.

17.     Upon information and belief, the Addendum which accompanies Ms. Peebles Lease is the same Addendum which JRK appends to all of its leases at all of the above-identified properties which JRK owns and or manages in the Commonwealth.

18.     At the conclusion of the Lease's term, Ms. Peebles vacated the apartment on August 18, 2018.

19.     On August 23, 2018, JRK sent a document entitled "Statement of Security Deposit" to Ms. Peebles.  See Statement of Security Deposit attached hereto as **Exhibit F**.

20.    The Statement of Security Deposit shows deductions taken from Ms. Peebles' security deposit monies under the category "New Charges." Id.

21.    These deductions from Ms. Peebles' security deposit were $50.00 for "Touch-Up Paint" and $65.00 for "Carpet Clean per Lease," totaling $115.00 in deductions from Ms. Peebles' security deposit monies. Id.

22.    On information and belief, JRK routinely retains its tenants' security deposit monies for instances of normal wear and tear such as "carpet cleaning," "touch-up painting," and "apartment cleaning," pursuant to the Addendum, for all of its tenants at all of its above-listed properties in the Commonwealth of Massachusetts.

23.    On July 21, 2018, Mr. Berger and Tressa Ellis entered into one-year residential lease (the " Berger Lease") agreement to rent an apartment at One Webster Apartment Homes, located at 1 Webster Avenue, #302, Chelsea, Massachusetts.

24.    Mr. Berger was required to pay a $1,000.00 security deposit, which was paid prior to moving into the apartment. See Rent and Security Deposit Receipt attached hereto as **Exhibit G**.

25.    The same Addendum which accompanied the Peebles Lease was attached to the Berger Lease (the "Addendum"), entitled "Move Out Cleaning & Replacement Charges" and was signed by all parties. See Addendum attached hereto as **Exhibit H**.

26.    The Addendum to the Berger Lease contains the following statement:

> **Resident is _required_ to have the apartment professionally cleaned and carpet cleaned upon moveout.  If the apartment is not returned to us in this condition _the following charges will be applied_.**

Id. (emphasis added).

5

27.    JRK failed to return Mr. Berger's security deposit funds to him within the 30 days required by G.L. c. 186, § 15B(4).

28.    On August 1, 2019, the Plaintiffs sent a demand letter pursuant to G. L. c. 93A, to JRK and its affiliated owners of the above-listed properties, highlighting JRK's violations of law and seeking relief for Ms. Peebles as well as the putative class of All Others Similarly Situated to which JRK responded but failed to make a reasonable offer of settlement.  <u>See</u> Plaintiffs' 93A Demand Letter attached hereto as **<u>Exhibit I</u>**.

**CLAIMS**

**<u>COUNT I</u>**

**Violation of G. L. c. 186, § 15B(4)(iii)**

29.    The Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 28.

30.    General laws c. 186, § 15B(4), requires JRK to return the Plaintiffs' security deposit monies within thirty (30) days of the termination of the Plaintiffs' tenancy.

31.    JRK is not entitled to deduct from the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" pursuant to G. L. c. 186, § 15B(4)(iii).

32.    JRK has violated G. L. c. 186, § 15B(4), by unlawfully retaining portions of, or the entirety of, the Plaintiffs' security deposits monies to remedy "reasonable wear and tear" resulting from the tenancy and failing to return those unlawfully withheld security deposit monies to the Plaintiffs within thirty (30) days of the termination of the Plaintiffs' tenancy.

33.    The Plaintiffs' security deposit monies which JRK has unlawfully retained to remedy "reasonable wear and tear" are monies that the Plaintiffs were entitled to have returned

6

to them within thirty (30) days of the termination of their tenancies pursuant to G. L. c. 186, § 15B(4).

34.    JRK's unlawful retention of the Plaintiffs' security deposit monies constitutes a violation of G. L. c. 186, § 15B(4), and has resulted in damages to the Plaintiffs in the form of lost security deposit monies and interest thereon.

35.    Pursuant to the Addendum which, upon information and belief, JRK uses on all of its leases, JRK employs the practice of unlawfully retaining the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" at all of the above-listed properties owned and or managed by JRK.

## COUNT II

### Violation of G. L. c. 186, § 15B(6)(e)

36.    The Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 35.

37.    General laws c. 186, § 15B(6)(e), mandates that JRK return the entirety of the Plaintiffs' security deposit if it fails to "return to the [Plaintiffs] the security deposit or balance thereof to which the tenant is entitled" . . . "within thirty days after the termination of the tenancy."

38.    JRK is not entitled to deduct from the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" pursuant to G. L. c. 186, § 15B(4)(iii).

39.    The Plaintiffs' security deposit monies which JRK has unlawfully retained to remedy "reasonable wear and tear" are monies that the Plaintiffs were entitled to have returned to them within thirty (30) days of the termination of their tenancies pursuant to G. L. c. 186, § 15B(4).

40.    JRK's unlawful retention of the Plaintiffs' security deposit monies to which the Plaintiffs were entitled constitutes a violation of G. L. c. 186, § 15B(6)(e), and has resulted in damages to the Plaintiffs in the form of lost security deposit monies and interest thereon.

41.    The Plaintiffs are entitled to the to the return of the entirety of their security deposit monies pursuant to G. L. c. 186, § 15B(6), as a result of JRK's violation of G. L. c. 186, § 15B(4)(iii).

42.    Pursuant to the Addendum which JRK uses on all of its leases, JRK employs the practice of unlawfully retaining the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" and failing to return those security deposit monies that the Plaintiffs are entitled to within thirty (30) days of the termination of tenancy at all of the above-listed properties owned and or managed by JRK.

## COUNT III

### Violation of G. L. c. 186, § 15B(7)

43.    The Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 42.

44.    General laws c. 186, § 15B(7), requires JRK to pay to the Plaintiffs "three times the amount of" of the security deposit monies or "balance thereof" which JRK has unlawfully retained and failed to return to the Plaintiffs within thirty (30) days of termination of the tenancy in violation of G. L. c. 186, § 15B(6)(e).

45.    JRK's unlawful retention of the Plaintiffs' security deposit monies to which the Plaintiffs were entitled constitutes a violation of G. L. c. 186, § 15B(6)(e), and has resulted in damages to the Plaintiffs in the form of lost security deposit monies and interest thereon.

46.    The Plaintiffs are entitled to treble the amount of the security deposit monies unlawfully withheld by JRK in violation of G. L. c. 186, § 15B(6)(e), pursuant to G. L. c. 186, § 15B(7).

47.    Pursuant to the Addendum which JRK uses on all of its leases, JRK employs the practice of unlawfully retaining the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" and failing to return those security deposit monies that the Plaintiffs are entitled to within thirty (30) days of the termination of tenancy at all of the above-listed properties owned and or managed by JRK.

## COUNT IV

### Violation of G. L. c. 186, § 15B(6)(c)

48.    The Plaintiffs reallege and incorporate herein the allegations contained in Paragraphs 1 through 47.

49.    General laws c. 186, § 15B(6)(c) makes it unlawful for JRK to use:

in any lease signed by the tenant any provision which conflicts with any provision of this section and attempts to enforce such provision or attempts to obtain from the tenant or prospective tenant a waiver of any provision of this section

Id.

50.    The Addendum, which JRK uses on all of its leases, explicitly requires that a tenant agree to allow JRK to deduct from the tenants' security deposit monies to pay for "reasonable wear and tear" such as touch-up paint, apartment cleaning, and carpet cleaning.

51.    This Addendum provision directly "conflicts" with the provisions of G. L. c. 186, § 15B(4), which bars JRK from deducting a tenants' security deposit monies for "reasonable wear and tear."

52.    The Addendum's conflict with G. L. c. 186, § 15B(4), renders it in violation of G. L. c. 186, § 15B(6)(c).

53.     The Plaintiffs are entitled to the return of the entirety of their security deposit monies pursuant to G. L. c. 186, § 15B(6), as a result of JRK's violation of G. L. c. 186, § 15B(6)(c).

54.     Pursuant to the Addendum which JRK uses on all of its leases, JRK employs the practice of unlawfully retaining the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" and failing to return those security deposit monies that the Plaintiffs are entitled to within thirty (30) days of the termination of tenancy at all of the above-listed properties owned and or managed by JRK.

## COUNT V

### Violation of G. L. c. 93A

55.     The Plaintiffs reallege and incorporate herein the allegations contained in Paragraphs 1 through 54.

56.     JRK is involved in the conduct of trade or commerce.

57.     JRK's above-described violations of G. L. c. 186, § 15B, *et seq*. constitute "unfair or deceptive acts or practices" in the conduct of trade or commerce in violation of G. L. c. 93A, § 2.

58.     Withholding the Plaintiffs' security deposit monies for "reasonable wear and tear" in violation of the law is an unfair or deceptive act or practice.

59.     Requiring tenants to agree to the Addendum to the Lease which conflicts with the law is an unfair or deceptive act or practice.

60.     The Attorney General's Regulations render JRK's violations of G. L. c. 186, §§ 15B(4)(iii), and (6)(e), failing to return the Plaintiffs' security deposit monies within thirty (30) days of tenancy, an unfair or deceptive act or practice.  See 940 Code Mass. Regs. 3.17(4)(g).

10

61.    The Attorney General's Regulations render JRK's violations of G. L. c. 186, §§ 15B(6)(c), and (7), unfair or deceptive acts or practices.  See 940 Code Mass. Regs. 3.17(4)(k).

62.    The Attorney General's Regulations render JRK's use of the Addendum, in violation of G. L. c. 186, § 15B(6)(c), an unfair or deceptive act or practice.  See 940 Code Mass. Regs. 3.17(3)(a)(1).

63.    JRK was sent a statutorily compliant 93A demand letter on August 1, 2019, pursuant to G. L. c. 93A, § 9(3).  See Ex. F.

64.    JRK's violations of G. L. c. 93A, *et seq.* are knowing and willful violations.

65.    As a result of JRK's unfair or deceptive acts or practices in the conduct of trade or commerce the Plaintiffs have suffered injuries in the form of lost security deposit monies and interest accrued thereon.

## REQUEST FOR RELIEF AND JURY DEMAND

WHEREFORE, the Plaintiffs Branda Peebles and All Others Similarly Situated hereby request the following relief from the Court:

1.    That JRK be ordered to return the entirety of the security deposit monies and interest accrued thereon it has taken from any tenant at any of the above-listed properties dating back to November 13, 2013, up until present as a remedy for JRK's violations of G. L. c. 186, §§ 15B(4)(iii),(6)(c), and (6)(e), trebled pursuant to JRK's knowing and willful violations of G. L. c. 93A;

2.    That JRK be ordered to return treble the amount of unlawfully withheld security deposit monies and interest accrued thereon it has retained from any tenant at any of the above-listed properties dating back to November 13, 2013, up until present as a remedy for JRK's violations of G. L. c. 186, §§ 15B(6)(e) and (7);

3.    That the Court orders JRK to cease and desist from using the unlawful Addendum to its Leases;

4.    That the Court orders JRK to cease and desist from violating G. L. c. 186, § 15B, *et seq*;

5.    Award Plaintiffs attorneys' fees;

6.    Award Plaintiffs costs;

7.    Award Plaintiffs such other relief that the Court deems just and proper.

### PLAINTIFFS DEMAND A JURY TRIAL ON ALL CLAIMS SO TRIABLE

Branda Peebles and Joshua Berger,
Individually and on behalf of All Others
Similarly Situated,

By their attorneys,

Keith L. Sachs (BBO# 634025)
Daniel S. Dullea (BBO# 670416)
DDSK Law
900 Cummings Center, Suite 210-U
Beverly, MA 01915

Dated: November 13, 2019

12

# EXHIBIT A



**William Francis Galvin**
Secretary of the Commonwealth of Massachusetts



# Corporations Division

## Business Entity Summary

**ID Number: 001170973**

Request certificate     New search

**Summary for:  JRK PROPERTY HOLDINGS, INC.**

| | |
|---|---|
| **The exact name of the Foreign Corporation:**   JRK PROPERTY HOLDINGS, INC. | |
| **Entity type:**   Foreign Corporation | |
| **Identification Number:** 001170973 | |
| **Date of Registration in Massachusetts:** <br> 04-28-2015 | |
| **Last date certain:** | |
| **Organized under the laws of: State: CA Country: USA on: 09-13-1991** | |
| **Current Fiscal Month/Day:** 12/31 | |
| **The location of the Principal Office:** <br><br> Address:  11766 WILSHIRE BLVD. <br><br> City or town, State, Zip code,     LOS ANGELES,  CA  90025  USA <br> Country: | |
| **The location of the Massachusetts office, if any:** <br><br> Address: <br><br> City or town, State, Zip code, <br> Country: | |
| **The name and address of the Registered Agent:** <br><br> Name:  NATIONAL REGISTERED AGENTS, INC. <br><br> Address:  155 FEDERAL ST., STE 700 <br><br> City or town, State, Zip code,     BOSTON,  MA  02110  USA <br> Country: | |

**The Officers and Directors of the Corporation:**

| Title | Individual Name | Address |
|---|---|---|
| PRESIDENT | ROBERT LEE | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| TREASURER | JAY SCHULMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| SECRETARY | JOHN MCKEE | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| DIRECTOR | JAMES LIPPMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS |

| | | ANGELES, CA 90025 USA |
|---|---|---|
| DIRECTOR | JOHN MCKEE | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| DIRECTOR | JAY SCHULMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |

**Business entity stock is publicly traded:** ☐

**The total number of shares and the par value, if any, of each class of stock which this business entity is authorized to issue:**

| Class of Stock | Par value per share | Total Authorized | | Total issued and outstanding |
|---|---|---|---|---|
| | | No. of shares | Total par value | No. of shares |
| | | | | |

| ☐ Consent | ☐ **Confidential Data** | ☐ **Merger Allowed** | ☐ **Manufacturing** |
|---|---|---|---|

**View filings for this business entity:**

ALL FILINGS
Amended Foreign Corporations Certificate
Annual Report
Annual Report - Professional
Application for Reinstatement
~~Articles of Consolidation – Foreign and Domestic~~

[ View filings ]

**Comments or notes associated with this business entity:**

[ New search ]

EXHIBIT B



## William Francis Galvin
### Secretary of the Commonwealth of Massachusetts



# Corporations Division

## Business Entity Summary

**ID Number: 001142364**

Request certificate     New search

**Summary for:  STEVENS POND APARTMENTS PROPERTY OWNER LLC**

| |
|---|
| **The exact name of the Foreign Limited Liability Company (LLC):**   STEVENS POND APARTMENTS PROPERTY OWNER LLC |
| **Entity type:**   Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001142364 |
| **Date of Registration in Massachusetts:** 07-22-2014 |
| **Last date certain:** |
| **Organized under the laws of: State:** DE **Country:** USA **on:** 07-11-2014 |
| **The location of the Principal Office:** <br><br> Address:  11766 WILSHIRE BLVD. STE. 1500 <br><br> City or town, State, Zip code,        LOS ANGELES,   CA   90025   USA <br> Country: |
| **The location of the Massachusetts office, if any:** <br><br> Address: <br> City or town, State, Zip code, <br> Country: |
| **The name and address of the Resident Agent:** <br><br> Name:    NATIONAL REGISTERED AGENTS, INC. <br><br> Address:  155 FEDERAL ST., STE 700 <br><br> City or town, State, Zip code,        BOSTON,   MA   02110   USA <br> Country: |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
|  |  |  |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|---|---|---|
| REAL PROPERTY | JAY SCHULMAN | 11766 WILSHIRE BLVD. STE. 1500 LOS ANGELES, CA 90025 USA |

Business Corporations, external cause 35/035

| ☐ **Consent** | ☐ **Confidential Data** | ☐ **Merger Allowed** | ☐ **Manufacturing** |
|---|---|---|---|

**View filings for this business entity:**

ALL FILINGS
Annual Report
Annual Report - Professional
Application For Registration
Certificate of Amendment
Certificate of Cancellation

[ View filings ]

**Comments or notes associated with this business entity:**

[ New search ]

# EXHIBIT C



**William Francis Galvin**
Secretary of the Commonwealth of Massachusetts



# Corporations Division

## Business Entity Summary

**ID Number: 001140015**

<span>Request certificate</span>    <span>New search</span>

**Summary for: ONE WEBSTER APARTMENTS PROPERTY OWNER LLC**

| |
|---|
| **The exact name of the Foreign Limited Liability Company (LLC):** ONE WEBSTER APARTMENTS PROPERTY OWNER LLC |
| **Entity type:** Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001140015 |
| **Date of Registration in Massachusetts:** 06-23-2014 |
| **Last date certain:** |
| **Organized under the laws of: State:** DE **Country:** USA **on:** 06-06-2014 |

| The location of the Principal Office: |
|---|
| Address: 11766 WILSHIRE BLVD. STE. 1500 |
| City or town, State, Zip code, Country:      LOS ANGELES, CA 90025 USA |

| The location of the Massachusetts office, if any: |
|---|
| Address: |
| City or town, State, Zip code, Country: |

| The name and address of the Resident Agent: |
|---|
| Name: NATIONAL REGISTERED AGENTS, INC. |
| Address: 155 FEDERAL ST., STE 700 |
| City or town, State, Zip code, Country:      BOSTON, MA 02110 USA |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
| | | |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|---|---|---|
| REAL PROPERTY | JAY SCHULMAN | 11766 WILSHIRE BLVD. STE. 1500 LOS ANGELES, CA 90025 USA |

| ☐ | ☐ **Confidential Data** | ☐ **Merger Allowed** | ☐ |
|---|---|---|---|
| **Consent** | | | **Manufacturing** |

**View filings for this business entity:**

```
ALL FILINGS
Annual Report
Annual Report - Professional
Application For Registration
Certificate of Amendment
Certificate of Cancellation
```

[ View filings ]

**Comments or notes associated with this business entity:**

[                                                                    ]

[ New search ]

# EXHIBIT D

# Apartment Lease Contract

**NAA**
NATIONAL
APARTMENT
ASSOCIATION

Date of Lease Contract: **August 17, 2017**
*(when the Lease Contract is filled out)*

*This is a binding document. Read carefully before signing.*

## Moving In — General Information

**1. PARTIES.** This Lease Contract is between *you*, the resident(s) *(list all people signing the Lease Contract):*
**Branda Peebles, Brian Twomey**

and *us*, the owner:
**Stevens Pond Apartments Property Owner LLC**

*(name of apartment community or title holder).* You've agreed to rent Apartment No. **4723** , at **4723 Scotts Mill Court** *(street address)* in **01906** *(zip code)* for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached. Unless otherwise agreed to by both parties in writing, all residents listed shall use the apartment as their primary residence during the term of the Lease.

**2. OCCUPANTS.** The apartment will be occupied only by you and *(list all other occupants who are under 18 and not required to sign the Lease):*

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than **7** consecutive days without our prior written consent, and no more than twice that many days in any one month. *If the previous space isn't filled in, two days per month is the limit.*

**3. LEASE TERM.** The initial term of the Lease Contract begins on the **19th** day of **August** , **2017** , and ends at midnight the **18th** day of **August** , **2018** . Unless the landlord serves a notice of non-renewal at least thirty (30) days prior to the expiration of the initial term, OR the tenant serves a notice to vacate at least sixty (60) days prior to the expiration of the initial term, this Lease Contract will automatically renew on *(check one):*

☒ a month-to-month basis ("Extended Term"), terminable upon thirty (30) days written notice as required by paragraph 33. The monthly rental rate for any Extended Term will be the market rate (at the time of the applicable extension) for a comparable apartment in the development plus a month-to-month premium of **250.00** .

☐ successive terms of _____ months ("Extended Term"), unless the landlord serves a notice of non-renewal at least thirty (30) days prior to the expiration of any successive term, OR the tenant serves a notice to vacate at least sixty (60) days prior to the expiration of any successive term. The monthly rental rate for the Extended Term will be the market rate (at the time of the applicable extension) for a comparable apartment in the development plus a month-to-month premium of _____ .

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ **500.00** , due on or before the date this Lease Contract is signed. If we request the last month's rent from you along with the security deposit, we will comply with the requirements of G.L. c. 186 §15B (2). See paragraphs 37 and 38 for security deposit return information.

**5. KEYS AND FURNITURE.** You will be provided **2** apartment key(s), **2** mailbox key(s), and _____ other access devices for **Club House** . Your apartment will be *[check one]:*
☐ furnished or ☒ unfurnished.

☐ *(check if applicable)* Each person who is 18 years of age or older AND listed as a resident on the lease will be given a FOB for access to the building and amenities, at no cost to use during his or her tenancy. If the FOB is lost, stolen or damaged a fee will be charged for a replacement. If the FOB is not returned or is returned damaged when you move out, there may be a deduction from the security

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ **1960.00** per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☐ at _____

Prorated rent of $ **784.00** is due for the remainder of the first month, on **August 19** , **2017** *(year).* Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. If you don't pay all rent on or before 30 days after the first of the month, you'll pay a late charge of $ **196.00** . You'll also pay a charge of $ **75.00** for each returned check or rejected electronic payment. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. Notwithstanding any memo or reference on payments remitted by you, we may, but are not required to, apply payments by you to the oldest outstanding amount(s) due on your resident ledger.

**7. UTILITIES.** We'll pay for the following items, if checked:
☐ gas ☐ electricity ☐ master antenna
☒ trash ☐ cable TV ☐ other _____
☐ heat ☐ water

You'll pay for all other utilities, related deposits, and any charges, fees, or services on such utilities and are responsible for transferring those utilities into your name upon your possession. However, we will pay for all utilities we are required to pay for under Massachusetts law, unless this Lease Contract provides otherwise. You must not allow utilities to be disconnected for any reason—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the Lease Contract term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-powered lighting. If water/sewer utilities are sub-metered for the apartment, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance.

**8. INSURANCE.** Except as required by state law, we do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless due to owner's omission, fault, negligence, or misconduct.

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.

Additionally, you are *[check one]* ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance is a breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law. If you are required to purchase personal liability insurance you must provide evidence of coverage at lease inception, and must confirm an active policy upon request by owner at any time during the term of the Lease. SUBJECT TO APPLICABLE LAW, THE LANDLORD WILL PROVIDE INSURANCE FOR UP TO $750 IN BENEFITS TO COVER THE ACTUAL COSTS OF RELOCATION OF THE TENANT IF DISPLACED BY FIRE OR DAMAGE RESULTING FROM FIRE.

**9. SECURITY DEVICES. What We Must Provide.** When occupancy begins we will provide you with: (1) an operating locking device on your door; and, (2) an operating locking device on every openable exterior

keys provided to you, and shall not provide or transfer your keys to anyone without management's prior written consent.

You may at any time ask us to: (1) install one keyed deadbolt lock on an exterior door if it does not have one; (2) install a bar on a sliding glass door if it does not have one; and (3) change or rekey locks or latches. We will comply with those requests, but you may be required to pay for them unless prohibited by state law.

**What You Are Now Requesting.**  You now request the following to be installed at your expense (if one is not already installed).

☐ keyed deadbolt lock          ☐ doorviewer
☐ keyless deadbolt             ☐ sliding door pinlock
☐ sliding door bar

**Payment.**  We will pay for missing devices that are required by statute. You will pay for: (1) re-keying that you request (except when we failed to rekey after the previous resident moved out); and (2) repairs or replacements due to misuse or damage by you or your family, occupants, or guests. You must pay immediately after the work is done.

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.**  The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form.

**See special provisions on the last page**

_____
_____
_____
_____

See any additional special provisions.

**11. DAMAGES AND REIMBURSEMENT.**  You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to a violation of the Lease Contract or rules, improper use, negligence, or intentional conduct by you or your invitees, guests or occupants **unless it is caused by our omission, fault, negligence or misconduct. Unless caused by our fault, omission, misconduct or negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following if occurring during the Lease Contract term or renewal period: (1) damage to doors, windows, or screens caused by you, your guests and/or invitees; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.** We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

**12. RENT INCREASES AND LEASE CONTRACT CHANGES.**  No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10, by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 15.

**13. DELAY OF OCCUPANCY.**  If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay unless it is due to our omission, fault, negligence, misconduct or any other reason outside of our reasonable control. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay, and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the initial term as set forth in Paragraph 3—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date —you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the initial term as set forth in Paragraph 3 and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new initial term as set forth in Paragraph 3 for all purposes. This new date may not be moved to an earlier date unless we and you agree.

**14. DISCLOSURE RIGHTS.**  If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it.

## While You're Living in the Apartment

**15. COMMUNITY POLICIES OR RULES.**  You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Our rules are considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if they are distributed and applicable to all units in the apartment community and do not change dollar amounts on page 1 of this Lease Contract.

**16. LIMITATIONS ON CONDUCT.**  The apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances or any trash addendums, if applicable. Passageways may be used only for entry or exit. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in or near pools and all common areas. You, your occupants, or guests may not, anywhere in the apartment community: use candles or use kerosene lamps without our prior written approval; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes and we assent in writing to the proposed business operation. This Lease is for residential purposes only. You acknowledge that those signing the Lease will use it as their primary residence, unless otherwise agreed to by contemporaneous writing signed by both parties. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses

**17. PROHIBITED CONDUCT.**  You and your occupants or guests may not engage in the following activities: behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; engaging in any criminal activity at or near the development regardless of whether an arrest or conviction occurs as a result of said conduct; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; or injuring our reputation by making bad faith allegations against us to others or violating any Federal, state, or local law, or ordinance.

**18. PARKING.**  We may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles. Motorcycles or motorized bikes may not be parked inside an apartment unit or on sidewalks, under stairwells, or in handicapped parking areas. We may have unauthorized or illegally parked vehicles towed as allowed by state statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license or no current inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or

19. **RELEASE OF RESIDENT.** Unless allowed by this Lease Contract, or Massachusetts law, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

20. **MILITARY PERSONNEL CLAUSE.** You may terminate the Lease Contract if you enlist or are drafted or commissioned and on active duty in the U.S. Armed Forces. You also may terminate the Lease Contract if:

(1) you are (i) a member of the U.S. Armed Forces or reserves on active duty or (ii) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; *and*

(2) you (i) receive orders for permanent change-of-station, (ii) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, *or* (iii) are relieved or released from active duty.

After you deliver to us your written termination notice, the Lease Contract will be terminated under this military clause 30 days after the date on which your next rental payment is due. You must furnish us a copy of your military orders, such as permanent change-of-station orders, call-up orders, or deployment orders or written notification from your commanding officer. Military permission for base housing does not constitute change-of-station order. After you move out, we'll return your security deposit, less lawful deductions. For the purposes of this Lease Contract, orders described in (2) above will only release the resident who qualifies under (1) and (2) above and receives the orders during the Lease Contract term and such resident's spouse or legal dependents living in the resident's household. A co-resident who is not your spouse or dependent cannot terminate under this military clause. Unless you state otherwise in paragraph 10, you represent when signing this Lease Contract that: (1) you do not already have deployment or change-of-station orders; (2) you will not be retiring from the military during the Lease Contract term; and (3) the term of your enlistment or obligation will not end before the Lease Contract term ends. Even if you are entitled to terminate this Lease Contract under this paragraph, liquidated damages for making a false representation of the above will be the amount of unpaid rent for the remainder of the lease term when and if you move out, less rents from others received in mitigation under paragraph 29. You must immediately notify us if you are called to active duty or receive deployment or permanent change-of-station orders.

21. **RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of stoves, appliances, sinks, toilets, smoke detectors and carbon monoxide detectors, keyed deadbolt locks, keyless bolting devices, window latches, and other safety or security devices. You agree to make every effort to follow the Security Guidelines in this Lease Contract.

**Smoke Detectors and Carbon Monoxide Detectors.** We'll furnish smoke detectors and carbon monoxide detectors as required by statute, we'll test them and provide working batteries when you first take possession. After that, you must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report smoke detector and/or carbon monoxide detector malfunctions to us. Neither you nor others may disable smoke detectors and/or carbon monoxide detectors. If you damage or disable the smoke detector and/or carbon monoxide detector or remove a battery without replacing it with a working battery, you may be liable to us for actual damages and attorney's fees. If you disable or damage the smoke detector and/or carbon monoxide detector, or fail to replace a dead battery or report malfunctions to us, you will be liable to us and others for any loss, damage, or fines from fire, smoke, or water.

**Casualty Loss.** We're not liable to any resident, guest, or occupant for damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, theft, or vandalism unless due to our omission, fault, negligence or misconduct. Unless we instruct otherwise, you must—for 24 hours a day during freezing weather—(1) keep the apartment heated to at least 50 degrees; (2) keep cabinet and closet doors open; and (3) drip hot and cold water faucets. You'll be liable for damage to our and others' property if damage is caused by broken water pipes due to your violating these requirements. If you ask our representatives to perform services not contemplated in this Lease Contract, you will indemnify us and hold us harmless from all liability for these services.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, suspected criminal activity, or other emergency involving imminent harm. You should then contact our representative. You won't treat any of

local law-enforcement agency. You also must furnish us with the law-enforcement agency's incident report number upon request.

22. **CONDITION OF THE PREMISES AND ALTERATIONS.** You have inspected the apartment, fixtures, and furniture and agree that they are free of any defects, including defects materially affecting the health or safety of ordinary persons. You will be given an Apartment Condition Statement on or before move-in. Within 15 days after move-in, you must sign and note on the form all defects or damage and return it to our representative. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use reasonable diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment, but we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, additional phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors and carbon monoxide detectors, furniture, telephone and cable TV wiring, screens, locks, and security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

23. **REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST—FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SIGNED AND IN WRITING TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; mold; electrical problems; malfunctioning lights; broken or missing locks or latches; the presence of bugs, insects, vermin, or other pests; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are normally not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections. Rent will not abate in whole or in part, except as allowed by state law.

If fire or catastrophic damage totally destroys the apartment, or repair is beyond reason we may terminate this Lease Contract within a reasonable time by giving you written notice. If the Lease Contract is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

24. **ANIMALS.** No animals (including mammals, reptiles, birds, fish, rodents and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in writing. If we allow an animal, you must sign a separate animal addendum, which may require additional rents, fees or other charges. You must remove an illegal animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. We will authorize a service animal and/or support animal and be required to sign an addendum regarding any such service or comfort animal for a disabled (handicapped) person. We may require a written statement from a qualified professional verifying the need for the support animal. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal

apartment immediately after the entry; *and*

(2) entry is for: inspecting the apartment, making repairs or showing apartment to prospective residents (after move-out or vacate notice has been given), purchasers or mortgage lenders (or their agents), or verifying compliance with this Lease Contract.

**26. MULTIPLE RESIDENTS OR OCCUPANTS.** Each resident is jointly and severally liable for all Lease Contract obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident of your apartment constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of Lease Contract termination, repair requests, and entry permissions) constitute notice from all residents. In eviction suits, each resident hereby appoints all other residents of your apartment as an agent authorized to receive notices and service of process. Security deposit refunds may be by one check jointly payable to all residents; the check and any deduction itemizations may be mailed to one resident only.

**27. REPLACEMENTS AND SUBLETTING.** Replacing a resident, sub-letting, or assignment is allowed only when we consent in writing which consent shall not be unreasonably withheld or delayed. If departing or remaining residents found a replacement resident acceptable to us before moving out and we consent in writing to the replacement, subletting, or assignment, then:

(1) an administrative (paperwork) and/or transfer fee *will* be due, and a rekeying fee *will* be due if rekeying is requested or required; and

(2) you *will* remain liable for all Lease Contract obligations for the rest of the original Lease Contract term.

**Procedures for Replacement.** If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract; *or* (2) the remaining and replacement residents must sign an entirely new Lease Contract. The departing resident will no longer have a right to occupancy, but will remain liable for the remainder of the original Lease Contract term unless we agree otherwise in writing.

## Responsibilities of Owner and Resident

**28. RESPONSIBILITIES OF OWNER.** Subject to 105 CMR 410.00, the State Sanitary Code, we'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 22;
(2) maintain building fixtures, furniture, hot water, heating and A/C equipment;
(3) comply with applicable federal, state, and local law regarding safety, sanitation, and fair housing; and
(4) make all legally required repairs, notwithstanding your obligation to pay for damages for which you are liable.

**29. DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia as defined by Massachusetts law; (6) any illegal drugs or paraphernalia are found in your apartment; (7) you or any guest or occupant engages in any of the prohibited conduct described in Paragraph 17; or (8) you or any occupant, in bad faith, makes an invalid complaint to an official or employee of a utility company or the government.

**Eviction.** *If you default, we may end your right of occupancy by giving you a 14 day written notice to vacate in the event that the default is due to your non-payment of rent, or a 7 day written notice to vacate in the event that the default is due to any other provision of this Lease.* Notice may be by: (1) regular mail; (2) personal delivery to any resident; (3) personal delivery at the apartment to any occupant over 16 years old; (4) sliding the notice under the main entry door and into the apartment; or (5) by any other service available under Massachusetts law. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other Lease Contract obligations. After giving notice to vacate or filing an eviction suit, we may still accept use and occupancy fees or other sums

due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. If your one (1) year lease has expired, we reserve the right to evict you even if we continue to accept sums for use and occupancy only.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then (1) the use and occupancy monthly rate during the holdover period will be increased by 25% over the then-existing market rent, without notice; (2) you will be liable to us for all use and occupancy fees for the full term of the previously signed Lease Contract of a new resident who cannot occupy because of the holdover—subject to the landlord's duty to re-let or mitigate; and (3) at our option we may extend the Lease Contract term for up to one month by delivering written notice to you or your apartment while you continue to hold over.

**Other Remedies.** We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us any amounts stated to be rental discounts in paragraph 10, concessions provided in any concession addendum attached to this lease, in addition to any other sums due. Upon your default, we have all legal remedies, including, but not limited to, Lease Contract termination, pursuit of an eviction, and reimbursement for any and all attorney's fees and/or litigation costs/expenses. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). Any and all amounts which remain unpaid for thirty (30) days from the date due shall bear interest at the maximum rate permitted by law, in which event interest shall accrue at the highest amount permitted by law. You shall be responsible for any and all attorney's fees, expenses, or other costs incurred by the Landlord to enforce any provision of this Lease whether related to your conduct, or the conduct of your household member(s), guest(s) and/or invitee(s).

**Mitigation of Damages.** If you move out early, you'll be subject to all remedies. We'll exercise customary diligence to relet and minimize damages. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for any sums due including all reletting costs.

## General Clauses

**30. MISCELLANEOUS.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us. Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax signatures are binding. All notices must be signed.

Exercising one remedy won't constitute an election or waiver of other remedies. All remedies are cumulative. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease Contract binds subsequent owners. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract.

Cable channels that are provided may be changed during the Lease Contract term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting.

All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**Obligation to Remove Personal Property Upon Vacating.** Resident shall remove any and all personal property from the apartment upon vacating and/or relinquishing possession of same. In the event that the Resident vacates the premises leaving any personal property therein, same may be deemed abandoned/trash, and may be discarded by the landlord at the Resident's expense. Cost for removal shall be in addition to any and all other sums due to the landlord pursuant to the Lease.

**31. PAYMENTS.** At our option and without notice, we may apply money received (other than utility payments subject to governmental regulations) first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than the sub-metered water and sewer

## Security Guidelines for Residents

**32. SECURITY GUIDELINES.** We'd like to give you some important safety guidelines. We recommend that you follow these guidelines and use common sense in practicing safe conduct. Inform all other occupants in your dwelling, including any children you may have, about these guidelines.

### PERSONAL SECURITY—WHILE INSIDE YOUR APARTMENT

1. Lock your doors and windows—even while you're inside.
2. Engage the keyless deadbolts on all doors while you're inside.
3. When answering the door, see who is there by looking through a window or peephole. If you don't know the person, first talk with him or her without opening the door. Don't open the door if you have any doubts.
4. Don't put your name, address, or phone number on your key ring.
5. Dial 911 for emergencies. If the 911 number does not operate in your area, keep phone numbers handy for the police, fire, and emergency medical services. If an emergency arises, call the appropriate governmental authorities first, then call the management.
6. Check your smoke detector monthly to make sure it is working properly and the batteries are still okay.
7. Check your doorlocks, window latches, and other devices regularly to be sure they are working properly.
8. Immediately report to management—in writing, dated and signed—any needed repairs of locks, latches, doors, windows, smoke detectors, and alarm systems.
9. Immediately report to management—in writing, dated and signed—any malfunction of other safety devices outside your apartment, such as broken gate locks, burned-out lights in stairwells and parking lots, blocked passages, broken railings, etc.
10. Close curtains, blinds, and window shades at night.

### PERSONAL SECURITY—WHILE OUTSIDE YOUR APARTMENT

11. Lock your doors while you're gone. Lock any door handle lock, keyed deadbolt lock, sliding door pin lock, sliding door handle latch, and sliding door bar that you have.
12. Close and latch your windows while you're gone, particularly when you're on vacation.
13. Tell your roommate or spouse where you're going and when you'll be back.
14. Don't walk alone at night. Don't allow your family to do so.
15. Don't hide a key under the doormat or a nearby flowerpot. These are the first places a burglar will look.
16. Don't give entry keys, codes or electronic gate cards to anyone.
17. Let the manager and your friends know if you'll be gone for an extended time. Ask your neighbors to watch your apartment since the management cannot assume that responsibility.
18. While on vacation, temporarily stop your newspaper and mail delivery, or have your mail and newspaper picked up daily by a friend.
19. Carry your door key in your hand, whether it is daylight or dark, when walking to your entry door. You are more vulnerable when looking for your keys at the door.

### PERSONAL SECURITY AWARENESS

No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. We disclaim any express or implied warranties of security. The best safety measures are the ones you perform as a matter of common sense and habit.

## When Moving Out

**33. MOVE-OUT NOTICE.** Before moving out, you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire Lease Contract term if you move out early (paragraph 19) except under the military clause (paragraph 20). YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

- We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3. Oral move-out notice will not be accepted and will not terminate your Lease Contract.

- Your move-out notice must not terminate the Lease Contract sooner than the end of the Lease Contract term or renewal period.

YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. Please use our written move-out form. You must obtain from our representative written acknowledgment that we received your move-out notice.

**34. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the Lease Contract term or renewal period ends unless you continue to pay rent until the conclusion of the lease term or the apartment is relet, which ever occurs first. Early move-out may result in reletting charges under paragraph 29. You may not apply any security deposit to rent without the landlord's written consent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must vacate the apartment before the 30-day period for security deposit refund begins. You must give us, in writing, each resident's forwarding address.

**35. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges, which shall be deemed property damage.

**36. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**37. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; repairs or damages beyond normal wear and tear, water/sewer charges and other amounts provided by law. Your security deposit will be handled pursuant to MGL ch. 186 sec 15B, however we reserve the right to pursue any damages that exceed the amount of the security deposit due to your acts or those of your occupants or guests under applicable law (whether a security deposit is held or not).

**38. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.** We'll mail you your security deposit refund (less lawful deductions) and an itemized accounting of any deductions to the extent required by statute no later than 30 days after surrender, vacating, or abandonment, unless statutes provide otherwise.

## Signatures, Originals and Attachments

**39. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, each with original signatures—one for you and one or more for us. Our rules and community policies, if any, will be attached to the Lease Contract and given to you at signing. When an Apartment Condition Statement form is completed, both you and we should retain a copy. The items checked below are attached to this Lease Contract and are binding even if not initialed or signed.

- ☒ Animal Addendum
- ☐ Apartment Condition Statement
- ☒ Mold Addendum
- ☐ Enclosed Garage, Carport, or Storage Unit Addendum
- ☒ Community Policies Addendum
- ☐ Lease Contract Guaranty (_____ guaranties, if more than one)
- ☐ Notice of Intent to Move Out Form
- ☐ Parking Permit or Sticker (quantity: _____)
- ☒ Satellite Dish or Antenna Addendum

You are legally bound by this document. Please read it carefully.

Before submitting a rental application or signing a Lease Contract, you may take a copy of these documents to review and/or consult an attorney.

Additional provisions or changes may be made in the Lease Contract if agreed to in writing by all parties.

Name and address of locator service *(if applicable)*

Resident or Residents *(all sign below)*

Owner or Owner's Representative *(signing on behalf of owner)*

**If this document is electronically signed by resident, the email address used for e-signature shall be utilized to return a counter-signed Lease. Resident acknowledges that they are responsible for viewing/storing/printing the counter-signed lease through the residential portal, attached to the email or otherwise electronically forwarded to resident's account.

Address and phone number of owner's representative for notice purposes

One Founders Way

Saugus, MA 09106

(781) 231-1901

Date form is filled out *(same as on top of page 1)*    08/17/2017

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2). Your monthly rental payment is $1960. In addition to paragraph 30 of this lease, in the event that you do not vacate your unit on the lease end date in paragraph 3, you will be considered a month-to-month resident if Landlord chooses to accept a use and occupancy payment after the lease end date. As a month-to-month resident you shall be responsible for payment of the then current market rent plus a month-to-month fee set by the property. No additional notice is required for this to become effective. After the 30th, 60 day written notice to vacate is required for all leases. Failure to comply will result in penalty of minimum 2 months insufficient notice fees. All MTM tenants also require a 60 day written notice to vacate. Cash will not be accepted as a form of payment. Checks must be made out to the Property. Money orders are not accepted. No Exceptions. After the 30th of each month the rent is late and will be charged a 10% late fee.

# MASSACHUSETTS
# RENT AND SECURITY DEPOSIT RECEIPT



To: **Brian Twomey**
**Branda Peebles**
(Names of all residents)

RE: **4723 Scotts Mill Court, #4723**
(Street address and dwelling unit number, if applicable)

**Saugus, MA 01906**
(City, State, Zip)

We hereby acknowledge receipt of your Payment in the total amount of $ **884.00** to be applied as follows:

| | | | |
|---|---|---|---|
| 1. | First Month Rent | $ | **784.00** |
| 2. | Last Month's Rent | $ | **0.00** |
| 3. | Security Deposit | $ | **500.00** |
| 4. | Installation of Locks and Keys | $ | **126.00** |

SECURITY DEPOSIT

1. The Lessor acknowledged receipt from the Lessee of $ **500.00** (an amount not to exceed first month's rent) to be held by the Lessor during the term hereof, or any extension or renewal, as a security deposit pursuant to the terms hereof; it being understood that THIS IS NOT TO BE CONSIDERED PREPAID RENT, nor shall damages be limited to the amount of the security deposit.

2. The Lessor acknowledges that, subject to damages prescribed by law, he shall, within thirty (30) days after the termination of this lease or upon the Lessee's vacating the premises completely together with all his goods and possessions, whichever shall last occur, return the security deposit or any balance thereof, and any interest thereon, if due, after deducting

   (a) Any unpaid rent or water and sewer charges which have not been validly withheld or deducted pursuant to the provisions of any special or general law; and

   (b) Any unpaid increase in real estate taxes which the Lessee is obligated to pay pursuant to a tax escalation clause which conforms to the requirements of Mass. General Laws, Chapter 186, Section 15C; and

   (c) A reasonable amount necessary to repay any damage caused to the premises by the Lessee or any person under the Lessee's control or on the premises with the Lessee consent, reasonable wear and tear excluded. In the case of such damage, the Lessor shall provide the Lessee within thirty (30) days with an itemized list of damages, sworn to by the Lessor or his agent under pains and penalties of perjury, itemizing in precise detail the nature of the damage and of the repairs necessary to correct it, and written evidence, such as estimates, bills, invoices or receipts, indicating the actual or estimated cost thereof.

3. The Lessor must provide Lessee with a written statement of the condition of the premises, as required by law. If the Lessee disagrees with the Lessor's statement of condition, the Lessee must attach a separate list of any damage existing in the premises and return the statement to the Lessor. No amount shall be deducted from the security deposit for any damage which was listed in the statement of condition or in any separate list submitted by the Lessee and approved by the Lessor or the Lessor's agent, unless the Lessor subsequently repaired or caused to be repaired said damage and can prove that the renewed damage was unrelated to the prior damage and was caused by the Lessee or by any person under the Lessee's control or on the premises with the Lessee's consent.

4. If the Lessor transfers the premises, the Lessor must transfer the security deposit or any balance, thereof, and any accrued interest, to the Lessor's successor in interest for the benefit of the Lessee.

   As required by law, the security deposit is presently or will be deposited in a separate, Interest-Bearing account.

   Account Number **898052465517** at **Bank Of America** (Bank Name)
   located at **1093 Broadway**
   (Street Address) **Saugus** (City), Massachusetts, **01906** (Zip).
   If the security deposit is held for one year or longer from the commencement of the tenancy, the Lessee shall be entitled to interest on the amount of the security deposit at the rate of five percent (5%) per year, or such lesser amount as may be received from the bank, payable at the end of each year of the tenancy.

5. Lessee is required to provide Lessor with a forwarding address upon vacating the premises.

LAST MONTH'S RENT
Pursuant to applicable law, the tenant is entitled to interest on last month's rent paid in advance from the date of tenancy, payable at the end of each year of tenancy and prorated upon termination. Interest shall not accrue for the last month for which rent was paid in advance. The rate of interest payable on last month's rent is 5%, provided however that if the landlord elects to deposit last month's rent in a bank account, interest will be limited to any lower rate actually paid by the bank. The tenant should provide the landlord with a forwarding address at the termination of tenancy indicating where such interest may be given or sent.

**NAA**
**NATIONAL APARTMENT ASSOCIATION**

## Animal Addendum
*Becomes part of Lease Contract*

Date: **August 17, 2017**
(when this Addendum is filled out)

*Please note: We consider animals a serious responsibility and a risk to each resident in the dwelling. If you do not properly control and care for an animal, you'll be held liable if it causes any damage or disturbs other residents.*

1. **DWELLING UNIT DESCRIPTION.** Unit No. **4723** , at **4723 Scotts Mill Court**
(street address) in **Saugus** (city), Massachusetts, **01906** (zip code).

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **August 17, 2017**
Owner's name: **Stevens Pond Apartments Property Owner LLC**

Residents (list all residents): **Branda Peebles, Brian Twomey**

The Lease Contract is referred to in this Addendum as the "Lease Contract."

3. **CONDITIONAL AUTHORIZATION FOR ANIMAL.** You may keep the animal that is described below in the dwelling until the Lease Contract expires. But we may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you or your animal, your guests, or any occupant violate any of the rules in this Addendum. You understand that we may limit the size and breed of dog(s) at our community, in our sole discretion. Without limiting the foregoing, dogs must be no larger than **12** inches at the shoulder and **50** pounds in weight at full growth. If your dog exceeds these requirements we reserve our right to terminate this authorization. A photograph of the pet as well as all inoculation records must be provided to management prior to any authorization taking effect. Restricted breeds may be changed from time to time and no dog of any restricted breed or mix of said breed are allowed. Breed type of a mixed breed dog is at times difficult to identify, therefore; it is within management's sole discretion as to whether an animal is a member of a restricted breed.

4. **ADDITIONAL ANIMAL RENT.** Your total monthly rent (as stated in the Lease Contract) has been increased by $ **0.00** by your request to maintain an animal in the unit. The monthly rent amount in Provision 6 of the Lease Contract includes this additional rent. This amount is not a deposit and is in consideration of our allowing the option to maintain an animal.

5. **LIABILITY NOT LIMITED.** Any additional animal rent in the Lease Contract does not limit residents' liability for property damages, cleaning, deodorization, de-fleaing, replacements, or personal injuries.

6. **DESCRIPTION OF ANIMAL(S).** You may keep only the animal(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)—mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect—into the dwelling or apartment community for any length of time, other than service animals.

Animal's name: _____
Type: _____
Breed:

Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

7. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form: **Breed Restriction strictly enforced. All pets (incl visiting pets) are required to have pet fee and/or pet deposit and/or pet rent to be on prprty. Breed Restrictions strictly enforced. All pets (including visiting pets) are required to have pet fee and/or pet deposit and/or pet rent to be on property. To add a pet, contact office ASAP and pay required fees. If an unauthorized pet is discovered, tenant is subject to a $2000 pet penalty. Additionally, pet rent will be retroactive and will be charged from date of move in thru date the unauthorized pet was discovered. Fees are immediately due upon discovery of pet and are owed by resident even if pet is removed.**

8. **EMERGENCY.** In an emergency involving an accident or injury to your animal, we have the right, but not a duty, consistent with Massachusetts Law, to take the animal to the following veterinarian for treatment, at your expense. Without limiting the foregoing, it shall be deemed an emergency if your dog is left in the dwelling unsupervised for greater than 24 hours, or 72 hours for a cat, and we will thus be authorized to enter the dwelling pursuant to this paragraph.

Doctor: _____
Address: _____
City/State/Zip: _____
Phone: _____

9. **ANIMAL RULES.** You are responsible for the animal's actions at all times. You agree to abide by these rules:

- The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

- Dogs, cats, and support animals must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

- Inside, the animal may urinate or defecate *only* in these designated areas: **Dogs = none. Cats = litterbox**

swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units.

- Your animal must be fed and watered inside the dwelling unit. Don't leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

- You must keep the animal on a leash and under your supervision when outside the dwelling or any private fenced area. We or our representative may pick up unleashed animals and/or report them to the proper authorities. We may impose reasonable charges for picking up and/or keeping unleashed animals.

- Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate *anywhere* on our property. You must take the animal off our property for that purpose. If we allow animal defecation inside the dwelling unit in this Addendum, you must ensure that it's done in a litter box with a kitty litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you'll be responsible for immediately removing the waste and repairing any damage. Despite anything this Addendum says, you must comply with all local ordinances regarding animal defecation.

10. **ADDITIONAL RULES.** We have the right to make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals. These rules can be in the form of separate animal rules or included in our community policies.

11. **VIOLATION OF RULES.** If you, your guest, or any occupant violates any rule or provision of this Animal Addendum (based upon our judgment) and we give you written notice, you must remove the animal immediately and permanently from the premises. We also have all other rights and remedies set forth in the Lease Contract, including damages, eviction, and attorney's fees.

12. **COMPLAINTS ABOUT ANIMAL.** You must immediately and permanently remove the animal from the premises if we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents.

13. **LIABILITY FOR DAMAGES, INJURIES, CLEANING, ETC.** You and all co-residents will be jointly and severally liable for the entire amount of all damages caused by the animal, including all cleaning, defleaing, and deodorizing. This provision applies to all parts of the dwelling unit, including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, as well as landscaping and other outside improvements. If items cannot be satisfactorily cleaned or repaired, you must pay for us to replace them completely. Payment for damages, repairs, cleaning, replacements, etc. are due immediately upon demand.

As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or anyone's property. You'll indemnify us for all costs of litigation and attorney's fees resulting from any such damage.

14. **MOVE-OUT.** When you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

15. **MULTIPLE RESIDENTS.** Each resident who signed the Lease Contract must sign this Animal Addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this Animal Addendum, even if the resident does not own the animal.

16. **GENERAL.** You acknowledge that no other oral or written agreement exists regarding animals. Except for special provisions noted in paragraph 7 above, our representative has no authority to modify this Animal Addendum or the animal rules except in writing, as described under paragraph 9 of this Animal Addendum. This Animal Addendum and the animal rules are considered part of the Lease Contract described above. It has been executed in multiple originals, one for you and one or more for us.

**You are legally bound by this document. Please read it carefully.**

**Resident or Residents**

*(All resident's must sign)*

**Owner or Owner's Representative**

*(Signs below)*

# UTILITY ADDENDUM FOR WATER, SEWER, GAS, TRASH AND ELECTRIC SERVICE



This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated **August 17, 2017** between **Stevens Pond Apartments Property Owner LLC**

("We") and **Branda Peebles, Brian Twomey**

("You") of Unit No. **4723**

located at **4723 Scotts Mill Court** (street address) in **Saugus, MA 01906** and is in addition to all terms and conditions in the Lease.

To the extent that the terms of this Utility Addendum conflict with those of the Lease, this Utility Addendum shall control.

1. Responsibility for payment of utilities will be as indicated below.

   a) **Water** service to your dwelling will be either:
      - ☒ paid by you; or
      - ☐ paid by you, through an approved sub-meter, to us; or
      - ☐ paid by us.

   b) **Sewer** service to your dwelling will be either:
      - ☒ paid by you; or
      - ☐ paid by you, through an approved sub-meter, to us; or
      - ☐ paid by us.

   c) **Gas** service to your dwelling will be either:
      - ☒ paid by you; or
      - ☐ paid by us.

   d) **Trash** service to your dwelling will be either.(Landlord is responsible for units of 3 or more):
      - ☐ paid by you; or
      - ☒ paid by us.

   e) **Electric** service to your dwelling will be either:
      - ☒ paid by you; or
      - ☐ paid by us.

2. You are responsible for transferring those utilities marked to be paid by you (above), into your name upon possession of the Unit. The failure to transfer any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction.

3. You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you were obligated to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your dwelling and you shall be subject to eviction proceedings based on a breach of this Lease, which may include a claim for waste damages.

4. We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence, fault, misconduct or omissions by us or our employees. You release us from any and all such claims by a utility company or third party supplier and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations not caused by us.

5. You agree not to tamper with, adjust, or disconnect any utility metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease and this Utility Addendum.

6. All charges for sub-metered water and sewer service shall be considered part of your rent for purposes under MGL Chapter 186 and 239.

7. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.

Resident Signature_____     Date_____

Resident Signature_____     Date_____

Resident Signature_____     Date_____

Resident Signature_____     Date_____

Management_____     Date_____

## Bed Bug Addendum

Date: **August 17, 2017**
*(when this Addendum is filled out)*

**NAA**
NATIONAL
APARTMENT
ASSOCIATION.

*Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.*

1. **DWELLING UNIT DESCRIPTION.** Unit No. **4723** ,
   **4723 Scotts Mill Court** *(street address)*
   in **Saugus** *(city)*,
   Massachusetts, **01906** *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract date: **August 17, 2017**
   Owner's name: **Stevens Pond Apartments Property Owner LLC**

   Residents *(list all residents)*: **Branda Peebles, Brian Twomey**

3. **PURPOSE.** This Addendum modifies the Lease Contract and addresses situations related to bed bugs *(cimex lectularius)* which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum. Nothing in this Addendum shall limit the requirements enumerated under the Lease Contract regarding reporting of insects, vermin or other pests, and/or your duty to prevent same in your unit.

4. **INSPECTION.** You agree that you: *(Check one)*
   ☒ have inspected the dwelling prior to move-in and that you did not observe any evidence of bed bugs or bed bug infestation; OR
   ☐ will inspect the dwelling within 48 hours after move-in/renewal and notify us of any bed bugs or bed bugs infestation.

5. **INFESTATIONS.**
   You agree that you have read all of the information on this addendum about bed bugs and:
   *(Check one)*
   ☒ you are not aware of any infestation or presence of bed bugs in your current or previous apartments, home or dwelling. You agree that you are not aware of any bed bug infestation or presence in any of your furniture, clothing, personal property or possessions. You agree that you have not been subjected to conditions in which there was any bed bug infestation or presence. OR
   ☐ you agree that if you previously lived anywhere that had a bed bug infestation that all of your personal property (including furniture, clothing and other belongings) has been treated by a licensed pest control professional. You agree that such items are free of further infestation. If you disclose a previous experience of bed bug infestation, we can review documentation of the treatment and inspect your personal property and possessions to confirm the absence of bed bugs. You agree that any previous bed bug infestation which you may have experienced is disclosed here:

   _____
   _____
   _____
   _____

6. **ACCESS FOR INSPECTION AND PEST TREATMENT.** You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the

methods established by a licensed pest control firm that we approve. You must do so at the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

7. **NOTIFICATION.** You must promptly notify us:
   • of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.
   • of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.
   • if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

8. **COOPERATION.** If we confirm the presence or infestation of bed bugs, you must cooperate and coordinate with us and our pest control agents to treat and eliminate the bed bugs. You must follow all directions from us or our agents to clean and treat the dwelling and building that are infested. You must remove or destroy personal property that cannot be treated or cleaned as close as possible to the time we treated the dwelling. Any items you remove from the dwelling must be disposed of off-site and not in the property's trash receptacles. If we confirm the presence or infestation of bed bugs in your dwelling, we have the right to require you to temporarily vacate the dwelling and remove all furniture, clothing and personal belongings in order for us to perform pest control services. If you fail to cooperate with us, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract.

9. **RESPONSIBILITIES.** If you, your co-tenants, occupants, invitees or guests are found to be the source of any bed bug infestation, then you may be obligated to the following responsibilities, you may be required to pay all reasonable costs of cleaning and pest control treatments incurred by us to treat your dwelling unit for bed bugs. If we confirm the presence or infestation of bed bugs after you vacate your dwelling, you may be responsible for the cost of cleaning and pest control treatments. If we must move other residents in order to treat adjoining or neighboring dwellings to your dwelling unit, you may be liable for payment of any lost rental income and other expenses incurred by us to relocate the neighboring residents and to clean and perform pest control treatments to eradicate infestations in other dwellings.

10. **TRANSFERS.** If we allow you to transfer to another dwelling in the community because of the presence of bed bugs, you must have your personal property and possessions treated according to accepted treatment methods or procedures established by a licensed pest control professional. You must provide proof of such cleaning and treatment to our satisfaction prior to any transfers.

## BED BUGS — A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

### Bed bugs don't discriminate

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

### Bed bugs don't transmit disease

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

### Identifying bed bugs

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors
- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes,

the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.

- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

### Preventing bed bug encounters when traveling

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

### Bed bug do's and don'ts

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.

You are legally bound by this document. Please read it carefully.

| **Resident or Residents** | **Owner or Owner's Representative** |
| *(All residents must sign)* | *(Signs below)* |

**Date of Signing Addendum**

## Mold Information and Prevention Addendum

**NATIONAL APARTMENT ASSOCIATION**

> *Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.*

1. **DWELLING UNIT DESCRIPTION.** Unit. No. **4723**,
   **4723 Scotts Mill Court** *(street address)*
   in **Saugus** *(city)*,
   Massachusetts, **01906** *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract date: **August 17, 2017**
   Owner's name: **Stevens Pond Apartments Property Owner LLC**

   Residents (list all residents): **Branda Peebles, Brian Twomey**

3. **ABOUT MOLD.** Mold is found virtually everywhere in our environment--both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

   Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

4. **PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

   • Keep your dwelling clean--particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.

   • Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines--especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.

   • Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that **you periodically open windows and doors on days when the outdoor weather is dry** (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.

   • Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.

   • Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

5. **IN ORDER TO AVOID MOLD GROWTH**, it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

   • rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;

   • overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;

   • leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;

   • washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;

   • leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and

   • insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

6. **IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON** *NON-POROUS* **SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold). Tilex® and Clorox® contain bleach which can discolor or stain. **Be sure to follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

   Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be present in quantities not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from *porous* items, such as fibers in sofas, chairs, drapes and carpets--provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes. If you are unsure of how to treat any non-porous surface, please notify us in writing and we will take appropriate action.

7. **DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces*, such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

8. **COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

   **If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.**

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**LEASE CONTRACT BUY-OUT AGREEMENT**

**NATIONAL APARTMENT ASSOCIATION**

1. **Dwelling Unit Description.** Unit. No. __4723__, __4723 Scotts Mill Court__ _(street address)_ in __Saugus__ _(city)_, Massachusetts, __01906__ _(zip code)._

2. **Lease Contract Description.**
Lease Contract date: __August 17, 2017__
Owner's name: __Stevens Pond Apartments Property Owner LLC__

Residents (list all residents): __Branda Peebles, Brian Twomey__

3. The purpose of this Buy-Out Agreement is to provide you the opportunity to buy out the Lease Contract prior to the end of the lease term, subject to the terms and conditions contained herein. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

4. **Buy-Out Procedures.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term _if all of the following occur:_

   (a) you give us written notice of buy-out at least __60__ days prior to the new termination date (i.e., your new move-out date), which _(check one)_ ☐ must be the last day of a month or ☒ may be during a month;

   (b) you specify the new termination date in the notice, i.e., the date by which you'll move out;

   (c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;

   (d) you are not in default under the Lease Contract on the new termination date (move-out date);

   (e) you move out on or before the new termination date and do not hold over;

   (f) you pay us a buy-out fee (consideration) of $ __3960.00__ ;

   (g) you pay us the amount of any concessions you received when signing the Lease Contract; and

   (h) you comply with any special provisions in paragraph 9 below.

5. **When payable.** The buy-out fee in paragraph 4(f) is due and payable no later than __30__ days after you give us your buy-out notice. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $ _____ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

6. **Showing unit to prospective residents.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

7. **Compliance essential.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically and the lease will continue without buy-out and any deposits as provided herein will be applied to any and all outstanding charges on your resident ledger. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

8. **Miscellaneous.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent--even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

9. **Special provisions.** Your right of buy-out _(check one)_ ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if you comply with Paragraph 4 herein **AND** you comply with all of the below additional provisions. Any special provisions below will supercede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

   __To cancel/terminate your rental contract, you must give a (minimum) 60 day notice, and in addition to, payback any and all concessions, as well as, pay a termination fee equal to two (2) month's rent, or, if less than two (2) months, the remaining balance of your lease contract.__

**Resident or Residents**

**Owner or Owner's Representative**

**LEASE CONTRACT ADDENDUM**
**FOR SATELLITE DISH OR ANTENNA**

**NAA**
**NATIONAL**
**APARTMENT**
**ASSOCIATION**

Under a Federal Communications Commission (FCC) order, you as our resident have a right to install a transmitting or receiving satellite dish or antenna on the leased dwelling, subject to FCC limitations. We as a rental housing owner are allowed to impose reasonable restrictions relating to such installation. You are required to comply with these restrictions as a condition of installing such equipment. This addendum contains the restrictions that you and we agree to follow.

1. **Dwelling Unit Description.** Unit. No. ___4723___,
   ___4723 Scotts Mill Court___ (street address)
   in ___Saugus___ (city),
   Massachusetts, ___01906___ (zip code).

2. **Lease Contract Description.**
   Lease Contract date: ___August 17, 2017___
   Owner's name: ___Stevens Pond Apartments___
   ___Property Owner LLC___

   Residents (list all residents): ___Branda Peebles, Brian___
   ___Twomey___

3. **Number and size.** You may install ___1___ satellite dish(es) or antenna(s) on the leased premises. A satellite dish may not exceed one meter (3.3 feet) in diameter. Antennas that only transmit signals or that are not covered by 47 CFR § 1.4000 are prohibited.

4. **Location.** Your satellite dish or antenna must be located: (1) inside your dwelling; or (2) in an area outside your dwelling such as a balcony, patio, yard, etc. of which you have exclusive use under your lease. Installation is not permitted on any parking area, roof, exterior wall, window, window sill, fence or common area, or in an area that other residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to you for your exclusive use.

5. **Safety and non-interference.** Your installation: (1) must comply with all applicable ordinances and laws and all reasonable safety standards; (2) may not interfere with our cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to our telecommunication systems; and (4) may not be connected to our electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching it to a portable, heavy object such as a small slab of concrete; (2) clamping it to a part of the building's exterior that lies within your leased premises (such as a balcony or patio railing); or (3) any other method approved by us in writing. No other methods are allowed. We may require reasonable screening of the satellite dish or antenna by plants, etc., so long as it does not impair reception.

6. **Signal transmission from exterior dish or antenna to interior of dwelling.** You may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If your satellite dish or antenna is installed outside your dwelling (on a balcony, patio, etc.), the signals received by it may be transmitted to the interior of your dwelling only by the following methods: (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accommodate the cable); (3) connecting cables "through a window pane," similar to how an external car antenna for a cellular phone can be connected to inside wiring by a device glued to either side of the window--without drilling a hole through the window; (4) wireless transmission of the signal from the satellite dish or antenna to a device inside the dwelling; or (5) any other method approved by us in writing.

7. **Safety in installation.** In order to assure safety, the strength and type of materials used for installation must be approved by us. Installation must be done by a qualified person or company approved by us. Our approval will not be unreasonably withheld. An installer provided by the seller of the satellite dish or antenna is presumed to be qualified.

8. **Maintenance.** You will have the sole responsibility for maintaining your satellite dish, antenna and all related equipment.

9. **Removal and damages.** You must remove the satellite dish or antenna and all related equipment when you move out of the dwelling. In accordance with the NAA Lease Contract, you must pay for any damages and for the cost of repairs or repainting caused by negligence, carelessness, accident or abuse which may be reasonably necessary to restore the leased premises to its condition prior to the installation of your satellite dish, antenna or related equipment. You will not be responsible for normal wear.

10. **Liability insurance.** You must take full responsibility for the satellite dish, antenna and related equipment. If the dish or antenna is installed at a height that could result in injury to others if it becomes unattached and falls, you must provide us with evidence of liability insurance (if available) to protect us against claims of personal injury and property damage to others, related to your satellite dish, antenna and related equipment. The insurance coverage must be $ ___125000.00___, which is an amount reasonably determined by us to accomplish that purpose. Factors affecting the amount of insurance include height of installation above ground level, potential wind velocities, risk of the dish/antenna becoming unattached and falling on someone, etc.

11. **Security Deposit.** An additional security deposit of $ _____ will be charged and due prior to the installation of the satellite dish and/or antenna. The Parties understand and agree that the total sum of the security deposits held shall comply with M.G.L. c.186 s.15B, and will not exceed one month's rent. We consider the additional security deposit a general security deposit for all purposes. The security deposit amount in Provision 4 of the Lease Contract will include this additional deposit amount. Refund of the additional security deposit will be subject to the terms and conditions set forth herein AND in the Lease Contract.

   This additional security deposit is required to help protect us against possible repair costs, damages, or failure to remove the satellite dish, antenna and related equipment at time of move-out. Factors affecting any security deposit may vary, depending on: (1) how the dish or antenna is attached (nails, screws, lag bolts drilled into walls); (2) whether holes were permitted to be drilled through walls for the cable between the satellite dish and the TV; and (3) the difficulty and cost repair or restoration after removal, etc.

12. **When you may begin installation.** You may start installation of your satellite dish, antenna or related equipment only after you have: (1) signed this addendum; (2) provided us with written evidence of the liability insurance referred to in paragraph 10 of this addendum; (3) paid us the additional security deposit, if applicable, in paragraph 11; and (4) received our written approval of the installation materials and the person or company that will do the installation, which approval may not be unreasonably withheld.

13. **Miscellaneous.** If additional satellite dishes or antennas are desired, an additional lease addendum must be executed.

14. **Special Provisions.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

___Resident or Residents___                    ___Owner or Owner's Representative___

**COMMUNITY POLICIES, RULES AND REGULATIONS
ADDENDUM**

*This addendum is incorporated into the Lease Contract (the "Lease") identified below and is in addition to all the terms and conditions contained in the Lease. If any terms of this Addendum conflict with the Lease, the terms of this Addendum shall be controlling:*

| | |
|---|---|
| *Property Owner:* | **Stevens Pond Apartments Property Owner LLC** |
| *Resident(s):* | **Branda Peebles, Brian Twomey** |
| *Unit No./Address:* | **#4723, 4723 Scotts Mill Court** |
| *Lease Date:* | **08/17/2017** |

I.   **GENERAL CONDITIONS FOR USE OF DWELLING PROPERTY AND RECREATIONAL FACILITIES.**
Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Dwelling Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. Owner and management may make changes to the Rules for use of any Amenity at any time.

**Additionally, Resident(s) expressly agrees to assume all risks of every type, including but not limited to risks of personal injury or property damage, of whatever nature or severity, related to Resident's use of the Amenities at the Community. Resident(s) agrees to hold Owner harmless and release and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type, whether or not foreseeable, that Resident(s) may have against Owner and that are in any way related to or arise from such use except for Owner's omission, fault, negligence or misconduct. This provision shall be enforceable to the fullest extent of the law.**

**THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.**

**The Community Policies contain material terms and any violation of same may result in the resident, household member(s) and/or guests being prohibited from further use of the common areas, as well as subject the household to termination of tenancy.**

II.  **POOL.** This Community ☒ **DOES** ☐ **DOES NOT** have a pool. When using the pool, Resident(s) agrees to the following:
- Residents and guests will adhere to the rules and regulations posted in the pool area and Management policies.
- All Swimmers swim at their own risk. Owner is not responsible for accidents or injuries.
- For their safety, Residents should not swim alone.
- Pool hours are posted at the pool.
- No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only.
- Proper swimming attire is required at all times and a swimsuit "cover up" should be worn to and from the pool. Young children who are not yet potty trained shall wear swim diapers in and around the pool facilities at all times.
- No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in pool areas, disposing of trash, and keeping pool gates closed.
- Resident(s) must accompany their guests.
- Resident(s) must notify Owner any time there is a problem or safety hazard at the pool.

**IN CASE OF EMERGENCY DIAL 911**

III. **FITNESS CENTER.** This Community ☒ **DOES** ☐ **DOES NOT** have a fitness center. When using the fitness center, Resident agrees to the following:
- Residents and guests will adhere to the rules and regulations posted in the fitness center and Management policies.
- The Fitness Center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment.
- Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous.
- Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well any other person's use that appears to be dangerous or in violation of Management Rules and Policies.
- Resident(s) shall consult a physician before using any equipment in the Fitness Center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician.
- Resident(s) will keep Fitness Center locked at all times during Resident's visit to the Fitness Center.
- Resident(s) will not admit any person to the Fitness Center who has not registered with the Management Office.
- Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the Fitness Center.

Card # issued:   (1) _____   (2) _____   (3)_____   (4) _____

IV.  **PACKAGE RELEASE.** This Community ☒ **DOES** ☐ **DOES NOT** accept packages on behalf of Residents.
*For communities that do accept packages on behalf of its Residents:*
Resident(s) gives Owner permission to sign and accept any parcels or letters sent to Resident(s) through UPS, Federal Express, Airborne, United States Postal Service or the like. Resident agrees that Owner does not accept responsibility or liability for any lost, damaged, or unordered deliveries, and agrees to hold Owner harmless for the same.

V.   **BUSINESS CENTER.** This Community ☐ **DOES** ☒ **DOES NOT** have a business center.
Resident(s) agrees to use the business center at Resident(s) sole risk and according to the Rules and Regulations posted in the business center and Management policies. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the written approval of Community Management. No inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will

1

- Notwithstanding this, any vehicle illegally parked in a fire lane, designated no parking space or handicapped space, or blocking an entrance, exit, driveway, dumpster, or parked illegally in a designated parking space, will immediately be towed, pursuant to Mass General Laws, at the vehicle owner's expense.
- The washing of vehicles is not permitted on the property unless specifically allowed in designated area.
- Any on property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may only be parked on the property with Management's permission (in Management's sole discretion), and must be registered with the Management Office and parked in the area(s) designated by Management.
- Resident agrees to comply with Owner's requests regarding moving their vehicle due to snow removal and/or any other necessary purpose in the Owner's sole discretion.

**VII. FIRE HAZARDS.** In order to minimize fire hazards and comply with city ordinances, Resident shall comply with the following:
- Residents and guests will adhere to the Community rules and regulations other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- **Grills, Barbeques, and any other outdoor cooking or open flame devices if prior written approval is granted by Management, will be used only on the ground level and will be placed a minimum of __1__ feet from any building.** Such devices will not be used close to combustible materials, tall grass or weeds, on exterior walls or on roofs, indoors, on balconies or patios, or in other locations which may cause fires.
- **Fireplaces:** Only firewood is permitted in the fireplace. No artificial substances, such as Duraflame® logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold.
- Flammable or combustible liquids and fuels shall not be used or stored (including stock for sale) in dwellings, near exits, stairways breezeways, or areas normally used for the ingress and egress of people. This includes motorcycles and any apparatus or engine using flammable or combustible liquid as fuel.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes.

**VIII. EXTERMINATING.** Resident(s) shall immediately report to Management, in writing, any problems related to rodents, skunks, cockroaches and/or insect infestation in the premises or the common areas. Unless prohibited by statute or otherwise stated in the Lease, Owner may conduct extermination operations in Residents' dwelling several times a year and as needed to prevent insect infestation. Owner will notify Residents in advance of extermination in Residents' Dwelling, and give Resident instructions for the preparation of the Dwelling and safe contact with insecticides. Residents will be responsible to prepare the Dwelling for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment, or otherwise fail to allow Owner access to inspection and/or conduct necessary extermination, it shall be considered a material breach of their lease agreement and Owner shall be entitled to take all legal steps to gain access and/or terminate the tenancy. All parties acknowledge that the failure to properly prepare the dwelling shall be considered irreparable injury. If Residents request extermination treatments in addition to those regularly provided by Owner, those requests must be in writing, and Owner shall evaluate and grant such requests in their sole discretion. **Residents agree to perform the tasks required by Owner and/or Owner's exterminator on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to, the following:**
- Clean in all cabinets, drawers and closets in kitchen and pantry.
- If roaches have been seen in closets, remove contents from shelves and floor.
- Remove infants and young children from the dwelling.
- Remove pets
- Remove chain locks or other types of obstruction on day of service.
- Cover fish tanks and turn off their air pumps.
- Do not wipe out cabinets after treatment.

In the case of suspected or confirmed bed bug infestation, resident will agree to the following:
- Resident will wash all clothing, bed sheets, draperies, towels, etc. in extremely hot water.
- Resident will thoroughly clean (off premises), all luggage, handbags, shoes and clothes hanging containers.
- Resident will cooperate with Owner's cleaning efforts for all mattresses and seat cushions or other upholstered furniture, and will dispose of same if requested.

<u>**RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY OWNER IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF INSECTICIDES**</u>

**IX. DRAPES AND SHADES.** Drapes or shades installed by Resident, when allowed, must be lined in white and present a uniform exterior appearance.

**X. WATER BEDS.** Resident shall not have water beds or other water furniture in the dwelling without prior written permission of Owner.

**XI. BALCONY or PATIO.** Balconies and patios shall be kept neat and clean at all times. No rugs, towels, laundry, clothing, appliances or other items shall be stored, hung or draped on railings or other portions of balconies or patios.

**XII. SIGNS.** Resident shall not display any signs, exterior lights or markings on dwelling. No awnings or other projections shall be attached to the outside of the building of which dwelling is a part.

**XIII. SATELLITE DISHES/ANTENNAS.** You must complete a satellite addendum and abide by its terms prior to installation or use.

**XIV. WAIVER/SEVERABILITY CLAUSE.** No waiver of any provision herein, or in any Community rules and regulations, shall be effective unless granted by the Owner in a signed and dated writing. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, this finding shall not effect the validity of the remaining portions of this addendum, the Lease Contract or any other addenda to the Lease Contract.

**XV. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
**Commercial Vehicles are not allowed to be parked on the property.**

I have read, understand and agree to comply with the preceding provisions.

_____   _____   _____   _____
Resident                      Date      Resident                      Date

_____   _____   _____   _____
Resident                      Date      Resident                      Date

_____   _____   _____   _____
Owner Representative          Date

**LEASE ADDENDUM**
**LIABILITY INSURANCE REQUIRED OF RESIDENT**

NAA
NATIONAL
APARTMENT
ASSOCIATION

1. **Dwelling Unit Description.** Unit No. __4723__, __4723 Scotts Mill Court__ *(street address)* in __Saugus__ *(city)*, Massachusetts, __01906__ *(zip code)*.

2. **Lease Contract Description.**
Lease Contract date: __August 17, 2017__
Owner's name: __Stevens Pond Apartments Property Owner LLC__

Residents *(list all residents)*: __Branda Peebles, Brian Twomey__

3. **Acknowledgment Concerning Insurance or Damage Waiver.** You acknowledge that we do not maintain insurance to protect you against personal injury, loss or damage to your personal property or belongings, or to cover your own liability for injury, loss or damage you (or your occupants or guests) may cause others. You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) for the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests. You understand that paragraph 8 of the Lease Contract requires you to maintain a liability insurance policy, which provides limits of liability to third parties in an amount not less than $ __100000.00__ per occurrence. You understand and agree to maintain at all times during the Term of the Lease Contract and any renewal periods a policy of personal liability insurance and personal property insurance satisfying the requirements listed below, at your sole expense.

4. **Required Policy.** You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third parties (including damage to our property), in a minimum policy coverage amount of $ __100000.00__ , from a carrier with an AM Best rating of A-VII or better, licensed to do business in Massachusetts. The carrier is required to provide notice to us within 30 days of any cancellation, non-renewal, or material change in your coverage. We retain the right to hold you responsible for any loss in excess of your insurance coverage.

5. **We may provide you with information of an insurance program that we make available to residents, which provides you with an opportunity to buy renter's insurance from a preferred company. However, you are free to contract for the required insurance with a provider of your choosing.**

6. **Subrogation Allowed.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes any language to the contrary in the Lease Contract.

7. **Your Insurance Coverage.** You have purchased the required personal liability insurance from the insurance company of your choosing listed below that is licensed to do business in this state, and have provided us with written proof of this insurance prior to the execution and commencement of the Lease Contract. You will provide additional proof of insurance in the future at our request.

Insurance Company: _____

8. **Default.** Any default under the terms of this Addendum shall be deemed an immediate, material and incurable default under the terms of the Lease Contract, and we shall be entitled to exercise all rights and remedies under the law.

9. **Miscellaneous.** Except as specifically stated in this Addendum, all other terms and conditions of the Lease Contract shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease Contract, the terms of this Addendum shall control.

10. **Special Provisions:** __Liability insurance does not protect you against loss or damage to your personal property or belongings. Personal property renter's insurance should be purchased. Proof of insurance must be provided to us prior to moving in. By signing below, you understand that we do not own or operate any insurance company, and that any information regarding an insurance company provided by us to you was done as a courtesy. We make no representations, guarantees or promises concerning the insurance or the services of any company. We may assist you in the filing of paperwork necessary for your procurement of the required liability insurance, but in no way shall we be held responsible for your enrollment or procurement of a policy.__

I have read, understand and agree to comply with the preceding provisions.

Resident or Residents
*[All residents must sign here]*

Owner or Owner's Representative
*[signs here]*

# WATER/SEWER USAGE ADDENDUM

This Water/Sewer Usage Addendum is dated and effective as _____ **August 17, 2017** _____
(date of the Lease) to which this addendum is attached and made a part thereof (the "Lease") and is made by and between
**Branda Peebles, Brian Twomey** _____
_____ ("Tenant")
and the "Landlord" named in said Lease for apartment # _____ **4723** _____.

1. Resident has been advised that a water sub-meter has been installed to measure the water usage in the apartment. Attached to this Addendum is a copy of the certificate filed by Landlord pursuant to the Act with the local health board or other department charged with enforcement of the State Sanitary Code. (If e-signature is used to sign these documents, the certificate will be emailed or provided prior to occupancy.)

2. Landlord shall be obligated to maintain the sub-meter system in good working order in accordance with the provisions of the State Sanitary Code. Tenant shall pay to Landlord, as additional rent, charges for water usage and sewer allocable to the Premises in accordance with the following provisions:

   a. In addition to the rent and other amounts due pursuant to the provisions of the Lease, you agree to pay, and shall be charged, for all water/sewer usage within your dwelling unit. These amounts charged are considered rent for all purposes. We will provide you with a bill for water/sewer usage which will include the current and immediately preceding sub-meter reading and the date of such reading, the amount of water consumed since the last reading, the charge per unit of water, the total charge, and the payment due date.

   b. To determine the calculated cost per unit of water to assess the charge, we will divide the total amount of any bill provided by the water company for water/sewer usage, which will include any customer service fee and taxes, for all water provided to the main water meter of which the sub-meter is a party, by the total amount of water consumed for the entire premises served by that main water meter. This will establish the monthly water rate. You will then be charged for the total number of units, measured by your sub-meter, times the monthly water rate.

   c. We send bills on a (check one):
      ❑ Monthly basis, therefore payments are due within 15 days after mailing; or
      ❑ Intervals greater than one month, therefore payments are due 30 days after mailing.

      If Tenant fails to make payments when due, such non-payment shall be deemed a material breach of the Lease. Such breach may be cured by payment in full prior to any court hearing with respect to such breach. Bills may be issued on Landlord's behalf by an outside sub-metering service manager. The billing entity from which Tenant shall receive monthly Utility bills and as designated by Landlord is:
      **Utility Billing, Inc. (UBI)** _____

      This designation may be changed by Landlord at any time. We will provide notice of changes if they occur.

   d. If your Lease starts after the beginning but before the end of the water company billing period, Landlord shall mail to Tenant on the first day of such term the sub-meter reading for the Premises as of the Lease commencement day.

   e. If the Lease terminates in the middle of the water company's billing period, Landlord shall give the Tenant on the last day of actual tenancy a final sub-meter reading for the Premises as of that day, together with a final bill, calculated by reference to the last bill issued to Landlord. If Landlord is unable to give a final sub-meter reading and bill to Tenant on the last day of the tenancy, Landlord shall do so by mail no later than the day thereafter. Notwithstanding paragraph 3(c) above, this amount shall be immediately due and payable or may be deducted from any security deposit. However, if it is later determined that based on actual cost received at the close of the water company's billing period that tenant's charge is less than what was used as a reference by Landlord to calculate the final bill, Landlord shall recalculate the amount due and mail Tenant a revised bill, together with a rebate for any overpayment.

3. Tenant acknowledges that Landlord cannot guarantee the level of charges for water and sewer utility service, which will vary over time depending on Tenant usage characteristics, changes in the rates imposed by the utility provider that provides service to Landlord and other factors. Any checks tendered for payment and dishonored due to insufficient funds shall be subject to the same penalty and fees as under the Lease.

   You understand and acknowledge that certain water conservation devices have been installed on the showers, faucets, and water closets in your dwelling unit. You agree not to remove or tamper with these devices and shall provide us with prompt written notice in the event any such device requires repair or replacement. Failure to comply with this provision shall constitute a material violation of the Lease.

Resident Signature _____    Date_____

Resident Signature _____    Date_____

# NO-SMOKING ADDENDUM

Date: **August 17, 2017**
(when this Addendum is filled out)



*All use of any tobacco product involving smoking, burning, or combustion of tobacco is prohibited in any portion of the dwelling community.*

1. **Dwelling Unit Description.** Unit. No. _____**4723**_____,
   **4723 Scotts Mill Court** (street
   *address*) in _____**Saugus**_____
   (*city*), Massachusetts, _____**01906**_____ (zip code).

2. **Lease Contract Description**
   Lease Contract date: **August 17, 2017**
   Owner's name: **Stevens Pond Apartments**
   **Property Owner LLC**

   Residents (*list all residents*): **Branda Peebles, Brian**
   **Twomey**

3. **Smoking Anywhere Inside Buildings of the Dwelling Community is Strictly Prohibited.** All forms and use of lighted or burning tobacco products and/or smoking as defined in Paragraph 6 herein inside any dwelling, building, or interior of any portion of the dwelling community is strictly prohibited. Any violation of the no-smoking policy is a material and substantial violation of this addendum and the Lease Contract.

   The prohibition on use of any lighted or burning tobacco products and/or smoking as defined in Paragraph 6 herein extends to all residents, their occupants, guests, invitees and all others who are present on or in any portion of the dwelling community. The no-smoking policy and rules extend to, but are not limited to, the management and leasing offices, building interiors and hallways, building common areas, dwellings, club house, exercise or spa facility, tennis courts, all interior areas of the dwelling community, commercial shops, businesses, and spaces, work areas, and all other spaces whether in the interior of the dwelling community or in the enclosed spaces on the surrounding community grounds. Smoking of non-tobacco products which are harmful to the health, safety, and welfare of other residents is also prohibited by this addendum and other provisions of the Lease Contract inside any dwelling or building.

   **Smoking Outside Buildings of the Dwelling Community.** Smoking is permitted only in specially designated areas outside the buildings of the dwelling community. The smoking-permissible areas are marked by signage.

   Smoking on balconies, patios, and limited common areas attached to or outside of your dwelling ☐ is ☒ is not permitted.

   The following outside areas of the community may be used for smoking: **10 Feet from all Buildings -**
   **Parking Lots**

   Even though smoking may be permitted in certain limited outside areas, we reserve the right to direct that you and your occupants, family, guests, and invitees cease and desist from smoking in those areas if smoke is entering the dwellings or buildings or if it is interfering with the health, safety, or welfare or disturbing the quiet enjoyment, or business operations of us, other residents, or guests.

   repairs, replacement, and cleaning due to your smoking or due to your violation of the no-smoking provisions of the Lease Contract are in excess of normal wear and tear. Smoke related damage, including but not limited to, the smell of tobacco smoke which permeates sheetrock, carpeting, wood, insulation, or other components of the dwelling or building is in excess of normal wear and tear in our smoke free dwelling community.

5. **Your Responsibility for Loss of Rental Income and Economic Damages Regarding Other Residents.** You are responsible for payment of all lost rental income or other economic and financial damages or loss to us due to smoking or smoke related damage caused by you or your occupants, family, guests, or invitees which results in or causes other residents to vacate their dwellings, results in disruption of other residents' quiet enjoyment, or adversely affects other residents' or occupants' health, safety, or welfare.

6. **Definition of Smoking.** Smoking refers to any use or possession of a cigar, cigarette, electronic cigarettes, hookah, or pipe containing tobacco or a tobacco product while that tobacco or product is burning, lighted, or ignited, regardless of whether the person using or possessing the product is inhaling or exhaling the smoke from such product. The term tobacco includes, but is not limited to any form, compound, or synthesis of the plant of the genus *Nicotiana* or the species N. *tabacum* which is cultivated for its leaves to be used in cigarettes, cigars, or pipes. Smoking also refers to use or possession of burning, lighted, or ignited non-tobacco products including marijuana if they are noxious, offensive, unsafe, unhealthy, or irritating to other persons. The term "electronic cigarettes" means any electronic device that produces a vapor or liquid nicotine and/or other substance to the uses as the user simulates smoking. The term shall include devices whether they are manufactured or referred to as e-cigarettes, e-cigars, e-pipes, or under any product name.

7. **Lease Contract Termination for Violation of the Addendum.** We have the right to terminate your Lease Contract or right of occupancy of the dwelling for any violation of this No-Smoking Addendum. Violation of the no-smoking provisions is a material and substantial default or violation of the Lease Contract. Despite the termination of the Lease Contract or your occupancy, you will remain liable for rent through the end of the Lease Contract term or the date on which the dwelling is re-rented to a new occupant, whichever comes first. Therefore, you may be responsible for payment of rent after you vacate the leased premises even though you are no longer living in the dwelling.

8. **Extent of Your Liability for Losses Due to Smoking.** Your responsibility for damages, cleaning, loss of rental income, and loss of other economic damages under this No-Smoking Addendum are in addition to, and not in lieu of, your responsibility for any other damages or loss under the Lease Contract or any other addendum.

9. **Your Responsibility for Conduct of Occupants, Family Members, and Guests.** You are responsible for communicating this community's no-smoking policy and for ensuring compliance with this addendum by your

requires your cooperation in reporting incidents or suspected violations of smoking. You must report violations of our no-smoking policy before we are obligated to investigate and act, and you must thereafter cooperate with us in prosecution of such violations.

This is an important and binding legal document. By signing this addendum you are acknowledging that a violation could lead to termination of your Lease Contract or right to continue living in the dwelling. If you or someone in your household is a smoker, you should carefully consider whether you will be able to abide by the terms of this addendum. Before signing you must advise us whether you or anyone who will be living in your dwelling is a smoker. You must check one of the following boxes.

❑ Neither you nor anyone who will be living in the dwelling is a smoker.
❑ Someone in my household is a smoker; however, we agree to follow your no-smoking policy.

**Resident or Residents**
*(All residents must sign here)*

**Owner or Owner's Representative**
*(Sign here)*

**NAA**
**NATIONAL**
**APARTMENT**
**ASSOCIATION.**

## LEASE RENEWAL/EXTENSION
## NON-WAIVER OF RIGHTS ADDENDUM

This Lease Renewal/Extension Non-Waiver of Rights Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated ___August 17, 2017___ between __Stevens Pond Apartments__ __Property Owner LLC__ ("We/Us") and _____ __Branda Peebles, Brian Twomey__ ("You") for apartment number ___4723___ ("Premises") located at __4723 Scotts Mill Court, Saugus, MA 01906__ ("Property"), and is in addition to all terms and conditions in the Lease.

You understand and agree that the execution of the Lease does not waive either parties' rights and/or responsibilities under any prior lease agreement between you and us. Without limiting the foregoing, any alleged violation(s) committed by you and/or your household member(s), guest(s) and/or invitee(s) of a prior lease agreement ("Prior Violations") shall be considered and included as grounds to terminate your tenancy in conjunction with violation(s) that occur during the term of the current Lease Contract. The Parties understand and agree that Prior Violations alone **will not** be sufficient grounds for default and/or eviction, except in the event that Prior Violations were unknown by us at the time of extension/renewal.

Prior Violations that are not waived by us include, but are not limited to:

  a) Consistently late rent payment history;

  b) Disturbances caused and/or created by you, your household member(s), guest(s), pet(s), and/or invitee(s), whether known or unknown at the time of extension/renewal;

  c) Damage caused to the Premises and/or the common areas of the development by you, your household member(s), guest(s), pet(s), and/or invitee(s), whether known or unknown at the time of extension/renewal;

  d) Criminal conduct at or near the development by you, your household member(s), guest(s), pet(s), and/or invitee(s), whether known or unknown at the time of extension/renewal; and

  e) Your failure to pay utility charges and/or any other amount(s) due under any prior Lease.

The execution of the Lease Contract shall not waive any prior notice(s) to quit or pending actions against you by us.

Resident Signature: _____    Date: _____

Resident Signature: _____    Date: _____

Resident Signature: _____    Date: _____

Resident Signature: _____    Date: _____

Management: _____    Date: _____

**NAA**
NATIONAL
APARTMENT
ASSOCIATION.

## ADDENDUM REGARDING MARIJUANA USE

1. **Dwelling Unit Description.** Unit. No. _____**4723**_____ ,
   _____**4723 Scotts Mill Court**_____ (street address)
   in _____**Saugus**_____ (city),
   Massachusetts, _____**01906**_____ (zip code).

2. **Lease Contract Description.**
   Lease Contract date: ____**August 17, 2017**____
   Owner's name: **Stevens Pond Apartments**
   **Property Owner LLC**
   _____

   Residents (list all residents): **Branda Peebles, Brian**
   **Twomey**
   _____
   _____

   Where the terms and conditions of this Addendum vary
   from or contradict any terms or conditions set forth in the
   Lease Contract, this Addendum shall control.

3. Massachusett's law permits the limited possession, use
   and/or manufacture of marijuana in specific and limited
   circumstances. However, this is not the case under
   federal law. Under federal law, specifically the Controlled
   Substances Act (CSA), marijuana is still categorized as a
   Schedule I substance. This means that under federal law,
   the manufacture, distribution, or possession of marijuana

   is strictly prohibited. Because the U.S. Department of
   Housing and Urban Development is controlled by the
   federal government, it agrees that the use of marijuana,
   whether prescribed for medical reasons or not, is a criminal
   offense and will not be protected under the fair housing
   laws. Therefore, apartment complexes are not required
   to accommodate the use of marijuana by a tenant who is a
   current medical marijuana user. Disabled tenants who are
   registered medical marijuana users, however, should not
   feel discouraged to request reasonable accommodations if
   the need arises.

4. The Premises listed above follows and complies with federal
   law regarding marijuana use and is, and will continue to
   be, a drug free community. Possession, use, manufacture
   or sale of any illegal substance, including marijuana, or any
   use of marijuana by the tenant and/or guests will result in
   termination pursuant to your Lease Agreement. If you have
   any questions or concerns about this policy, please speak
   to management.

5. By signing below, the resident acknowledges his or her
   understanding of the terms and conditions as stated above,
   and his or her agreement to comply with those terms and
   conditions.

**Resident or Residents** *(sign here)*          **Date of Signing Addendum**

_____          _____

_____          _____

_____          _____

**Owner or Owner's Representative** *(signs here)*          **Date of Signing Addendum**

_____          _____



## Pet Policy Regarding Dog Breed Restrictions

As much as we love dogs, we love our residents even more. Please follow the guidelines below to insure the safety of our residents, staff and visitors.



**Restricted breeds:**
The following breeds are not permitted at any
JRK Residential property:
Pit-bull Rottweiler
German Shepherd
Husky
Malamute
Akita Chow
Doberman Pinscher
Great Dane
St. Bernard
Wolf Hybrid



Resident signature:_____        Date:____



Our mascot, George.



08/17/17 04:13 PM
*Branda L Peebles*
Primary-ID: 12207090
IP 50.202.165.2 | 00 m 16 s on page



08/17/17 11:03 PM
*Brian J Twomey*
Co-Applicant-ID: 12207111
IP 96.237.241.192 | 00 m 12 s on page

08/18/17 11:43 AM
*Katelyn Szekely*
Owner/Manager
IP 73.123.133.184

**MOVE OUT CLEANING & REPLACEMENT CHARGES**

RESIDENT NAME(S): Branda Peebles and  Brian Twomey   APT. #: 4723

Painting of walls – *one coat* (Other than damage or heavy smoke)
Shampooing of carpets (Other than stains, heavy soil, and pet damage)

Resident is required to have the apartment professionally cleaned and carpet cleaned upon move out.  If the apartment is not returned to us in this condition the following charges will be applied.

|  | ONE BEDROOM | TWO BEDROOM | THREE BEDROOM | THREE BEDROOM TOWNHOME |
|---|---|---|---|---|
| PAINTING (PER COAT) | $300.00 | $400.00 | $475.00 | $600.00 |
| CARPET CLEANING | $80.00 | $90.00 | $110.00 | $175.00 |
| TOUCH-UP PAINT | $150.00 | $200.00 | $237.50 | $300.00 |
| APARTMENT CLEAN | $80.00 | $90.00 | $110.00 | $175.00 |

The following charges will be assessed regardless of how long resident occupies the apartment.

## REPLACEMENTS (flat charge):

| | | | |
|---|---|---|---|
| Bathtub/Shower Resurface | $ 315.00 | Oven Rack - *each* | $ 20.00 |
| Blinds (Mini-blind) - *each* | $ 40.00 | Peep Holes, partial | $ 10.00 |
| Blinds (Vertical) - *each* | $ 100.00 | Peep Holes, complete | $ 20.00 |
| Broiler Pan | $ 25.00 | Refrigerator Crisper Tray - *each* | $ 40.00 |
| Carpet Repairs - *each* | $ 20.00 | Refrigerator Ice Trays (set of 2) | $ 2.00 |
| Carpet Replacement | Actual Cost | Screens (Patio Door) | $ 50.00 |
| Closet Rod - *each* | $ 25.00 | Screen (Window) - *each* | $ 35.00 |
| Counter (Bathroom) | Actual Cost | Shower Doors | Actual Cost |
| Counter (Kitchen) | Actual Cost | Shower Head | $ 10.00 |
| Counter Resurface (Bathroom) - *each* | $ 50.00 | Smoke Detector/Alarm - *each* | $ 15.00 |
| Counter Resurface (Kitchen) - *each* | $ 90.00 | Smoke Detector/Battery - *each* | $ 4.00 |
| Door (Bifold) - *each* | $ 90.00 | Stove Burner - *each* | $ 25.00 |
| Door (Exterior) | $ 175.00 | Stove Burner Rings - *each* | $ 5.00 |
| Door (Interior) - *each* | $ 85.00 | Stove Drip Pan 8" - *each* | $ 10.00 |
| Draperies - *each* | $ 30.00 | Stove Drip Pan 6" - *each* | $ 8.00 |
| Drywall Repairs - *per hour* | $ 35.00 | Switch Plates/Sockets - *each* | $ 2.00 |
| Extermination (Special) - *per visit* | $ 40.00 | Toilet | $ 125.00 |
| Faucets (Bath/Kitchen) - *each* | $ 30.00 | Toilet Seat - *each* | $ 25.00 |
| Garage Door - *panel* | $ 100.00 | Towel Bars - *each* | $ 10.00 |
| Garage Door Opener (Remote) | $ 75.00 | Vinyl Repairs - *each* | $ 15.00 |
| Garbage Disposal | $ 85.00 | Vinyl Replacement | Actual Cost |
| Keys (Door) - *each* | $ 10.00 | Wallpaper Removal - *per hour* | $ 25.00 |
| Keys (Mailbox) - *each* | $ 15.00 | Window (Broken) | Actual Cost |
| Light bulbs - *each* | $ 1.00 | OTHER | |
| Light Fixture/Ceiling Fan - *each* | $ 45.00 | OTHER | |
| Light Globes - *each* | $ 10.00 | OTHER | |
| Lock & Deadbolt (Door) | $ 55.00 | OTHER | |
| Lock (Mailbox) | $ 20.00 | OTHER | |
| Medicine Cabinet | Actual Cost | OTHER | |
| Mirror (Bathroom) | Actual Cost | OTHER | |

## CLEANING CHARGES:

| | | | |
|---|---|---|---|
| Air Vents/Exhaust Fans - *each* | $ 5.00 | Range Top | $ 15.00 |
| Balcony/Patio | $ 10.00 | Refrigerator | $ 25.00 |
| Bathtub - *each* | $ 10.00 | Shower Wall Tile | $ 15.00 |
| Cabinets (Kitchen) | $ 10.00 | Sink (Kitchen/Bath) - *each* | $ 5.00 |
| Cabinets (Bathroom) | $ 5.00 | Switch Plates - *each* | $ 1.00 |
| Closet Shelves - *each* | $ 3.00 | Toilet - *each* | $ 20.00 |
| Counters | $ 5.00 | Trash Removal - *per bag* | $ 10.00 |
| Dishwasher | $ 10.00 | Vacuum Carpet - *per room* | $ 5.00 |
| Doors/Frames - *each* | $ 5.00 | Vent Hood | $ 10.00 |
| Faucets (Kitchen/Bath) - *each* | $ 2.00 | Walls (Wash) - *each* | $ 5.00 |
| Fireplace | $ 20.00 | Washer/Dryer | $ 10.00 |
| Floors (Kitchen/Bath) - *each* | $ 15.00 | Windows - *each* | $ 5.00 |
| Heat Registers - *each* | $ 5.00 | OTHER | |
| Light Fixtures - *each* | $ 2.00 | OTHER | |
| Medicine Cabinets - *each* | $ 2.00 | OTHER | |
| Mirrors - *each* | $ 2.00 | OTHER | |
| Oven | $ 25.00 | OTHER | |
| Patio Sliding Door | $ 5.00 | OTHER | |

Nothing herein shall be construed as a limitation on Agent's right to pursue Resident for damages and/or additional cleaning not specifically listed hereon. This document will be attached to the Inventory and Condition Form, and become part of that document upon vacating.

Resident Signature(s) _____   Date _____

Agent for Owner_____   Date _____


08/17/17 04:13 PM
*Branda L Peebles*
Primary-ID: 12207090
IP 50.202.186.2 | 00 m 09 s on page

08/17/17 11:03 PM
*Brian J Twomey*
Co-Applicant-ID: 12207111
IP 96.237.241.192 | 00 m 09 s on page


08/18/17 11:43 AM
*Katelyn Szekely*
Owner/Manager
IP 73.123.193.184

# EXHIBIT E

## MOVE OUT CLEANING & REPLACEMENT CHARGES

RESIDENT NAME(S): Branda Peebles and  Brian Twomey    APT. #: 4723

Painting of walls – *one coat* (Other than damage or heavy smoke)
Shampooing of carpets (Other than stains, heavy soil, and pet damage)

Resident is required to have the apartment professionally cleaned and carpet cleaned upon move out.  If the apartment is not returned to us in this condition the following charges will be applied.

| | ONE BEDROOM | TWO BEDROOM | THREE BEDROOM | THREE BEDROOM TOWNHOME |
|---|---|---|---|---|
| PAINTING (PER COAT) | $300.00 | $400.00 | $475.00 | $600.00 |
| CARPET CLEANING | $80.00 | $90.00 | $110.00 | $175.00 |
| TOUCH-UP PAINT | $150.00 | $200.00 | $237.50 | $300.00 |
| APARTMENT CLEAN | $80.00 | $90.00 | $110.00 | $175.00 |

The following charges will be assessed regardless of how long resident occupies the apartment.

### REPLACEMENTS (flat charge):

| | | | |
|---|---|---|---|
| Bathtub/Shower Resurface | $ 315.00 | Oven Rack - *each* | $ 20.00 |
| Blinds (Mini-blind) - *each* | $ 40.00 | Peep Holes, partial | $ 10.00 |
| Blinds (Vertical) - *each* | $ 100.00 | Peep Holes, complete | $ 20.00 |
| Broiler Pan | $ 25.00 | Refrigerator Crisper Tray - *each* | $ 40.00 |
| Carpet Repairs - *each* | $ 20.00 | Refrigerator Ice Trays (set of 2) | $ 2.00 |
| Carpet Replacement | Actual Cost | Screens (Patio Door) | $ 50.00 |
| Closet Rod - *each* | $ 25.00 | Screen (Window) - *each* | $ 35.00 |
| Counter (Bathroom) | Actual Cost | Shower Doors | Actual Cost |
| Counter (Kitchen) | Actual Cost | Shower Head | $ 10.00 |
| Counter Resurface (Bathroom) - *each* | $ 50.00 | Smoke Detector/Alarm - *each* | $ 15.00 |
| Counter Resurface (Kitchen) - *each* | $ 90.00 | Smoke Detector/Battery - *each* | $ 4.00 |
| Door (Bifold) - *each* | $ 90.00 | Stove Burner - *each* | $ 25.00 |
| Door (Exterior) | $ 175.00 | Stove Burner Rings - *each* | $ 5.00 |
| Door (Interior) - *each* | $ 85.00 | Stove Drip Pan 8" - *each* | $ 10.00 |
| Draperies - *each* | $ 30.00 | Stove Drip Pan 6" - *each* | $ 8.00 |
| Drywall Repairs - *per hour* | $ 35.00 | Switch Plates/Sockets - *each* | $ 2.00 |
| Extermination (Special) - *per visit* | $ 40.00 | Toilet | $ 125.00 |
| Faucets (Bath/Kitchen) - *each* | $ 30.00 | Toilet Seat - *each* | $ 25.00 |
| Garage Door - *panel* | $ 100.00 | Towel Bars - *each* | $ 10.00 |
| Garage Door Opener (Remote) | $ 75.00 | Vinyl Repairs - *each* | $ 15.00 |
| Garbage Disposal | $ 85.00 | Vinyl Replacement | Actual Cost |
| Keys (Door) - *each* | $ 10.00 | Wallpaper Removal - *per hour* | $ 25.00 |
| Keys (Mailbox) - *each* | $ 15.00 | Window (Broken) | Actual Cost |
| Light bulbs - *each* | $ 1.00 | OTHER | |
| Light Fixture/Ceiling Fan - *each* | $ 45.00 | OTHER | |
| Light Globes - *each* | $ 10.00 | OTHER | |
| Lock & Deadbolt (Door) | $ 55.00 | OTHER | |
| Lock (Mailbox) | $ 20.00 | OTHER | |
| Medicine Cabinet | Actual Cost | OTHER | |
| Mirror (Bathroom) | Actual Cost | OTHER | |

### CLEANING CHARGES:

| | | | |
|---|---|---|---|
| Air Vents/Exhaust Fans - *each* | $ 5.00 | Range Top | $ 15.00 |
| Balcony/Patio | $ 10.00 | Refrigerator | $ 25.00 |
| Bathtub - *each* | $ 10.00 | Shower Wall Tile | $ 15.00 |
| Cabinets (Kitchen) | $ 10.00 | Sink (Kitchen/Bath) - *each* | $ 5.00 |
| Cabinets (Bathroom) | $ 5.00 | Switch Plates - *each* | $ 1.00 |
| Closet Shelves - *each* | $ 3.00 | Toilet - *each* | $ 20.00 |
| Counters | $ 5.00 | Trash Removal - *per bag* | $ 10.00 |
| Dishwasher | $ 10.00 | Vacuum Carpet - *per room* | $ 5.00 |
| Doors/Frames - *each* | $ 5.00 | Vent Hood | $ 10.00 |
| Faucets (Kitchen/Bath) - *each* | $ 2.00 | Walls (Wash) - *each* | $ 5.00 |
| Fireplace | $ 20.00 | Washer/Dryer | $ 10.00 |
| Floors (Kitchen/Bath) - *each* | $ 15.00 | Windows - *each* | $ 5.00 |
| Heat Registers - *each* | $ 5.00 | OTHER | |
| Light Fixtures - *each* | $ 2.00 | OTHER | |
| Medicine Cabinets - *each* | $ 2.00 | OTHER | |
| Mirrors - *each* | $ 2.00 | OTHER | |
| Oven | $ 25.00 | OTHER | |
| Patio Sliding Door | $ 5.00 | OTHER | |

Nothing herein shall be construed as a limitation on Agent's right to pursue Resident for damages and/or additional cleaning not specifically listed hereon. This document will be attached to the Inventory and Condition Form, and become part of that document upon vacating.

Resident Signature(s) _____    Date _____

Agent for Owner_____    Date _____



08/17/17 04:13 PM
*Branda L Peebles*
Primary-ID: 12207090
IP 50.202.185.2 | 00 m 09 s on page

08/17/17 11:03 PM
*Brian J Twomey*
Co-Applicant-ID: 12207111
IP 96.237.241.192 | 00 m 09 s on page



08/18/17 11:43 AM
*Katelyn Szekely*
Owner/Manager
IP 73.123.193.184

# EXHIBIT F

**Statement of Security Deposit**

**From:**
**Accounts**
Stevens Pond
1 Founders' Way
Saugus, MA 01906

Aug 23, 2018

Account: 01-4723

**Residents:**
Branda L. Peebles
Brian J. Twomey

**To:**
Branda L. Peebles
119 Thoreau Way #632
Lawrence, MA 01843

| Agreement: | | | Monthly Charges: | | SECOND FLOOR |
|---|---|---|---|---|---|
| Lease begins | 08/19/17 | | | | 20.00 |
| Lease ends | 08/18/18 | | | | GLOBAL FEE |
| Move-in | 08/19/17 | | | | 20.00 |
| Notice | 06/02/18 | | | | POOL/POND VIEW |
| Move-out | 08/18/18 | | | | |

| | | | |
|---|---|---|---|
| | On Hand: | SECDP* | 1.29 |
| | | SECURITY DEPOSIT | 500.00 |
| | | | 501.29 |
| | Balances Due: | UTILITY BILLING | 44.76 |
| | | | 44.76 |
| | New Charges: | Touch Up Paint | 50.00 |
| | | Carpet Clean per Lease | 65.00 |
| | | | 115.00 |

| Summary: | | |
|---|---|---|
| | Total Deposits | 501.29 |
| | Total Prepaid | 0.00 |
| | Applied to Due | 44.76 |
| | Applied to Other | 115.00 |
| | Refunded | 341.53 |
| | Due Property | 0.00 |

If you should have any questions regarding this statement, please contact our office. The Leasing Office phone number is 781-231-1901.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY,



Landlord

Thank you

# EXHIBIT G

**MASSACHUSETTS**
**RENT AND SECURITY DEPOSIT RECEIPT**



To:  **Tressa Ellis**
    **Joshua Berger**
(Names of all residents)

RE:  **1 Webster Ave, #302, #302**
(Street address and dwelling unit number, if applicable)

    **Chelsea, MA 02150**
(City, State, Zip)

We hereby acknowledge receipt of your Payment in the total amount of $ _____**2786.00**_____ to be applied as follows:

1. First Month Rent                 $ _____**1854.00**_____
2. Last Month's Rent                $ _____
3. Security Deposit                  $ _____**1000.00**_____
4. Installation of Locks and Keys     $ _____**100.00**_____

SECURITY DEPOSIT

1. The Lessor acknowledged receipt from the Lessee of $ _____**1000.00**_____ (an amount not to exceed first month's rent) to be held by the Lessor during the term hereof, or any extension or renewal, as a security deposit pursuant to the terms hereof; it being understood that THIS IS NOT TO BE CONSIDERED PREPAID RENT, nor shall damages be limited to the amount of the security deposit.

2. The Lessor acknowledges that, subject to damages prescribed by law, he shall, within thirty (30) days after the termination of this lease or upon the Lessee's vacating the premises completely together with all his goods and possessions, whichever shall last occur, return the security deposit or any balance thereof, and any interest thereon, if due, after deducting

    (a)   Any unpaid rent or water and sewer charges which have not been validly withheld or deducted pursuant to the provisions of any special or general law; and

    (b)   Any unpaid increase in real estate taxes which the Lessee is obligated to pay pursuant to a tax escalation clause which conforms to the requirements of Mass. General Laws, Chapter 186, Section 15C; and

    (c)   A reasonable amount necessary to repay any damage caused to the premises by the Lessee or any person under the Lessee's control or on the premises with the Lessee consent, reasonable wear and tear excluded. In the case of such damage, the Lessor shall provide the Lessee within thirty (30) days with an itemized list of damages, sworn to by the Lessor or his agent under pains and penalties of perjury, itemizing in precise detail the nature of the damage and of the repairs necessary to correct it, and written evidence, such as estimates, bills, invoices or receipts, indicating the actual or estimated cost thereof.

3. The Lessor must provide Lessee with a written statement of the condition of the premises, as required by law. If the Lessee disagrees with the Lessor's statement of condition, the Lessee must attach a separate list of any damage existing in the premises and return the statement to the Lessor. No amount shall be deducted from the security deposit for any damage which was listed in the statement of condition or in any separate list submitted by the Lessee and approved by the Lessor or the Lessor's agent, unless the Lessor subsequently repaired or caused to be repaired said damage and can prove that the renewed damage was unrelated to the prior damage and was caused by the Lessee or by any person under the Lessee's control or on the premises with the Lessee's consent.

4. If the Lessor transfers the premises, the Lessor must transfer the security deposit or any balance, thereof, and any accrued interest, to the Lessor's successor in interest for the benefit of the Lessee.

    As required by law, the security deposit is presently or will be deposited in a separate, Interest-Bearing account.

    Account Number _____ at _____ (Bank Name)
    located at _____
    (Street Address) _____ (City), Massachusetts, _____ (Zip).
    If the security deposit is held for one year or longer from the commencement of the tenancy, the Lessee shall be entitled to interest on the amount of the security deposit at the rate of five percent (5%) per year, or such lesser amount as may be received from the bank, payable at the end of each year of the tenancy.

5. Lessee is required to provide Lessor with a forwarding address upon vacating the premises.

LAST MONTH'S RENT

Pursuant to applicable law, the tenant is entitled to interest on last month's rent paid in advance from the date of tenancy, payable at the end of each year of tenancy and prorated upon termination. Interest shall not accrue for the last month for which rent was paid in advance. The rate of interest payable on last month's rent is 5%, provided however that if the landlord elects to deposit last month's rent in a bank account, interest will be limited to any lower rate actually paid by the bank. The tenant should provide the landlord with a forwarding address at the termination of tenancy indicating where such interest may be given or sent.

Date Received: _____     Received By: _____

OWNER:   **One Webster**_____
              _____
              _____

SIGNATURE: _____
                 Management Company

**Joshua Berger, Tressa Ellis**

©2016, National Apartment Association, Inc. - 4/2016, Massachusetts





# EXHIBIT H

**MOVE OUT CLEANING & REPLACEMENT CHARGES**

RESIDENT NAME(S): Joshua B Berger and  Tressa H Ellis   APT. #: 302

Painting of walls – *one coat* (Other than damage or heavy smoke)
Shampooing of carpets (Other than stains, heavy soil, and pet damage)

Resident is required to have the apartment professionally cleaned and carpet cleaned upon move out.  If the apartment is not returned to us in this condition the following charges will be applied.

| | ONE BEDROOM | TWO BEDROOM | THREE BEDROOM | THREE BEDROOM TOWNHOME |
|---|---|---|---|---|
| PAINTING (PER COAT) | $300.00 | $400.00 | $475.00 | $600.00 |
| CARPET CLEANING | $80.00 | $90.00 | $110.00 | $175.00 |
| TOUCH-UP PAINT | $150.00 | $200.00 | $237.50 | $300.00 |
| APARTMENT CLEAN | $80.00 | $90.00 | $110.00 | $175.00 |

The following charges will be assessed regardless of how long resident occupies the apartment.

### REPLACEMENTS (flat charge):

| | | | |
|---|---|---|---|
| Bathtub/Shower Resurface | $ 315.00 | Oven Rack - *each* | $ 20.00 |
| Blinds (Mini-blind) - *each* | $ 40.00 | Peep Holes, partial | $ 10.00 |
| Blinds (Vertical) - *each* | $ 100.00 | Peep Holes, complete | $ 20.00 |
| Broiler Pan | $ 25.00 | Refrigerator Crisper Tray - *each* | $ 40.00 |
| Carpet Repairs - *each* | $ 20.00 | Refrigerator Ice Trays (set of 2) | $ 2.00 |
| Carpet Replacement | Actual Cost | Screens (Patio Door) | $ 50.00 |
| Closet Rod - *each* | $ 25.00 | Screen (Window) - *each* | $ 35.00 |
| Counter (Bathroom) | Actual Cost | Shower Doors | Actual Cost |
| Counter (Kitchen) | Actual Cost | Shower Head | $ 10.00 |
| Counter Resurface (Bathroom) - *each* | $ 50.00 | Smoke Detector/Alarm - *each* | $ 15.00 |
| Counter Resurface (Kitchen) - *each* | $ 90.00 | Smoke Detector/Battery - *each* | $ 4.00 |
| Door (Bifold) - *each* | $ 90.00 | Stove Burner - *each* | $ 25.00 |
| Door (Exterior) | $ 175.00 | Stove Burner Rings - *each* | $ 5.00 |
| Door (Interior) - *each* | $ 85.00 | Stove Drip Pan 8" - *each* | $ 10.00 |
| Draperies - *each* | $ 30.00 | Stove Drip Pan 6" - *each* | $ 8.00 |
| Drywall Repairs - *per hour* | $ 35.00 | Switch Plates/Sockets - *each* | $ 2.00 |
| Extermination (Special) - *per visit* | $ 40.00 | Toilet | $ 125.00 |
| Faucets (Bath/Kitchen) - *each* | $ 30.00 | Toilet Seat - *each* | $ 25.00 |
| Garage Door - *panel* | $ 100.00 | Towel Bars - *each* | $ 10.00 |
| Garage Door Opener (Remote) | $ 75.00 | Vinyl Repairs - *each* | $ 15.00 |
| Garbage Disposal | $ 85.00 | Vinyl Replacement | Actual Cost |
| Keys (Door) - *each* | $ 10.00 | Wallpaper Removal - *per hour* | $ 25.00 |
| Keys (Mailbox) - *each* | $ 15.00 | Window (Broken) | Actual Cost |
| Light bulbs - *each* | $ 1.00 | OTHER | |
| Light Fixture/Ceiling Fan - *each* | $ 45.00 | OTHER | |
| Light Globes - *each* | $ 10.00 | OTHER | |
| Lock & Deadbolt (Door) | $ 55.00 | OTHER | |
| Lock (Mailbox) | $ 20.00 | OTHER | |
| Medicine Cabinet | Actual Cost | OTHER | |
| Mirror (Bathroom) | Actual Cost | OTHER | |

### CLEANING CHARGES:

| | | | |
|---|---|---|---|
| Air Vents/Exhaust Fans - *each* | $ 5.00 | Range Top | $ 15.00 |
| Balcony/Patio | $ 10.00 | Refrigerator | $ 25.00 |
| Bathtub - *each* | $ 10.00 | Shower Wall Tile | $ 15.00 |
| Cabinets (Kitchen) | $ 10.00 | Sink (Kitchen/Bath) - *each* | $ 5.00 |
| Cabinets (Bathroom) | $ 5.00 | Switch Plates - *each* | $ 1.00 |
| Closet Shelves - *each* | $ 3.00 | Toilet - *each* | $ 20.00 |
| Counters | $ 5.00 | Trash Removal - *per bag* | $ 10.00 |
| Dishwasher | $ 10.00 | Vacuum Carpet - *per room* | $ 5.00 |
| Doors/Frames - *each* | $ 5.00 | Vent Hood | $ 10.00 |
| Faucets (Kitchen/Bath) - *each* | $ 2.00 | Walls (Wash) - *each* | $ 5.00 |
| Fireplace | $ 20.00 | Washer/Dryer | $ 10.00 |
| Floors (Kitchen/Bath) - *each* | $ 15.00 | Windows - *each* | $ 5.00 |
| Heat Registers - *each* | $ 5.00 | OTHER | |
| Light Fixtures - *each* | $ 2.00 | OTHER | |
| Medicine Cabinets - *each* | $ 2.00 | OTHER | |
| Mirrors - *each* | $ 2.00 | OTHER | |
| Oven | $ 25.00 | OTHER | |
| Patio Sliding Door | $ 5.00 | OTHER | |

Nothing herein shall be construed as a limitation on Agent's right to pursue Resident for damages and/or additional cleaning not specifically listed hereon. This document will be attached to the Inventory and Condition Form, and become part of that document upon vacating.

Resident Signature(s) _____   Date_____

Agent for Owner_____   Date _____


*¹Joshua B Berger      ²Tressa H Ellis      ³Roberta Silva*

# EXHIBIT I

# DDSK | LAW
### DiGangi Dullea Sachs Khan

August 1, 2019

***Via Certified Mail, Return Receipt Requested***

JRK Property Holdings
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

Tewksbury Apartments Property Owner
LLC
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

One Webster Apartments Property
Owner LLC
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

Stevens Pond Apartments Property Owner
LLC
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

Cabot Crossing Apartments Property
Owner LLC
11766 Wilshire Blvd Suite 1500
Los Angeles, CA 90025

Essex Apartments Property Owner LLC
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

Royal Crest Apartments Property
Owner LLC
11766 Wilshire Blvd Suite 1500
Los Angeles, CA 90025

C/O
National Registered Agents, Inc.
155 Federal Street, Suite 700
Boston, MA 02110

Re:   **Claims on Behalf of Branda Peebles and on Behalf of All Other Persons Who
Have Been Caused Similar Injury and Are Similarly Situated**

### DEMAND LETTER PURSUANT TO MASSACHUSETTS GENERAL LAWS
### CHAPTER 93A, SECTION 9

DDSK LAW LLC

JRK Property Holdings, et al.
PAGE 2
August 1, 2019

To whom it may concern:

This is a formal demand letter sent to you pursuant to Massachusetts General Laws Chapter 93A, § 9, on behalf of Branda Peebles and all other persons who have been caused similar injury and are similarly situated.

JRK Property Holdings, on behalf of its affiliated companies, One Webster Apartments Property Owner LLC, Tewksbury Apartments Property Owner LLC, Stevens Pond Apartments Property Owner LLC, Cabot Crossing Apartments Property Owner LLC, Royal Crest Apartments Property Owner LLC and Essex Apartments Property Owner LLC, manages and operates at least 6 (six) residential apartment complexes in Massachusetts:

1. Residences at Tewksbury Commons, 7 Archstone Ave., Tewksbury, MA 01876;

2. Essex Apartment Homes, 1 Avalon Dr., Peabody, MA 01960;

3. The Residence at Stevens Pond, 1 Founders Way Saugus, MA 01906;

4. One Webster Apartment Homes, 1 Webster Avenue Chelsea, MA 02150;

5. Royal Crest Estates, 37 Courtney Street, Fall River, MA 02720; and

6.  Cabot Crossing, 130 Bowden Street, Lowell, MA 01852.

Based upon a review of the Essex County, Middlesex County, Bristol County and Suffolk County Registries of Deeds, as well as the Massachusetts Secretary of State's records, it is abundantly clear that JRK Property Holdings manages the above-listed apartment complexes on behalf of the individual LLCs with which JRK Property Holdings has common ownership.  For purposes of this Demand, all entities named herein are collectively referred to as "JRK."

As described in greater detail below, JRK has systematically and continually violated G. L. c. 186, § 15B(4)(iii)(the "Security Deposit Statute"), by unlawfully retaining its tenants' security deposits or a portion thereof to pay for cleaning and other maintenance services that can only be attributed to "reasonable wear and tear." Specifically, JRK has been subsidizing, and continues to subsidize, its costs of doing business at the expense of the consumers of Massachusetts by unlawfully placing the financial burden of basic carpet cleaning and touch-up painting on all of its tenants through unlawful deductions from security deposits in direct violation of the Security Deposit Statute.

The Security Deposit Statute explicitly prohibits a landlord / owner from retaining any portion of a tenant's security deposit to remedy "reasonable wear and tear."  To wit, the pertinent portion of the Security Deposit Statute provides:

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 3
August 1, 2019

(4) The lessor shall, within thirty days after the termination of occupancy under a tenancy-at-will or the end of the tenancy as specified in a valid written lease agreement, return to the tenant the security deposit or any balance thereof; provided, however, that **the lessor may deduct from such security deposit for the following:**

\*\*\*

(iii) a reasonable amount necessary to repair any **damage** caused to the dwelling unit by the tenant or any person under the tenant's control or on the premises with the tenant's consent, **reasonable wear and tear excluded**.

G. L. c. 186, § 15B(4)(iii)(emphasis added).  Here, there can be no doubt that carpet cleaning and touch-up painting are the very definitions of "reasonable wear and tear" and therefore JRK may not retain its tenants' security deposit monies for such cleaning services.

In addition to the above-described practices of JRK being in clear violation of the Security Deposit Statute, violations of that statute constitute a violation of the Massachusetts Consumer Protection Statute, G. L. c. 93A, § 2, which makes it unlawful to engage in "unfair or deceptive acts or practices in the conduct of trade or commerce." G. L. c. 93A, § 2.  Indeed, as the Massachusetts Attorney General's Regulations set out:

(4) Security Deposit and Rent in Advance.  **It shall be an unfair or deceptive practice for an owner to:**

\*\*\*

(f) fail to furnish to the tenant, within 30 days after the termination of occupancy under a tenancy-at-will or the end of the tenancy as specified in a valid written rental agreement, an itemized list of damage, if any, and written evidence indicating the actual or estimated cost of repairs necessary to correct such damage, in accordance with M.G.L. c. 186, § 15B;

(g) **fail to return to the tenant the security deposit or balance thereof to which the tenant is entitled after deducting any sums in accordance with M.G.L. c. 186, § 15B**, together with interest, within thirty days after termination of occupancy under a tenancy-at-will agreement or the end of the tenancy as specified in a valid written rental agreement.

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 4
August 1, 2019

940 Code Mass. Regs. 3.17(4)(f)-(g)(emphasis added).

Here, the deducting of security deposit monies by JRK for "reasonable wear and tear" is in violation of the Attorney General's Regulations as those are not sums which JRK is entitled to deduct pursuant to the Security Deposit Statute. As such, JRK's deduction of security deposit monies for "reasonable wear and tear" constitutes an unfair or deceptive act or practice in violation of G. L. c. 93A, §§ 2, 9.

Pursuant to G. L. c. 93A, JRK may be liable for double or treble damages, those damages being any unlawfully retained security deposit monies of JRK tenants through the above-described practices of JRK. Similarly, the Security Deposit Statute calls for treble damages in the event JRK unlawfully withheld security deposit monies for cleaning fees associated with "reasonable wear and tear". See Phillips v. Equity Residential Management, L.L.C., 478 Mass. 251, 260-261 (2017)(landlord/owner responsible for treble damages and attorney's fees pursuant to G. L. c. 186, § 15B(7) for unlawfully retaining security deposit funds for "cleaning or repair" charges).

Without question, a finding of liability under G. L. c. 93A will require that JRK pay attorneys' fees incurred in pursing this action against JRK. JRK has thirty (30) days from receipt of this letter in which to respond and make a reasonable offer of settlement. Failure to make said offer within the prescribed timeframe may expose JRK to additional violations of G. L. c. 93A.

## FACTS

On August 17, 2017, Branda Peebles ("Ms. Peebles") and Brian Twomey entered into a one-year residential lease agreement with Stevens Pond Apartments, located at 4723 Scotts Mill Court, Saugus, Massachusetts. (See Lease Attached as **Exhibit A**). Ms. Peebles was required to pay a $500.00 security deposit, which was paid prior to moving into the apartment. An addendum attached to the lease, entitled "Move Out Cleaning & Replacement Charges" was signed by all parties. (See Lease Addendum Attached as **Exhibit B**).

The Addendum states that "Resident is required to have the apartment professionally cleaned and carpet cleaned upon move out. If the apartment is not returned to us in this condition the following charges will be applied." See Ex. B. The Addendum then lists the costs for basic cleaning and maintenance for what can only be described as "normal wear and tear" occasioned by a residential tenancy, such as, among other things, carpet cleaning, touch up painting and apartment cleaning.

At the conclusion of the lease, Ms. Peebles vacated the apartment on August 18, 2018. On August 23, 2018 a "Statement of Security Deposit." was sent to Ms. Peebles

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 5
August 1, 2019

and Mr. Twomey. (See August 23, 2018, Statement of Security Deposit, attached as **Exhibit C**). This statement indicates that deductions were taken from Ms. Peebles' security deposit under the category "New Charges." Id.  These charges were listed as $50.00 for "Touch-Up Paint" and $65.00 for "Carpet Clean per Lease," for a total deduction of $115.00 from their security deposit. Id.

  The JRK lease documents and policies make it impossible for JRK not to violate the statutes discussed herein.  At the inception of each tenancy, the lease contemplates that a tenant must either (1) pay for "reasonable wear and tear" out of their own pocket at lease end; or (2) have their security deposit monies unlawfully deducted for "reasonable wear and tear" at lease end.  In either scenario, JRK impermissibly requires a tenant to pay for "reasonable wear and tear" in violation of law.  Simply put, JRK cannot pass the cost of doing business onto the consumer tenants of the Commonwealth.

  Upon information and belief, and based upon the standard form lease and addenda used by JRK and JRK's common ownership and management of the six (6) properties identified above, it is clear that JRK employs the same unfair and deceptive acts or practices described herein at each of the six properties it owns and manages in the Commonwealth.  Accordingly, relief on a class-wide basis is appropriate.

## I.  STATUTORY AUTHORITY

  Chapter 93A, § 9(1) provides:

> **any** person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation thereunder…may bring an action in the superior court…for damages…

G. L. c. 93A, § 9(1) (emphasis added).  Section 2 declares "unlawful" any "unfair or deceptive acts or practices in the conduct of any trade or commerce".  G. L. c. 93A, § 2.

  Chapter 93A, § 9(2) further states that a person may:

> if the use or employment of the unfair or deceptive acts or practice has caused similar injury to numerous other persons similarly situated and if the Court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly situated persons; . . .

G. L. c. 93A, § 9(2).

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 6
August 1, 2019

The Claimants qualify as persons able to bring a 93A, § 9 action as lessees of residential property. JRK and the various housing complexes it owns or manages are Corporations and companies doing business in Massachusetts and are engaged in the conduct of trade or commerce. JRK's businesses involve Real Estate Development, Ownership, Operation, and Management.

## II.     JRK'S UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN THE CONDUCT OF TRADE OR COMMERCE

As described above, the retention of security deposit funds for "reasonable wear and tear" constitutes a clear violation of the Security Deposit Statute. That same conduct constitutes a violation of the Attorney General's regulations and, in turn, a violation of M.G.L. c. 93A.

The law allows for the retention of a security deposit under strict conditions as some measure of security for unpaid rent and reasonable amounts necessary to repair **damage** for which the tenant is responsible. See Jinwala v. Bizzaro, 24 Mass. App. Ct. 1, 4 (1987). The reasoning for the strict conditions of the Security Deposit Statute were discussed by the Massachusetts Appeals Court:

> By limiting the freedom of landlords and tenants to contract in this regard [see § 15B(8)], the Legislature manifested a concern for the welfare of tenants in residential property who, as a practical matter, are generally in inferior bargaining positions and find traditional avenues of redress relatively useless; i.e., the legal expense of chasing a security deposit would be more than the amount of the deposit." Goes v. Feldman, 8 Mass. App. Ct. 84, 91 (1979). Hampshire Village Associates v. District Court of Hampshire, supra at 152-153. Mellor v. Berman, supra at 282. To that end, the Legislature has provided that failure of a landlord to observe the security deposit law will result in forfeiture of the deposit, § 15B(6), and for some violations, if litigation is necessary to force the return of a deposit, see Castenholz v. Caira, 21 Mass. App. Ct. 758, 762-763 (1986), has mandated the imposition of treble damages, interest and costs, and attorney's fees. § 15B(7). See Hampshire Village Associates v. District Court of Hampshire, supra at 150-151. Mellor v. Berman, supra at 278-283.

> [T]he purpose of § 15B is seen not to be arbitrarily penal; rather, 'the underlying goal [is to establish] an "equitable relationship"' between tenants and Landlords. Castenholz v. Caira, 21 Mass. App. Ct. at 763, quoting from McGrath v. Mishara, 386 Mass. 74, 85 (1982).

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 7
August 1, 2019

Jinwala v. Bizzaro, 24 Mass. App. Ct. 1, 4-6 (1987).

It is entirely clear, both as a matter of common sense and law, that general cleaning is not within "damages" contemplated by the security deposit statute:

> [T]he deductions for cleaning costs incurred as a result of a breach of lease may not be permitted by the statute which, as relevant here, provides that "[n]o deduction may be made from the security deposit for any purpose other than 'a reasonable amount necessary to repair any damage caused to the dwelling unit by the tenant or any person under the tenant's control or on the premises with the tenant's consent, reasonable wear and tear excluded.

Taylor v. Beaudry, 82 Mass. App. Ct. 105, 105 (2012) (citing M.G.L. c. 186, § 15B(4)(iii) (1984); see also Phillips v. Equity Residential Management, L.L.C., 478 Mass. 251, 260-261 (2017)(landlord/owner responsible for treble damages and attorney's fees pursuant to G. L. c. 186, § 15B(7) for unlawfully retaining security deposit funds for "cleaning or repair" charges).

To be sure, JRK is fully aware that it cannot retain security deposit funds for anything other than unpaid rent or damages, as it explicitly recognizes and states in its Leases:  "You'll be liable for the following charges, if applicable: unpaid rent; repairs or damages **beyond normal wear and tear**, water /sewer charges and other amounts provided by law." See Ex. A at ¶ 37 (emphasis added).

## III.    CHAPTER 93A PROVIDES FOR MULTIPLE DAMAGES FOR A "WILLFUL OR KNOWING VIOLATION" OF SECTION TWO

Chapter 93A provides that if Claimant prevails, recovery shall be in the amount of actual damages and:

> up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.

M.G.L. c. 93A, § 9.

The amount that is multiplied is the amount of any judgment on the underlying claims regardless of the existence of available coverage.  See G.L. c. 93A, § 9(3) ("For the purposes of this chapter, the amount of actual damages to be multiplied by the court

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 8
August 1, 2019

shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim.")

Further, if the court finds there has been a violation, the Claimant(s) shall, in addition to other relief provided for, and irrespective of the amount in controversy, "be awarded reasonable attorneys fees and costs incurred in connection with said action". G.L. c. 93A, § 9(4).

## IV.    DEMAND FOR SETTLEMENT

Based on all of the foregoing, the Claimants hereby make the following Demand for Settlement for the aggregate total of damages to Claimants' financial loss:

**DEMAND**:

- Branda Peebles **and** all others similarly situated[1] demand the return of their entire security deposit where any portion was retained for the patently improper deduction of "reasonable wear and tear" maintenance/repairs, including, but not limited to, "Touch up paint" and "Carpet Clean per lease";

- Branda Peebles **and** all others similarly situated further demand that this amount be trebled as required by statute, as all of these practices are willful and knowing violations of Massachusetts law.

- Branda Peebles **and** all others similarly situated likewise demand that JRK immediately cease and desist in any further violations of 186, § 15B, specifically the unlawful retention of security deposits.

## V.     JRK IS OBLIGATED TO RESPOND TO THIS DEMAND WITHIN 30 DAYS WITH A REASONABLE OFFER OF SETTLEMENT IN ORDER TO AVOID THE POTENTIAL FOR MULTIPLE DAMAGES, ATTORNEY'S FEES AND COSTS

The purpose of the requirement for a demand letter is to encourage negotiation and settlement of a claim.  Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704 (1975).

---

[1] "Similarly Situated" means all tenants of JRK owned or managed properties, as set forth above, whose security deposit funds – either in whole or in part – were retained to remedy "reasonable wear and tear" dating back four (4) years from the date of this demand.

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 9
August 1, 2019

General laws chapter 93A, § 9(3) provides, if the court finds that the "refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated...section two" of Chapter 93A, then the court may award double or treble damages. G.L. c. 93A, § 9(3); Brandley v. United States Fidelity & Guaranty Co., 819 F. Supp. 101, 200 (D. Mass. 1993); see also Leardi v. Brown, 394 Mass. 151, 166 (1985) (defendant's responses "too indefinite...to be regarded as reasonable"); Whelihan v. Markowski, 37 Mass. App. Ct. 209 (1994) (defendant's offer of settlement was not reasonable for plaintiff's injury).

The failure to make a reasonable offer of settlement like the failure to make any written response to this demand letter within 30 days can itself constitute a violation of Chapter 93A. Any such failure can be considered "bad faith with knowledge or reason to know that the act or practice complained of violated said section two," thus triggering Chapter 93A's multiple damage provision. Id.

The burden of proving that the settlement offer was reasonable, thereby precluding recovery for multiple damages and attorney's fees, is on the defendant-offeror. Bachman v. Parkin, 19 Mass. App. Ct. 908, 910-11 (1984).

## VI.    CONCLUSION

For all of the above reasons, Branda Peebles, on behalf of herself **and** all other persons who have been caused similar injury and are similarly situated, pursuant to G.L. c. 93A, § 9, hereby make demand for settlement upon JRK as stated in Section IV above. JRK has 30 days from receipt of this letter to respond with a reasonable offer of settlement. Failure to do so could subject JRK to liability for multiple damages and attorney's fees and costs in the event Claimants are forced to prosecute their claims to conclusion.

Recently, we have been able to use the negotiation envisioned by G.L. c. 93A to settle similar cases. We are hoping this demand letter can spark similar negotiations toward a class settlement.

We look forward to receiving a written response within 30 days.

Sincerely,

D. Scott Dullea