**Exhibit 6**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          SUPERIOR COURT
                                                     BUS. LIT. SESSION
                                                     CIVIL ACTION NO.
                                                     SUCV2019-03714-BLS1

_____
                                    )
BRANDA PEEBLES and JOSHUA            )
BERGER, Individually, and on BEHALF  )
OF ALL OTHERS SIMILARLY              )
SITUATED,                            )
         Plaintiffs,                 )
                                     )
vs.                                  )
                                     )
JRK PROPERTY HOLDINGS, INC.,         )
STEVENS POND APARTMENTS              )
PROPERTY OWNER, LLC, and ONE         )
WEBSTER APARTMENTS                   )
PROPERTY OWNER, LLC,                 )
         Defendants.                 )
_____     )

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### INTRODUCTION

This action involves the Defendants' JRK Property Holdings, Inc. ("JRK"), Stevens Pond

Apartments Property Owner, LLC ("Stevens Pond"), and One Webster Apartments Property

Owner, LLC ("One Webster") (collectively the "Defendants" or "JRK") violations of the

Massachusetts Security Deposit Statute, G. L. c. 186, §15B *et seq*.

Specifically, JRK, as an owner and/or property manager of six (6) residential apartment

complexes in the Commonwealth of Massachusetts comprised of over 1,000 apartment units,

routinely deducts monies from its tenants' security deposit funds to remedy "reasonable wear

and tear" in violation of G. L. c. 186, §§15B(4)(iii), (6)(e) and (6)(c).  JRK engages in this

practice pursuant to a lease addendum (the "Move Out Addendum") that it includes in all its residential leases at all its properties.

The Move Out Addendum requires tenants to have their apartment unit professionally cleaned prior to moving out, and if they do not, JRK deducts funds from the tenants' security deposit monies to remedy normal wear and tear such as touch-up painting and carpet cleaning. Every tenant at a JRK owned or managed property during the relevant time was subject to the Move Out Addendum charges.

The named Plaintiffs, Branda Peebles ("Ms. Peebles") and Joshua Berger ("Mr. Berger"), are former tenants of JRK who filed the instant class action lawsuit on behalf of themselves and all other similarly situated (collectively the "Plaintiffs").

As set out further below, the Plaintiffs allege that JRK unlawfully retained the security deposit monies of tenants at all of its properties during the relevant time period to remedy "reasonable wear and tear" in violation of G. L. c. 186, §§15B(4)(iii), (6)(e) and (6)(c). As a remedy, the Plaintiffs seek the return of *all* the withheld security deposit monies retained by JRK at *all* JRK properties during the time period.

Further, the Plaintiffs have alleged that the inclusion of the Move Out Addendum in JRK's leases constitutes an unlawful lease provision in violation of G. L. c. 186, §15B(6)(c), the penalty for which is also JRK's forfeiture of the entirety of the tenant's security deposit. To that end, the Plaintiffs are seeking the return of *all* the security deposit monies retained by JRK from *any* tenant for *any* reason whatsoever at *all* JRK properties during the time period.

Finally, G. L. c. 186, §15B(7) *mandates* damages in the amount of three times the entire security deposit, plus 5% (five percent) interest from the date of the violation as well as attorney's fees and costs for JRK's violation of G. L. c. 186, §15B(6)(e).

The Plaintiffs now move this Honorable Court to certify a class of Plaintiffs pursuant to Mass. R. Civ. P. 23 and G. L. c. 93A(9)(2).  For the reasons set forth herein, the Plaintiffs' Motion for Class Certification should be **ALLOWED**, and a class of Plaintiffs as proposed and defined by the Plaintiffs below should be certified.

## BASIC FACTUAL BACKGROUND

*A.  JRK, its Affiliated Entities and Residential Properties*

The Defendant JRK Property Holdings, Inc.("JRK") is a foreign corporation organized under the laws of California and registered to do business in the Commonwealth of Massachusetts.  (See Business Entity Summaries attached hereto as **Exhibit A**).

JRK and its affiliated entities[1], including Defendants Stevens Pond Apartments Property Owner, LLC ("Stevens Pond"), and One Webster Apartments Property Owner, LLC ("One Webster"), own and/or manage six (6) residential apartment complexes in Massachusetts.[2]

On information and belief, JRK leases over 1,000 (one thousand) units to residents of the Commonwealth across its six residential apartment complexes.[3]  As set out in greater detail

---

[1] Tewksbury Apartments Property Owner LLC, Cabot Crossing Apartments Property Owner LLC, Royal Crest Apartments Property Owner LLC, Essex Apartments Property Owner LLC, Stevens Pond Apartments Property Owner, LLC, and One Webster Apartments Property Owner, LLC.  JRK shares a principal place of business and officers with each of these entities.  For the purposes of this memorandum, any reference to "JRK" is meant to include these affiliated entities, as well as Defendant JRK Property Holdings, Inc.  (See Ex. A).

[2] Residences at Tewksbury Commons, 7 Archstone Ave., Tewksbury, MA 01876; Essex Apartment Homes, 1 Avalon Dr., Peabody, MA 01960; The Residence at Stevens Pond, 1 Founders Way, Saugus, MA 01906; One Webster Apartment Homes, 1 Webster Avenue, Chelsea, MA 02150; Royal Crest Estates, 25 Courtney Street, Fall River, MA 02720; and Cabot Crossing, 130 Bowden Street, Lowell, MA 01852.

[3] Research conducted on JRK properties suggests there are 246 units at the Residences at Tewksbury, 121 units at One Webster, 326 units at Stevens Pond, 154 units at Essex Apartment Homes, 24 units at Royal Crest Estates, and 252 units at Cabot Crossing for a total of 1,123 units.  (See Affidavit of Attorney Keith Sachs attached hereto as **Exhibit B**).

below, given JRK's turnover rates, JRK entered into approximately 3,000 (three thousand) lease agreements with Massachusetts residents over the relevant time period for the instant action.

B. *The Named Plaintiffs and JRK's Move Out Addendum*

On August 17, 2017, Plaintiff Branda Peebles ("Ms. Peebles") and another entered into a one-year lease agreement with JRK to rent an apartment at JRK's Stevens Pond apartment complex, located in Saugus, Massachusetts. (See Peebles Lease (cover only) attached hereto as **Exhibit C**). JRK required a $500.00 (five hundred dollars) security deposit from Ms. Peebles, which she paid prior to moving in.

Ms. Peebles' lease contained a standard-form addendum entitled "Move Out Cleaning and Replacement Charges" (the "Move Out Addendum"), which was signed by Ms. Peebles and JRK. (See Peebles Move Out Addendum attached hereto as **Exhibit D**). The Move Out Addendum contained the following mandate at the top:

> **Resident is _required_ to have the apartment professionally cleaned and carpet cleaned upon moveout. If the apartment is not returned to us in this condition _the following charges will be applied._**

(Id.)(emphasis added). The Move Out Addendum then goes on to specify charges to be applied for remedying normal wear and tear to the apartment such as "carpet clean", "apartment clean" and "touch-up paint." (Id.).

Ms. Peebles vacated her apartment at Stevens Pond on August 18, 2018. On August 23, 2018, JRK sent a document entitled "Statement of Security Deposit" (the "Security Deposit Receipt") to Ms. Peebles. (See Peebles Security Deposit Receipt attached hereto as **Exhibit E**). Ms. Peebles' Security Deposit Receipt showed that JRK had deducted $50.00 (fifty dollars) from Ms. Peebles' security deposit monies for "Touch-up Paint" and $65.00 (sixty-five dollars) from Ms. Peebles' security deposit monies for "Carpet Clean per Lease," totaling $115.00 (one

hundred and fifteen dollars) in deductions from Ms. Peebles' security deposit monies to remedy normal wear and tear allegedly done by her to her apartment. (Id.).

On July 21, 2018, Plaintiff Joshua Berger ("Mr. Berger") and another entered into a one-year lease agreement with JRK to rent an apartment at JRK's One Webster apartment complex, located in Chelsea, Massachusetts.  (See Berger Lease (cover only) attached hereto as **Exhibit F**).  JRK required a $1,000.00 (one thousand dollars) security deposit from Mr. Berger, which he paid prior to moving in.

Mr. Berger's lease also contained a standard-form addendum entitled "Move Out Cleaning and Replacement Charges," which was signed by Mr. Berger and JRK.  (See Berger Move Out Addendum attached hereto as **Exhibit G**).  The Move Out Addendum accompanying Mr. Berger's lease is identical to the Move Out Addendum accompanying Ms. Peebles' lease, containing the same above-produced cleaning mandate and associated charges.  (Id.).

C.  *The Instant Action and Legal Allegations*

On August 1, 2019, the undersigned sent a demand letter to JRK pursuant to G. L. c. 93A, seeking relief for Mr. Berger, Ms. Peebles, and all others similarly situated for JRK's unlawful retention of its tenants' security deposit monies to remedy normal wear and tear in violation of the Massachusetts Security Deposit Statute G. L. c. 186, §§15B(4)(iii), (6)(e) and (6)(c).  (See 93A Demand Letter (without exhibits) attached hereto as **Exhibit H**).  JRK responded to the Demand, but without a reasonable offer for settlement.

On November 25, 2019, the Plaintiffs filed the class action complaint (the "Complaint") in the instant action on behalf of themselves and all others similarly situated.  (See Complaint (without exhibits) attached hereto as **Exhibit I**).  The underlying allegations in the Complaint can be summarized as follows:

General laws c. 186, §15B(4)(iii) provides in pertinent part:

(4) **The lessor shall, within thirty days after the termination of occupancy under a tenancy-at-will or the end of the tenancy as specified in a valid written lease agreement, return to the tenant the security deposit or any balance thereof**; provided, however, that the lessor may deduct from such security deposit for the following:

\*\*\*

(iii) a reasonable amount necessary to repair any damage caused to the dwelling unit by the tenant or any person under the tenant's control or on the premises with the tenant's consent, **<u>reasonable wear and tear excluded</u>**.

(emphasis added). Thus, JRK is not permitted to withhold its tenants' security deposit monies to remedy reasonable wear and tear.

The Plaintiffs have alleged that JRK's retaining monies from tenants' security deposits for things such as "touch-up paint" and "carpet clean" pursuant to the Move Out Addendum are violative of the above provision of the Security Deposit Statute. By unlawfully holding the tenants' security deposit monies, JRK has also violated the above provision by failing to return the tenants' security deposit monies within thirty days of termination of the tenancy. (<u>Id</u>.).

The penalty for failing to return a tenant's security deposit within thirty days in violation of section (4)(iii) is JRK's forfeiture to claim any portion of that tenant's security deposit for any reason whatsoever:

(6) **The lessor shall forfeit his right to retain any portion of the security deposit for any reason**, or, in any action by a tenant to recover a security deposit, to counterclaim for any damage to the premises **if he**:

\*\*\*

(e) **fails to return to the tenant the security deposit or balance thereof to which the tenant is entitled after deducting therefrom any sums in accordance with the provisions of this section, together with any interest thereon, within thirty days after termination of the tenancy**.

G. L. c. 186, §15B(6)(e)(emphasis added).

Moreover, not only does JRK forfeit it's right to retain any portion of the tenants' security deposit monies for any reason whatsoever, the Security Deposit Statute mandates that the remedy for the tenant is damages in the amount of three times the *entire* security deposit, plus 5% (five percent) interest from the date of the violation as well as attorney's fees and costs for JRK's violation of G. L. c. 186, §15B(6)(e):

> (7) If the lessor or his agent fails to comply with clauses (a), (d), or (e) of subsection 6, the tenant shall be awarded damages in an amount equal to three times the amount of such security deposit or balance thereof to which the tenant is entitled plus interest at the rate of five per cent from the date when such payment became due, together with court costs and reasonable attorney's fees.

G. L. c. 186, §15B(7).

As an additional claim, the Plaintiffs have alleged that the inclusion of the Move Out Addendum constitutes an unlawful lease provision in violation of section 6(c) of the Security Deposit Statute. That section provides:

> (6) The lessor shall forfeit his right to retain any portion of the security deposit for any reason, or, in any action by a tenant to recover a security deposit, to counterclaim for any damage to the premises if he:
>
> ***
>
> (c) uses in any lease signed by the tenant any provision which conflicts with any provision of this section and attempts to enforce such provision or attempts to obtain from the tenant or prospective tenant a waiver of any provision of this section;

G. L. c. 186, §15B(6)(c). Here, the inclusion of the Move Out Addendum conflicts with the Security Deposit's prohibition on retaining tenants' security deposit funds to remedy wear and tear under section (4)(iii). Again, the penalty for JRK's inclusion of the unlawful lease provision is return of the entirety of the tenants' security deposit. (Id.).

7

Finally, the Plaintiffs have alleged that the above-described conduct by JRK also constitutes per se unfair or deceptive acts or practices in trade or commerce in violation of G. L. c. 93A and as interpreted by the Code of Mass Regs. 3.17(3)(a)(1), (4)(g), (4)(k).

### D. Class Allegations, JRK's Stipulation and 30(b)(6) Testimony

The Plaintiffs have alleged that JRK engages in the above-described practices – withholding security deposit funds to remedy normal wear and tear pursuant to the Move Out Addendum – at all of its six properties in Massachusetts.  The Plaintiffs allege that JRK uses the same Move Out Addendum and cleaning fee policies that the named Plaintiffs were subject to for all of its tenants at all of its properties – approximately 3,000 individual tenancies over the relevant time period.  (See Ex. I).

Indeed, to that end, on June 17, 2021, the Defendants, by stipulation (the "Stipulation"), agreed that any tenant of Stevens Pond or One Webster during the relevant period would have been subject to the same exact lease and Move Out Addendum as Ms. Peebles and Mr. Berger. (See JRK Stipulation attached hereto as **Exhibit J**).  The Stipulation also went on to provide the turnover rates for Stevens Pond and One Webster during the relevant time period. (Id.).

The Stevens Pond complex contains 326 (three hundred and twenty-six) units and the One Webster complex contains 121 (one hundred and twenty-one) units.  (See Property Info Sheets attached hereto as **Exhibit K**).  With a turnover rate of approximately 60%, Stevens Pond would have had approximately 900 (nine hundred) tenancies over the relevant time period.  With a turnover rate of approximately 71%, One Webster would have had approximately 375 (three hundred and seventy-five) tenancies over the relevant time period.

Based on JRK's Stipulation and documents provided in discovery, there are approximately 1,200+ tenants or former tenants of Stevens Pond and One Webster who were

subjected to the same exact above-described unlawful lease provisions and addenda as the named Plaintiffs.

When JRK's other four properties are included, estimating an approximate turnover rate of 65%, there is an additional 1,800+ tenants or former tenants of JRK who the Plaintiffs have alleged were also subjected to the same exact above-described unlawful lease provisions and addenda as the named Plaintiffs and former residents of Stevens Pond and One Webster.

At deposition, JRK's 30(b)(6) deponent, Thomas Manzo ("Manzo"), confirmed and agreed with the Stipulation regarding the shared use of the same lease and Move Out Addendum at Stevens Pond and One Webster.  (See Full Mini Deposition Transcript of Thomas Manzo attached hereto as **Exhibit L** at 33:16-37:5; 46:11-24; 53:7-54:8; 60:4-19).  Further, Manzo agreed that "it would make complete business sense" for JRK to use the same form lease and Move Out Addendum at both of JRK's Stevens Pond and One Webster properties.  (Id. at 64:12-17).

When Manzo was asked whether JRK's properties other than Stevens Pond or One Webster use the same form lease and Move Out Addendum, counsel for the Defendants instructed Manzo not to answer.  (Id. at 65:2-9).  Finally, Manzo admitted that JRK maintains records such that it has the ability to determine the number of times and amounts of security deposit monies were withheld at JRK properties in Massachusetts for carpet cleaning and other cleaning charges during the relevant time period. (Id. at 71:1-74:23).

E. *The Proposed Class(es)*

Plaintiffs seek to certify the following main class of Plaintiffs:

**Current and former tenants of any building owned or managed by JRK in the Commonwealth of Massachusetts during the relevant time period who paid a security deposit and who's lease contained the Move Out Addendum.**

Alternatively, the Plaintiffs would seek to certify any of the following sub-classes:

- Current and former tenants of any building owned or managed by JRK in the Commonwealth of Massachusetts during the relevant time period who paid a security deposit and who's lease contained the Move Out Addendum and who had any portion of their security deposit monies retained by JRK for any reason whatsoever.

- Current and former tenants of any building owned or managed by JRK in the Commonwealth of Massachusetts during the relevant time period who paid a security deposit and who's lease contained the Move Out Addendum and who had any portion of their security deposit monies retained by JRK for "carpet cleaning", "touch-up paint" or to remedy other normal wear and tear.

- Current and former tenants of Stevens Pond and One Webster during the relevant time period who paid a security deposit and who's lease contained the Move Out Addendum and who had any portion of their security deposit monies retained by JRK for any reason whatsoever.

- Current and former tenants of Stevens Pond and One Webster during the relevant time period who paid a security deposit and who's lease contained the Move Out Addendum and who had any portion of their security deposit monies retained by JRK for "carpet cleaning", "touch-up paint" or to remedy other normal wear and tear.

Clearly a class of individuals exists who have been wronged by the above-described conduct of JRK. Indeed, the JRK Stipulation alone creates a certifiable 1,000+ member class of current and former tenants of Stevens Pond and One Webster over the relevant time period. The Plaintiffs, however, seek to certify a class that will provide relief for *all* those who have been wronged by JRK. Fortunately, the law and policy of the Commonwealth are on the Plaintiffs' side in this endeavor.

# ARGUMENT

## I.    The Plaintiffs Meet the Criteria for Certification under Mass. R. Civ. P. 23

A. Courts favor class actions and the burden to establish certification is not high.

Courts interpret Mass. R. Civ. P. 23(a) liberally in favor of the maintenance of class actions. See e.g. Feeney v. Dell, 454 Mass. 192, 200 (Mass. 2009); see also Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 94 (Mass. 2001).

"[T]he plaintiffs 'do not bear the burden of producing evidence sufficient to prove that the requirements [of class certification] have been met,' but need only provide 'information sufficient to enable the motion judge to form a reasonable judgment" that the class meets the relevant requirements." Bellerman v. Fitchburg Gas and Elec. Light Co., 470 Mass. 43, 51-52 (quoting Weld, 434 Mass. at 87). It is reversible error to "[d]eny class status by imposing at the certification stage, the burden of proof that will be required of the plaintiffs at trial." Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 361 (2008).

"If a plaintiff satisfies this certification burden, then neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule." Id. at 363 (quoting Weld, 434 Mass. at 84-85).

B. Courts favor class actions in Security Deposit Statute cases.

Security deposit cases lend themselves to class actions where, as here, damages are easily calculable pursuant to blanket policies and fees applied uniformly to a large group of tenants. There is no shortage of class certification in litigation involving G. L. c. 186, § 15B violations and other lease cases. See e.g. Schaffer v. Grafton Acquisitions, LLC, 1785CV01602-D (Mass.

Super. Ct. Nov. 14, 2019); Ortins v. Lincoln Property Co., 2014CV01122 (Mass. Super. Ct. Oct. 31, 2017); Reniere v. Alpha Management Corp., 2013CV00560 (Mass. Super Ct. Nov. 21, 2014); Perry v. Equity Resident. Mgmt, LLC, 2014 WL 4198850 (D. Mass. Aug. 26, 2014).

C.  The Plaintiffs have met the certification requirement under Rule 23.

Rule 23(a) of the Massachusetts Rules of Civil Procedure provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Mass. R. Civ. P. 23(a).  Additionally, Mass. R. Civ. P. 23(b) provides:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Mass. R. Civ. P. 23(b).

i.  *Numerosity*

Under Rule 23(a)(1), certification is appropriate if the class is so large that joinder of all members is "impracticable."  There is no "magic number" with respect to numerosity, classes as small as 11 have been certified.  See Campbell v. Glodis, 2011 WL 2736502 (Mass. Sup. Ct. May 27, 2011)(Inge, J.).  "Numbers alone do not control.  In assessing numerosity, the court also considers efficiency, limitation on judicial resources, and expenses to the plaintiff."  Id. at *3.

Here, the Plaintiffs have certainly fulfilled the numerosity requirement.  As set out above, the putative class for all JRK buildings is approximately 3,000+ members.  Indeed, the class of Stevens Pond and One Webster tenants JRK has already admitted to via the Stipulation is approximately 1,000+ members on its own.  This undoubtedly fulfills the numerosity

requirement.  See Gammella v. P. F. Chang's Bistro, Inc., 482 Mass. 1, 12 (2019)(reversible error to deny class certification for lack of numerosity where class included "hundreds of employees"); Layes v. RHP Properties, Inc., 95 Mass. App. Ct. 804, 823 (2019)("a class of 240 members is sufficiently numerous to qualify for class treatment").

Moreover, it is clearly more efficient to litigate 3,000 identical claims against the same Defendant in one action than it is to litigate it in 3,000 separate actions.  For those exact same reasons, it is also more judicially efficient and a far less burdensome expense for the putative class tenants to be grouped together in a class action rather than bearing the cost of a lawsuit on their own.

    *ii.*    *Commonality*

Under Rule 23(a)(2), the plaintiff is required to show that there are questions of law or fact common to the class.  A plaintiff satisfies this requirement when the class members have a common interest that arises out of a common relationship to a definite wrong, and all class members have the right to seek the same relief against the defendants. Spear v. H.V. Greene Co., 246 Mass. 259, 266, 140 N.E. 795 (1923).

"It is not essential that the interest of each member of the class be identical in all aspects with that of the plaintiffs." Id. Courts have given "permissive application to the commonality requirements." Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 606, 477 N.E.2d 116 (1985).

Here, the commonality is quite straightforward.  The class claims all arise from JRK's unlawful retention of tenants' security deposit monies to remedy normal wear and tear pursuant to the Move Out Addendum included in every JRK lease.  Quite literally every claim by every proposed class member would be against the same defendant (JRK) for the same violations of G.

L. c. 186, § 15B et seq., and G. L. c. 93A, and seeking the same relief; return of their unlawfully

withheld security deposit monies, trebled, plus statutory interest, costs and attorney's fees.

### iii.    Typicality

Rule 23(a)(3) requires that the claims of the representative parties are typical of the

claims of the class.  "Typicality is established when there is a sufficient relationship between the

injury to the named plaintiff and the conduct affecting the class, and the claims of the named

plaintiff and those of the class are based on the same legal theory."  Weld, 434 Mass. at 87

(internal citations and quotations omitted).

Here, there is a sufficient relationship between the injury to the named Plaintiffs and to

the class.  Ms. Peebles and Mr. Berger's claims, like those of the proposed class, arise out of

JRK's unlawful retention of tenants' security deposit monies.  Ms. Peebles had security deposit

monies deducted to remedy normal wear and tear.  JRK failed to return Mr. Berger's security

deposit monies within 30 days.  Both Ms. Peebles and Mr. Berger's leases contained the

unlawful Move Out Addendum.  JRK treated the named Plaintiffs the same as the proposed class

as every JRK lease included the unlawful Move Out Addendum and JRK mishandled the

security deposit funds of the proposed class pursuant to same.

### iv.    Adequacy

Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the

interests of the class.  To fulfill this requirement "[t]he moving party must show that the interests

of the representative part[ies] will not conflict with the interests of class members, and second,

that counsel chosen by the representative party is qualified, experienced and able to vigorously

conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).

Here, the named plaintiffs have no adverse interests or conflicts with any of the proposed class members or their claims. The named plaintiffs are interested only in seeking relief for themselves and all others who are similarly situated and have suffered similar harm as a result of JRK's conduct.

Finally, the undersigned is qualified and able to vigorously conduct the litigation in the case at bar. The undersigned is a seasoned litigator with over 25 (twenty-five) years of experience, including class action experience specifically in the security deposit/landlord-tenant field and in the consumer protection field more generally. (See Ex. B)

> *v.* *Common Questions Predominate and the Class is Superior to other Methods of Adjudication*

Having made the required showing under Rule 23(a), the Plaintiffs must now satisfy the requirements of Rule 23(b). To certify a class under Rule 23(b), the Plaintiffs must show that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

"Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied." Smilow v. S.W. Bell Mobile Sys. Inc., 323 F.3d 32, 40 (1st Cir. 2003).

Here, all of the common issues regarding liability predominate:

- Did JRK violate the Security Deposit Statute by using tenants' security deposit funds to remedy normal wear and tear?

- Did JRK violate the Security Deposit Statute by failing to return the tenants' security deposit funds within thirty days of the end of the tenancy?

- Did JRK violate the Security Deposit Statute by including the Move Out Addendum in its leases with all its tenants?

- Did JRK violate the Consumer Protection Statute based on the above violations of the Security Deposit Statute?

Each of these claims regards a common legal theory applicable to all members of the class. To the extent the amount of the individual tenants' damages may differ it is of no consequence as the "potential existence of individualized questions on damages does not defeat a predominance finding, as long as there is a sufficient constellation of common issues." Escobar v. Helping Hands Co., 2017 Mass. Super. LEXIS 162 at *14 (quoting Salvas, 452 Mass at 367-68).

Moreover, questions on damages are easily rectified by JRK's records regarding security deposit retention, which it has already admitted that it keeps. Once the base amount retained is established, the rest of the damages are statutorily prescribed in the form of trebling, interest, costs and attorney's fees.

Finally, to determine whether a class action is superior to other methods of adjudication, "requires consideration of the efficiency of the class-action device, the possible expense to the plaintiffs, and the likelihood of judicial economy being served." Id. at *16.

"A class action is the superior method if it will achieve economies of time, effort, and expense and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Further, class actions are superior if each plaintiff's cause of action is the type that allows those plaintiffs to pool claims which would be uneconomical to litigate individually." Lannan v. Levy & White, 186 F. Supp. 3d 77, 90 (D. Mass. 2016)(internal quotations and citations omitted).

Superiority "should be construed in light of the underlying objectives of class actions" and "is intended to be less stringent" than other factors. <u>Smilow</u>, 323 F.3d at 41. It is meant to "vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." <u>Id</u>.

This case is ripe for class adjudication. The vast majority of the tenant class members are individuals of limited means who would be hesitant to take on the cost and burdens associated with suing their current or former landlord. This is the precise type of case that the consumer protection class action was designed to serve. Certifying the class in this case would further the policies of the Commonwealth while serving to deter property owners and managers like JRK from blatantly violating Massachusetts consumer protection laws on a massive scale.

Finally, there is no other practicable way to serve the rights of the class members. Clear numerosity precludes joinder of the thousands of claims or the filing of thousands of separate actions as an alternative to class adjudication. The only way to get full relief for all those aggrieved by JRK's conduct is through a class action.

## II.    **The Plaintiffs Meet the Criteria for Certification under G. L. c. 93A**

As an alternative to the Rule 23 analysis, because JRK's conduct in violating the Security Deposit Statute also constitutes a violation of the Massachusetts Consumer Protection Statute, G. L. c. 93A, the Plaintiffs may use the 93A mechanism for class certification as well.[4]

"To pursue a class action under G. L. c. 93A, plaintiffs must show that the putative class members suffered 'similar,' although not necessarily identical, injuries as a result of the defendant's unfair or deceptive conduct." <u>Bellerman</u>, 470 Mass. at 53.

---

[4] As set out further in the complaint, JRK's violations of the Security Deposit Statute are considered per se unfair or deceptive acts or practices by the Code of Mass Regulations, in violation of c. 93A.

Again, "the plaintiffs 'do not bear the burden of producing evidence sufficient to prove that the requirements [of class certification] have been met," but need only provide 'information sufficient to enable the motion judge to form a reasonable judgment" that the class meets the relevant requirements." Id. at 51-52 (quoting Weld,434 Mass. at 87).

The Traditional "common law class" certification requirements as interpreted under Mass. R. Civ. P. 23 do not apply to class certification pursuant to G. L. c. 93A:

> Although the requirements of rule 23 (a) provide a "useful framework" for considering class certification under G. L. c. 93A, the similarity requirements of the rule do not equate with the requirement of G. L. c. 93A that the plaintiffs be "similarly situated" and have suffered a similar injury as members of the class they seek to represent. The class action provisions of G. L. c. 93A also have "a more mandatory tone" than does rule 23 in that they omit the predominance and superiority elements of rule 23 (b), but a judge retains some discretion to consider these factors in determining whether putative class members are "similarly situated" and have suffered a "similar injury."

Bellerman, 470 Mass. at 53 (citations omitted).

While a judge is afforded broad discretion in allowing or denying class certification, "pursuant to G. L. c. 93A, [a judge's] discretion to deny class certification is tempered by the 'public policy of the Commonwealth [which] strongly favors G. L. c. 93A class actions.'" Bellerman v. Fitchburg Gas and Elec. Light Co., 475 Mass. 67, 71 (2016)(quoting Feeney, 454 Mass. at 200).

In sum, "[i]n considering certification under G. L. c. 93A, a judge must bear in mind the 'pressing need for an effective private remedy' ... and that traditional technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice." Bellerman, 470 Mass. at 52-53 (quoting Aspinall v. Philip Morris Cos., 442 Mass. 381,442 (2004) (quoting Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 605-606 (1985)).

Here, quite clearly, the proposed class and named plaintiffs are similarly situated and have suffered a similarly injury: they are all tenants or former tenants of JRK who paid a security deposit and had their security deposit monies unlawfully retained by JRK in violation of the Massachusetts Security Deposit Statute, which is also unfair or deceptive conduct in violation of c. 93A. They seek the same relief -- return of the unlawfully withheld security deposit monies with any applicable statutory trebling, interest, costs and attorney's fees – from the same Defendant; JRK.

## **CONCLUSION**

For all of the reasons stated herein, the Plaintiffs have met all of the criteria for class certification under both Rule 23 of the Massachusetts Rules of Civil Procedure as well as G. L. c. 93A. The Plaintiffs respectfully request that this court ALLOW the instant Motion for Class Certification and certify a class of Plaintiffs as defined above to the Court's satisfaction.

BRANDA PEEBLES & JOSHUA
BERGER, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,
By their Attorneys,

/s/ *Keith L. Sachs*

Keith L. Sachs (BBO# 634025)
Shaun M. Khan (BBO# 681080)
DDSK Law LLC
900 Cummings Center
Suite 210-U
Beverly, MA 01915
P: (978) 338-6620
F: (978) 338-6621
ksachs@ddsklaw.com
skhan@ddsklaw.com

Dated:        February 28, 2023

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was sent electronically on this date to counsel of record at the following:

Thomas Wintner: twintner@mintz.com
Mathilda McGee-Tubb: MSMcGee-Tubb@mintz.com

Dated: February 28, 2023

/s/ *Keith L. Sachs*

# EXHIBIT A

# Secretary of the Commonwealth of Massachusetts

William Francis Galvin

# Business Entity Summary

**ID Number: 001170973**

| Request certificate | New search |
|---|---|

**Summary for:  JRK PROPERTY HOLDINGS, INC.**

| **The exact name of the Foreign Corporation:**  JRK PROPERTY HOLDINGS, INC. |
|---|
| **Entity type:**  Foreign Corporation |
| **Identification Number:** 001170973 |
| **Date of Registration in Massachusetts:** 04-28-2015 |
| **Last date certain:** |
| **Organized under the laws of: State:** CA **Country:** USA **on:** 09-13-1991 |
| **Current Fiscal Month/Day:** 12/31 |
| **The location of the Principal Office:** Address:  11766 WILSHIRE BLVD., STE. 1500  City or town, State, Zip code,    LOS ANGELES,  CA   90025   USA  Country: |
| **The location of the Massachusetts office, if any:** Address:  City or town, State, Zip code, Country: |
| **The name and address of the Registered Agent:** Name:   NATIONAL REGISTERED AGENTS, INC.  Address:  155 FEDERAL ST., STE 700  City or town, State, Zip code,    BOSTON,  MA   02110   USA  Country: |
| **The Officers and Directors of the Corporation:** |

| Title | Individual Name | Address |
|---|---|---|
| PRESIDENT | DANIEL LIPPMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| CEO | ROBERT LEE | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| GENERAL COUNSEL | JAMES BAUMANN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |

| DIRECTOR | DANIEL LIPPMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
|---|---|---|
| DIRECTOR | JAMES LIPPMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| DIRECTOR | MATTHEW LIPPMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| DIRECTOR | ALEXANDRA LANDY | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |

**Business entity stock is publicly traded:**

**The total number of shares and the par value, if any, of each class of stock which this business entity is authorized to issue:**

| | | Total Authorized | | Total issued and outstanding |
|---|---|---|---|---|
| Class of Stock | Par value per share | No. of shares | Total par value | No. of shares |
| | | | | |

|  Consent | Confidential Data | Merger Allowed | Manufacturing |
|---|---|---|---|

**View filings for this business entity:**

ALL FILINGS
Amended Foreign Corporations Certificate
Annual Report
Annual Report - Professional
Application for Reinstatement

**View filings**

**Comments or notes associated with this business entity:**

**New search**

**Secretary of the Commonwealth of Massachusetts**

William Francis Galvin

# Business Entity Summary

**ID Number: 001112365**     [ Request certificate ]     [ New search ]

**Summary for:  TEWKSBURY APARTMENTS PROPERTY OWNER LLC**

| |
|---|
| **The exact name of the Foreign Limited Liability Company (LLC):**  TEWKSBURY APARTMENTS PROPERTY OWNER LLC |
| **The name was changed from: DSF IV TEWKSBURY OWNER LLC on** 08-18-2017 |
| **Entity type:**  Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001112365 |
| **Date of Registration in Massachusetts:** 07-22-2013 |
| **Last date certain:** |
| **Organized under the laws of: State: DE Country: USA on: 06-03-2013** |
| **The location of the Principal Office:** <br><br> Address:  11766 WILSHIRE BLVD., STE. 1500 <br><br> City or town, State, Zip code,     LOS ANGELES,  CA  90025  USA Country: |
| **The location of the Massachusetts office, if any:** <br><br> Address: <br><br> City or town, State, Zip code, Country: |
| **The name and address of the Resident Agent:** <br><br> Name:   NATIONAL REGISTERED AGENTS, INC. <br><br> Address:  155 FEDERAL ST., STE <br><br> City or town, State, Zip code,     BOSTON,  MA  02110  USA Country: |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
| MANAGER | TEWKSBURY APARTMENTS REIT LLC | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|-------|-----------------|---------|
| REAL PROPERTY | DANIEL LIPPMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | JAMES BAUMANN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | JAMES LIPPMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | MATTHEW LIPPMAN | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | ROBERT LEE | 11766 WILSHIRE BLVD., STE. 1500 LOS ANGELES, CA 90025 USA |

☐ **Consent**    ☐ **Confidential Data**    ☐ **Merger Allowed**    ☐ **Manufacturing**

**View filings for this business entity:**

ALL FILINGS
Annual Report
Annual Report - Professional
Application For Registration
Certificate of Amendment

**View filings**

**Comments or notes associated with this business entity:**

**New search**

## Secretary of the Commonwealth of Massachusetts

William Francis Galvin

# Business Entity Summary

**ID Number: 001140015**     [ Request certificate ]     [ New search ]

**Summary for:  ONE WEBSTER APARTMENTS PROPERTY OWNER LLC**

| |
|---|
| **The exact name of the Foreign Limited Liability Company (LLC):**  ONE WEBSTER APARTMENTS PROPERTY OWNER LLC |
| **Entity type:**  Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001140015 |
| **Date of Registration in Massachusetts:** 06-23-2014 |
| **Last date certain:** |
| **Organized under the laws of: State:** DE **Country:** USA **on:** 06-06-2014 |
| **The location of the Principal Office:** |
| Address: 11766 WILSHIRE BLVD. STE. 1500 |
| City or town, State, Zip code,      LOS ANGELES,   CA   90025   USA Country: |
| **The location of the Massachusetts office, if any:** |
| Address: |
| City or town, State, Zip code, Country: |
| **The name and address of the Resident Agent:** |
| Name:    NATIONAL REGISTERED AGENTS, INC. |
| Address: 155 FEDERAL ST., STE 700 |
| City or town, State, Zip code,      BOSTON,   MA   02110   USA Country: |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
| | | |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|---|---|---|

| REAL PROPERTY | JAY SCHULMAN | 11766 WILSHIRE BLVD. STE. 1500 LOS ANGELES, CA 90025 USA |
|---|---|---|

☐ **Consent**    ☐ **Confidential Data**    ☐ **Merger Allowed**    ☐ **Manufacturing**

**View filings for this business entity:**

> ALL FILINGS
> Annual Report
> Annual Report - Professional
> Application For Registration
> Certificate of Amendment
> Certificate of Cancellation

**[ View filings ]**

**Comments or notes associated with this business entity:**

**[ New search ]**

## Secretary of the Commonwealth of Massachusetts

William Francis Galvin

# Business Entity Summary

**ID Number: 001142364**

[ Request certificate ]    [ New search ]

**Summary for:  STEVENS POND APARTMENTS PROPERTY OWNER LLC**

| |
|---|
| **The exact name of the Foreign Limited Liability Company (LLC):** STEVENS POND APARTMENTS PROPERTY OWNER LLC |
| **Entity type:** Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001142364 |
| **Date of Registration in Massachusetts:** 07-22-2014 |
| **Last date certain:** |
| **Organized under the laws of: State:** DE **Country:** USA **on:** 07-11-2014 |
| **The location of the Principal Office:** Address: 11766 WILSHIRE BLVD. STE. 1500  City or town, State, Zip code, Country:  LOS ANGELES,  CA  90025  USA |
| **The location of the Massachusetts office, if any:** Address:  City or town, State, Zip code, Country: |
| **The name and address of the Resident Agent:** Name:  NATIONAL REGISTERED AGENTS, INC.  Address: 155 FEDERAL ST., STE 700  City or town, State, Zip code, Country:  BOSTON,  MA  02110  USA |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
| | | |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|---|---|---|
| | | |

| REAL PROPERTY | JAY SCHULMAN | 11766 WILSHIRE BLVD. STE. 1500 LOS ANGELES, CA 90025 USA |
|---|---|---|

| ☐ Consent | ☐ Confidential Data | ☐ Merger Allowed | ☐ Manufacturing |
|---|---|---|---|

**View filings for this business entity:**

```
ALL FILINGS                                                    ▲
Annual Report
Annual Report - Professional
Application For Registration
Certificate of Amendment
Certificate of Cancellation                                   ▼
```

**View filings**

**Comments or notes associated with this business entity:**

**New search**

## Secretary of the Commonwealth of Massachusetts

William Francis Galvin

# Business Entity Summary

**ID Number: 001354790**                  [Request certificate]    [New search]

**Summary for: CABOT CROSSING APARTMENTS PROPERTY OWNER LLC**

| |
|---|
| **The exact name of the Foreign Limited Liability Company (LLC):** CABOT CROSSING APARTMENTS PROPERTY OWNER LLC |
| **Entity type:** Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001354790 |
| **Date of Registration in Massachusetts:** 11-13-2018 |
| **Last date certain:** |
| **Organized under the laws of: State:** DE **Country:** USA **on:** 11-08-2018 |
| **The location of the Principal Office:** |
| Address: 11766 WILSHIRE BLVD., STE 1500 |
| City or town, State, Zip code,      LOS ANGELES,   CA   90025   USA Country: |
| **The location of the Massachusetts office, if any:** |
| Address: |
| City or town, State, Zip code, Country: |
| **The name and address of the Resident Agent:** |
| Name:   NATIONAL REGISTERED AGENTS, INC. |
| Address: 155 FEDERAL STREET, SUITE 700 |
| City or town, State, Zip code,      BOSTON,   MA   02110   USA Country: |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
| | | |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|---|---|---|
| | | |

| REAL PROPERTY | JOHN MCKEE | 11766 WILSHIRE BLVD., STE 1500 LOS ANGELES, CA 90025 USA |
| --- | --- | --- |
| REAL PROPERTY | JAMES LIPPMAN | 11766 WILSHIRE BLVD., STE 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | ROBERT LEE | 11766 WILSHIRE BLVD., STE 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | MATTHEW LIPPMAN | 11766 WILSHIRE BLVD., STE 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | DANIEL LIPPMAN | 11766 WILSHIRE BLVD., STE 1500 LOS ANGELES, CA 90025 USA |

| ☐ Consent | ☐ Confidential Data | ☐ Merger Allowed | ☐ Manufacturing |
| --- | --- | --- | --- |

**View filings for this business entity:**

ALL FILINGS
Annual Report
Annual Report - Professional
Application For Registration
Certificate of Amendment
Certificate of Cancellation

**View filings**

**Comments or notes associated with this business entity:**

**New search**

## Secretary of the Commonwealth of Massachusetts

William Francis Galvin

# Business Entity Summary

**ID Number: 001116611**

Request certificate     New search

**Summary for:  ROYAL CREST APARTMENTS PROPERTY OWNER LLC**

| |
|---|
| **The exact name of the Foreign Limited Liability Company (LLC):** ROYAL CREST APARTMENTS PROPERTY OWNER LLC |
| **Entity type:**  Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001116611 |
| **Date of Registration in Massachusetts:** 09-18-2013 |
| **Last date certain:** |
| **Organized under the laws of: State:** DE **Country:** USA **on:** 09-13-2013 |
| **The location of the Principal Office:** Address:  11766 WILSHIRE BLVD., SUITE 1500  City or town, State, Zip code, Country:     LOS ANGELES,   CA   90025   USA |
| **The location of the Massachusetts office, if any:** Address:  City or town, State, Zip code, Country: |
| **The name and address of the Resident Agent:** Name:    NATIONAL REGISTERED AGENTS, INC.  Address:  155 FEDERAL ST., SUITE 700  City or town, State, Zip code, Country:     BOSTON,   MA   02110   USA |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
| MANAGER | JRK MF OPPORTUNITIES I L.P. | 11766 WILSHIRE BLVD., SUITE 1500 LOS ANGELES, CA 90025 USA |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|---|---|---|

| REAL PROPERTY | ROBERT LEE | 11766 WILSHIRE BLVD., SUITE 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | DANIEL LIPPMAN | 11766 WILSHIRE BLVD., SUITE 1500 LOS ANGELES, CA 90025 USA |

|  | Consent | ☐ **Confidential Data** | ☐ **Merger Allowed** | ☐ **Manufacturing** |

**View filings for this business entity:**

> ALL FILINGS
> Annual Report
> Annual Report - Professional
> Application For Registration
> Certificate of Amendment
> Certificate of Cancellation

[ View filings ]

**Comments or notes associated with this business entity:**

[ New search ]

**Secretary of the Commonwealth of Massachusetts**

William Francis Galvin

# Business Entity Summary

**ID Number: 001224319**

Request certificate New search

**Summary for:  ESSEX APARTMENTS PROPERTY OWNER LLC**

| |
|---|
| **The exact name of the Foreign Limited Liability Company (LLC):**  ESSEX APARTMENTS PROPERTY OWNER LLC |
| **Entity type:**  Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001224319 |
| **Date of Registration in Massachusetts:** 05-20-2016 |
| **Last date certain:** |
| **Organized under the laws of: State:** DE **Country:** USA **on:** 05-17-2016 |
| **The location of the Principal Office:** <br><br> Address:  11766 WILSHIRE BLVD., STE 1500 <br><br> City or town, State, Zip code,      LOS ANGELES,   CA   90025   USA <br> Country: |
| **The location of the Massachusetts office, if any:** <br><br> Address: <br><br> City or town, State, Zip code, <br> Country: |
| **The name and address of the Resident Agent:** <br><br> Name:    NATIONAL REGISTERED AGENTS, INC. <br><br> Address:  155 FEDERAL ST., STE 700 <br><br> City or town, State, Zip code,      BOSTON,   MA   02110   USA <br> Country: |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
| | | |
| | | |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|---|---|---|
| | | |

| REAL PROPERTY | JAMES LIPPMAN | 11766 WILSHIRE BLVD., STE 1500 LOS ANGELES, CA 90025 USA |
|---|---|---|
| REAL PROPERTY | ROBERT LEE | 11766 WILSHIRE BLVD., STE 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | DANIEL LIPPMAN | 11766 WILSHIRE BLVD., STE 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | MATTHEW LIPPMAN | 11766 WILSHIRE BLVD. STE. 1500 LOS ANGELES, CA 90025 USA |
| REAL PROPERTY | JAMES BAUMANN | 11766 WILSHIRE BLVD. STE. 1500 LOS ANGELES, CA 90025 USA |

| ☐ Consent | ☐ Confidential Data | ☐ Merger Allowed | ☐ Manufacturing |
|---|---|---|---|

**View filings for this business entity:**

ALL FILINGS
Annual Report
Annual Report - Professional
Application For Registration
Certificate of Amendment
Certificate of Cancellation

**View filings**

**Comments or notes associated with this business entity:**

**New search**

# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                               BUS. LIT. SESSION
                                               CIVIL ACTION NO.
                                               SUCV2019-03714-BLS1

---

|                                              |   |
|----------------------------------------------|---|
| BRANDA PEEBLES and JOSHUA                     | ) |
| BERGER, Individually, and on BEHALF          | ) |
| OF ALL OTHERS SIMILARLY                       | ) |
| SITUATED,                                     | ) |
|     Plaintiffs,          | ) |
|                                              | ) |
| vs.                                          | ) |
|                                              | ) |
| JRK PROPERTY HOLDINGS, INC.,                 | ) |
| STEVENS POND APARTMENTS                       | ) |
| PROPERTY OWNER, LLC, and ONE                  | ) |
| WEBSTER APARTMENTS                            | ) |
| PROPERTY OWNER, LLC,                          | ) |
|     Defendants.          | ) |

---

## ATTORNEY KEITH L. SACHS'S AFFIDAVIT IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Keith L. Sachs, on oath do depose and state as follows:

1. I am over the age of eighteen and base this affidavit on my personal knowledge, my firm's records in this matter, and other information/documents which I believe to be true and accurate.

2. I am counsel for the Plaintiffs Branda Peebles and Joshua Berger, Individually, and on Behalf of All Others Similarly Situated.

3. I am admitted to practice law and remain in good standing before the Supreme Judicial Court (1996), the United States District Court for the District of Massachusetts (1998), and the United States Court of Appeals for the First Circuit (2007).

4.  In January 2019 I, along with other partners, founded the law firm, DDSK Law, LLC ("DDSK"), in Beverly, Massachusetts.

5.  Prior to opening DDSK, I was employed by Metaxas Brown Pidgeon ("MBP") in Beverly, Massachusetts, from December 2006 through December 2019.

6.  I was a law clerk to the Justices of the Massachusetts Superior Court from September 1996 through August 1997, and thereafter practiced civil litigation in Boston, Massachusetts, until joining MBP in 2006.

7.  My current practice focuses primarily on commercial and general civil litigation matters, including class matters, and I regularly appear before the District and Superior Courts of Massachusetts, as well as the Federal District Court for the District of Massachusetts.

8.  Over the years I have represented both tenants and landlords in the Housing, District, and Superior Courts of the Commonwealth of Massachusetts.

9.  I have been involved as co-counsel in three previous Class Actions with my prior firm, MBP, and am familiar with the workings of Rule 23, as well as the topic at hand in this matter under G. L. c. 186, §15B.

10. My firm is able to devote both attorney time and expense resources to this matter.

11. Attached to Plaintiffs' memorandum are Exhibits A-L.

12. Attached as Exhibit A are true and accurate copies of documents downloaded from the Secretary of The Commonwealth's website (https://www.sec.state.ma.us/) regarding all six Properties at issue in Plaintiffs' motion.

13. Attached as Exhibit B is this affidavit.

14. Exhibits C-G are true and accurate copies of the documents they purport to be which were produced by the Defendant.

15. Attached as Exhibit H is a true and accurate copy of the 93A demand letter sent to Defendants.

16. Attached as Exhibit I is a true and accurate copy of the complaint filed in this action.

17. Exhibits J-K are true and accurate copies of the documents they purport to be which were produced by the Defendant.

18. Attached as Exhibit L is a true and accurate copy of the deposition transcript of the Defendants' 30(b)(6) designee, Thomas Manzo.

19. The contents of footnote 3 in Plaintiffs' memorandum states that JRK has management/ultimate ownership of the of the following number of units in the Commonwealth:

    a.  246 units at the Residences at Tewksbury;

    b.  121 units at One Webster;

    c.  326 units at Stevens Pond;

    d.  154 units at Essex Apartment Homes;

    e.  24 units at Royal Crest Estates

    f.  252 units at Cabot Crossing (for a total of 1,123 units)

20. The information regarding the number of units regarding One Webster and Stevens Pond was taken from Exhibit J.

21. The information for the number of units at the Residences at Tewksbury, Essex Apartment Homes, Royal Crest Estates, and Cabot Crossing were obtained by my online research of property card records, registry of deeds records, and news articles.

22. I believe the number of units for the Residences at Tewksbury, Essex Apartment Homes, Royal Crest Estates, and Cabot Crossing to be accurate.

Signed under the pains and penalties of perjury this 28th day of February 2022.

*/s/ Keith L. Sachs*

Keith L. Sachs

# EXHIBIT C



**Apartment Lease Contract**

Date of Lease Contract: **August 17, 2017**
(when the Lease Contract is filled out)

*This is a binding document. Read carefully before signing.*

## Moving In — General Information

**1. PARTIES.** This Lease Contract is between you, the resident(s) (*list all people signing the Lease Contract*):

**Branda Peebles, Brian Twomey**

and as the owner:

**Stevens Pond Apartments Property Owner LLC**

(*name of apartment community or title holder*). You've agreed to rent Apartment No. **4723** , at **4723 Scotts Mill Court** (*street address*)
in **Saugus** (*city*), Massachusetts,
**01906** (*zip code*) for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached. Unless otherwise agreed to by both parties in writing, all residents listed shall use the apartment as their primary residence during the term of the Lease.

**2. OCCUPANTS.** The apartment will be occupied only by you and (*list all other occupants who are under 18 and not required to sign the Lease*):

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than _____**7**_____ consecutive days without our prior written consent, and no more than twice that many days in any one month. *If the previous space isn't filled in, two days per month is the limit.*

**3. LEASE TERM.** The initial term of the Lease Contract begins on the **19th** day of **August** , **2017** , and ends at midnight the **18th** day of **August** , **2018** . If the landlord serves a notice of non-renewal at least thirty (30) days prior to the expiration of the initial term, OR the tenant serves a notice to vacate at least sixty (60) days prior to the expiration of the initial term, this Lease Contract will automatically renew on (*check one*):

☒ a month-to-month basis ("Extended Term"), terminable upon thirty (30) days written notice as required by paragraph 33. The monthly rental rate for any Extended Term will be the market rate (at the time of the applicable extension) for a comparable apartment in the development plus a month-to-month premium of **250.00** .

☐ successive terms of _____ months ("Extended Term"), unless the landlord serves a notice of non-renewal at least thirty (30) days prior to the expiration of any successive term, OR the tenant serves a notice to vacate at least sixty (60) days prior to the expiration of any successive term. The monthly rental rate for the Extended Term will be the market rate (at the time of the applicable extension) for a comparable apartment in the development plus a month-to-month premium of _____.

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ **500.00** , due on or before the date this Lease Contract is signed. If we request the last month's rent from you along with the security deposit, we will comply with the requirements of G.L. c. 186 §15B (2). See paragraphs 37 and 38 for security deposit return information.

**5. KEYS AND FURNITURE.** You will be provided **2** apartment key(s), **2** mailbox key(s), and _____ other access devices for **Club House** . Your apartment will be (*check one*):
☐ furnished or ☒ unfurnished

☐ (*check if applicable*) Each person who is 18 years of age or older AND listed as a resident on the lease will be given a FOB for access to the building and amenities, at no cost to use during his or her tenancy. If the FOB is lost, stolen or damaged a fee will be charged for a replacement. If the FOB is not returned or is returned damaged when you move out, there may be a deduction from the security deposit or damage charge for the replacement and/or repair of same.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ **1960.00** per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☐ at _____

Prorated rent of $ **784.00** is due for the remainder of the first month, on **August 19** , **2017** (*year*). Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. If you don't pay all rent on or before 30 days after the first of the month, you'll pay a late charge of $ **196.00** . You'll also pay a charge of $ **75.00** for each returned check or rejected electronic payment. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. Notwithstanding any memo or reference on payments remitted by you, we may, but are not required to, apply payments by you to the oldest outstanding amount(s) due on your resident ledger.

**7. UTILITIES.** We'll pay for the following items, if checked:
☐ gas            ☐ electricity       ☐ master antenna
☒ trash         ☐ cable TV         ☐ other _____
☐ heat          ☐ water

You'll pay for all other utilities, related deposits, and any charges, fees, or services on such utilities and are responsible for transferring those utilities into your name upon your possession. However, we will pay for all utilities we are required to pay for under Massachusetts law, unless this Lease Contract provides otherwise. You must ask what utilities to be disconnected for any reason—including disconnection for not paying your bill—until the lease term or renewal period ends. Cable channels that are provided may be changed during the Lease Contract term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-powered lighting. If water/sewer utilities are sub-metered for the apartment, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance.

**8. INSURANCE.** Except as required by state law, we do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless due to owner's omission, fault, negligence, or misconduct.

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.

Additionally, you are (*check one*) ☒ required to purchase personal liability insurance ☐ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance is a breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law. If you are required to purchase personal liability insurance you must provide evidence of coverage at lease inception, and must confirm an active policy upon request by owner at any time during the term of the Lease. SUBJECT TO APPLICABLE LAW, THE LANDLORD WILL PROVIDE INSURANCE FOR UP TO $750 IN BENEFITS TO COVER THE ACTUAL COSTS OF RELOCATION OF THE TENANT IF DISPLACED BY FIRE OR DAMAGE RESULTING FROM FIRE.

**9. SECURITY DEVICES. What We Must Provide.** When occupancy begins we will provide you with (1) an operating locking device on your door; and, (2) an operating locking device on every openable exterior window. Keyed locks will be re-keyed after the prior resident moves out and changed accordingly. The rekeying will be done either before you move in or within 7 days after you move in. You may not duplicate any

Branda Peebles, Brian Twomey

© 2016, National Apartment Association, Inc. - 4/2016, Massachusetts

0817201706910 1MA07111350

Page 1 of 6

JRK0000052

CONFIDENTIAL



08/17/17 00:23 PM
*Branda L Peebles*
Primary-ID: 12207090
IP:98.237.241.192 | 05 m 00 s on page



08/17/17 04:17 PM
*Brian J Twomey*
Co-Applicant-ID: 12207111
IP:50.202.185.2 | 00 m 03 s on page

08/18/17 11:42 AM
*Katelyn Szekely*
Owner/Manager
IP:73.123.193.184

# EXHIBIT D

MOVE OUT CLEANING & REPLACEMENT CHARGES

RESIDENT NAME(S): Branda Peebles and Brian Twomey    APT. #: 4723

Painting of walls – one coat (Other than damage or heavy smoke)
Shampooing of carpets (Other than stains, heavy soil, and pet damage)

Resident is required to have the apartment professionally cleaned and carpet cleaned upon move out. If the apartment is not returned to us in this condition the following charges will be applied.

| | ONE BEDROOM | TWO BEDROOM | THREE BEDROOM | THREE BEDROOM TOWNHOME |
|---|---|---|---|---|
| PAINTING (PER COAT) | $300.00 | $400.00 | $475.00 | $600.00 |
| CARPET CLEANING | $80.00 | $90.00 | $110.00 | $175.00 |
| TOUCH-UP PAINT | $150.00 | $200.00 | $237.50 | $300.00 |
| APARTMENT CLEAN | $80.00 | $90.00 | $110.00 | $175.00 |

The following charges will be assessed regardless of how long resident occupies the apartment.

### REPLACEMENTS (flat charge):

| | | | |
|---|---|---|---|
| Bathtub/Shower Resurface | $ 315.00 | Oven Rack - each | $ 20.00 |
| Blinds (Mini-blind) - each | $ 40.00 | Peep Holes, partial | $ 10.00 |
| Blinds (Vertical) - each | $ 100.00 | Peep Holes, complete | $ 20.00 |
| Broiler Pan | $ 25.00 | Refrigerator Crisper Tray - each | $ 40.00 |
| Carpet Repairs - each | $ 20.00 | Refrigerator Ice Trays (set of 2) | $ 2.00 |
| Carpet Replacement | Actual Cost | Screens (Patio Door) | $ 50.00 |
| Closet Rod - each | $ 25.00 | Screen (Window) - each | $ 35.00 |
| Counter (Bathroom) | Actual Cost | Shower Doors | Actual Cost |
| Counter (Kitchen) | Actual Cost | Shower Head | $ 10.00 |
| Counter Resurface (Bathroom) - each | $ 50.00 | Smoke Detector/Alarm - each | $ 15.00 |
| Counter Resurface (Kitchen) - each | $ 90.00 | Smoke Detector/Battery - each | $ 4.00 |
| Door (Bifold) - each | $ 90.00 | Stove Burner - each | $ 25.00 |
| Door (Exterior) | $ 176.00 | Stove Burner Rings - each | $ 5.00 |
| Door (Interior) - each | $ 85.00 | Stove Drip Pan 8" - each | $ 10.00 |
| Draperies - each | $ 30.00 | Stove Drip Pan 6" - each | $ 8.00 |
| Drywall Repairs - per hour | $ 35.00 | Switch Plates/Sockets - each | $ 2.00 |
| Extermination (Special) - per visit | $ 40.00 | Toilet | $ 125.00 |
| Faucets (Bath/Kitchen) - each | $ 30.00 | Toilet Seat - each | $ 25.00 |
| Garage Door - panel | $ 100.00 | Towel Bars - each | $ 10.00 |
| Garage Door Opener (Remote) | $ 75.00 | Vinyl Repairs - each | $ 15.00 |
| Garbage Disposal | $ 85.00 | Vinyl Replacement | Actual Cost |
| Keys (Door) - each | $ 10.00 | Wallpaper Removal - per hour | $ 25.00 |
| Keys (Mailbox) - each | $ 15.00 | Window (Broken) | Actual Cost |
| Light bulbs - each | $ 1.00 | OTHER | |
| Light Fixture/Ceiling Fan - each | $ 45.00 | OTHER | |
| Light Globes - each | $ 10.00 | OTHER | |
| Lock & Deadbolt (Door) | $ 55.00 | OTHER | |
| Lock (Mailbox) | $ 20.00 | OTHER | |
| Medicine Cabinet | Actual Cost | OTHER | |
| Mirror (Bathroom) | Actual Cost | OTHER | |

### CLEANING CHARGES:

| | | | |
|---|---|---|---|
| Air Vents/Exhaust Fans - each | $ 5.00 | Range Top | $ 15.00 |
| Balcony/Patio | $ 10.00 | Refrigerator | $ 25.00 |
| Bathtub - each | $ 10.00 | Shower Wall Tile | $ 15.00 |
| Cabinets (Kitchen) | $ 10.00 | Sink (Kitchen/Bath) - each | $ 5.00 |
| Cabinets (Bathroom) | $ 5.00 | Switch Plates - each | $ 1.00 |
| Closet Shelves - each | $ 3.00 | Toilet - each | $ 20.00 |
| Counters | $ 5.00 | Trash Removal - per bag | $ 10.00 |
| Dishwasher | $ 10.00 | Vacuum Carpet - per room | $ 5.00 |
| Doors/Frames - each | $ 5.00 | Vent Hood | $ 10.00 |
| Faucets (Kitchen/Bath) - each | $ 2.00 | Walls (Wash) - each | $ 5.00 |
| Fireplace | $ 20.00 | Washer/Dryer | $ 10.00 |
| Floors (Kitchen/Bath) - each | $ 15.00 | Windows - each | $ 5.00 |
| Heat Registers - each | $ 6.00 | OTHER | |
| Light Fixtures - each | $ 2.00 | OTHER | |
| Medicine Cabinets - each | $ 2.00 | OTHER | |
| Mirrors - each | $ 2.00 | OTHER | |
| Oven | $ 25.00 | OTHER | |
| Patio Sliding Door | $ 5.00 | OTHER | |

Nothing herein shall be construed as a limitation on Agent's right to pursue Resident for damages and/or additional cleaning not specifically listed hereon. This document will be attached to the Inventory and Condition Form, and become part of that document upon vacating.

Resident Signature(s) _____    Date _____

Agent for Owner _____    Date _____

08/17/17 04:18 PM
*Branda L Peebles*
Primary-ID: 12207080
IP 50.202.195.2 | 00 m 09 s on page

08/17/17 11:03 PM
*Brian J Twomey*
Co-Applicant-ID: 12207111
IP 96.237.241.192 | 00 m 09 s on page

08/18/17 11:43 AM
*Katelyn Szekely*
Owner/Manager
IP 73.123.193.184

JRK0000078

CONFIDENTIAL

# EXHIBIT E

**From:**
**Accounts**

Stevens Pond
1 Founders' Way
Saugus, MA 01906

**Statement of Security Deposit**

Aug 23, 2018

Account: 01-4723

**To:**

Branda L. Peebles
119 Thoreau Way #632
Lawrence, MA 01843

**Residents:**

Branda L. Peebles
Brian J. Twomey

| **Agreement:** | | | **Monthly Charges:** | |
|---|---|---|---|---|
| Lease begins | 08/19/17 | | | SECOND FLOOR |
| Lease ends | 08/18/18 | | | 20.00 |
| Move-in | 08/19/17 | | | GLOBAL FEE |
| Notice | 06/02/18 | | | 20.00 |
| Move-out | 08/18/18 | | | POOL/POND VIEW |

| | | | |
|---|---|---|---|
| On Hand: | SECDP* | | 1.29 |
| | SECURITY DEPOSIT | | 500.00 |
| | | | ------------ |
| | | | 501.29 |
| Balances Due: | UTILITY BILLING | | 44.76 |
| | | | ------------ |
| | | | 44.76 |
| New Charges: | Touch Up Paint | | 50.00 |
| | Carpet Clean per Lease | | 65.00 |
| | | | ------------ |
| | | | 115.00 |

| **Summary:** | | |
|---|---|---|
| | Total Deposits | 501.29 |
| | Total Prepaid | 0.00 |
| | Applied to Due | 44.76 |
| | Applied to Other | 115.00 |
| | | ------------ |
| | Refunded | 341.53 |
| | | ------------ |
| | Due Property | 0.00 |

If you should have any questions regarding this statement, please contact our office. The Leasing Office phone number is 781-231-1901.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY,

_____
Landlord
Thank you.

JRK0000083

# EXHIBIT F

## Apartment Lease Contract

**NATIONAL APARTMENT ASSOCIATION**

Date of Lease Contract: __July 21, 2018__
(when the Lease Contract is filled out)

*This is a binding document. Read carefully before signing.*

### Moving In — General Information

1. **PARTIES.** This Lease Contract is between *you*, the resident(s) (*list all people signing the Lease Contract*):
__Joshua Berger, Tressa Ellis__

and *us*, the owner:
__One Webster__

(*name of apartment community or title holder*). You've agreed to rent Apartment No. __302__, at __1 Webster Ave, #302__
(*street address*)
in __Chelsea__ (*city*), Massachusetts,
__02150__ (*zip code*) for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors' in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor is attached. Unless otherwise agreed to by both parties in writing, all residents listed shall use the apartment as their primary residence during the term of the Lease.

2. **OCCUPANTS.** The apartment will be occupied only by you and (*list all other occupants who are under 18 and not required to sign the Lease*):

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than _____ consecutive days without our prior written consent, and no more than twice that many days in any one month. *If the previous space isn't filled in, two days per month is the limit.*

3. **LEASE TERM.** The initial term of the Lease Contract begins on the __31st__ day of __August__, __2018__, and ends at midnight the __1st__ day of __November__, __2019__. Unless the landlord serves a notice of non-renewal at least thirty (30) days prior to the expiration of the initial term, OR the tenant serves a notice to vacate at least sixty (60) days prior to the expiration of the initial term, this Lease Contract will automatically renew on (*check one*):

☒ a month-to-month basis ("Extended Term"), terminable upon thirty (30) days written notice as required by paragraph 33. The monthly rental rate for any Extended Term will be the market rate (at the time of the applicable extension) for a comparable apartment in the development plus a month-to-month premium of __300.00__.

☐ successive terms of _____ months ("Extended Term"), unless the landlord serves a notice of non-renewal at least thirty (30) days prior to the expiration of any successive term, OR the tenant serves a notice to vacate at least sixty (60) days prior to the expiration of any successive term. The monthly rental rate for the Extended Term will be the market rate (at the time of the applicable extension) for a comparable apartment in the development plus a month-to-month premium of _____.

4. **SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $__1000.00__, due on or before the date this Lease Contract is signed. If we request the last month's rent from you along with the security deposit, fill in the amount in compliance with the requirements of G.L.c 186 ¶ 15B (2). See paragraphs 37 and 38 for security deposit return information.

5. **KEYS AND FURNITURE.** You will be provided __2__ apartment key(s), __2__ mailbox key(s), and _____ other access devices for __Key Card__. Your apartment will be (*check one*):
☐ furnished or ☒ unfurnished.

☐ (*check if applicable*) Each person who is 18 years of age or older AND listed as a resident on the lease will be given a FOB for access to the building and amenities, at no cost to use during his or her tenancy. If the FOB is lost, stolen or damaged a fee will be charged for a replacement. If the FOB is not returned or is returned damaged when you move out, there may be a deduction from the security deposit or damage charge for the replacement or repair of same.

6. **RENT AND CHARGES.** Unless modified by addenda, you will pay $__1854.00__ per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☐ at our online payment site, or
☐ at _____.

Prorated rent of $__62.00__ is due for the remainder of the first month, on __August 31__, __2018__ (*year*). Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. If you don't pay all rent on or before 3rd days after the first of the month, you'll pay a late charge of $__350.00__. You'll also pay a charge of $__75.00__ for each returned check or rejected electronic payment. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll also have all other remedies for such violation. Notwithstanding any memo or reference on payments remitted by you, we may, but are not required to, apply payments by you to the oldest outstanding amount(s) due on your resident ledger.

7. **UTILITIES.** We'll pay for the following items, if checked:
☐ gas        ☐ electricity     ☐ master antenna
☒ trash      ☐ cable TV        ☒ other __Laundry__
☐ heat       ☐ water

You'll pay for all other utilities, related deposits, and any charges, fees, or services on such utilities and are responsible for transferring these utilities into your name upon your possession. However, we will pay for all utilities we are required to pay under Massachusetts law, unless this Lease Contract provides otherwise. You must not allow utilities to be disconnected for any reason—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the Lease Contract term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-powered lighting. If water/sewer utilities are sub-metered for the apartment, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance.

8. **INSURANCE.** Except as required by state law, we do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless due to owner's omission, fault, negligence, or misconduct.

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like.

Additionally, you are (*check one*) ☐ required to purchase personal liability insurance ☒ not required to purchase personal liability insurance. If no box is checked, personal liability insurance is not required. If required, failure to maintain personal liability insurance is a breach of this Lease Contract and may result in the termination of tenancy and eviction and/or any other remedies as provided by this Lease Contract or state law. If you are required to purchase personal liability insurance you must provide evidence of coverage at lease inception, and must confirm an active policy upon request by owner at any time during the term of the Lease. SUBJECT TO APPLICABLE LAW, THE LANDLORD WILL PROVIDE INSURANCE UP TO $750 IN BENEFITS TO COVER THE ACTUAL COSTS OF RELOCATION OF THE TENANT IF DISPLACED BY FIRE OR DAMAGE RESULTING FROM FIRE

9. **SECURITY DEVICES. What We Must Provide.** When occupancy begins we will provide you with: (1) an operating locking device on your door; and, (2) an operating locking device on every openable exterior window. Keyed locks will be re-keyed after the prior resident moves out and charged accordingly. The rekeying will be done either before you move in or within 7 days after you move in. You may not duplicate any

*¹Joshua B Berger*    *²⁹Tressa H Ellis*    *⁵⁷Roberta Silva*

CONFIDENTIAL                                                                    JRK0000110

# EXHIBIT G

## MOVE OUT CLEANING & REPLACEMENT CHARGES

RESIDENT NAME(S): Joshua B Berger and Tressa H Ellis    APT. #: 302

Painting of walls – *one coat* (Other than damage or heavy smoke)
Shampooing of carpets (Other than stains, heavy soil, and pet damage)

Resident is required to have the apartment professionally cleaned and carpet cleaned upon move out. If the apartment is not returned to us in this condition the following charges will be applied.

| | ONE BEDROOM | TWO BEDROOM | THREE BEDROOM | THREE BEDROOM TOWNHOME |
|---|---|---|---|---|
| PAINTING (PER COAT) | $300.00 | $400.00 | $475.00 | $600.00 |
| CARPET CLEANING | $80.00 | $90.00 | $110.00 | $175.00 |
| TOUCH-UP PAINT | $150.00 | $200.00 | $237.50 | $300.00 |
| APARTMENT CLEAN | $80.00 | $90.00 | $110.00 | $175.00 |

The following charges will be assessed regardless of how long resident occupies the apartment.

### REPLACEMENTS (flat charge):

| | | | |
|---|---|---|---|
| Bathtub/Shower Resurface | $ 315.00 | Oven Rack - *each* | $ 20.00 |
| Blinds (Mini-blind) - *each* | $ 40.00 | Peep Holes, partial | $ 10.00 |
| Blinds (Vertical) - *each* | $ 100.00 | Peep Holes, complete | $ 20.00 |
| Broiler Pan | $ 25.00 | Refrigerator Crisper Tray - *each* | $ 40.00 |
| Carpet Repairs - *each* | $ 20.00 | Refrigerator Ice Trays (set of 2) | $ 2.00 |
| Carpet Replacement | Actual Cost | Screens (Patio Door) | $ 50.00 |
| Closet Rod - *each* | $ 25.00 | Screen (Window) - *each* | $ 35.00 |
| Counter (Bathroom) | Actual Cost | Shower Doors | Actual Cost |
| Counter (Kitchen) | Actual Cost | Shower Head | $ 10.00 |
| Counter Resurface (Bathroom) - *each* | $ 50.00 | Smoke Detector/Alarm - *each* | $ 15.00 |
| Counter Resurface (Kitchen) - *each* | $ 90.00 | Smoke Detector/Battery - *each* | $ 4.00 |
| Door (Bifold) - *each* | $ 90.00 | Stove Burner - *each* | $ 25.00 |
| Door (Exterior) | $ 175.00 | Stove Burner Rings - *each* | $ 5.00 |
| Door (Interior) - *each* | $ 85.00 | Stove Drip Pan 8" - *each* | $ 10.00 |
| Draperies - *each* | $ 30.00 | Stove Drip Pan 6" - *each* | $ 8.00 |
| Drywall Repairs - *per hour* | $ 35.00 | Switch Plates/Sockets - *each* | $ 2.00 |
| Extermination (Special) - *per visit* | $ 40.00 | Toilet | $ 125.00 |
| Faucets (Bath/Kitchen) - *each* | $ 30.00 | Toilet Seat - *each* | $ 25.00 |
| Garage Door - *panel* | $ 100.00 | Towel Bars - *each* | $ 10.00 |
| Garage Door Opener (Remote) | $ 75.00 | Vinyl Repairs - *each* | $ 15.00 |
| Garbage Disposal | $ 85.00 | Vinyl Replacement | Actual Cost |
| Keys (Door) - *each* | $ 10.00 | Wallpaper Removal - *per hour* | $ 25.00 |
| Keys (Mailbox) - *each* | $ 15.00 | Window (Broken) | Actual Cost |
| Light bulbs - *each* | $ 1.00 | OTHER | |
| Light Fixture/Ceiling Fan - *each* | $ 45.00 | OTHER | |
| Light Globes - *each* | $ 10.00 | OTHER | |
| Lock & Deadbolt (Door) | $ 55.00 | OTHER | |
| Lock (Mailbox) | $ 20.00 | OTHER | |
| Medicine Cabinet | Actual Cost | OTHER | |
| Mirror (Bathroom) | Actual Cost | OTHER | |

### CLEANING CHARGES:

| | | | |
|---|---|---|---|
| Air Vents/Exhaust Fans - *each* | $ 5.00 | Range Top | $ 15.00 |
| Balcony/Patio | $ 10.00 | Refrigerator | $ 25.00 |
| Bathtub - *each* | $ 10.00 | Shower Wall Tile | $ 15.00 |
| Cabinets (Kitchen) | $ 10.00 | Sink (Kitchen/Bath) - *each* | $ 5.00 |
| Cabinets (Bathroom) | $ 5.00 | Switch Plates - *each* | $ 1.00 |
| Closet Shelves - *each* | $ 3.00 | Toilet - *each* | $ 20.00 |
| Counters | $ 5.00 | Trash Removal - *per bag* | $ 10.00 |
| Dishwasher | $ 10.00 | Vacuum Carpet - *per room* | $ 5.00 |
| Doors/Frames - *each* | $ 5.00 | Vent Hood | $ 10.00 |
| Faucets (Kitchen/Bath) - *each* | $ 2.00 | Walls (Wash) - *each* | $ 5.00 |
| Fireplace | $ 20.00 | Washer/Dryer | $ 10.00 |
| Floors (Kitchen/Bath) - *each* | $ 15.00 | Windows - *each* | $ 5.00 |
| Heat Registers - *each* | $ 5.00 | OTHER | |
| Light Fixtures - *each* | $ 2.00 | OTHER | |
| Medicine Cabinets - *each* | $ 2.00 | OTHER | |
| Mirrors - *each* | $ 2.00 | OTHER | |
| Oven | $ 25.00 | OTHER | |
| Patio Sliding Door | $ 5.00 | OTHER | |

Nothing herein shall be construed as a limitation on Agent's right to pursue Resident for damages and/or additional cleaning not specifically listed hereon. This document will be attached to the Inventory and Condition Form, and become part of that document upon vacating.

Resident Signature(s) _____    Date _____

Agent for Owner_____    Date _____

[1] *Joshua B Berger*    [2] *Tressa H Ellis*    [3] *Roberta Silva*

# EXHIBIT H

# DDSK | LAW
## DiGangi Dullea Sachs Khan

August 1, 2019

*Via Certified Mail, Return Receipt Requested*

JRK Property Holdings
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

One Webster Apartments Property
Owner LLC
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

Cabot Crossing Apartments Property
Owner LLC
11766 Wilshire Blvd Suite 1500
Los Angeles, CA 90025

Royal Crest Apartments Property
Owner LLC
11766 Wilshire Blvd Suite 1500
Los Angeles, CA 90025

Tewksbury Apartments Property Owner
LLC
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

Stevens Pond Apartments Property Owner
LLC
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

Essex Apartments Property Owner LLC
11766 Wilshire Boulevard
Suite 1500
Los Angeles, CA 90025

C/O
National Registered Agents, Inc.
155 Federal Street, Suite 700
Boston, MA 02110

Re:  **Claims on Behalf of Branda Peebles and on Behalf of All Other Persons Who
Have Been Caused Similar Injury and Are Similarly Situated**

## <u>DEMAND LETTER PURSUANT TO MASSACHUSETTS GENERAL LAWS CHAPTER 93A, SECTION 9</u>

Email: ddsklaw.com                    Main: (978) 338-6620                    Fax: (978) 338-6621

900 Cummings Center, Suite 210U, Beverly, Massachusetts 01915

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 2
August 1, 2019

To whom it may concern:

This is a formal demand letter sent to you pursuant to Massachusetts General Laws Chapter 93A, § 9, on behalf of Branda Peebles and all other persons who have been caused similar injury and are similarly situated.

JRK Property Holdings, on behalf of its affiliated companies, One Webster Apartments Property Owner LLC, Tewksbury Apartments Property Owner LLC, Stevens Pond Apartments Property Owner LLC, Cabot Crossing Apartments Property Owner LLC, Royal Crest Apartments Property Owner LLC and Essex Apartments Property Owner LLC, manages and operates at least 6 (six) residential apartment complexes in Massachusetts:

1. Residences at Tewksbury Commons, 7 Archstone Ave., Tewksbury, MA 01876;

2. Essex Apartment Homes, 1 Avalon Dr., Peabody, MA 01960;

3. The Residence at Stevens Pond, 1 Founders Way Saugus, MA 01906;

4. One Webster Apartment Homes, 1 Webster Avenue Chelsea, MA 02150;

5. Royal Crest Estates, 37 Courtney Street, Fall River, MA 02720; and

6.  Cabot Crossing, 130 Bowden Street, Lowell, MA 01852.

Based upon a review of the Essex County, Middlesex County, Bristol County and Suffolk County Registries of Deeds, as well as the Massachusetts Secretary of State's records, it is abundantly clear that JRK Property Holdings manages the above-listed apartment complexes on behalf of the individual LLCs with which JRK Property Holdings has common ownership.  For purposes of this Demand, all entities named herein are collectively referred to as "JRK."

As described in greater detail below, JRK has systematically and continually violated G. L. c. 186, § 15B(4)(iii)(the "Security Deposit Statute"), by unlawfully retaining its tenants' security deposits or a portion thereof to pay for cleaning and other maintenance services that can only be attributed to "reasonable wear and tear." Specifically, JRK has been subsidizing, and continues to subsidize, its costs of doing business at the expense of the consumers of Massachusetts by unlawfully placing the financial burden of basic carpet cleaning and touch-up painting on all of its tenants through unlawful deductions from security deposits in direct violation of the Security Deposit Statute.

The Security Deposit Statute explicitly prohibits a landlord / owner from retaining any portion of a tenant's security deposit to remedy "reasonable wear and tear."  To wit, the pertinent portion of the Security Deposit Statute provides:

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 3
August 1, 2019

(4) The lessor shall, within thirty days after the termination of occupancy under a tenancy-at-will or the end of the tenancy as specified in a valid written lease agreement, return to the tenant the security deposit or any balance thereof; provided, however, that **the lessor may deduct from such security deposit for the following:**

\*\*\*

(iii) a reasonable amount necessary to repair any **damage** caused to the dwelling unit by the tenant or any person under the tenant's control or on the premises with the tenant's consent, **reasonable wear and tear excluded**.

G. L. c. 186, § 15B(4)(iii)(emphasis added).  Here, there can be no doubt that carpet cleaning and touch-up painting are the very definitions of "reasonable wear and tear" and therefore JRK may not retain its tenants' security deposit monies for such cleaning services.

In addition to the above-described practices of JRK being in clear violation of the Security Deposit Statute, violations of that statute constitute a violation of the Massachusetts Consumer Protection Statute, G. L. c. 93A, § 2, which makes it unlawful to engage in "unfair or deceptive acts or practices in the conduct of trade or commerce." G. L. c. 93A, § 2.  Indeed, as the Massachusetts Attorney General's Regulations set out:

(4) Security Deposit and Rent in Advance.  **It shall be an unfair or deceptive practice for an owner to:**

\*\*\*

(f) fail to furnish to the tenant, within 30 days after the termination of occupancy under a tenancy-at-will or the end of the tenancy as specified in a valid written rental agreement, an itemized list of damage, if any, and written evidence indicating the actual or estimated cost of repairs necessary to correct such damage, in accordance with M.G.L. c. 186, § 15B;

**(g) fail to return to the tenant the security deposit or balance thereof to which the tenant is entitled after deducting any sums in accordance with M.G.L. c. 186, § 15B,** together with interest, within thirty days after termination of occupancy under a tenancy-at-will agreement or the end of the tenancy as specified in a valid written rental agreement.

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 4
August 1, 2019

940 Code Mass. Regs. 3.17(4)(f)-(g)(emphasis added).

Here, the deducting of security deposit monies by JRK for "reasonable wear and tear" is in violation of the Attorney General's Regulations as those are not sums which JRK is entitled to deduct pursuant to the Security Deposit Statute. As such, JRK's deduction of security deposit monies for "reasonable wear and tear" constitutes an unfair or deceptive act or practice in violation of G. L. c. 93A, §§ 2, 9.

Pursuant to G. L. c. 93A, JRK may be liable for double or treble damages, those damages being any unlawfully retained security deposit monies of JRK tenants through the above-described practices of JRK. Similarly, the Security Deposit Statute calls for treble damages in the event JRK unlawfully withheld security deposit monies for cleaning fees associated with "reasonable wear and tear". See Phillips v. Equity Residential Management, L.L.C., 478 Mass. 251, 260-261 (2017)(landlord/owner responsible for treble damages and attorney's fees pursuant to G. L. c. 186, § 15B(7) for unlawfully retaining security deposit funds for "cleaning or repair" charges).

Without question, a finding of liability under G. L. c. 93A will require that JRK pay attorneys' fees incurred in pursing this action against JRK. JRK has thirty (30) days from receipt of this letter in which to respond and make a reasonable offer of settlement. Failure to make said offer within the prescribed timeframe may expose JRK to additional violations of G. L. c. 93A.

## FACTS

On August 17, 2017, Branda Peebles ("Ms. Peebles") and Brian Twomey entered into a one-year residential lease agreement with Stevens Pond Apartments, located at 4723 Scotts Mill Court, Saugus, Massachusetts. (See Lease Attached as **Exhibit A**). Ms. Peebles was required to pay a $500.00 security deposit, which was paid prior to moving into the apartment. An addendum attached to the lease, entitled "Move Out Cleaning & Replacement Charges" was signed by all parties. (See Lease Addendum Attached as **Exhibit B**).

The Addendum states that "Resident is required to have the apartment professionally cleaned and carpet cleaned upon move out. If the apartment is not returned to us in this condition the following charges will be applied." See Ex. B. The Addendum then lists the costs for basic cleaning and maintenance for what can only be described as "normal wear and tear" occasioned by a residential tenancy, such as, among other things, carpet cleaning, touch up painting and apartment cleaning.

At the conclusion of the lease, Ms. Peebles vacated the apartment on August 18, 2018. On August 23, 2018 a "Statement of Security Deposit." was sent to Ms. Peebles

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 5
August 1, 2019

and Mr. Twomey. (See August 23, 2018, Statement of Security Deposit, attached as
**Exhibit C**). This statement indicates that deductions were taken from Ms. Peebles'
security deposit under the category "New Charges." Id. These charges were listed as
$50.00 for "Touch-Up Paint" and $65.00 for "Carpet Clean per Lease," for a total
deduction of $115.00 from their security deposit. Id.

The JRK lease documents and policies make it impossible for JRK not to violate
the statutes discussed herein. At the inception of each tenancy, the lease contemplates
that a tenant must either (1) pay for "reasonable wear and tear" out of their own pocket at
lease end; or (2) have their security deposit monies unlawfully deducted for "reasonable
wear and tear" at lease end. In either scenario, JRK impermissibly requires a tenant to
pay for "reasonable wear and tear" in violation of law. Simply put, JRK cannot pass the
cost of doing business onto the consumer tenants of the Commonwealth.

Upon information and belief, and based upon the standard form lease and addenda
used by JRK and JRK's common ownership and management of the six (6) properties
identified above, it is clear that JRK employs the same unfair and deceptive acts or
practices described herein at each of the six properties it owns and manages in the
Commonwealth. Accordingly, relief on a class-wide basis is appropriate.

## I.    STATUTORY AUTHORITY

Chapter 93A, § 9(1) provides:

> **any** person, other than a person entitled to bring action under section eleven
> of this chapter, who has been injured by another person's use or
> employment of any method, act or practice declared to be unlawful by
> section two or any rule or regulation thereunder…may bring an action in
> the superior court…for damages…

G. L. c. 93A, § 9(1) (emphasis added). Section 2 declares "unlawful" any "unfair or
deceptive acts or practices in the conduct of any trade or commerce". G. L. c. 93A, § 2.

Chapter 93A, § 9(2) further states that a person may:

> if the use or employment of the unfair or deceptive acts or practice has
> caused similar injury to numerous other persons similarly situated and if the
> Court finds in a preliminary hearing that he adequately and fairly represents
> such other persons, bring the action on behalf of himself and such other
> similarly situated persons; . . .

G. L. c. 93A, § 9(2).

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 6
August 1, 2019

      The Claimants qualify as persons able to bring a 93A, § 9 action as lessees of residential property.  JRK and the various housing complexes it owns or manages are Corporations and companies doing business in Massachusetts and are engaged in the conduct of trade or commerce.  JRK's businesses involve Real Estate Development, Ownership, Operation, and Management.

## II.    JRK'S UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN THE CONDUCT OF TRADE OR COMMERCE

      As described above, the retention of security deposit funds for "reasonable wear and tear" constitutes a clear violation of the Security Deposit Statute.  That same conduct constitutes a violation of the Attorney General's regulations and, in turn, a violation of M.G.L. c. 93A.

      The law allows for the retention of a security deposit under strict conditions as some measure of security for unpaid rent and reasonable amounts necessary to repair **damage** for which the tenant is responsible. See Jinwala v. Bizzaro, 24 Mass. App. Ct. 1, 4 (1987).  The reasoning for the strict conditions of the Security Deposit Statute were discussed by the Massachusetts Appeals Court:

> By limiting the freedom of landlords and tenants to contract in this regard [see § 15B(8)], the Legislature manifested a concern for the welfare of tenants in residential property who, as a practical matter, are generally in inferior bargaining positions and find traditional avenues of redress relatively useless; i.e., the legal expense of chasing a security deposit would be more than the amount of the deposit." Goes v. Feldman, 8 Mass. App. Ct. 84, 91 (1979). Hampshire Village Associates v. District Court of Hampshire, supra at 152-153. Mellor v. Berman, supra at 282. To that end, the Legislature has provided that failure of a landlord to observe the security deposit law will result in forfeiture of the deposit, § 15B(6), and for some violations, if litigation is necessary to force the return of a deposit, see Castenholz v. Caira, 21 Mass. App. Ct. 758, 762-763 (1986), has mandated the imposition of treble damages, interest and costs, and attorney's fees. § 15B(7). See Hampshire Village Associates v. District Court of Hampshire, supra at 150-151. Mellor v. Berman, supra at 278-283.

> [T]he purpose of § 15B is seen not to be arbitrarily penal; rather, 'the underlying goal [is to establish] an "equitable relationship"' between tenants and  Landlords. Castenholz v. Caira, 21 Mass. App. Ct. at 763, quoting from McGrath v. Mishara, 386 Mass. 74, 85 (1982).

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 7
August 1, 2019

Jinwala v. Bizzaro, 24 Mass. App. Ct. 1, 4-6 (1987).

It is entirely clear, both as a matter of common sense and law, that general cleaning is not within "damages" contemplated by the security deposit statute:

> [T]he deductions for cleaning costs incurred as a result of a breach of lease may not be permitted by the statute which, as relevant here, provides that "[n]o deduction may be made from the security deposit for any purpose other than 'a reasonable amount necessary to repair any damage caused to the dwelling unit by the tenant or any person under the tenant's control or on the premises with the tenant's consent, reasonable wear and tear excluded.

Taylor v. Beaudry, 82 Mass. App. Ct. 105, 105 (2012) (citing M.G.L. c. 186, § 15B(4)(iii) (1984); see also Phillips v. Equity Residential Management, L.L.C., 478 Mass. 251, 260-261 (2017)(landlord/owner responsible for treble damages and attorney's fees pursuant to G. L. c. 186, § 15B(7) for unlawfully retaining security deposit funds for "cleaning or repair" charges).

To be sure, JRK is fully aware that it cannot retain security deposit funds for anything other than unpaid rent or damages, as it explicitly recognizes and states in its Leases:  "You'll be liable for the following charges, if applicable: unpaid rent; repairs or damages **beyond normal wear and tear**, water /sewer charges and other amounts provided by law."  See Ex. A at ¶ 37 (emphasis added).

## III.    CHAPTER 93A PROVIDES FOR MULTIPLE DAMAGES FOR A "WILLFUL OR KNOWING VIOLATION" OF SECTION TWO

Chapter 93A provides that if Claimant prevails, recovery shall be in the amount of actual damages and:

> up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.

M.G.L. c. 93A, § 9.

The amount that is multiplied is the amount of any judgment on the underlying claims regardless of the existence of available coverage.  See G.L. c. 93A, § 9(3) ("For the purposes of this chapter, the amount of actual damages to be multiplied by the court

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 8
August 1, 2019

shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim.")

Further, if the court finds there has been a violation, the Claimant(s) shall, in addition to other relief provided for, and irrespective of the amount in controversy, "be awarded reasonable attorneys fees and costs incurred in connection with said action". G.L. c. 93A, § 9(4).

## IV.    DEMAND FOR SETTLEMENT

Based on all of the foregoing, the Claimants hereby make the following Demand for Settlement for the aggregate total of damages to Claimants' financial loss:

### DEMAND:

- Branda Peebles **and** all others similarly situated[1] demand the return of their entire security deposit where any portion was retained for the patently improper deduction of "reasonable wear and tear" maintenance/repairs, including, but not limited to, "Touch up paint" and "Carpet Clean per lease";

- Branda Peebles **and** all others similarly situated further demand that this amount be trebled as required by statute, as all of these practices are willful and knowing violations of Massachusetts law.

- Branda Peebles **and** all others similarly situated likewise demand that JRK immediately cease and desist in any further violations of 186, § 15B, specifically the unlawful retention of security deposits.

## V.    JRK IS OBLIGATED TO RESPOND TO THIS DEMAND WITHIN 30 DAYS WITH A REASONABLE OFFER OF SETTLEMENT IN ORDER TO AVOID THE POTENTIAL FOR MULTIPLE DAMAGES, ATTORNEY'S FEES AND COSTS

The purpose of the requirement for a demand letter is to encourage negotiation and settlement of a claim. Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704 (1975).

---

[1] "Similarly Situated" means all tenants of JRK owned or managed properties, as set forth above, whose security deposit funds – either in whole or in part – were retained to remedy "reasonable wear and tear" dating back four (4) years from the date of this demand.

DDSK Law LLC

JRK Property Holdings, et al.
PAGE 9
August 1, 2019

General laws chapter 93A, § 9(3) provides, if the court finds that the "refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated...section two" of Chapter 93A, then the court may award double or treble damages. G.L. c. 93A, § 9(3); Brandley v. United States Fidelity & Guaranty Co., 819 F. Supp. 101, 200 (D. Mass. 1993); see also Leardi v. Brown, 394 Mass. 151, 166 (1985) (defendant's responses "too indefinite...to be regarded as reasonable"); Whelihan v. Markowski, 37 Mass. App. Ct. 209 (1994) (defendant's offer of settlement was not reasonable for plaintiff's injury).

The failure to make a reasonable offer of settlement like the failure to make any written response to this demand letter within 30 days can itself constitute a violation of Chapter 93A. Any such failure can be considered "bad faith with knowledge or reason to know that the act or practice complained of violated said section two," thus triggering Chapter 93A's multiple damage provision. Id.

The burden of proving that the settlement offer was reasonable, thereby precluding recovery for multiple damages and attorney's fees, is on the defendant-offeror. Bachman v. Parkin, 19 Mass. App. Ct. 908, 910-11 (1984).

## VI.    CONCLUSION

For all of the above reasons, Branda Peebles, on behalf of herself **and** all other persons who have been caused similar injury and are similarly situated, pursuant to G.L. c. 93A, § 9, hereby make demand for settlement upon JRK as stated in Section IV above. JRK has 30 days from receipt of this letter to respond with a reasonable offer of settlement. Failure to do so could subject JRK to liability for multiple damages and attorney's fees and costs in the event Claimants are forced to prosecute their claims to conclusion.

Recently, we have been able to use the negotiation envisioned by G.L. c. 93A to settle similar cases. We are hoping this demand letter can spark similar negotiations toward a class settlement.

We look forward to receiving a written response within 30 days.

Sincerely,

D. Scott Dullea

# EXHIBIT I

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUS. LIT. SESSION
CIVIL ACTION NO.
*19-3714*

|  |  |
|---|---|
| BRANDA PEEBLES and JOSHUA BERGER, Individually, and on BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br>        Plaintiffs, <br><br> vs. <br><br> JRK PROPERTY HOLDINGS, INC., STEVENS POND APARTMENTS PROPERTY OWNER, LLC, and ONE WEBSTER APARTMENTS PROPERTY OWNER, LLC, <br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
F I L E D

NOV 25 2019

MICHAEL JOSEPH DONOVAN
CLERK OF COURT

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

This action involves the Defendant's systemic use of an unlawful lease provision in order to force its tenants to incur costs for remedying "reasonable wear and tear" for which the tenants are not responsible under the law. In addition to the unlawful lease provisions, the Defendant systemically and unlawfully retains the security deposit monies or portions thereof of its tenants in order to remedy "reasonable wear and tear" in violation of Massachusetts law. Such practices are in violation of the Massachusetts Security Deposit Statute, G.L. c. 186, § 15B, *et seq.*, and the Massachusetts Consumer Protection Statute, G.L. c. 93A.

The Defendant's violations of law have occurred on a class-wide basis and the instant action seeks relief for the named Plaintiff as well as the putative class of Similarly Situated

Individuals who have suffered the same injury as a result of the Defendant's conduct as further described herein and who are entitled to relief pursuant to G. L. c. 93A, § 9(2).

## PARTIES

1.      Plaintiff Branda Peebles ("Ms. Peebles") is a natural person residing in Lawrence, Essex County, Massachusetts.

2.      Plaintiff Joshua Berger ("Mr. Berger") is a natural person residing at Weymouth, Norfolk County, Massachusetts.

3.      Ms. Peebles and  Mr. Berger on behalf of All Others Similarly Situated, who are those putative class individuals who have suffered a similar injury as Ms. Peebles and Mr. Berger as a result of the Defendant's unlawful conduct pursuant to G. L. c. 93A, § 9(2)(together with Ms. Peebles and Mr. Berger the "Plaintiffs").

4.      Defendant JRK Property Holdings, Inc. ("JRK"), is a foreign corporation organized under the laws of California and registered to do business in the Commonwealth of Massachusetts with a principal place of business located at 11766 Wilshire Boulevard, Los Angeles, California 90025.  See Business Entity Summary attached hereto as **Exhibit A**.

5.      Defendant Stevens Pond Apartments Property Owner, LLC, is a foreign corporation organized under the laws of Delaware and registered to do business in the Commonwealth of Massachusetts with a principal place of business located at 11766 Wilshire Boulevard, Los Angeles, California 90025.  See Business Entity Summary attached hereto as **Exhibit B**.

6.      Defendant One Webster Apartments Property Owner LLC, is a foreign corporation organized under the laws of Delaware and registered to do business in the Commonwealth of Massachusetts with a principal place of business located at 11766 Wilshire

2

Boulevard, Los Angeles, California 90025. See Business Entity Summary attached hereto as

**Exhibit C**.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over JRK pursuant to G. L. c. 223A, § 3.

8.      Venue is appropriate in this Court pursuant to G. L. c. 223, § 8.

**FACTS**

9.      JRK, on behalf of its affiliated companies; One Webster Apartments Property

Owner LLC, Tewksbury Apartments Property Owner LLC, Stevens Pond Apartments Property

Owner LLC, Cabot Crossing Apartments Property Owner LLC, Royal Crest Apartments

Property Owner LLC, and Essex Apartments Property Owner LLC, manages and operates at

least 6 (six) residential apartment complexes in the Commonwealth of Massachusetts:

a.      Residences at Tewksbury Commons, 7 Archstone Ave., Tewksbury, MA 10876;
b.      Essex Apartment Homes, 1 Avalon Dr., Peabody, MA 01960;
c.      The Residence at Stevens Pond, 1 Founders Way, Saugus, MA 01906;
d.      One Webster Apartment Homes, 1 Webster Avenue, Chelsea, MA 02150;
e.      Royal Crest Estates, 37 Courtney Street, Fall River, MA 02720; and
f.      Cabot Crossing, 130 Bowden Street, Lowell, MA 01852.[1]

10.     Based upon a review of the Essex County, Middlesex County, Bristol County and

Suffolk County Registries of Deeds, as well as the Massachusetts Secretary of State's records, it

is clear that JRK manages and / or owns the above-listed apartment complexes on behalf of the

individual LLCs with which JRK has common ownership.

11.     On information and belief, JRK regularly collects the rents and security deposits

of the tenants of the above-listed properties in its capacity as property manager and / or owner of

those properties.

---

[1] For the purposes of the instant action, references to "JRK" include its affiliated companies, including but not limited to those listed in paragraph 7 of the Complaint.

3

12.     On August 17, 2017, Ms. Peebles and Brian Twomey entered into a one-year residential lease (the "Peebles Lease") agreement to rent an apartment at the Residence at Stevens Pond, located at 4723 Scotts Mill Court, Saugus, Massachusetts. <u>See</u> Lease attached hereto as **Exhibit D**.

13.     Ms. Peebles was required to pay a $500.00 security deposit, which was paid prior to moving into the apartment.

14.     An addendum attached to the Peebles Lease (the "Addendum"), entitled "Move Out Cleaning & Replacement Charges" was signed by all parties. <u>See</u> Addendum attached hereto as **Exhibit E**.

15.     The Addendum to the Peebles Lease contains the following statement:

> **Resident is <u>required</u> to have the apartment professionally cleaned and carpet cleaned upon moveout. If the apartment is not returned to us in this condition <u>the following charges will be applied</u>.**

<u>Id</u>. (emphasis added).

16.     The Addendum then lists the costs for basic cleaning and maintenance for instances of normal wear and tear such as "carpet clean," "touch-up paint," and "apartment clean." <u>Id</u>.

17.     Upon information and belief, the Addendum which accompanies Ms. Peebles Lease is the same Addendum which JRK appends to all of its leases at all of the above-identified properties which JRK owns and or manages in the Commonwealth.

18.     At the conclusion of the Lease's term, Ms. Peebles vacated the apartment on August 18, 2018.

19.     On August 23, 2018, JRK sent a document entitled "Statement of Security Deposit" to Ms. Peebles. <u>See</u> Statement of Security Deposit attached hereto as **Exhibit F**.

4

20.    The Statement of Security Deposit shows deductions taken from Ms. Peebles' security deposit monies under the category "New Charges." Id.

21.    These deductions from Ms. Peebles' security deposit were $50.00 for "Touch-Up Paint" and $65.00 for "Carpet Clean per Lease," totaling $115.00 in deductions from Ms. Peebles' security deposit monies. Id.

22.    On information and belief, JRK routinely retains its tenants' security deposit monies for instances of normal wear and tear such as "carpet cleaning," "touch-up painting," and "apartment cleaning," pursuant to the Addendum, for all of its tenants at all of its above-listed properties in the Commonwealth of Massachusetts.

23.    On July 21, 2018, Mr. Berger and Tressa Ellis entered into one-year residential lease (the " Berger Lease") agreement to rent an apartment at One Webster Apartment Homes, located at 1 Webster Avenue, #302, Chelsea, Massachusetts.

24.    Mr. Berger was required to pay a $1,000.00 security deposit, which was paid prior to moving into the apartment. See Rent and Security Deposit Receipt attached hereto as **Exhibit G**.

25.    The same Addendum which accompanied the Peebles Lease was attached to the Berger Lease (the "Addendum"), entitled "Move Out Cleaning & Replacement Charges" and was signed by all parties. See Addendum attached hereto as **Exhibit H**.

26.    The Addendum to the Berger Lease contains the following statement:

> **Resident is _required_ to have the apartment professionally cleaned and carpet cleaned upon moveout. If the apartment is not returned to us in this condition _the following charges will be applied_.**

Id. (emphasis added).

5

27.     JRK failed to return Mr. Berger's security deposit funds to him within the 30 days required by G.L. c. 186, § 15B(4).

28.     On August 1, 2019, the Plaintiffs sent a demand letter pursuant to G. L. c. 93A, to JRK and its affiliated owners of the above-listed properties, highlighting JRK's violations of law and seeking relief for Ms. Peebles as well as the putative class of All Others Similarly Situated to which JRK responded but failed to make a reasonable offer of settlement. See Plaintiffs' 93A Demand Letter attached hereto as **Exhibit I**.

**CLAIMS**

**COUNT I**

**Violation of G. L. c. 186, § 15B(4)(iii)**

29.     The Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 28.

30.     General laws c. 186, § 15B(4), requires JRK to return the Plaintiffs' security deposit monies within thirty (30) days of the termination of the Plaintiffs' tenancy.

31.     JRK is not entitled to deduct from the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" pursuant to G. L. c. 186, § 15B(4)(iii).

32.     JRK has violated G. L. c. 186, § 15B(4), by unlawfully retaining portions of, or the entirety of, the Plaintiffs' security deposits monies to remedy "reasonable wear and tear" resulting from the tenancy and failing to return those unlawfully withheld security deposit monies to the Plaintiffs within thirty (30) days of the termination of the Plaintiffs' tenancy.

33.     The Plaintiffs' security deposit monies which JRK has unlawfully retained to remedy "reasonable wear and tear" are monies that the Plaintiffs were entitled to have returned

to them within thirty (30) days of the termination of their tenancies pursuant to G. L. c. 186, § 15B(4).

34.    JRK's unlawful retention of the Plaintiffs' security deposit monies constitutes a violation of G. L. c. 186, § 15B(4), and has resulted in damages to the Plaintiffs in the form of lost security deposit monies and interest thereon.

35.    Pursuant to the Addendum which, upon information and belief, JRK uses on all of its leases, JRK employs the practice of unlawfully retaining the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" at all of the above-listed properties owned and or managed by JRK.

## COUNT II

### Violation of G. L. c. 186, § 15B(6)(e)

36.    The Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 35.

37.    General laws c. 186, § 15B(6)(e), mandates that JRK return the entirety of the Plaintiffs' security deposit if it fails to "return to the [Plaintiffs] the security deposit or balance thereof to which the tenant is entitled" . . . "within thirty days after the termination of the tenancy."

38.    JRK is not entitled to deduct from the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" pursuant to G. L. c. 186, § 15B(4)(iii).

39.    The Plaintiffs' security deposit monies which JRK has unlawfully retained to remedy "reasonable wear and tear" are monies that the Plaintiffs were entitled to have returned to them within thirty (30) days of the termination of their tenancies pursuant to G. L. c. 186, § 15B(4).

40.    JRK's unlawful retention of the Plaintiffs' security deposit monies to which the Plaintiffs were entitled constitutes a violation of G. L. c. 186, § 15B(6)(e), and has resulted in damages to the Plaintiffs in the form of lost security deposit monies and interest thereon.

41.    The Plaintiffs are entitled to the to the return of the entirety of their security deposit monies pursuant to G. L. c. 186, § 15B(6), as a result of JRK's violation of G. L. c. 186, § 15B(4)(iii).

42.    Pursuant to the Addendum which JRK uses on all of its leases, JRK employs the practice of unlawfully retaining the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" and failing to return those security deposit monies that the Plaintiffs are entitled to within thirty (30) days of the termination of tenancy at all of the above-listed properties owned and or managed by JRK.

**COUNT III**

**Violation of G. L. c. 186, § 15B(7)**

43.    The Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 42.

44.    General laws c. 186, § 15B(7), requires JRK to pay to the Plaintiffs "three times the amount of" of the security deposit monies or "balance thereof" which JRK has unlawfully retained and failed to return to the Plaintiffs within thirty (30) days of termination of the tenancy in violation of G. L. c. 186, § 15B(6)(e).

45.    JRK's unlawful retention of the Plaintiffs' security deposit monies to which the Plaintiffs were entitled constitutes a violation of G. L. c. 186, § 15B(6)(e), and has resulted in damages to the Plaintiffs in the form of lost security deposit monies and interest thereon.

46.     The Plaintiffs are entitled to treble the amount of the security deposit monies unlawfully withheld by JRK in violation of G. L. c. 186, § 15B(6)(e), pursuant to G. L. c. 186, § 15B(7).

47.     Pursuant to the Addendum which JRK uses on all of its leases, JRK employs the practice of unlawfully retaining the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" and failing to return those security deposit monies that the Plaintiffs are entitled to within thirty (30) days of the termination of tenancy at all of the above-listed properties owned and or managed by JRK.

## COUNT IV

### Violation of G. L. c. 186, § 15B(6)(c)

48.     The Plaintiffs reallege and incorporate herein the allegations contained in Paragraphs 1 through 47.

49.     General laws c. 186, § 15B(6)(c) makes it unlawful for JRK to use:

in any lease signed by the tenant any provision which conflicts with any provision of this section and attempts to enforce such provision or attempts to obtain from the tenant or prospective tenant a waiver of any provision of this section

Id.

50.     The Addendum, which JRK uses on all of its leases, explicitly requires that a tenant agree to allow JRK to deduct from the tenants' security deposit monies to pay for "reasonable wear and tear" such as touch-up paint, apartment cleaning, and carpet cleaning.

51.     This Addendum provision directly "conflicts" with the provisions of G. L. c. 186, § 15B(4), which bars JRK from deducting a tenants' security deposit monies for "reasonable wear and tear."

52.     The Addendum's conflict with G. L. c. 186, § 15B(4), renders it in violation of G. L. c. 186, § 15B(6)(c).

9

53.     The Plaintiffs are entitled to the return of the entirety of their security deposit monies pursuant to G. L. c. 186, § 15B(6), as a result of JRK's violation of G. L. c. 186, § 15B(6)(c).

54.     Pursuant to the Addendum which JRK uses on all of its leases, JRK employs the practice of unlawfully retaining the Plaintiffs' security deposit monies to remedy "reasonable wear and tear" and failing to return those security deposit monies that the Plaintiffs are entitled to within thirty (30) days of the termination of tenancy at all of the above-listed properties owned and or managed by JRK.

## COUNT V

### Violation of G. L. c. 93A

55.     The Plaintiffs reallege and incorporate herein the allegations contained in Paragraphs 1 through 54.

56.     JRK is involved in the conduct of trade or commerce.

57.     JRK's above-described violations of G. L. c. 186, § 15B, *et seq.* constitute "unfair or deceptive acts or practices" in the conduct of trade or commerce in violation of G. L. c. 93A, § 2.

58.     Withholding the Plaintiffs' security deposit monies for "reasonable wear and tear" in violation of the law is an unfair or deceptive act or practice.

59.     Requiring tenants to agree to the Addendum to the Lease which conflicts with the law is an unfair or deceptive act or practice.

60.     The Attorney General's Regulations render JRK's violations of G. L. c. 186, §§ 15B(4)(iii), and (6)(e), failing to return the Plaintiffs' security deposit monies within thirty (30) days of tenancy, an unfair or deceptive act or practice.  See 940 Code Mass. Regs. 3.17(4)(g).

10

61.    The Attorney General's Regulations render JRK's violations of G. L. c. 186, §§ 15B(6)(c), and (7), unfair or deceptive acts or practices. See 940 Code Mass. Regs. 3.17(4)(k).

62.    The Attorney General's Regulations render JRK's use of the Addendum, in violation of G. L. c. 186, § 15B(6)(c), an unfair or deceptive act or practice. See 940 Code Mass. Regs. 3.17(3)(a)(1).

63.    JRK was sent a statutorily compliant 93A demand letter on August 1, 2019, pursuant to G. L. c. 93A, § 9(3). See Ex. F.

64.    JRK's violations of G. L. c. 93A, *et seq*. are knowing and willful violations.

65.    As a result of JRK's unfair or deceptive acts or practices in the conduct of trade or commerce the Plaintiffs have suffered injuries in the form of lost security deposit monies and interest accrued thereon.

## REQUEST FOR RELIEF AND JURY DEMAND

WHEREFORE, the Plaintiffs Branda Peebles and All Others Similarly Situated hereby request the following relief from the Court:

1.    That JRK be ordered to return the entirety of the security deposit monies and interest accrued thereon it has taken from any tenant at any of the above-listed properties dating back to November 13, 2013, up until present as a remedy for JRK's violations of G. L. c. 186, §§ 15B(4)(iii),(6)(c), and (6)(e), trebled pursuant to JRK's knowing and willful violations of G. L. c. 93A;

2.    That JRK be ordered to return treble the amount of unlawfully withheld security deposit monies and interest accrued thereon it has retained from any tenant at any of the above-listed properties dating back to November 13, 2013, up until present as a remedy for JRK's violations of G. L. c. 186, §§ 15B(6)(e) and (7);

3.      That the Court orders JRK to cease and desist from using the unlawful Addendum to its Leases;

4.      That the Court orders JRK to cease and desist from violating G. L. c. 186, § 15B, *et seq*;

5.      Award Plaintiffs attorneys' fees;

6.      Award Plaintiffs costs;

7.      Award Plaintiffs such other relief that the Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL CLAIMS SO TRIABLE**

                                        Branda Peebles and Joshua Berger,
                                        Individually and on behalf of All Others
                                        Similarly Situated,

                                        By their attorneys,



                                        _____
                                        Keith L. Sachs (BBO# 634025)
                                        Daniel S. Dullea (BBO# 670416)
                                        DDSK Law
                                        900 Cummings Center, Suite 210-U
                                        Beverly, MA 01915

Dated: November 13, 2019

12

# EXHIBIT J

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                         SUPERIOR COURT
                                                    BUS. LIT. SESSION NO. 1

| | |
|---|---|
| BRANDA PEEBLES and JOSHUA BERGER, Individually and on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 1984-cv-03714 |
| v. | ) ) |
| JRK PROPERTY HOLDINGS, INC., STEVENS POND APARTMENTS PROPERTY OWNER, LLC, and ONE WEBSTER APARTMENTS PROPERTY OWNER, LLC, | ) ) ) ) |
| Defendants. | ) |

## **DEFENDANTS' STIPULATION REGARDING LEASES**

Defendants JRK Property Holdings, Inc., Stevens Pond Apartments Property Owner, LLC, and One Webster Apartments Property Owner, LLC, by their undersigned counsel, without waiving any defenses or objections, including without limitation as to relevancy, hereby stipulate and agree as follows:

1.  The exemplar Apartment Lease Contracts and accompanying addenda provided for 2016 through 2021 for the Residences at Stevens Pond are representative of the leases and accompanying addenda of other tenants at the Residences at Stevens Pond, 1 Founders Way, Saugus, Massachusetts, for each of those years, with respect to the provisions pertaining to move-out and the tenant(s)' security deposit.

2.  The exemplar Apartment Lease Contracts and accompanying addenda provided for 2016 through 2021 for One Webster Apartment Homes are representative of the leases and

1

accompanying addenda of other tenants at One Webster Apartment Homes, 1 Webster

Avenue, Chelsea, Massachusetts, for each of those years, with respect to the provisions

pertaining to move-out and the tenant(s)' security deposit.

3. The properties in Massachusetts owned or operated by JRK had the following turnover

rates during the relevant years:

| Property | 2016 | 2017 | 2018 | 2019 | 4 Year Avg. |
|---|---|---|---|---|---|
| One Webster Apartment Homes | 76% | 66% | 71% | 71% | 71% |
| Residences at Stevens Pond | 57% | 60% | 65% | 59% | 60% |

Agreed:

JRK PROPERTY HOLDINGS, INC.,
STEVENS POND APARTMENTS
PROPERTY OWNER, LLC, and ONE
WEBSTER APARTMENTS PROPERTY
OWNER, LLC,

By their attorneys,

*/s/ Thomas H. Wintner*
Thomas H. Wintner (BBO # 667329)
Mathilda S. McGee-Tubb (BBO # 687434)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111
617.542.6000 (telephone)
617.542.2241 (fax)
twintner@mintz.com
msmcgee-tubb@mintz.com

Dated: June 17, 2021

# EXHIBIT K

SSI440
01SVP
Select: 4/5/2021
326 Apts, 381,825 Sq. Ft.

**Resident History Report (From 1/1/1970 Thru 12/31/2099)**
**JRK Residential**
**RESIDENCES AT STEVENS POND - Saugus, MA**
**April 05, 2021**

Page: 1 of 6
04/2021
04/06/21
13:39

| Tran. Date | Date Of Record | Due Date | SC Desc. | Invoice | Code | Billings | Adjust. | Non-Rec. Adjust. | Payments Ret | Refer. | Refunds | Forfeits To | Write-Offs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **4723** | | | | | | | | | | | | | | |
| 01-4723 | | | Peebles, Brenda L.; Twomey, Brian J. | | | | | | | | | | | |
| Status: | | | Previous | | | | | | | | | | | |
| Beginning Balance: | | | 0.00 | | | | | | | | | | | |
| 07/30/17 | 07/30/17 | 07/30/17 | BA Billing via web service | S000028712 | LOCKS | 126.00 | | | | | | | | 126.00 |
| 07/30/17 | 07/30/17 | 07/30/17 | BA Billing via web service | S000028713 | SECDP | 250.00 | | | | | | | | 376.00 |
| 07/30/17 | 07/30/17 | 07/30/17 | AI W PS120727085-MC BPeebl | S000028713 | SECDP | | | | $250.00- | | | | | 126.00 |
| 07/30/17 | 07/30/17 | 07/30/17 | AI W PS120727085-MC BPeebl | S000028712 | LOCKS | | | | $126.00- | | | | | 0.00 |
| 08/19/17 | 08/19/17 | 08/19/17 | PA Payment | S000029190 | RENT | | | | $849.00- | 145670467 | | | | 849.00- |
| 08/19/17 | 08/19/17 | 08/19/17 | PA Payment | S000029830 | RENT | | | | $35.00- | 145670467 | | | | 884.00- |
| 08/19/17 | 08/19/17 | 08/19/17 | BA Move In Prorates | S000029190 | RENT | 849.00 | | | | | | | | 35.00- |
| 08/19/17 | 08/26/17 | 08/19/17 | PA MI Prorate= $784 | S000029921 | RENT | | 65.00- | | | | | | | 100.00- |
| 08/19/17 | 08/26/17 | 08/19/17 | PA MI Prorate= $784 | S000029921 | GYMFE | | 50.00 | | | | | | | 50.00- |
| 08/19/17 | 08/26/17 | 08/19/17 | PA MI Prorate= $784 | S000029921 | SECDP | | 250.00 | | | | | | | 200.00- |
| 08/19/17 | 08/26/17 | 08/19/17 | PA MI Prorate= $784 | S000029921 | TCONC | | 200.00- | | | | | | | 0.00- |
| 09/01/17 | 09/01/17 | 09/01/17 | RC Recurring Charges Update | S000029830 | RENT | 1,960.00 | | | | | | | | 1,960.00 |
| 09/01/17 | 09/01/17 | 09/01/17 | PA Payment | S000029830 | RENT | | | | $1,925.00- | 328 | | | | 35.00 |
| 09/01/17 | 09/01/17 | 11/01/17 | PA Payment | S000031467 | RENT | | | | $35.00- | 328 | | | | 0.00 |
| 09/08/17 | 09/08/17 | 09/01/17 | PA AOC | S000029921 | SECDP | | | | $250.00- | KG | | | | 250.00- |
| 09/08/17 | 09/08/17 | 11/01/17 | PA AOC | S000031467 | RENT | | | | $35.00- | KG | | | | 215.00- |
| 09/08/17 | 09/08/17 | 09/01/17 | PA AOC | S000029921 | GYMFE | | | | $50.00- | KG | | | | 265.00- |
| 09/08/17 | 09/08/17 | 09/01/17 | PA AOC | S000029921 | RENT | | | | $265.00- | KG | | | | 0.00- |
| 09/12/17 | 09/12/17 | 09/12/17 | PA Payment | S000029967 | GARAG | 150.00 | | | | | | | | 150.00 |
| 09/27/17 | 09/27/17 | 09/27/17 | AI UBI 07/31/17-08/31/17 | S000030473 | UBILL | 4.92 | | | | | | | | 154.92 |
| 10/01/17 | 10/01/17 | 10/01/17 | RC Recurring Charges Update | S000030806 | RENT | 1,875.00 | | | | | | | | 2,029.92 |
| 10/01/17 | 10/01/17 | 10/01/17 | RC Recurring Charges Update | S000030806 | GARAG | 150.00 | | | | | | | | 2,179.92 |
| 10/01/17 | 10/01/17 | 10/01/17 | RC Recurring Charges Update | S000030806 | POLVW | 45.00 | | | | | | | | 2,224.92 |
| 10/01/17 | 10/01/17 | 10/01/17 | RC Recurring Charges Update | S000030806 | 2NDFL | 20.00 | | | | | | | | 2,244.92 |
| 10/01/17 | 10/01/17 | 10/01/17 | RC Recurring Charges Update | S000030806 | GLOBL | 20.00 | | | | | | | | 2,264.92 |
| 10/02/17 | 10/02/17 | 09/12/17 | PA Payment | S000029967 | GARAG | | | | $150.00- | 239 | | | | 2,114.92 |
| 10/02/17 | 10/02/17 | 09/27/17 | PA Payment | S000030473 | UBILL | | | | $4.92- | 239 | | | | 2,110.00 |
| 10/02/17 | 10/02/17 | 10/01/17 | PA Payment | S000030806 | 2NDFL | | | | $20.00- | 239 | | | | 2,090.00 |
| 10/02/17 | 10/02/17 | 10/01/17 | PA Payment | S000030806 | GARAG | | | | $150.00- | 239 | | | | 1,940.00 |
| 10/02/17 | 10/02/17 | 10/01/17 | PA Payment | S000030806 | GLOBL | | | | $20.00- | 239 | | | | 1,920.00 |
| 10/02/17 | 10/02/17 | 10/01/17 | PA Payment | S000030806 | POLVW | | | | $45.00- | 239 | | | | 1,875.00 |
| 10/02/17 | 10/02/17 | 10/01/17 | PA Payment | S000030806 | RENT | | | | $1,595.00- | 239 | | | | 280.00 |
| 10/05/17 | 01/26/18 | 02/01/18 | PA Rent= $1960, did not receive | S000034127 | RENT | | | | $20.00- | KG | | | | 260.00 |
| 10/05/17 | 01/26/18 | 10/05/17 | PA Rent= $1960, did not receive | S000034536 | RENT | | 20.00- | | | | | | | 240.00 |
| 10/05/17 | 01/26/18 | 10/05/17 | PA Rent= $1960, did not receive | S000034536 | RENT | | | | $20.00 | KG | | | | 260.00 |
| 10/05/17 | 10/05/17 | 10/05/17 | PA Did not receive garage | S000030860 | RENT | 280.00- | | | | | | | | 20.00- |
| 10/12/17 | 10/12/17 | 10/05/17 | PA Allocating | S000030806 | RENT | | | | $280.00- | DK | | | | 300.00- |
| 10/12/17 | 10/12/17 | 10/05/17 | PA Allocating | S000030860 | RENT | | | | $280.00 | DK | | | | 20.00- |
| 10/27/17 | 10/27/17 | 10/27/17 | AI UBI 08/31/17-09/30/17 | S000031402 | UBILL | 30.99 | | | | | | | | 10.99 |

Current Residents , Previous Residents , Subsidy and Non-Subsidy transactions

CONFIDENTIAL

JRK0000254

SSI440
01ONE
Select: 4/6/2021
121 Apts, 101,099 Sq. Ft.

**Resident History Report (From 1/1/1970 Thru 12/31/2099)**
**JRK Residential**
**ONE WEBSTER - Chelsea, MA**
**April 06, 2021**

Page: 1 of 7
04/2021
04/06/21
13:33

| Tran.Date | Date Of Record | Due Date | SC Desc. | Invoice | Code | Billings | Adjust. | Non-Rec. Adjust. | Payments Ret | Refer. | Refunds | Forfeits To | Write-Offs | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **302** | | | | | | | | | | | | | | |
| 01-302 | | | Berger, Joshua B.; Ellis, Tressa H. | | | | | | | | | | | |
| Status: | | | Previous | | | | | | | | | | | |
| Beginning Balance: | | | 0.00 | | | | | | | | | | | |
| 07/17/18 | 07/17/18 | 07/17/18 | BA Billing via web service | S000009619 | SECDP | 200.00 | | | | | | | | 200.00 |
| 07/17/18 | 07/17/18 | 07/17/18 | BA Billing via web service | S000009620 | LOCKS | 100.00 | | | | | | | | 300.00 |
| 07/17/18 | 07/17/18 | 07/17/18 | AI W PS149782596-VS JBerger | S000009619 | SECDP | | | | $200.00- | | | | | 100.00 |
| 07/17/18 | 07/17/18 | 07/17/18 | AI W PS149782596-VS JBerger | S000009620 | LOCKS | | | | $100.00- | | | | | 0.00 |
| 08/31/18 | 08/31/18 | 08/31/18 | PA MI SD | S000010107 | SECDP | 800.00 | | | | | | | | 800.00 |
| 08/31/18 | 08/31/18 | 08/31/18 | PA GYM FEE | S000010108 | GYMFE | 70.00 | | | | | | | | 870.00 |
| 08/31/18 | 08/31/18 | 08/31/18 | PA Payment | S000010106 | FLOOR | | | | $1.00- | 53631092 | | | | 869.00 |
| 08/31/18 | 08/31/18 | 08/31/18 | PA Payment | S000010106 | RENT | | | | $60.00- | 53631092 | | | | 809.00 |
| 08/31/18 | 08/31/18 | 09/01/18 | PA Payment | S000010200 | GLOBL | | | | $15.00- | 53631092 | | | | 794.00 |
| 08/31/18 | 08/31/18 | 09/01/18 | PA Payment | S000010200 | FLOOR | | | | $20.00- | 53631092 | | | | 774.00 |
| 08/31/18 | 08/31/18 | 09/01/18 | PA Payment | S000010200 | RENT | | | | $1,809.00- | 53631092 | | | | 1,035.00- |
| 08/31/18 | 08/31/18 | 09/01/18 | PA Payment | S000010200 | GLOBL | | | | | 53631092 | | | | 1,035.00- |
| 08/31/18 | 08/31/18 | | PA Payment | 0 | | | | | $30.00- | 53631092 | | | | 1,065.00- |
| 08/31/18 | 08/31/18 | 09/01/18 | PA Payment | S000010200 | RENT | | | | $10.00- | 53631092 | | | | 1,075.00- |
| 08/31/18 | 08/31/18 | 10/01/18 | PA Payment | S000010517 | RENT | | | | $1.00- | 53631092 | | | | 1,076.00- |
| 08/31/18 | 08/31/18 | | PA Payment | 0 | FLOOR | | | | $10.00- | 53631092 | | | | 1,086.00- |
| 08/31/18 | 08/31/18 | | PA Payment | 0 | GLOBL | | | | $15.00- | 53631092 | | | | 1,101.00- |
| 08/31/18 | 08/31/18 | 03/01/19 | PA Payment | S000012303 | RENT | | | | $815.00- | 53631092 | | | | 1,916.00- |
| 08/31/18 | 08/31/18 | 08/31/18 | BA Move In Prorates | S000010106 | RENT | 60.00 | | | | | | | | 1,856.00- |
| 08/31/18 | 08/31/18 | 08/31/18 | BA Move In Prorates | S000010106 | FLOOR | 1.00 | | | | | | | | 1,855.00- |
| 09/01/18 | 09/01/18 | 09/01/18 | RC Recurring Charges Update | S000010200 | RENT | 1,819.00 | | | | | | | | 36.00- |
| 09/01/18 | 09/01/18 | 09/01/18 | RC Recurring Charges Update | S000010200 | FLOOR | 20.00 | | | | | | | | 16.00- |
| 09/01/18 | 09/01/18 | 09/01/18 | RC Recurring Charges Update | S000010200 | GLOBL | 15.00 | | | | | | | | 1.00- |
| 09/06/18 | 09/06/18 | 03/01/19 | PA aoc | S000012303 | RENT | | | | $1.00 | | | | | 0.00 |
| 09/06/18 | 09/06/18 | 03/01/19 | PA aoc | S000012303 | RENT | | | | $1.00- | | | | | 1.00- |
| 09/06/18 | 09/06/18 | 08/31/18 | PA AOC | S000010107 | SECDP | | | | $800.00- | | | | | 801.00- |
| 09/06/18 | 09/06/18 | | PA AOC | 0 | FLOOR | | | | $40.00- | | | | | 761.00- |
| 09/06/18 | 09/06/18 | | PA AOC | 0 | GLOBL | | | | $15.00- | | | | | 746.00- |
| 09/06/18 | 09/06/18 | 03/01/19 | PA AOC | S000012303 | RENT | | | | $816.00- | | | | | 70.00 |
| 09/06/18 | 09/06/18 | 08/31/18 | PA AOC | S000010108 | GYMFE | | | | $70.00- | | | | | 0.00 |
| 09/06/18 | 09/06/18 | | PA AOC | S000012303 | RENT | | | | $1.00- | | | | | 1.00- |
| 09/26/18 | 09/26/18 | AI | UBI 08/01/18-08/31/18 | S000010405 | UBILL | 27.90 | | | | | | | | 26.90 |
| 10/01/18 | 10/01/18 | 10/01/18 | RC Recurring Charges Update | S000010517 | RENT | 1,819.00 | | | | | | | | 1,845.90 |
| 10/01/18 | 10/01/18 | 10/01/18 | RC Recurring Charges Update | S000010517 | GARAG | 95.00 | | | | | | | | 1,940.90 |
| 10/01/18 | 10/01/18 | 10/01/18 | RC Recurring Charges Update | S000010517 | FLOOR | 20.00 | | | | | | | | 1,960.90 |
| 10/01/18 | 10/01/18 | 10/01/18 | RC Recurring Charges Update | S000010517 | GLOBL | 15.00 | | | | | | | | 1,975.90 |
| 10/01/18 | 10/01/18 | 09/26/18 | AI W PS154559211-VS JBerger | S000010405 | UBILL | | | | $27.90- | | | | | 1,948.00 |
| 10/01/18 | 10/01/18 | 10/01/18 | AI W PS154559211-VS JBerger | S000010517 | FLOOR | | | | $20.00- | | | | | 1,928.00 |
| 10/01/18 | 10/01/18 | 10/01/18 | AI W PS154559211-VS JBerger | S000010517 | GARAG | | | | $95.00- | | | | | 1,833.00 |

Current Residents , Previous Residents , Subsidy and Non-Subsidy transactions

CONFIDENTIAL

JRK0000233

# EXHIBIT L

1               COMMONWEALTH OF MASSACHUSETTS

2       SUFFOLK, ss.        Superior Court

                          Business Litigation Session

3                          C.A. No. 2019-03714-BLS1

4       - - - - - - - - - - - - - - - - - -x

                                          :

5       BRANDA PEEBLES and JOSHUA BERGER,  :

        Individually and on BEHALF OF ALL  :

6       OTHERS SIMILARLY SITUATED,         :

                     Plaintiffs,           :

7                                          :

8                   vs.                    :

                                          :

        JRK PROPERTY HOLDINGS, INC.;       :

9       STEVENS POND APARTMENTS PROPERTY   :

        OWNER, LLC; and ONE WEBSTER        :

10      APARTMENTS PROPERTY OWNER, LLC,    :

                     Defendants.           :

11      - - - - - - - - - - - - - - - - - -x

12              VIDEOCONFERENCE DEPOSITION OF JRK PROPERTY

13      HOLDINGS, INC.; STEVENS POND APARTMENTS PROPERTY

14      OWNER, LLC; and ONE WEBSTER APARTMENTS PROPERTY

15      OWNER, LLC, by and through their representative,

16      THOMAS L. MANZO, appearing remotely from Los

17      Angeles, California, a witness called by the

18      Plaintiffs, taken pursuant to Rule 30(b)(6) of the

19      Massachusetts Rules of Civil Procedure, before

20      Alexander K. Loos, Registered Diplomate Reporter and

21      Notary Public in and for the Commonwealth of

22      Massachusetts, appearing remotely from Melrose,

23      Massachusetts, on Thursday, November 10, 2022,

24      commencing at 12:09 p.m.

Page 2

```
 1    PRESENT:
 2        VIA VIDEOCONFERENCE
          DDSK Law, LLC
 3        (By Keith L. Sachs, Esq.)
          E-mail: Ksachs@ddsklaw.com
 4        900 Cummings Center
 5        Suite 210-U
 6        Beverly, MA 01915
 7        978.338.6620
 8        for the Plaintiffs.
 9
10        VIA VIDEOCONFERENCE
11    Mintz, Levin, Cohn, Ferris, Glovsky and
12    Popeo, PC
13        (By Mathilda McGee-Tubb, Esq.)
14        E-mail: Msmcgeetubb@mintz.com
15        One Financial Center
16        Boston, MA 02111
17        617.348.4404
18        for the Defendants.
19
20    ALSO PRESENT:
21
22        Yaas Galaif (Via videoconference)
23
24              * * * * *
```

Page 3

```
 1             I N D E X
 2
   WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
 3
 4  THOMAS L. MANZO
 5  BY MR. SACHS        6
 6
 7              * * * *
 8         E X H I B I T S
 9
   NO.       DESCRIPTION       PAGE
10
   Exhibit 1  Notices of Rule 30(b)(6)     11
11     deposition
12  Exhibit 2  Ms. Peebles' resident history   29
       report
13
   Exhibit 3  The Residences at Stevens Pond,  31
14     2016 Sample Apartment Lease
       Contract, first page and Move
15     Out Cleaning & Replacement
       Charges addendum
16
   Exhibit 4  The Residences at Stevens Pond,  35
17     2017 sample Apartment Lease
       Contract, first page and Move
18     Out Cleaning & Replacement
       Charges addendum
19
   Exhibit 5  The Residences at Stevens Pond,  36
20     2018 sample Apartment Lease
21     Contract, first page and Move
22     Out Cleaning & Replacement
23     Charges addendum
24
```

Page 4

```
 1         E X H I B I T S, Continued
 2  NO.       DESCRIPTION       PAGE
 3
   Exhibit 6  The Residences at Stevens Pond,  36
 4     2019 sample Apartment Lease
       Contract, first page and Move
 5     Out Cleaning & Replacement
       Charges addendum
 6
   Exhibit 7  The Residences at Stevens Pond,  36
 7     2020 sample Apartment Lease
       Contract, first page and Move
 8     Out Cleaning & Replacement
       Charges addendum
 9
   Exhibit 8  The Residences at Stevens Pond,  37
10     2021 sample Apartment Lease
       Contract, first page and Move
11     Out Cleaning & Replacement
       Charges addendum
12
   Exhibit 9  Resident History Report for    43
13     Joshua Berger
14  Exhibit 10  One Webster, 2016 sample     46
       Apartment Lease Contract, first
15     page and Move Out Cleaning &
       Replacement Charges addendum
16
   Exhibit 11  One Webster, 2017 sample     53
17     Apartment Lease Contract, first
18     page and Move Out Cleaning &
       Replacement Charges addendum
19  Exhibit 12  One Webster, 2018 sample     53
20     Apartment Lease Contract, first
       page and Move Out Cleaning &
       Replacement Charges addendum
21
   Exhibit 13  One Webster, 2019 sample     60
22     Apartment Lease Contract, first
23     page and Move Out Cleaning &
24     Replacement Charges addendum
```

Page 5

```
 1       E X H I B I T S, Continued
 2  NO.        DESCRIPTION       PAGE
 3
 4  Exhibit 14  One Webster, 2020 sample    60
       Apartment Lease Contract, first
 5     page and Move Out Cleaning &
       Replacement Charges addendum
 6  Exhibit 15  One Webster, 2021 sample    60
       Apartment Lease Contract, first
 7     page and Move Out Cleaning &
       Replacement Charges addendum
 8
 9  Exhibit 16  Defendants' Stipulation     61
       Regarding Leases
10
11  Exhibit 17  Apartment Lease Contract for  65
12     Mr. Berger, et al., dated
13     7/21/18
14
15  Exhibit 18  Apartment Lease Contract for  66
16     Ms. Peebles, et al., dated
17     8/17/17
18
19  Exhibit 19  Statement of Security Deposit,  67
20     dated 8/23/18, to Ms. Peebles
21
22
23
24              * * * *
```

2 (Pages 2 - 5)

Page 6

1    P R O C E E D I N G S
2        THOMAS L. MANZO
3    a witness called for examination by the Plaintiffs,
4    having been satisfactorily identified by the
5    production of his driver's license and being first
6    duly sworn by the Notary Public, was examined and
7    testified as follows:
8        DIRECT EXAMINATION
9    BY MR. SACHS:
10    Q.  All right.  Thank you.
11       So -- I'm sorry.  So is it Mr. Manzo?
12    Manzo?
13    A.  If we were in Italy, you would say Manzo.
14    But it's been Americanized, so it's Manzo these
15    days.
16    Q.  So now it's Smith, right?  It's --
17    A.  Basically.
18    Q.  All right.
19       All right.
20       Mr. Manzo, my name is Keith Sachs.  I
21    represent the plaintiffs in this matter.
22       And you understand that you're here today
23    for your deposition, correct?
24    A.  Yes.

Page 7

1    Q.  All right.
2       And just briefly, though, I just want to --
3    and I'm going to go into, like, logistics and
4    whatnot, but first I just want you to tell me who is
5    your actual employer?
6    A.  JRK Residential.
7    Q.  Okay.  And JRK Residential, how is that
8    related to JRK Property Holdings, Inc.?
9    A.  We are the management company.
10    Q.  All right.
11       So JRK Residential is, if you will, from an
12    org chart, above JRK Holdings?
13    A.  I don't think so.  I think JRK Holdings --
14    Q.  Is --
15    A.  -- is above JRK Residential.
16    Q.  Okay.  All right.
17       So JRK Holdings is the main entity.  Under
18    that, at least for first tier, is JRK Residential,
19    correct?
20    A.  I don't know the exact corporate structure.
21    I couldn't tell you how they all interact, but I
22    would say Property Holdings is above Residential
23    somehow.
24    Q.  Okay.  That's fine.

Page 8

1       And you're here today to testify on behalf
2    of JRK Property Holdings, Inc., correct?
3    A.  Yes.
4    Q.  All right.
5       As well as Stevens Pond Apartments,
6    correct?
7    A.  Yes.
8    Q.  And One Webster Apartments as well?
9    A.  Yes.
10    Q.  Okay.  All right.
11       And we'll get into those relationships in a
12    little bit, but this is your deposition.
13       Have you ever been deposed before,
14    Mr. Manzo?
15    A.  Yes.
16    Q.  Okay.  So generally just, you know, from a
17    background standpoint, you know, the court reporter,
18    Mr. Loos, is taking down everything that we're
19    saying, right?  So I need to finish my questions
20    before you need to start your answers.  Same thing.
21    I'll let you finish your answers before I start the
22    next question.
23       Mr. Loos can't take down head shakes,
24    things like that.  So we just need to make a record

Page 9

1    that's something that we can all read.
2       If we start talking over one another,
3    Mr. Loos will tell us, I'm sure, especially after
4    the third or fourth time you will do so.
5       If you need to take a break at any time,
6    let me know.  It's fine.  If there's a question
7    pending, obviously I need you to answer that before
8    you take a break.
9       If I ask a question that doesn't make sense
10    to you -- and I guarantee you I will do that -- just
11    say, "Hey, your question doesn't make any sense."
12       All right?
13       So -- and I'm not going to do, you know,
14    what a lot of lawyers do, which is to say, like,
15    "I'm going to assume you understand a question if
16    you answer it," all right?  I'm not.  You know,
17    listen.  If -- you know, don't give me an answer if
18    you're not comfortable with the question.  I'm happy
19    to break it down or whatever it may be.
20       If you need to speak to counsel prior to
21    answering something that really is confusing,
22    totally fine with me.  You need to take a bathroom
23    break, whatever, just you let me know.
24       But those are the basic ground rules.  So

3 (Pages 6 - 9)

Page 10

1  if you're okay with that, we can start moving with
2  this.
3        Are you good with that?
4    A.  Yep.
5        MR. SACHS:  All right.
6        So Alex can -- I just want to take what I
7  marked as Exhibit S and use it as the first exhibit,
8  which is the deposition notices.
9        THE REPORTER:  Do you want me to put them
10  on screen?
11        MR. SACHS:  I don't -- so I know -- it's my
12  understanding that Mr. Manzo -- tell me if -- I
13  believe your counsel has sent you all the exhibits,
14  already.
15        THE WITNESS:  Right.
16        MR. SACHS:  And if you have them, and it's
17  easier for you to just pull them up on your screen
18  rather than, you know, going through the, you know,
19  mechanics of having Alex post them, I'm happy to
20  have you just look at them on your screen.
21        THE REPORTER:  So S will be Exhibit 1?
22        MR. SACHS:  Yeah, so exhibit S will now --
23  for purposes of this deposition, will become
24  Exhibit 1.

Page 11

1        (Document marked as Manzo
2        Exhibit 1 for identification)
3        MR. SACHS:  The way -- and just Mr. -- I'm
4  sorry.
5        MS. McGEE-TUBB:  I'm sorry to interrupt,
6  but I just want to make sure that we're always clear
7  what page the witness is looking at when we're -- if
8  we're all looking at the exhibits individually.
9        So Mr. Manzo, if -- when you're looking at
10  an exhibit, if you can just tell us the number on
11  the bottom of the page -- it says "JRK" followed by
12  a series of numbers -- so that we're sure that we're
13  all on the same place.
14        Keith, does that work for you?
15        MR. SACHS:  Works for me, except for it's
16  not going to work on this one because this is the
17  dep notice.  So it will be, like, three different
18  things that have Pages 1 through 5; but I'm sure we
19  can -- we can deal with it.
20    Q.  But so -- so generally Mr. Manzo, what
21  we've marked as Exhibit 1, which you're looking at,
22  which is Exhibit S that I sent through counsel, are
23  the deposition notices for JRK Property Holdings,
24  Stevens Pond Apartments Property Owner, LLC, and One

Page 12

1  Webster Apartments Property Owner, LLC.
2        Had you, prior to today, had the
3  opportunity to review that -- those documents?
4    A.  Yes.
5    Q.  Okay.  And -- and when I ask you anything
6  about these documents, I'm not asking you anything
7  about what you discussed with your counsel.  That's
8  all privileged or whatever.  So if I say something
9  that sounds like I'm asking that, I'm really not
10  asking.  I'm sure Mathilda will object pretty
11  quickly if I do.
12        So and -- as it relates to these three
13  deposition notices for those three entities, you've
14  been designated as the person to testify on behalf
15  of all the entities, correct?
16    A.  Yes.
17    Q.  Okay.  And you said that your official
18  employer is JRK Residential.
19        What's the full name of JRK Residential?
20    A.  I believe it's JRK Residential Group, Inc.
21    Q.  All right.
22        And so for purposes of the deposition right
23  now, I'm just going to refer to it as "JRK
24  Residential" if that's okay with you.

Page 13

1    A.  Yes.
2    Q.  Is that -- okay.
3        And what is your position with JRK
4  Residential?
5    A.  I am the president.
6    Q.  And how long have you held that position,
7  Mr. Manzo?
8    A.  A little bit more than eight years.
9    Q.  And can you just briefly give me your
10  educational background, high school, college.
11    A.  I went to The Hill School in Pottstown,
12  Pennsylvania.  I went to Dartmouth College in
13  Hanover, New Hampshire.
14    Q.  What year did you graduate from Dartmouth?
15    A.  2007.
16    Q.  All right.  So you don't know any of my
17  friends.  They were long gone before then, long
18  gone.
19        And have you been involved in -- well, let
20  me ask you this:
21        What is JRK Residential's primary business?
22    A.  Operating, managing multifamily properties.
23    Q.  Okay.  And prior to your eight years at JRK
24  Residential, did you have experience in, let's just

4 (Pages 10 - 13)

Page 14

1  call it, property management for residential units?
2      A.  I've been at JRK for 14 years.
3      Q.  Okay.
4      A.  So for the six years prior, I was also
5  working in that.
6      Q.  Okay.  And for how many years that you've
7  been working for JRK have you -- has JRK had
8  properties in Massachusetts?  If you know.
9      A.  I don't know off the top of my head.
10     Q.  Okay.  But you understand now, obviously,
11 that JRK -- and whether it's JRK Residential or it's
12 JRK Holdings -- there's a relationship with
13 properties that they manage in Massachusetts,
14 correct?
15     A.  Yes.
16     Q.  And with respect to what we've marked as
17 Exhibit 1, there's topic schedules on there.
18         So -- and you can certainly look at each
19 one if you like, but is there any one of those
20 topics that have been enumerated which, you know,
21 you have not been designated to testify about?
22         MR. SACHS:  And this, you know, may be,
23 Mathilda, a time for you to state objections if you
24 think that makes sense.

Page 15

1         MS. McGEE-TUBB:  Yes, I think this is the
2  right point.
3         So pursuant to our prior discussion, the
4  three 30(b)(6) deponents here, we've objected to a
5  number of the topics identified in the notices.  We
6  served written objections to those notices of
7  deposition, and we will incorporate and refer to
8  those here.
9         And Keith, pursuant to our discussion in
10 September, we've agreed to go forward with this
11 deposition for these three 30(b)(6) deponents with
12 the understanding that this witness will not answer
13 questions on the objected-to topics, and plaintiffs
14 reserve the right to pursue motion practice at a
15 later date and with the acknowledgement that this
16 was a prior agreement before proceeding with this
17 deposition.
18         MR. SACHS:  Okay.  So -- so I guess
19 maybe -- and I kind of skimmed over this part, and
20 maybe it was because I knew this was coming.
21         As it relates to the little stipulation, I
22 think we have to kind of change that for this.  And
23 so far as -- you know, yes, we're, you know,
24 reserving certain objections until the time of trial

Page 16

1  and motions to strike, but there are objections that
2  you will make during this deposition -- for which we
3  will not be fighting about on the record, and to the
4  extent we need to, we will fight about them in
5  court -- meaning that I know that there's certain
6  things that, you know, generally it would be a
7  privilege issue where you're going to instruct not
8  to answer.  But here, because of your objections,
9  it's my understanding that there will be
10 instructions not to answer, and those are things
11 that we've agreed to deal with in a court setting
12 later.
13         So I just want to make sure, as the
14 questions come out, you make your objection.  I'm
15 not trying to trick you or anything by not doing it,
16 but just make your objection and we can say, "Okay.
17 Yes.  That's subject to what we already talked
18 about."
19         If that makes sense to you.
20         MS. McGEE-TUBB:  That's correct.
21         So obviously, as in any deposition, I may
22 raise objections to form or objections as to
23 privilege.  And if it's with respect to privilege,
24 you know, potentially instruct the witness not to

Page 17

1  answer.
2         If the objection is with respect to the
3  scope of this deposition based on the topics that
4  we've agreed to produce a witness, I will instruct
5  the witness not to answer on that basis.
6         MR. SACHS:  Okay.  Perfect.  And that, I
7  think, encapsulates everything we talked about back
8  in September in terms of what's going to happen here
9  today and the acknowledgement that there's going to
10 be motion practice after the fact.
11         Right?
12         MS. McGEE-TUBB:  Correct.  With the -- the
13 caveat this is a procedure that we -- we both agreed
14 to pursue, yeah.
15         MR. SACHS:  Exactly.  Exactly.
16         And just for the record -- because I do
17 believe from a timing perspective it makes more
18 sense to do it this way than to deal with motions
19 to, you know, quash or whatever the heck there were
20 going to be, to get everything out on the record so
21 we know exactly what we're dealing with at the time
22 of a motion.
23         If that makes sense.
24         MS. McGEE-TUBB:  Right.  Yes.

5 (Pages 14 - 17)

Page 18

1     MR. SACHS:  Okay.  All right.
2     Q.  So -- all right.
3     So -- so basically, Mr. Manzo, as it
4  relates to your testimony today, I'm going to ask
5  questions.  If they fall within the general
6  objections -- which I'm sure, you know, you -- and
7  I'm not asking you to acknowledge anything, but I'm
8  sure you've discussed generally what is
9  objectionable with your counsel and your counsel
10  will object, and we will simply move on.  We will
11  get that on the record.
12     I'm not here to waste your time today.  I'm
13  not here to waste Mathilda's time or Mr. Loos' time,
14  and certainly not mine.  So basically we're going to
15  go through what we can.  And if there's answers that
16  remain that we're going to fight about, what we'll
17  do is what's referred to as suspending the
18  deposition until a court tells us how we have to
19  deal with it.
20     So worst-case scenario, you may actually
21  have to sign on to Zoom again some day, but you
22  won't have to come to my office in beautiful
23  Massachusetts in February, I promise.
24     A.  I appreciate that.

Page 19

1     Q.  All right.
2     So as it relates to JRK Property Holdings,
3  what is the relationship between JRK Property
4  Holdings and the One Webster Apartments Property
5  Owner, LLC?
6     A.  JRK Property Holdings ultimately controls
7  One Webster.
8     Q.  Okay.  So from that standpoint, is there
9  any shared ownership between the entities?  That is
10  you know, whoever the owner is, if you will --
11  whether they're stockholders or whatever they may be
12  of JRK Holdings -- are they the same owners of One
13  Webster?
14     A.  I don't know.
15     Q.  But that would be present in some corporate
16  document somewhere I'm assuming, correct?
17     A.  I assume so.  I don't know.
18     Q.  And this is not -- there's no score for
19  this deposition.  This is not a test.  All right?
20  So if you don't know just -- that's fine.  That's
21  totally fine.  Just tell me you don't know.
22  Because, again, I don't want to waste your time
23  continuing to ask the same question that you don't
24  know the answer to.

Page 20

1     All right?
2     So do you know -- aside from ownership, do
3  you know if there are the identical officers for JRK
4  Property Holdings and One Webster?
5     A.  I don't know.  I don't know the structure.
6     Q.  Okay.  So as far as One Webster itself, do
7  you know whether One Webster has employees?
8     A.  One Webster is the owner of the actual
9  apartment building.
10     Q.  Okay.  So -- all right.  So let's talk
11  about that.
12     One Webster, as the owner of the
13  property -- and so -- and can we just agree that
14  when we're talking about entities like One Webster
15  or Stevens Pond, when we say it's the owner of a
16  property, we're talking about the apartment complex
17  that's at issue, correct?
18     A.  Yes.
19     Q.  Okay.  So One Webster owns the property in
20  which the -- on which the apartments exist, correct?
21     A.  Yes.
22     Q.  Okay.  So does One Webster itself have its
23  own, you know, cadre of management people who get
24  paid by One Webster?

Page 21

1     A.  My understanding is they are employees of
2  JRK Residential Group, the management company.
3     Q.  Okay.
4     A.  JRK Residential Group is contracted by One
5  Webster to run the property.
6     Q.  Okay.  So is it -- I mean, and I may be
7  using legal terms so I'll probably draw an
8  objection, but is it fair to say that One Webster is
9  essentially a single-purpose entity in terms of just
10  owning the property where the apartments exist?
11     MS. McGEE-TUBB:  Objection.
12     You can answer, if you know.
13     THE WITNESS:  I don't know the technical
14  answer to that.
15     MR. SACHS:  I knew I was right about
16  getting objections.  I knew I was right about it.
17     Q.  All right.
18     So as far as -- so -- so One Webster, for
19  instance, right, it's got tenants, and we'll go
20  through the number of units and whatnot.
21     If I'm a tenant at One Webster, to whom do
22  I make my rent check to on a monthly basis?
23     A.  One Webster.
24     Q.  Okay.  And One Webster, then, is that money

6 (Pages 18 - 21)

Page 22

1  then paid to -- and, again, because of -- I wasn't
2  aware of the JRK Residential Group prior to today,
3  so if I start mixing up JRK Holdings and JRK
4  Residential, just, you know, forgive me, but I'm
5  going to try to be clear about it.
6       But as far as the rent checks when they're
7  collected by One Webster, does that money all then
8  just go straight to JRK Holdings, if you know?
9    A.  I don't think so.  I think One Webster
10 operates its own bank account --
11   Q.  Okay.
12   A.  -- does it own economics, accounting.
13   Q.  I'm sorry.  Go ahead.
14   A.  I believe One Webster does its own
15 accounting.
16   Q.  So ultimately, you know, what would ever be
17 profits from One Webster, are those all profits that
18 would then go to JRK Holdings?
19     MS. McGEE-TUBB:  Objection.
20     THE WITNESS:  No.
21   BY MR. SACHS:
22   Q.  Okay.  So One Webster has its -- sorry.
23 The door just opened.
24     So One Webster, on its own, has its own

Page 23

1  bank accounts and holds monies for tenants for rent;
2  is that correct?
3    A.  Yes.
4    Q.  Okay.  And as it relates to security
5  deposits at One Webster, are those checks made out
6  to One Webster as well?
7    A.  Yes.
8    Q.  All right.
9       So does at any time JRK Holdings or JRK
10 Residential get money from One Webster as part of
11 its management of One Webster?
12     MS. McGEE-TUBB:  Objection.
13     Can you split that up?
14     MR. SACHS:  Sorry.
15   Q.  So -- all right.  So let me just back up.
16     So it's my understanding that JRK Property
17 Holdings or JRK Residential Group -- and correct me
18 which one -- is the management arm over One Webster;
19 is that correct?
20   A.  It's JRK Residential is the contracted
21 management company.
22   Q.  Okay.  So as the contracted management
23 company, does JRK Residential get money from One
24 Webster as the contracted management company?

Page 24

1    A.  They would get the management fee.
2    Q.  And do you know what the -- the -- the way
3  the management fee is set between the two entities?
4      MS. McGEE-TUBB:  Objection.
5      THE WITNESS:  I believe it's five percent
6  of income.
7    BY MR. SACHS:
8    Q.  Okay.  So as it relates to security
9  deposits and things like that, is that all money,
10 that's just held by One -- and again, we're just on
11 One Webster right now -- is that money that's held
12 by One Webster in a One Webster named account?
13     MS. McGEE-TUBB:  Objection.
14     THE WITNESS:  I believe so.
15   BY MR. SACHS:
16   Q.  All right.
17     So other than the -- and I'm not saying
18 it's absolute, but call it approximately a five
19 percent management fee, is there any other monies
20 that JRK Residential gets through its management
21 contract with One Webster?
22   A.  Not that I'm aware of, but I haven't
23 reviewed that contract.
24   Q.  Okay.  So just excuse me while I take some

Page 25

1  notes Mr. Manzo, okay?
2      So as it relates then to -- and I'm going
3  to ask all the same questions as it relates to JRK
4  Residential and -- well, let me just -- because I
5  just want to be clear about this.
6      Because is it fair to say that JRK
7  Residential Group and JRK Property Holdings,
8  although they're separate entities, that when we
9  talk about them in terms of who receives money, are
10 they -- do you look at them as the same entity for
11 purposes of receiving money from things that they
12 manage or not?
13     MS. McGEE-TUBB:  Objection.
14     THE WITNESS:  I don't know.  I don't.  I
15 don't know the technical answer to the structures.
16   BY MR. SACHS:
17   Q.  Okay.  So -- but it's fair to say that JRK
18 Residential Group is within the JRK Holdings family,
19 but it's just an entity that comes, you know,
20 structurally under JRK Holdings, correct?
21   A.  That's my understanding.  I have never gone
22 through all of the various documents.
23   Q.  No.  I understand that.  I'm sorry.
24     I mean, this is kind of a new thing for me,

7 (Pages 22 - 25)

Page 26

1  too, in terms of this other entity about which I
2  wasn't aware.
3      But is it fair to say that JRK Holdings as,
4  you know, call it the parent of JRK Residential,
5  would share in monies obtained by JRK Residential
6  through its management contracts?
7      MS. McGEE-TUBB:  Objection.
8      THE WITNESS:  I -- I don't know how the
9  agreement works.
10  BY MR. SACHS:
11  Q.  Okay.
12  A.  No.
13  Q.  No.  That's fine.
14      So all the things we just talked about as
15  it relates to JRK Residential Group and One Webster
16  as it relates to ownership, officers, management,
17  that kind of stuff, is that -- this the same
18  relationship that JRK Residential Group has with
19  Stevens Pond Apartments Property, LLC?
20  A.  Yes.
21  Q.  Okay.  So same thing in terms of it's a
22  management contract with a management fee, correct?
23  A.  Yes.
24  Q.  Okay.  So do you -- as far as you know --

Page 27

1  if you were to say, you know, the head, if you will,
2  of One Webster, give me a name.
3      Is there a person who is the head, the
4  management of One Webster?
5      MS. McGEE-TUBB:  Objection.
6      THE WITNESS:  I don't think I understand
7  the question.
8  BY MR. SACHS:
9  Q.  Sure.
10      I mean, as far as One Webster Property
11  Owner, LLC, does it have a manager?
12  A.  No -- I don't know.  I don't know.
13  Q.  Okay.  And then the same thing with
14  Stevens -- Stevens Pond Apartments Property Owner,
15  LLC, does that have a manager?
16  A.  I don't know.
17  Q.  So as it relates to both One Webster and
18  Stevens Pond, are there people on site at those
19  properties who are actual employees of either One
20  Webster or Stevens Pond?
21  A.  I believe they're employees of JRK
22  Residential Group.
23  Q.  Are you aware whether either One Webster or
24  Stevens Pond has any employees of their own?

Page 28

1  A.  Not that I'm aware of.
2  Q.  All right.
3      And in Massachusetts, are there other
4  properties that JRK -- JRK Residential has a
5  management contract with?
6      MS. McGEE-TUBB:  Objection.  This is a
7  question I'm going to ask the witness not to answer
8  based on our objections to the deposition notices.
9      MR. SACHS:  Okay.
10      So I'm not asking for identification of
11  properties, just a simple question of whether there
12  are other entities.  If it's the same objection,
13  that's fine.  I just want to be clear about it.
14      MS. McGEE-TUBB:  You can ask the "yes" or
15  "no," question, but beyond that, beyond that, this
16  is beyond the scope.
17      MR. SACHS:  Okay.
18  Q.  So the simple question of other than One
19  Webster and Stevens Pond, are there other entities
20  in Massachusetts, residential apartments that JRK
21  Residential has a management contract with?
22  A.  Yes.
23  Q.  All right.
24      And -- all right.  We'll move on.

Page 29

1      All right.
2      So I want to now start getting -- and I'm
3  going to try to go through these pieces of paper as
4  quickly as possible.
5      And at this point, other than starting with
6  the last one, which we marked as -- as 1, I'm
7  actually going to go to what would be your packet,
8  Mr. Manzo, as Exhibit A, which will now become
9  Exhibit 2, if you will.
10      (Document marked as Manzo
11      Exhibit 2 for identification)
12      MR. SACHS:  Are you there, Mathilda?
13      MS. McGEE-TUBB:  I'm there, yes.
14      Mr. Manzo, does that make sense to you?
15      THE WITNESS:  Yeah, I have it.
16      MR. SACHS:  Okay.  All right.
17      So Exhibit A -- and Mr. Loos, this would
18  then be Exhibit 2 as far as we're going.
19  Q.  And Mr. Manzo, this is a document that was
20  produced by JRK.
21      Have you ever seen this before?
22  A.  Yes.
23  Q.  Okay.  And can you tell me what it is?
24  A.  It's a general ledger.

8 (Pages 26 - 29)

Page 30

1  Q.  Okay.  And what is a general ledger?
2     I'm a blue-collar kid from Jersey.  I don't
3  know much of this stuff, so -- all right.
4     A.  It just records the charges and payments of
5  the individual resident.
6     Q.  Okay.  And the one that we're looking at
7  that we just marked Exhibit 2, this is for the
8  Residences at Stevens Pond, correct?
9     A.  Yes.
10    Q.  All right.
11       And is that just another name for Stevens
12  Pond Owners, LLC?
13    A.  Yes.
14    Q.  Okay.  So from a legal standpoint, whether
15  it's the Residences at Stevens Pond or Stevens Pond
16  Property Owner, LLC, it's the same entity?
17    A.  Yes.
18       MS. McGEE-TUBB:  Objection.
19  BY MR. SACHS:
20    Q.  Was that a "yes"?
21    A.  Yes.
22    Q.  All right.
23       And I have -- despite the, you know, six
24  pages here, I have one question about this document.

Page 31

1        On the first page of it, in the upper
2  left-hand corner, prior to all the listings where it
3  says "326 Apartments," do you see that?
4     A.  Yes.
5     Q.  All right.
6        Is that a fair description of the number of
7  units at the Residences at Stevens Pond?
8     A.  Yes.
9        MR. SACHS:  All right.
10       Let's go to the next the exhibit, which
11  will be B in your packet, Mr. Manzo, it will now be
12  3.
13       (Document marked as Manzo
14        Exhibit 3 for identification)
15  BY MR. SACHS:
16    Q.  So just for clarity, JRK has produced a
17  number of what we'll call --
18       MR. SACHS:  Mathilda, tell me if this is
19  wrong.
20    Q.  -- exemplar leases for the time periods
21  that are that are at issue.  But rather than giving
22  you the entire lease for each one that I want to go
23  through, what I have given you is the first page of
24  the lease and then the Move Out Cleaning &

Page 32

1  Replacement Charges addendum, if you will, at the
2  end of it.
3        So if there's anything unclear as you're
4  looking at this, I just want you to know I've only
5  included the first page of the lease and the
6  attachment at the end.
7        Does that make sense to you?
8     A.  Yes.
9     Q.  Okay.
10       MS. McGEE-TUBB:  And so just to be clear,
11  your questions are only going to be the pages that
12  are included in these exhibits, right?
13       MR. SACHS:  No.  There will be ten trick
14  questions about the pages that are not here, I
15  swear.
16       MS. McGEE-TUBB:  I'm ready for those to
17  come.
18       MR. SACHS:  Sorry.  That's the Jersey in
19  me, you know.  Sorry.
20       No.  Yeah.
21       So -- and honestly, the questions are
22  really only going to be about the cleaning charge
23  thing at the back.  The front page is really just to
24  establish that this is the front page of the lease.

Page 33

1  That's it.
2        There's going to be no lease questions,
3  just addendum questions, because I figured it was
4  the least I could do, okay?
5        In any event, so what we've marked as
6  Exhibit 3, Mr. Manzo, this is a lease dated for
7  October 22nd, 2016, and it has an address of
8  Founders Way.
9        Do you know what property that relates to?
10    A.  Stevens Pond.
11    Q.  Okay.  All right.
12       So this is a Stevens Pond lease.
13       Is that a document that you're familiar
14  with?
15    A.  Yes.
16    Q.  Okay.  And the second page of this, which
17  is marked as JRK 602, is the Move Out Cleaning &
18  Replacement Charges.
19       Do you see that?
20    A.  Yes.
21    Q.  All right.
22       And that's a document you're familiar with?
23    A.  Yes.
24    Q.  Okay.

9 (Pages 30 - 33)

Page 34

1       And about, you know, a 16th of the way down
2   the page, there's a writing that starts with
3   "resident is required."
4       Do you see that?
5   A.  Yes.
6   Q.  All right.
7       It says:
8           "Resident is required to have the
9       apartment professionally cleaned and carpet
10      cleaned upon move out.  If the apartment is
11      not returned to us in this condition, the
12      following charges will be applied:"
13      Did I read that correctly?
14  A.  Yes.
15  Q.  All right.
16      And then that piece of paper lists out a
17  bunch of different charges for different types of
18  cleaning and painting, correct?
19  A.  Yes.
20      MS. McGEE-TUBB:  Objection.
21      MR. SACHS:  All right.
22      Moving onto the next exhibit, which is C in
23  your packet, which will be, what, 4 now, Mr. Loos?
24      THE REPORTER:  Yes.

Page 35

1       (Document marked as Manzo
2       Exhibit 4 for identification)
3   BY MR. SACHS:
4   Q.  And this -- and like I said, I don't want
5   to waste your time.  I will represent to you that
6   this is the same exact front page of a lease with
7   the same exact cleaning addendum; it's just for, you
8   know, a 2017 lease.
9       And my questions would be the same, that
10  does this exhibit contain the same language in the
11  cleaning, the move out and -- Move Out Cleaning &
12  Replacement Charges as the one I read previously?
13      MS. McGEE-TUBB:  Mr. Manzo, you can -- you
14  can take a moment to look at the document to answer
15  that question as well.
16  BY MR. SACHS:
17  Q.  Yes.  No, I wasn't trying not to have you
18  look at it.  All I'm saying is we don't need to
19  restate the same question for each of these
20  documents.  I just want you to take a look at it and
21  you can confirm for me whether it's the same
22  language.
23  A.  Yes, it is.
24      MR. SACHS:  And then the next exhibit,

Page 36

1   which will be D in your packet, which will be 5.
2       (Document marked as Manzo
3       Exhibit 5 for identification)
4   BY MR. SACHS:
5   Q.  This is also a Stevens Pond property lease
6   beginning in 2018.
7       Does that also have the same language in
8   the Move Out Cleaning & Replacement Charges?
9   A.  Yes.
10      MR. SACHS:  The next exhibit, which is E in
11  your packet, which will be 6.
12      (Document marked as Manzo
13      Exhibit 6 for identification)
14      MR. SACHS:  This is a 2019 lease, also for
15  Stevens Pond.
16  Q.  Does that have the same language that we've
17  been discussing in the Move Out Cleaning &
18  Replacement Charges piece?
19  A.  Yes.
20      MR. SACHS:  The next exhibit, F in your
21  packet, now 7 for purposes of the deposition.
22      (Document marked as Manzo
23      Exhibit 7 for identification)
24

Page 37

1   BY MR. SACHS:
2   Q.  This is a 2020 Stevens Pond lease.
3       Does this also have the same language in
4   the Move Out Cleaning & Replacement Charges?
5   A.  Yes.
6       MR. SACHS:  Okay.  And then Exhibit G,
7   which will now be Exhibit 8 for the deposition.
8       (Document marked as Manzo
9       Exhibit 8 for identification)
10  BY MR. SACHS:
11  Q.  This is a 2021 Stevens Pond lease.  And on
12  the Move Out Cleaning & Replacement Charges, do you
13  notice that the language is actually different than
14  the -- the others that we just went through?
15  A.  Yes.
16  Q.  All right.
17      And can you -- so as far as the difference,
18  I think it's the second sentence.  Whereas, the
19  earlier ones all had the sentence that said "if the
20  apartment is not returned to us in this condition,
21  the following charges will be applied," right?
22      MS. McGEE-TUBB:  Objection.
23  BY MR. SACHS:
24  Q.  Did I read that correctly?

10 (Pages 34 - 37)

Page 38

1    I can go back. I'm looking at Exhibit 7,
2 which is the same as the previous before it, the
3 language, that says:
4        "If the apartment is not returned to
5        us in this condition, the following charges
6        will be applied:"
7    Did I read that correct on Exhibit 7, which
8 was Exhibit F in your packet?
9    A. Are you asking me?
10   Q. Yes.
11   A. I'll reopen that and look.
12   And can you read it again? I had closed
13 the exhibit.
14   Q. Yeah. So it's just -- I'll read the whole
15 thing:
16        "Resident is required to have the
17        apartment professionally cleaned and carpet
18        cleaned upon move out. If the apartment is
19        not returned to us in this condition, the
20        following charges will be applied:"
21        Right? I read that correctly from
22 Exhibit 7, Exhibit F in your packet?
23   A. Yes.
24   Q. Okay. And then what we've marked as

Page 39

1 Exhibit 8, that says on the Move Out Cleaning &
2 Replacement Charges, it says:
3        "Resident must ensure the apartment is
4        cleaned before move out; this may require
5        the resident to have the apartment
6        professionally cleaned. The following
7        charges apply to apartments with damage or
8        cleanliness issues beyond normal wear and
9        tear:"
10       Do you agree that that is different than in
11 the previous leases that we read?
12   A. Yes.
13   Q. Okay. And do you know why that language
14 was changed in the 2021 lease?
15   MS. McGEE-TUBB: Objection.
16   You can answer, to the extent you know and
17 that wouldn't reveal any privileged communications.
18   BY MR. SACHS:
19   Q. Yeah. So I'm certainly not asking you to
20 tell me anything you've talked with your lawyer.
21 I'm just talking about, in the usual course of
22 business, do you know why that would have been
23 changed without reference to any legal
24 conversations?

Page 40

1    A. That more accurately reflects our policy
2 and procedure.
3    Q. Okay. And so when you say it more
4 accurately reflects your policy and procedure, in
5 2020, what was your policy and procedure as it
6 related to Move Out Cleaning & Replacement Charges?
7    MS. McGEE-TUBB: Objection.
8    Are you referring to a specific property?
9    BY MR. SACHS:
10   Q. Sorry. Yeah. We're on the Stevens Pond
11 one, so I'm just -- fair enough -- Stevens Pond.
12   A. Each move out was dealt on a case-by-case
13 basis with the property manager on site.
14   Q. Okay. And in -- let's just use 2020.
15   Who was the property manager on site at
16 Stevens Pond?
17   A. I don't know.
18   Q. So -- but was that -- so would the property
19 manager on site at Stevens Pond in 2020, that would
20 have been a JRK employee, correct?
21   A. Yes.
22   Q. Okay. So do you know if there was any
23 certain criterion that the property manager on site
24 at Stevens Pond would use to determine whether, you

Page 41

1 know, cleaning or other repairs were needed because
2 they were beyond normal wear and tear?
3    A. Our policy would be for them to walk the
4 apartment with the resident, or at least attempt to.
5 Sometimes the resident, you know, can't schedule or
6 can't make it, et cetera.
7    Q. Yes.
8    A. And would evaluate it for damages above
9 wear and tear, and discuss what would be charged to
10 the resident, obviously giving them an opportunity
11 to potentially mitigate those charges.
12   Q. Okay. So did -- and I'm just, for -- for
13 purposes of our discussion, you know, in the 2000 --
14 when did we start? 2016 is the time period -- 2016
15 to 2020 time frame, did Stevens Pond have, you know,
16 a definition of what "normal wear and tear" was when
17 it would do these move-out evaluations --
18 evaluations about whether work needed to be done?
19   A. It's done based on industry standard.
20   Q. Okay. And is -- you know, is there an
21 industry standard that Stevens Pond used as it
22 related to normal wear and tear? Like was it
23 published somewhere is my point.
24   A. It's a judgment call made by the property

Page 42

1  manager.
2     Q.  Okay.  Is that evaluation of, you know,
3  normal wear and tear something that you personally
4  have had to do in your job at JRK Residential for
5  Massachusetts properties at any time?
6     A.  No.
7     Q.  So as far as any evaluation of normal wear
8  and tear, that would fall to whoever the property
9  manager on site was at Stevens Pond at any given
10  time in the years of 2016 to 2020, correct?
11     A.  Correct.
12     Q.  And do you -- and I know I asked you
13  specifically about 2020.  But do you know, sitting
14  here today, the identities of any of the on-site
15  property managers at Stevens Pond between 2016 and
16  '20?
17     A.  I remember some of them, but not all of
18  them.
19     Q.  Okay.  Any names that can fall trippingly
20  off the tongue at this point or --
21     A.  Kristen Goshorn.
22     Q.  Do you know how to spell the last name?
23     A.  G-o-s-h-o-r-n.
24     Q.  Okay.  Anybody else you remember?

Page 43

1     A.  I believe Melissa Haberman.
2     Q.  And do you know whether JRK provided the --
3  you know, we'll just refer to them as the on-site
4  property managers at Stevens Pond -- provided them
5  with any training as it related to what is and what
6  is not normal wear and tear for purposes of charging
7  tenants at the time of move out?
8     A.  No.
9        MR. SACHS:  All right.
10        So I'm going to move on to Exhibit H, which
11  will be -- are we at 9 now, Mr. Loos?
12        THE REPORTER:  Yes.
13        (Document marked as Manzo
14        Exhibit 9 for identification)
15     BY MR. SACHS:
16     Q.  All right.
17        And now we're moving on to One Webster.
18        Well, before -- hang on a second.
19        Before I move on to this next exhibit, as
20  it relates to Stevens Pond in the 2016 to 2020 time
21  period, are you aware of how often tenants on move
22  out would be charged for -- and I'll take one
23  example -- for touch-up paint?  Do you know how
24  often that would happen?

Page 44

1     A.  No.
2     Q.  Okay.  Would you know how often they would
3  be charged for carpet cleaning?
4     A.  No.
5     Q.  But would Stevens Pond or JRK have records
6  that show all those charges that were sent to
7  tenants moving out in the 2016 to 2020 time period?
8     A.  Yes.  It was obviously a long time ago.  I
9  don't know if we have all of them, but we certainly
10  would have some of them.
11     Q.  So it would certainly be Stevens Pond, if
12  not JRK as the management arm, it would be either
13  Stevens Pond or JRK's policy to keep a record of
14  everybody they charged any move-out touch-up paint
15  or carpet cleaning or anything like that, correct?
16     A.  Yes.
17        MS. McGEE-TUBB:  Objection.
18     BY MR. SACHS:
19     Q.  Okay.  All right.
20        So Exhibit 9 --
21        MS. McGEE-TUBB:  Before you move on to One
22  Webster, we've been going almost an hour, not quite
23  an hour.  But if we want take to take a break at
24  around an hour point, is this a good time?

Page 45

1        MR. SACHS:  No.  That's fine.  Yeah.
2  That's fine.
3        MS. McGEE-TUBB:  Why don't we take a short
4  break just because it seems like a good pause point.
5  Just, you know, five or ten minutes.
6        MR. SACHS:  No.  We're changing entities.
7  I will not read anything into that.
8        MS. McGEE-TUBB:  I truly thought it was a
9  natural break.  Again, so we can go off record.
10        Thank you.
11        MR. SACHS:  Totally fine.
12        Ten minutes?
13        MS. McGEE-TUBB:  That's good.  Thanks.
14        MR. SACHS:  Awesome.  Thank you.
15        (Recess taken)
16     BY MR. SACHS:
17     Q.  On what in your packet, Mr. Manzo, was
18  Exhibit H, which should be 9 for the exhibit, and
19  that is a resident history report from One Webster.
20        Do you see that?
21     A.  I do.
22        MS. McGEE-TUBB:  I'm sorry.  I just want to
23  to be clear.
24        This is Exhibit H, which is now Exhibit 9?

Page 46

1     MR. SACHS: 9, yes.
2     MS. McGEE-TUBB: Okay. Thank you.
3     BY MR. SACHS:
4     Q.   And is this similar to the report we looked
5   at for -- for Stevens Pond earlier?
6     A.   Yes.
7     Q.   Okay. And this document shows, on the
8   upper left-hand side, that One Webster has
9   121 units, correct?
10    A.   Yes.
11    MR. SACHS: And now we're going to do the
12  same thing that we did with One Webster as it
13  relates to One Webster and the -- the leases.
14    So Exhibit I, which will now be 10 for
15  purposes of the deposition --
16    (Document marked as Manzo
17    Exhibit 10 for identification)
18    MR. SACHS: -- I'll represent is a 2000 --
19  a July 8th 2016, One Webster lease that has the Move
20  Out and Cleaning -- sorry, Move Out Cleaning &
21  Replacement Charges addendum similar -- well, strike
22  that. Identical, if you will, if you agree, to the
23  one that was on the Stevens Pond leases.
24    Q.   Do you see that?

Page 47

1     MS. McGEE-TUBB: Objection.
2     MR. SACHS: Well, I'll -- all right. I'll
3   ask it as a question rather than a statement.
4     Q.   Mr. Manzo, as it relates to what's been
5   marked as Exhibit 10, is the Move Out Cleaning &
6   Replacement Charges document, is that identical to
7   the one that was on the lease for 2016 to the
8   Stevens Pond property?
9     A.   I would have to compare them side by side.
10    Q.   Okay. Let me just tell you which one is
11  which, then.
12    So the 2016 Stevens Pond is -- hang on a
13  second; my apologies -- is -- would be Exhibit B in
14  your packet, Exhibit 3 for purposes of the
15  deposition.
16    So just take a minute, look at that and let
17  me know if you can agree that it's the same addendum
18  as it relates to move out and cleaning.
19    MS. McGEE-TUBB: Objection.
20    Are you asking him if they're the addendum
21  or -- I mean, there's a bunch of numbers on both of
22  those pages. Are you asking him to compare the full
23  documents?
24    MR. SACHS: I'm asking him to compare the

Page 48

1   language that starts with "resident is required"
2   that ends in the second sentence with "charges will
3   be applied" and whether that is the same.
4     THE WITNESS: That is the same.
5     MR. SACHS: And that doesn't include a
6   number.
7     THE WITNESS: That language is the same.
8     BY MR. SACHS:
9     Q.   Okay. All right.
10    So that language is the -- same for
11  both -- and this is just the 2016 lease. And I
12  think with regard to Stevens Pond we went
13  through 2016, '17, '18, '19 and '20, and the
14  language was the same in all of those Move Out
15  Cleaning & Replacement Charges attachments, correct?
16    MS. McGEE-TUBB: Objection.
17    MR. SACHS: Well, I mean, if you recall. I
18  mean, we can go back through them again, but --
19    THE WITNESS: Can you just restate that,
20  please.
21    MR. SACHS: Sure.
22    Q.   As it relates to what we went through, the
23  exhibits on the Stevens Pond property, we went
24  through a 2016 lease, '17 lease, '18 lease, '19

Page 49

1   lease, and a '20 lease -- and those all had the
2   identical language in the move out and cleaning --
3   Move Out Cleaning & Replacement Charges attachment,
4   correct?
5     MS. McGEE-TUBB: Objection.
6     You can answer, if you remember.
7     THE WITNESS: I know it change -- I don't
8   remember what year it changed, but correct. At
9   least for the first couple of addendums.
10    BY MR. SACHS:
11    Q.   So it wasn't until the 2021 Stevens Pond
12  lease that we saw a change in the language, correct?
13    A.   Correct.
14    Q.   Okay. All right.
15    So as it relates to both Stevens Pond and
16  One Webster, was it the policy of each Stevens Pond
17  and One Webster to charge tenants if the apartment
18  wasn't -- quote, unquote -- "professionally
19  cleaned"?
20    A.   No.
21    Q.   Okay. What was the policy as it related to
22  professional cleaning for both One Webster and
23  Stevens Pond in the 2016 to 2020 date period?
24    A.   It was handled on a case-by-case basis with

13 (Pages 46 - 49)

Page 50

1  the property manager. And, you know, any charges
2  would have had to be above wear and tear.
3      Q. Okay. And as it related -- we talked about
4  this before.
5          As it relates to wear and tear, there was
6  no training of those property managers as to what
7  wear and tear, normal wear and tear actually was,
8  correct?
9      MS. McGEE-TUBB: Objection.
10         THE WITNESS: It's industry standard.
11  They're professional property managers. They use
12  their experience to make that determination.
13     BY MR. SACHS:
14     Q. Okay. So when you say -- and I may be
15  repeating myself.
16         But when you say "industry standard," is
17  there a specific industry standard publication or
18  any sort of writing that I can look to right now
19  that says, "This is the industry standard for what
20  is above and beyond normal wear and tear"?
21     A. Not that I'm aware of.
22     Q. Okay. And what about -- same question as
23  it relates to, you know, carpet cleaning.
24         Was it Stevens Pond and One Webster's

Page 51

1  policy, between 2016 and 2020, to charge tenants at
2  move out for the carpet cleaning?
3      A. You would have to be more specific. It was
4  the policy to charge for excessive carpet damage --
5      Q. Okay.
6      A. -- where applicable.
7      Q. So as it relates to the carpet cleaning,
8  you know, I think you said what was, you know,
9  excessive carpet cleaning that had to be done.
10         What would that mean?
11     MS. McGEE-TUBB: Objection.
12     BY MR. SACHS:
13     Q. Or you can restate what you said because I
14  paraphrased it incorrectly.
15     A. Any damage determined by the manager, and
16  hopefully the resident, during the final walk above
17  normal wear and tear would be charged back to the
18  resident.
19     Q. So as it relates to carpets, what was
20  Stevens Pond and One Webster's policy as it related
21  to determining what was beyond normal wear and tear
22  for a carpet?
23     A. It was a judgment call made by the property
24  manager based on the walk of that specific

Page 52

1  apartment.
2      Q. Okay. And do you know what would be -- in
3  making that judgment call, what that -- that
4  property manager would consider?
5      A. I mean, I think you're asking for examples.
6      Q. Yeah.
7      A. So, you know, pet damage, urine, staining,
8  things of that nature.
9      Q. Okay. So -- so is it your testimony that
10  neither Stevens Pond nor One Webster charged tenants
11  at move out for carpet cleaning as a regular charge?
12     A. I would have to review every single move
13  out.
14     Q. Okay. So the -- so you would agree that
15  the only way to determine, you know, who was charged
16  for what at move out -- whether it was touch-up
17  paint, carpet cleaning or anything else -- would be
18  to review all the records of both Stevens Pond and
19  One Webster?
20     MS. McGEE-TUBB: Objection.
21         THE WITNESS: Yes. You would have to
22  really be there at that time to make that
23  determination.
24     MR. SACHS: Okay. All right.

Page 53

1          So moving on to the next exhibit, which is
2  Exhibit J in your packet, which will now be
3  Exhibit 11 for purposes of the deposition.
4          (Document marked as Manzo
5          Exhibit 11 for identification)
6  BY MR. SACHS:
7      Q. This is a May 17, 2017, One Webster lease,
8  with a Move Out Cleaning & Replacement Charges
9  addendum.
10         Again, the same question. Is that the
11  identical language to the 2016 One Webster cleaning
12  addendum that we just looked at?
13     A. Yes.
14     MR. SACHS: Moving to Exhibit K in your
15  packet, which will be Exhibit 12 for deposition.
16         (Document marked as Manzo
17         Exhibit 12 for identification)
18  BY MR. SACHS:
19     Q. It's a May 2, 2018, One Webster lease,
20  front page, with the Move Out Cleaning & Replacement
21  Charges attachment.
22         Is that the same language as both the 2016
23  and '17 that we just looked at?
24     A. Yes.

14 (Pages 50 - 53)

Page 54

1    Q.  And I just want to be clear that the
2  language is very specific, right?  It says:
3        "If the apartment is not returned to
4        us in this condition, the following charges
5        will be applied:"
6        "Will be applied," correct?  Did I read
7  that correctly?
8    A.  Yes.
9    Q.  Okay.  And as far as -- let's just take a
10  couple of examples.
11        Like painting, right?  What -- what
12  determination was made into whether painting needed
13  to be done and charged to a tenant at the time of
14  move out?
15        MS. McGEE-TUBB:  Objection.
16        THE WITNESS:  Again, it would be subject to
17  the move out walk.  The property manager, if they
18  saw holes in the wall, marks, damage, things that
19  are above normal wear and tear, would make a
20  determination as to what that cost the property and
21  bill it back to the resident.
22    BY MR. SACHS:
23    Q.  Okay.  So did -- did both Stevens and --
24  break it out if the policies are different -- but

Page 55

1  did both Stevens Pond and One Webster have a policy
2  that they would repaint every unit at the end of
3  every tenancy?
4    A.  It depends.  Units -- it depends on the
5  situation.  Sometimes people break their lease after
6  a month and something like that wouldn't be
7  necessary.
8    Q.  Okay.  So let's -- let's just say it's a
9  normal one-year lease.
10        At the end of a one-year lease, would it be
11  Stevens Pond and One Webster's general policy to
12  repaint the entire unit at the end of that?
13    A.  They would paint it as needed.
14    Q.  Okay.  And what goes into the -- the
15  calculation as to "as needed" for repainting an
16  entire unit?
17    A.  It's a judgment call made by the property
18  manager.
19    Q.  Okay.  So you would agree that when someone
20  moves into an apartment, they generally hang
21  pictures, right?
22    A.  Yes.
23    Q.  They hang mirrors, correct?
24    A.  We provide some mirrors, but they might.

Page 56

1    Q.  Sure.
2        But people are generally putting nails in a
3  wall, right, when they move in to hang a picture or
4  something else, correct?
5    A.  Yes.
6    Q.  All right.
7        So you would agree that, you know, when
8  someone leaves and they've removed the nails and
9  there's a hole, that that hole is generally a normal
10  wear and tear of a tenancy, correct?  Would you
11  agree with that?
12        MS. McGEE-TUBB:  Objection.
13        THE WITNESS:  I think it depends how they
14  hang it.  There's more destructive ways to hang them
15  than other ways.
16    BY MR. SACHS:
17    Q.  Okay.
18    A.  But...
19    Q.  Well, so let me ask you this:
20        What would you, as a representative of JRK,
21  consider "normal" for purposes of hanging a picture?
22        MS. McGEE-TUBB:  Same objection.
23        THE WITNESS:  Small nail --
24        MS. McGEE-TUBB:  Go ahead.  You can answer.

Page 57

1        THE WITNESS:  Yeah.  Personally, I would
2  consider a small nail hole.
3    BY MR. SACHS:
4    Q.  Okay.  Okay.
5        And is there any number of nail holes that
6  is -- would be excessive?
7        Let's say somebody had an obsession with
8  whatever, they hung 100 pictures and there were 100
9  nail holes.
10        Would you consider that beyond normal?
11    A.  I think you need to use common sense when
12  evaluating it.
13    Q.  Okay.  And so -- but does that example, you
14  know, would you consider that beyond normal wear and
15  tear, 100 nails?
16    A.  I don't think I would count the number of
17  nail holes.  But if it took a long time to repair
18  them because they were everywhere, that would
19  certainly be in excess of normal.
20    Q.  Okay.  So in the -- the Move Out Cleaning &
21  Replacement Charges -- and we'll just look at the
22  one that we have in front of us, which is in
23  Exhibit 12, Exhibit K in your packet -- one of the
24  charges that will be applied says touch-up paint,

Page 58

1  $150 for a one bedroom.
2      Do you see that?
3      A.  Exhibit K?
4      Q.  Yeah.
5      A.  Yes.
6      Q.  All right.
7          And then it goes on.  Two bedroom is 200
8  bucks; three bedroom is 237.50; a three-bedroom
9  townhome is 300.
10         What does -- in the 2016 to 2020 time
11  period, did both Stevens Pond and One Webster
12  consider as touch-up paint?  When would touch-up
13  paint have to be done?
14     MS. McGEE-TUBB:  Objection.
15     THE WITNESS:  Touch-up paint is when you
16  don't have to paint every wall of an apartment.
17  BY MR. SACHS:
18     Q.  Okay.  And why would touch-up paint be
19  necessary?
20     A.  Marks on the wall.
21     Q.  Okay.  Anything else?
22     A.  Maybe grease stains in the kitchen.
23     Q.  Yeah.
24         So would you consider marks on the wall and

Page 59

1  grease stains in the kitchen to be beyond normal
2  wear and tear?
3      A.  It would depend on -- I would have to be in
4  the apartment.  I would have to be looking at it in
5  person.
6      Q.  Okay.  So all of these determinations as it
7  relates to any tenant would be fact specific related
8  to the tenant itself, or him or herself, or them,
9  whoever?
10     A.  Yes.
11     Q.  So is it -- are you saying that both
12  Stevens Pond and One Webster did not have a policy
13  where they would just automatically clean -- sorry,
14  charge for carpet cleaning, for instance, at the
15  time of a move out?
16     A.  Yes.
17     Q.  Okay.  Was there anything, as it related to
18  at the time of move out, where Stevens Pond or One
19  Webster did have a policy of automatically charging
20  tenants for any sort of cleaning or repair?
21     A.  No.
22     MR. SACHS:  All right.
23         Moving on to Exhibit L in your packet which
24  would be 13.

Page 60

1          (Document marked as Manzo
2          Exhibit 13 for identification)
3      BY MR. SACHS:
4      Q.  This is a 2019 One Webster lease.  Again,
5  just asking the same question about whether the
6  language in the Move Out Cleaning & Replacement
7  Charges is the same.
8      A.  Same language.
9      MR. SACHS:  Okay.  Moving on to Exhibit M
10  in your packet, Exhibit 14 for dep.
11         (Document marked as Manzo
12         Exhibit 14 for identification)
13     BY MR. SACHS:
14     Q.  This is a 2020 One Webster lease.
15         Same question about whether the language in
16  the Move Out Cleaning & Replacement Charges
17  attachment is the same.
18         And when I say "the same," I mean as the
19  '16, '17, '18 and '19 lease that we just looked at.
20     A.  It's the same.
21     MR. SACHS:  And then Exhibit N in your
22  packet, 15 for purposes of the deposition.
23         (Document marked as Manzo
24         Exhibit 15 for identification)

Page 61

1      BY MR. SACHS:
2      Q.  It is a January 2021 lease for One Webster,
3  and I believe this is the year that the language
4  does change.
5          So does this Move Out Cleaning &
6  Replacement Charges, does this have different
7  language than the '16, '17, '18, '19, and '20 leases
8  that we just looked at?
9      A.  Yes.
10     Q.  All right.
11         And, again, you don't recall why that
12  language was changed outside of any discussions with
13  your attorney, that kind of stuff?
14     A.  It better reflects our policy and
15  procedure.
16     MR. SACHS:  Just give me a second here.  I
17  might go out of order.
18         I want to go to what would be Exhibit R in
19  your packet, Mr. Manzo -- I'm just skipping a
20  couple -- which will be 16 for purposes of the
21  deposition.
22         (Document marked as Manzo
23         Exhibit 16 for identification)
24

16 (Pages 58 - 61)

Page 62

1    BY MR. SACHS:
2    Q.  Just let me know when you get there.
3    A.  I have it.
4    Q.  All right.
5       Are you familiar with this document at all?
6    A.  Yes.
7    Q.  Okay.  And don't tell me anything as it
8    relates to discussions with counsel or anything like
9    that, but when was the last time you reviewed this
10   document, which is entitled "Defendants' Stipulation
11   Regarding Leases"?
12   A.  This morning.
13   Q.  Okay.  And prior to this morning, had you
14   reviewed it at any time?
15   A.  I don't remember.
16   Q.  Do you know if you had any input when this
17   document was drafted?
18      MS. McGEE-TUBB:  Objection.
19   BY MR. SACHS:
20   Q.  Outside of discussion with counsel or
21   anything, did you ever review it?
22      So it's dated June 17th of 2021.
23      Do you know if you looked at it at any time
24   prior to June 17th, 2021?

Page 63

1    A.  I don't remember if I looked at this.
2    Q.  All right.
3       So -- but do you see where at Number 1 in
4    the stipulation it says:
5          "The exemplar apartment lease
6          contracts and accompanying addenda provided
7          for 2016 through 2021 for the Residences at
8          Stevens Pond are representative of the
9          leases and accompanying addenda of other
10         tenants at the Residences at Stevens
11         Pond..." for those years.
12      Would you agree that this stipulation is
13   correct; that, in fact, between 2016 and 2021, you
14   used the same leases as attachments for all your
15   tenants, correct?
16      MS. McGEE-TUBB:  Objection.
17      The -- there's more to that paragraph in
18   the stipulation that should be part of the question.
19      MR. SACHS:  I was really trying not to read
20   the whole thing.
21      MS. McGEE-TUBB:  I'm sorry, but you left
22   out the material part.
23      MR. SACHS:  Is there a material part in it?
24      All right.

Page 64

1       Well, all right.
2    Q.  So if you read Paragraph 1 -- and you can
3    read it to yourself -- would you agree that that
4    stipulation is correct as it relates to leases
5    provided for Stevens Pond between 2016 and 2021?
6    A.  Yes.
7    Q.  Okay.  And the same thing as it relates to
8    Paragraph 2 as for One Webster between 2016 and
9    2021?  Would you agree that that stipulation is also
10   correct?
11   A.  Yes.
12   Q.  Okay.  And as it relates to using the same
13   lease forms at both One Webster and Stevens Pond,
14   you would agree that just makes complete business
15   sense to use the same form for both properties,
16   correct?
17   A.  Yes.
18   Q.  All right.
19      And if you managed other properties, you'd
20   agree that you wouldn't use a different form, right?
21      MS. McGEE-TUBB:  Objection.
22      THE WITNESS:  I would have to -- it would
23   have to be a specific property.
24

Page 65

1    BY MR. SACHS:
2    Q.  So as far as other Massachusetts properties
3    that you do manage, do they use the same forms that
4    we went through here today as far as the lease and
5    the addenda?
6       MS. McGEE-TUBB:  Objection.
7       I'm going to instruct the witness not to
8    answer based on our objections to the deposition
9    notices.
10      MR. SACHS:  Okay.  All right.
11      So let's move to what's Exhibit O in your
12   packet, Mr. Manzo.  Which will be -- what are we,
13   Mr. Loos, what are we at, 17 now?
14      THE REPORTER:  Yes.
15      (Document marked as Manzo
16      Exhibit 17 for identification)
17      MR. SACHS:  You know, I'm really trying to
18   drag this out until Wintner gets here.  I don't know
19   how much longer I can wait.
20   Q.  Exhibit 17, Mr. Manzo, this is -- you know,
21   this is a particularly -- this is for Mr. Berger
22   who's one of the plaintiffs in this action.
23      Do you see his name on there?
24   A.  Yes.

17 (Pages 62 - 65)

Page 66

1    Q.  All right.
2        And this is a 2018 One Webster lease,
3    correct?
4    A.  Yes.
5    Q.  All right.
6        And you see that the Move Out Cleaning &
7    Replacement Charges, Mr. Berger's lease has the same
8    identical language to the other One Webster lease
9    that we looked at as an exemplar for 2018, correct?
10   A.  Yes.
11       MR. SACHS:  Moving on to what's Exhibit P
12   in your packet, 18 for purposes of depo.
13       (Document marked as Manzo
14       Exhibit 18 for identification)
15   BY MR. SACHS:
16   Q.  This is an August 17th, 2017, lease for one
17   of the other plaintiffs, Branda Peebles.
18       Do you see that?
19   A.  Yes.
20   Q.  And Ms. Peebles' lease is for the Stevens
21   Pond property, correct?
22   A.  Yes.
23   Q.  And you would agree the Move Out Cleaning &
24   Replacement Charges attachment to Ms. Peebles' lease

Page 67

1    has the same identical language to the 2018 exemplar
2    lease that we've looked at for Stevens Pond,
3    correct?
4    A.  Yes.
5        MR. SACHS:  And then moving on to Exhibit
6    Q, which is 19 for purposes of the depo.
7        (Document marked as Manzo
8        Exhibit 19 for identification)
9    BY MR. SACHS:
10   Q.  Do you recognize this document?
11   A.  Yes.
12   Q.  Okay.  And what do you recognize it to be?
13   A.  A Statement of Security Deposit, or SODA.
14   Q.  Yeah.
15       So is this -- so who would -- as far as
16   this document itself, which is marked as JRK 83, who
17   would prepare, back in August -- so it's dated
18   August 23, 2018.
19       Who would, at that time, have prepared this
20   document?
21   A.  The property manager.
22   Q.  And was -- in 2018, was that one of the two
23   people that you named, if you remember?
24   A.  I'm not certain.

Page 68

1    Q.  Okay.  So do you know how -- so this shows,
2    you know, the lease beginning and ending date, and
3    then it shows the amount of the security deposit.
4    There's some billing for utilities, and then it
5    shows new charges:  "Touch-up paint," $50, and
6    "carpet clean per lease," $65.
7        Do you know how that would have been
8    determined that both the touch-up paint and the
9    carpet cleaning where necessary for Ms. Peebles?
10   A.  It would have been walked by the property
11   manager, ideally with Ms. Peebles.
12   Q.  Yeah.
13       But would you agree that where it says
14   "carpet clean per lease" means that they just
15   charged her to clean the carpet because that's what
16   the lease said?
17       MS. McGEE-TUBB:  Objection.
18       THE WITNESS:  No.  That -- I think that's a
19   misnomer.
20       BY MR. SACHS:
21   Q.  Okay.  And when you say that, what do you
22   mean?
23   A.  That is -- that, in my opinion, is for
24   damage done to this carpet.

Page 69

1    Q.  Okay.  And is there anything on this piece
2    of paper, JRK 83, that notes what would have been,
3    you know, beyond normal wear and tear that required
4    carpet cleaning?
5    A.  Not on this piece of paper.
6    Q.  Okay.  Do you know if Ms. Peebles had a dog
7    or a cat?
8    A.  I don't.
9    Q.  So the only way to know ultimately why she
10   was charged for carpet cleaning would be to talk to
11   the actual property manager who made the decision to
12   make those charges, correct?
13   A.  In this case, we have the invoice from this
14   carpet cleaning, and the vendor charged us for
15   staining and other damages.
16   Q.  Okay.  So -- but that -- so are you --
17   so -- strike that.
18       MR. SACHS:  Mathilda, let me ask you, I'm
19   sorry, is that invoice something that was produced?
20   I just -- it's not in my brain right now.
21       MS. McGEE-TUBB:  Yes.
22       MR. SACHS:  Okay.  All right.
23   Q.  So as it relates to that invoice, is that
24   what you're telling me would be the only evidence of

18 (Pages 66 - 69)

Page 70

1  what the condition of the carpet was?
2    A.  At the time, there was likely photos; but
3  this is from too long ago to -- I don't think we
4  were able to find them.
5    Q.  Yeah.
6      So does -- so this is Stevens Pond.
7      So does Stevens Pond itself have a
8  retention policy as it relates to photos or other
9  evidence used in determining move out cleaning
10  charges?
11    A.  No.  Most of these issues are resolved
12  relatively immediately after move out.  So they're
13  generally saved locally, but there's not a retention
14  policy.
15    Q.  Yeah.
16      So what about the touch-up paint that is
17  listed on Ms. Peebles' invoice here that is JRK 83?
18  Do you know what the touch-up paint was for and why
19  it was needed?
20    A.  Not without being in the apartment.
21    Q.  Okay.  And is that touch-up paint of $50,
22  that seems to be less than what's on the actual
23  addendum for a -- I don't know what size apartment
24  she had -- because it looked like the -- the minimum

Page 71

1  charge was 150 bucks.
2      So was there -- did the property manager in
3  2018 have some sort of discretion to determine how
4  much should be charged?
5    A.  Yes.
6    Q.  Okay.  And as far as at both One Webster
7  and Stevens Pond, do you know how often in the 2016
8  to 2020 time period that touch-up paint charges were
9  charged back to tenants at move out?
10    A.  No.
11    Q.  Do you know if it happened or occurred
12  frequently?
13    A.  I would be speculating.
14    Q.  So sitting here today, you have no idea?
15    A.  No.
16    MR. SACHS:  All right.
17      Just let me look through my stuff here for
18  a second.
19    Q.  Do you -- so sitting here today, would you
20  know, at both Stevens Pond and One Webster, how
21  often tenants at move out were charged back for
22  cleaning, or touch-up paint, or anything else that
23  might be listed in the cleaning and move out
24  replacement charges?

Page 72

1    A.  No.
2    Q.  Is -- is there a way to determine that
3  based on both Stevens Pond and One Webster's
4  documents?
5    A.  You would have to find as many of the SODAs
6  as you could.
7    Q.  Okay.  So -- and between 2016 and 2020, do
8  you still have all of those for One Webster and
9  Stevens Pond available in some electronic format?
10    A.  I don't know that we have all.  We
11  certainly would have a -- a reasonable portion of
12  them.
13    Q.  Okay.  Would both Stevens Pond and One
14  Webster have records, again for the 2016 to 2020
15  time period, for the amount of security deposit
16  monies that were withheld, you know, each year?
17    MS. McGEE-TUBB:  Objection.
18    BY MR. SACHS:
19    Q.  Let me just reask that.
20      So let's say, you know, if you -- in 2020,
21  you have a certain amount of leases that terminate.
22      Would there be a record of, for 2020, when
23  leases were terminating, the amount of security
24  deposit monies that both One Webster and Stevens

Page 73

1  Pond would have withheld because of cleaning or
2  other repair issues?
3    A.  You would have to look at each SODA.  But
4  yes, you could do it that way.
5    Q.  Do you know, sitting here today, what
6  percentage of tenants at both One Webster and
7  Stevens Pond, in the 2016 to 2020 time period, had
8  any amount of their security deposit retained at
9  move out?
10    A.  No.
11    MS. McGEE-TUBB:  Objection.
12    BY MR. SACHS:
13    Q.  And, again, is there a way to determine
14  that based on the records of Stevens Pond and One
15  Webster?
16    MS. McGEE-TUBB:  Objection.
17      And with respect to this question, in
18  particular object to the scope beyond -- as it
19  pertains to security deposit deductions for reasons
20  other than the Move Out Cleaning & Repair Charges.
21  I think that's what you're trying to get at anyway,
22  but I want to make it clear that I'm instructing the
23  witness not to answer beyond those particular
24  categories of security deposit deductions.

19 (Pages 70 - 73)

Page 74

1      MR. SACHS:  Yeah.  And my question is to
2  the Move Out Cleaning & Replacement Charges stuff.
3      THE WITNESS:  I don't remember the question
4  anymore.
5  BY MR. SACHS:
6      Q.  I don't even remember what day it is,
7  Mr. Manzo --
8      A.  Yeah.
9      Q.  -- so don't feel bad about it.
10     So I think it was a question of what
11 percentage of tenants between 2016 and '20 at both
12 Stevens Pond and One Webster had any amount of their
13 security deposit retained by those entities because
14 of any issue on the Move Out Cleaning & Replacement
15 Charges addendum.
16     A.  No.
17     Q.  Okay.  And to the extent -- well, let me
18 ask you this:
19     Is that something that is determinable by
20 looking at the records of both Stevens Pond and One
21 Webster?
22     A.  Yes.  You would have to look at every SODA.
23     MR. SACHS:  Could you give me three minutes
24 just to go through stuff?  I'm just hoping that

Page 75

1  Wintner shows up.  That's it.
2      MS. McGEE-TUBB:  You are welcome to wrap
3  this up before he is able to come.
4      MR. SACHS:  I just want to go through a
5  couple of things real quick and I'll be right back.
6  Three minutes, that's all I need.
7      All right.
8      (Recess taken)
9  BY MR. SACHS:
10     Q.  So I just have a couple of more questions.
11     One of questions I want to ask you,
12 Mr. Manzo, as it relates to what was marked as
13 Exhibit 19, which was Exhibit Q in your pile, which
14 is the -- the security charge, the statement of
15 security deposit back to Ms. Peebles, do you know
16 whether she participated in a walk-through that
17 resulted in the charges on Exhibit 19?
18     A.  I don't.
19     Q.  Would it be -- well, strike that.
20     Was it One Webster and Stevens Pond's
21 policy to charge people part of their security
22 deposit even if they did not participate in a final
23 walk-through?
24     MS. McGEE-TUBB:  Objection.

Page 76

1      THE WITNESS:  It's unrelated.  The policy
2  is to charge for damages above reasonable wear and
3  tear.  We always hope that the resident will
4  participate in a final walk-through, but they don't
5  always.  They don't always do that.
6  BY MR. SACHS:
7      Q.  Okay.  And do you know how often moving out
8  tenants would participate -- again, in the 2016 to
9  2020 time frame -- participate in that final
10 walk-through that would result in charges or not
11 charges?
12     A.  No.
13     Q.  Was it -- as it relates to the lease that
14 we've been going through for both Stevens Pond and
15 One Webster for the 2016 to '20 period that had all
16 the identical language, was it Stevens Pond and One
17 Webster's intention to enforce the provisions of
18 that lease as it related to cleaning and other
19 charges at the end of a tenancy?
20     A.  No.
21     MR. SACHS:  Objection.
22 BY MR. SACHS:
23     Q.  Did -- are there any occasions on which
24 you're aware that Stevens Pond would --

Page 77

1      MR. SACHS:  You know what?  Strike that.
2      I'm done.  So I'm done for -- yeah.  Sorry.
3  I just decided not to ask that.
4      So I'm done, suspending based on all the
5  stuff that we just talked about and the motion and
6  all that kind of stuff.
7      I guess, Mathilda, we've got to figure out
8  whether we need to move any deadlines and whatnot to
9  deal with this motion.
10     THE REPORTER:  Are we going to go off the
11 record?
12     MS. McGEE-TUBB:  Can we stay on for just
13 one minute.
14     THE REPORTER:  Sure.
15     MS. McGEE-TUBB:  Thank you.
16     MR. SACHS:  This is where she asks me to
17 give her my children, and I'm not doing it.
18     Well, actually, you can have them.
19     MS. McGEE-TUBB:  I've got my own, thanks.
20     Duly noted on your position on keeping the
21 deposition open.
22     It's our position that the deposition is --
23 is closed.  We produced a witness on the topics we
24 said that we would produce on, and those topics have

20 (Pages 74 - 77)

Page 78

1  been addressed today.
2      And then I also wanted --
3      MR. SACHS:  Sorry.  I'm just simply, you
4  know, reserving the suspension issue on the idea
5  that we've got this motion pending -- well, motion
6  to be pending.  And if a judge agrees with me that
7  we can get other testimony -- whether it's, you
8  know, Mr. Manzo or somebody else -- then somebody
9  else will be here.
10     MS. McGEE-TUBB:  Understood.
11     But we won't be coming back on the topics
12 that we've produced the witness on today, yeah.
13     MR. SACHS:  You will not be coming back on
14 the topics that you produced on today, subject to a
15 judge telling you that they have to answer the
16 questions that weren't answered.
17     MS. McGEE-TUBB:  I think I followed that.
18     Yep.  If a judge tells us we have to answer
19 the questions that we did not answer today, then,
20 yes, we will back and answer those questions.
21     MR. SACHS:  Yeah.  That's all.
22     MS. McGEE-TUBB:  Yes.  Exactly.
23     And then I also want to just put on the
24 record that the witness will read and sign.

Page 79

1      MR. SACHS:  Okay.  Yeah.
2      Just let me know, though, whatever you need
3  for timing or whatnot.
4      MS. McGEE-TUBB:  Yeah.
5      MR. SACHS:  30 days?
6      MS. McGEE-TUBB:  Yeah.  30 days should
7  be -- should be fine.  It was a two-hour deposition.
8      MR. SACHS:  That's fine.
9      THE REPORTER:  Copy, Ms. McGee-Tubb?
10     MS. McGEE-TUBB:  I'm sorry.
11     THE REPORTER:  Copy?
12     MS. McGEE-TUBB:  Yes.  Yes.  Thank you.
13     THE REPORTER:  Off the record?
14     MS. McGEE-TUBB:  I'm good to go off, yeah.
15     (Whereupon, the deposition was
16         suspended at 1:58 p.m.)
17
18
19
20
21
22
23
24

Page 80

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.                )
3      I, Alexander K. Loos, RDR and Notary Public in
4  and for the Commonwealth of Massachusetts, do hereby
5  certify that there came before me on the 10th day of
6  November, 2022, at 12:09 p.m., the person
7  hereinbefore named, who was by me duly sworn to
8  testify to the truth and nothing but the truth of
9  his knowledge touching and concerning the matters in
10 controversy in this cause; that he was thereupon
11 examined upon his oath, and his examination reduced
12 to typewriting under my direction; and that the
13 deposition is a true record of the testimony given
14 by the witness.  I further certify that I am neither
15 attorney or counsel for, nor related to or employed
16 by, any attorney or counsel employed by the parties
17 hereto or financially interested in the action.
18                              ve hereunto set my hand
19                              al this 22nd day of
20
21
22
23 Notary Public
24 Commission expires 5/5/28

Page 81

1  Mathilda McGee-Tubb, Esq.
2  Msmcgeetubb@mintz.com
3          November 22, 2022
4  RE:   Peebles, Et Al v. JRK Properties, Et Al
5      11/10/2022, Mr. Thomas L. Manzo (#5578320)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

21 (Pages 78 - 81)

Page 82

1  Peebles, Et Al v. JRK Properties, Et Al
2  Mr. Thomas L. Manzo (#5578320)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Mr. Thomas L. Manzo                Date
25

Page 83

1  Peebles, Et Al v. JRK Properties, Et Al
2  Mr. Thomas L. Manzo (#5578320)
3          ACKNOWLEDGEMENT OF DEPONENT
4     I, Mr. Thomas L. Manzo, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Mr. Thomas L. Manzo                Date
13 *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.