# EXHIBIT L

1              COMMONWEALTH OF MASSACHUSETTS
2       SUFFOLK, ss.        Superior Court
                            Business Litigation Session
3                           C.A. No. 2019-03714-BLS1
4       - - - - - - - - - - - - - - - - - -x
                                           :
5       BRANDA PEEBLES and JOSHUA BERGER,   :
        Individually and on BEHALF OF ALL   :
6       OTHERS SIMILARLY SITUATED,          :
                     Plaintiffs,            :
7                                           :
                vs.                         :
8                                           :
        JRK PROPERTY HOLDINGS, INC.;        :
9       STEVENS POND APARTMENTS PROPERTY    :
        OWNER, LLC; and ONE WEBSTER         :
10      APARTMENTS PROPERTY OWNER, LLC,     :
                     Defendants.            :
11      - - - - - - - - - - - - - - - - - -x
12              VIDEOCONFERENCE DEPOSITION OF JRK PROPERTY
13      HOLDINGS, INC.; STEVENS POND APARTMENTS PROPERTY
14      OWNER, LLC; and ONE WEBSTER APARTMENTS PROPERTY
15      OWNER, LLC, by and through their representative,
16      THOMAS L. MANZO, appearing remotely from Los
17      Angeles, California, a witness called by the
18      Plaintiffs, taken pursuant to Rule 30(b)(6) of the
19      Massachusetts Rules of Civil Procedure, before
20      Alexander K. Loos, Registered Diplomate Reporter and
21      Notary Public in and for the Commonwealth of
22      Massachusetts, appearing remotely from Melrose,
23      Massachusetts, on Thursday, November 10, 2022,
24      commencing at 12:09 p.m.

Page 2

```
 1     PRESENT:
 2         VIA VIDEOCONFERENCE
           DDSK Law, LLC
 3         (By Keith L. Sachs, Esq.)
           E-mail: Ksachs@ddsklaw.com
 4         900 Cummings Center
 5         Suite 210-U
 6         Beverly, MA 01915
 7         978.338.6620
 8         for the Plaintiffs.
 9
10         VIA VIDEOCONFERENCE
11     Mintz, Levin, Cohn, Ferris, Glovsky and
12     Popeo, PC
13         (By Mathilda McGee-Tubb, Esq.)
14         E-mail: Msmcgeetubb@mintz.com
15         One Financial Center
16         Boston, MA 02111
17         617.348.4404
18         for the Defendants.
19
20     ALSO PRESENT:
21
22         Yaas Galaif (Via videoconference)
23
24              * * * * *
```

Page 3

```
 1              I N D E X
 2
     WITNESS      DIRECT CROSS  REDIRECT RECROSS
 3
 4   THOMAS L. MANZO
 5   BY MR. SACHS        6
 6
 7
                    * * * *
 8
             E X H I B I T S
 9
     NO.       DESCRIPTION        PAGE
10
     Exhibit 1  Notices of Rule 30(b)(6)     11
11        deposition
12   Exhibit 2  Ms. Peebles' resident history  29
          report
13
     Exhibit 3  The Residences at Stevens Pond,  31
14        2016 Sample Apartment Lease
          Contract, first page and Move
15        Out Cleaning & Replacement
          Charges addendum
16
     Exhibit 4  The Residences at Stevens Pond,  35
17        2017 sample Apartment Lease
          Contract, first page and Move
18        Out Cleaning & Replacement
          Charges addendum
19
20   Exhibit 5  The Residences at Stevens Pond,  36
21        2018 sample Apartment Lease
22        Contract, first page and Move
23        Out Cleaning & Replacement
24        Charges addendum
```

Page 4

```
 1         E X H I B I T S, Continued
 2   NO.        DESCRIPTION       PAGE
 3
     Exhibit 6  The Residences at Stevens Pond,   36
 4        2019 sample Apartment Lease
          Contract, first page and Move
 5        Out Cleaning & Replacement
          Charges addendum
 6
     Exhibit 7  The Residences at Stevens Pond,   36
 7        2020 sample Apartment Lease
          Contract, first page and Move
 8        Out Cleaning & Replacement
          Charges addendum
 9
     Exhibit 8  The Residences at Stevens Pond,   37
10        2021 sample Apartment Lease
          Contract, first page and Move
11        Out Cleaning & Replacement
          Charges addendum
12
     Exhibit 9  Resident History Report for   43
13        Joshua Berger
14   Exhibit 10  One Webster, 2016 sample    46
          Apartment Lease Contract, first
15        page and Move Out Cleaning &
          Replacement Charges addendum
16
     Exhibit 11  One Webster, 2017 sample    53
17        Apartment Lease Contract, first
          page and Move Out Cleaning &
18        Replacement Charges addendum
19   Exhibit 12  One Webster, 2018 sample    53
20        Apartment Lease Contract, first
          page and Move Out Cleaning &
21        Replacement Charges addendum
22   Exhibit 13  One Webster, 2019 sample    60
23        Apartment Lease Contract, first
24        page and Move Out Cleaning &
          Replacement Charges addendum
```

Page 5

```
 1         E X H I B I T S, Continued
 2   NO.        DESCRIPTION       PAGE
 3
     Exhibit 14  One Webster, 2020 sample    60
 4        Apartment Lease Contract, first
          page and Move Out Cleaning &
 5        Replacement Charges addendum
 6   Exhibit 15  One Webster, 2021 sample    60
          Apartment Lease Contract, first
 7        page and Move Out Cleaning &
          Replacement Charges addendum
 8
     Exhibit 16  Defendants' Stipulation    61
 9        Regarding Leases
10
11   Exhibit 17   Apartment Lease Contract for   65
12        Mr. Berger, et al., dated
13        7/21/18
14
15   Exhibit 18   Apartment Lease Contract for   66
16        Ms. Peebles, et al., dated
17        8/17/17
18
19   Exhibit 19   Statement of Security Deposit,   67
20        dated 8/23/18, to Ms. Peebles
21
22
23
24              * * * *
```

2 (Pages 2 - 5)

1      P R O C E E D I N G S
2          THOMAS L. MANZO
3   a witness called for examination by the Plaintiffs,
4   having been satisfactorily identified by the
5   production of his driver's license and being first
6   duly sworn by the Notary Public, was examined and
7   testified as follows:
8          DIRECT EXAMINATION
9   BY MR. SACHS:
10     Q.  All right.  Thank you.
11         So -- I'm sorry.  So is it Mr. Manzo?
12  Manzo?
13     A.  If we were in Italy, you would say Manzo.
14  But it's been Americanized, so it's Manzo these
15  days.
16     Q.  So now it's Smith, right?  It's --
17     A.  Basically.
18     Q.  All right.
19         All right.
20         Mr. Manzo, my name is Keith Sachs.  I
21  represent the plaintiffs in this matter.
22         And you understand that you're here today
23  for your deposition, correct?
24     A.  Yes.

1      Q.  All right.
2          And just briefly, though, I just want to --
3   and I'm going to go into, like, logistics and
4   whatnot, but first I just want you to tell me who is
5   your actual employer?
6      A.  JRK Residential.
7      Q.  Okay.  And JRK Residential, how is that
8   related to JRK Property Holdings, Inc.?
9      A.  We are the management company.
10     Q.  All right.
11         So JRK Residential is, if you will, from an
12  org chart, above JRK Holdings?
13     A.  I don't think so.  I think JRK Holdings --
14     Q.  Is --
15     A.  -- is above JRK Residential.
16     Q.  Okay.  All right.
17         So JRK Holdings is the main entity.  Under
18  that, at least for first tier, is JRK Residential,
19  correct?
20     A.  I don't know the exact corporate structure.
21  I couldn't tell you how they all interact, but I
22  would say Property Holdings is above Residential
23  somehow.
24     Q.  Okay.  That's fine.

1          And you're here today to testify on behalf
2   of JRK Property Holdings, Inc., correct?
3      A.  Yes.
4      Q.  All right.
5          As well as Stevens Pond Apartments,
6   correct?
7      A.  Yes.
8      Q.  And One Webster Apartments as well?
9      A.  Yes.
10     Q.  Okay.  All right.
11         And we'll get into those relationships in a
12  little bit, but this is your deposition.
13         Have you ever been deposed before,
14  Mr. Manzo?
15     A.  Yes.
16     Q.  Okay.  So generally just, you know, from a
17  background standpoint, you know, the court reporter,
18  Mr. Loos, is taking down everything that we're
19  saying, right?  So I need to finish my questions
20  before you need to start your answers.  Same thing.
21  I'll let you finish your answers before I start the
22  next question.
23         Mr. Loos can't take down head shakes,
24  things like that.  So we just need to make a record

1   that's something that we can all read.
2          If we start talking over one another,
3   Mr. Loos will tell us, I'm sure, especially after
4   the third or fourth time you will do so.
5          If you need to take a break at any time,
6   let me know.  It's fine.  If there's a question
7   pending, obviously I need you to answer that before
8   you take a break.
9          If I ask a question that doesn't make sense
10  to you -- and I guarantee you I will do that -- just
11  say, "Hey, your question doesn't make any sense."
12         All right?
13         So -- and I'm not going to do, you know,
14  what a lot of lawyers do, which is to say, like,
15  "I'm going to assume you understand a question if
16  you answer it," all right?  I'm not.  You know,
17  listen.  If -- you know, don't give me an answer if
18  you're not comfortable with the question.  I'm happy
19  to break it down or whatever it may be.
20         If you need to speak to counsel prior to
21  answering something that really is confusing,
22  totally fine with me.  You need to take a bathroom
23  break, whatever, just you let me know.
24         But those are the basic ground rules.  So

Page 10

1  if you're okay with that, we can start moving with
2  this.
3        Are you good with that?
4        A. Yep.
5        MR. SACHS: All right.
6        So Alex, can -- I just want to take what I
7  marked as Exhibit S and use it as the first exhibit,
8  which is the deposition notices.
9        THE REPORTER: Do you want me to put them
10  on screen?
11        MR. SACHS: I don't -- so I know -- it's my
12  understanding that Mr. Manzo -- tell me if -- I
13  believe your counsel has sent you all the exhibits,
14  already.
15        THE WITNESS: Right.
16        MR. SACHS: And if you have them, and it's
17  easier for you to just pull them up on your screen
18  rather than, you know, going through the, you know,
19  mechanics of having Alex post them, I'm happy to
20  have you just look at them on your screen.
21        THE REPORTER: So S will be Exhibit 1?
22        MR. SACHS: Yeah, so exhibit S will now --
23  for purposes of this deposition, will become
24  Exhibit 1.

Page 11

1        (Document marked as Manzo
2        Exhibit 1 for identification)
3        MR. SACHS: The way -- and just Mr. -- I'm
4  sorry.
5        MS. McGEE-TUBB: I'm sorry to interrupt,
6  but I just want to make sure that we're always clear
7  what page the witness is looking at when we're -- if
8  we're all looking at the exhibits individually.
9        So Mr. Manzo, if -- when you're looking at
10  an exhibit, if you can just tell us the number on
11  the bottom of the page -- it says "JRK" followed by
12  a series of numbers -- so that we're sure that we're
13  all on the same place.
14        Keith, does that work for you?
15        MR. SACHS: Works for me, except for it's
16  not going to work on this one because this is the
17  dep notice. So it will be, like, three different
18  things that have Pages 1 through 5; but I'm sure we
19  can -- we can deal with it.
20        Q. But so -- so generally Mr. Manzo, what
21  we've marked as Exhibit 1, which you're looking at,
22  which is Exhibit S that I sent through counsel, are
23  the deposition notices for JRK Property Holdings,
24  Stevens Pond Apartments Property Owner, LLC, and One

Page 12

1  Webster Apartments Property Owner, LLC.
2        Had you, prior to today, had the
3  opportunity to review that -- those documents?
4        A. Yes.
5        Q. Okay. And -- and when I ask you anything
6  about these documents, I'm not asking you anything
7  about what you discussed with your counsel. That's
8  all privileged or whatever. So if I say something
9  that sounds like I'm asking that, I'm really not
10  asking. I'm sure Mathilda will object pretty
11  quickly if I do.
12        So and -- as it relates to these three
13  deposition notices for those three entities, you've
14  been designated as the person to testify on behalf
15  of all the entities, correct?
16        A. Yes.
17        Q. Okay. And you said that your official
18  employer is JRK Residential.
19        What's the full name of JRK Residential?
20        A. I believe it's JRK Residential Group, Inc.
21        Q. All right.
22        And so for purposes of the deposition right
23  now, I'm just going to refer to it as "JRK
24  Residential" if that's okay with you.

Page 13

1        A. Yes.
2        Q. Is that -- okay.
3        And what is your position with JRK
4  Residential?
5        A. I am the president.
6        Q. And how long have you held that position,
7  Mr. Manzo?
8        A. A little bit more than eight years.
9        Q. And can you just briefly give me your
10  educational background, high school, college.
11        A. I went to The Hill School in Pottstown,
12  Pennsylvania. I went to Dartmouth College in
13  Hanover, New Hampshire.
14        Q. What year did you graduate from Dartmouth?
15        A. 2007.
16        Q. All right. So you don't know any of my
17  friends. They were long gone before then, long
18  gone.
19        And have you been involved in -- well, let
20  me ask you this:
21        What is JRK Residential's primary business?
22        A. Operating, managing multifamily properties.
23        Q. Okay. And prior to your eight years at JRK
24  Residential, did you have experience in, let's just

4 (Pages 10 - 13)

Page 14

1  call it, property management for residential units?
2      A.  I've been at JRK for 14 years.
3      Q.  Okay.
4      A.  So for the six years prior, I was also
5  working in that.
6      Q.  Okay.  And for how many years that you've
7  been working for JRK have you -- has JRK had
8  properties in Massachusetts?  If you know.
9      A.  I don't know off the top of my head.
10     Q.  Okay.  But you understand now, obviously,
11  that JRK -- and whether it's JRK Residential or it's
12  JRK Holdings -- there's a relationship with
13  properties that they manage in Massachusetts,
14  correct?
15     A.  Yes.
16     Q.  And with respect to what we've marked as
17  Exhibit 1, there's topic schedules on there.
18         So -- and you can certainly look at each
19  one if you like, but is there any one of those
20  topics that have been enumerated which, you know,
21  you have not been designated to testify about?
22     MR. SACHS:  And this, you know, may be,
23  Mathilda, a time for you to state objections if you
24  think that makes sense.

Page 15

1      MS. McGEE-TUBB:  Yes, I think this is the
2  right point.
3         So pursuant to our prior discussion, the
4  three 30(b)(6) deponents here, we've objected to a
5  number of the topics identified in the notices.  We
6  served written objections to those notices of
7  deposition, and we will incorporate and refer to
8  those here.
9         And Keith, pursuant to our discussion in
10  September, we've agreed to go forward with this
11  deposition for these three 30(b)(6) deponents with
12  the understanding that this witness will not answer
13  questions on the objected-to topics, and plaintiffs
14  reserve the right to pursue motion practice at a
15  later date and with the acknowledgement that this
16  was a prior agreement before proceeding with this
17  deposition.
18     MR. SACHS:  Okay.  So -- so I guess
19  maybe -- and I kind of skimmed over this part, and
20  maybe it was because I knew this was coming.
21         As it relates to the little stipulation, I
22  think we have to kind of change that for this.  And
23  so far as -- you know, yes, we're, you know,
24  reserving certain objections until the time of trial

Page 16

1  and motions to strike, but there are objections that
2  you will make during this deposition -- for which we
3  will not be fighting about on the record, and to the
4  extent we need to, we will fight about them in
5  court -- meaning that I know that there's certain
6  things that, you know, generally it would be a
7  privilege issue where you're going to instruct not
8  to answer.  But here, because of your objections,
9  it's my understanding that there will be
10  instructions not to answer, and those are things
11  that we've agreed to deal with in a court setting
12  later.
13         So I just want to make sure, as the
14  questions come out, you make your objection.  I'm
15  not trying to trick you or anything by not doing it,
16  but just make your objection and we can say, "Okay.
17  Yes.  That's subject to what we already talked
18  about."
19         If that makes sense to you.
20     MS. McGEE-TUBB:  That's correct.
21         So obviously, as in any deposition, I may
22  raise objections to form or objections as to
23  privilege.  And if it's with respect to privilege,
24  you know, potentially instruct the witness not to

Page 17

1  answer.
2         If the objection is with respect to the
3  scope of this deposition based on the topics that
4  we've agreed to produce a witness, I will instruct
5  the witness not to answer on that basis.
6     MR. SACHS:  Okay.  Perfect.  And that, I
7  think, encapsulates everything we talked about back
8  in September in terms of what's going to happen here
9  today and the acknowledgement that there's going to
10  be motion practice after the fact.
11         Right?
12     MS. McGEE-TUBB:  Correct.  With the -- the
13  caveat this is a procedure that we -- we both agreed
14  to pursue, yeah.
15     MR. SACHS:  Exactly.  Exactly.
16         And just for the record -- because I do
17  believe from a timing perspective it makes more
18  sense to do it this way than to deal with motions
19  to, you know, quash or whatever the heck there were
20  going to be, to get everything out on the record so
21  we know exactly what we're dealing with at the time
22  of a motion.
23         If that makes sense.
24     MS. McGEE-TUBB:  Right.  Yes.

5 (Pages 14 - 17)

Page 18

1    MR. SACHS: Okay. All right.
2    Q. So -- all right.
3    So -- so basically, Mr. Manzo, as it
4 relates to your testimony today, I'm going to ask
5 questions. If they fall within the general
6 objections -- which I'm sure, you know, you -- and
7 I'm not asking you to acknowledge anything, but I'm
8 sure you've discussed generally what is
9 objectionable with your counsel and your counsel
10 will object, and we will simply move on. We will
11 get that on the record.
12    I'm not here to waste your time today. I'm
13 not here to waste Mathilda's time or Mr. Loos' time,
14 and certainly not mine. So basically we're going to
15 go through what we can. And if there's answers that
16 remain that we're going to fight about, what we'll
17 do is what's referred to as suspending the
18 deposition until a court tells us how we have to
19 deal with it.
20    So worst-case scenario, you may actually
21 have to sign on to Zoom again some day, but you
22 won't have to come to my office in beautiful
23 Massachusetts in February, I promise.
24    A. I appreciate that.

Page 19

1    Q. All right.
2    So as it relates to JRK Property Holdings,
3 what is the relationship between JRK Property
4 Holdings and the One Webster Apartments Property
5 Owner, LLC?
6    A. JRK Property Holdings ultimately controls
7 One Webster.
8    Q. Okay. So from that standpoint, is there
9 any shared ownership between the entities? That is
10 you know, whoever the owner is, if you will --
11 whether they're stockholders or whatever they may be
12 of JRK Holdings -- are they the same owners of One
13 Webster?
14    A. I don't know.
15    Q. But that would be present in some corporate
16 document somewhere I'm assuming, correct?
17    A. I assume so. I don't know.
18    Q. And this is not -- there's no score for
19 this deposition. This is not a test. All right?
20 So if you don't know just -- that's fine. That's
21 totally fine. Just tell me you don't know.
22 Because, again, I don't want to waste your time
23 continuing to ask the same question that you don't
24 know the answer to.

Page 20

1    All right?
2    So do you know -- aside from ownership, do
3 you know if there are the identical officers for JRK
4 Property Holdings and One Webster?
5    A. I don't know. I don't know the structure.
6    Q. Okay. So as far as One Webster itself, do
7 you know whether One Webster has employees?
8    A. One Webster is the owner of the actual
9 apartment building.
10    Q. Okay. So -- all right. So let's talk
11 about that.
12    One Webster, as the owner of the
13 property -- and so -- and can we just agree that
14 when we're talking about entities like One Webster
15 or Stevens Pond, when we say it's the owner of a
16 property, we're talking about the apartment complex
17 that's at issue, correct?
18    A. Yes.
19    Q. Okay. So One Webster owns the property in
20 which the -- on which the apartments exist, correct?
21    A. Yes.
22    Q. Okay. So does One Webster itself have its
23 own, you know, cadre of management people who get
24 paid by One Webster?

Page 21

1    A. My understanding is they are employees of
2 JRK Residential Group, the management company.
3    Q. Okay.
4    A. JRK Residential Group is contracted by One
5 Webster to run the property.
6    Q. Okay. So is it -- I mean, and I may be
7 using legal terms so I'll probably draw an
8 objection, but is it fair to say that One Webster is
9 essentially a single-purpose entity in terms of just
10 owning the property where the apartments exist?
11    MS. McGEE-TUBB: Objection.
12    You can answer, if you know.
13    THE WITNESS: I don't know the technical
14 answer to that.
15    MR. SACHS: I knew I was right about
16 getting objections. I knew I was right about it.
17    Q. All right.
18    So as far as -- so -- so One Webster, for
19 instance, right, it's got tenants, and we'll go
20 through the number of units and whatnot.
21    If I'm a tenant at One Webster, to whom do
22 I make my rent check to on a monthly basis?
23    A. One Webster.
24    Q. Okay. And One Webster, then, is that money

6 (Pages 18 - 21)

Page 22

1  then paid to -- and, again, because of -- I wasn't
2  aware of the JRK Residential Group prior to today,
3  so if I start mixing up JRK Holdings and JRK
4  Residential, just, you know, forgive me, but I'm
5  going to try to be clear about it.
6        But as far as the rent checks when they're
7  collected by One Webster, does that money all then
8  just go straight to JRK Holdings, if you know?
9     A.  I don't think so.  I think One Webster
10  operates its own bank account --
11    Q.  Okay.
12    A.  -- does it own economics, accounting.
13    Q.  I'm sorry.  Go ahead.
14    A.  I believe One Webster does its own
15  accounting.
16    Q.  So ultimately, you know, what would ever be
17  profits from One Webster, are those all profits that
18  would then go to JRK Holdings?
19        MS. McGEE-TUBB:  Objection.
20        THE WITNESS:  No.
21    BY MR. SACHS:
22    Q.  Okay.  So One Webster has its -- sorry.
23  The door just opened.
24        So One Webster, on its own, has its own

Page 23

1  bank accounts and holds monies for tenants for rent;
2  is that correct?
3     A.  Yes.
4     Q.  Okay.  And as it relates to security
5  deposits at One Webster, are those checks made out
6  to One Webster as well?
7     A.  Yes.
8     Q.  All right.
9        So does at any time JRK Holdings or JRK
10  Residential get money from One Webster as part of
11  its management of One Webster?
12        MS. McGEE-TUBB:  Objection.
13        Can you split that up?
14        MR. SACHS:  Sorry.
15    Q.  So -- all right.  So let me just back up.
16        So it's my understanding that JRK Property
17  Holdings or JRK Residential Group -- and correct me
18  which one -- is the management arm over One Webster;
19  is that correct?
20    A.  It's JRK Residential is the contracted
21  management company.
22    Q.  Okay.  So as the contracted management
23  company, does JRK Residential get money from One
24  Webster as the contracted management company?

Page 24

1     A.  They would get the management fee.
2     Q.  And do you know what the -- the -- the way
3  the management fee is set between the two entities?
4        MS. McGEE-TUBB:  Objection.
5        THE WITNESS:  I believe it's five percent
6  of income.
7     BY MR. SACHS:
8     Q.  Okay.  So as it relates to security
9  deposits and things like that, is that all money,
10  that's just held by One -- and again, we're just on
11  One Webster right now -- is that money that's held
12  by One Webster in a One Webster named account?
13        MS. McGEE-TUBB:  Objection.
14        THE WITNESS:  I believe so.
15    BY MR. SACHS:
16    Q.  All right.
17        So other than the -- and I'm not saying
18  it's absolute, but call it approximately a five
19  percent management fee, is there any other monies
20  that JRK Residential gets through its management
21  contract with One Webster?
22    A.  Not that I'm aware of, but I haven't
23  reviewed that contract.
24    Q.  Okay.  So just excuse me while I take some

Page 25

1  notes Mr. Manzo, okay?
2        So as it relates then to -- and I'm going
3  to ask all the same questions as it relates to JRK
4  Residential and -- well, let me just -- because I
5  just want to be clear about this.
6        Because is it fair to say that JRK
7  Residential Group and JRK Property Holdings,
8  although they're separate entities, that when we
9  talk about them in terms of who receives money, are
10  they -- do you look at them as the same entity for
11  purposes of receiving money from things that they
12  manage or not?
13        MS. McGEE-TUBB:  Objection.
14        THE WITNESS:  I don't know.  I don't.  I
15  don't know the technical answer to the structures.
16    BY MR. SACHS:
17    Q.  Okay.  So -- but it's fair to say that JRK
18  Residential Group is within the JRK Holdings family,
19  but it's just an entity that comes, you know,
20  structurally under JRK Holdings, correct?
21    A.  That's my understanding.  I have never gone
22  through all of the various documents.
23    Q.  No.  I understand that.  I'm sorry.
24        I mean, this is kind of a new thing for me,

7 (Pages 22 - 25)

Page 26

1  too, in terms of this other entity about which I
2  wasn't aware.
3      But is it fair to say that JRK Holdings as,
4  you know, call it the parent of JRK Residential,
5  would share in monies obtained by JRK Residential
6  through its management contracts?
7      MS. McGEE-TUBB:  Objection.
8      THE WITNESS:  I -- I don't know how the
9  agreement works.
10  BY MR. SACHS:
11  Q.  Okay.
12  A.  No.
13  Q.  No.  That's fine.
14      So all the things we just talked about as
15  it relates to JRK Residential Group and One Webster
16  as it relates to ownership, officers, management,
17  that kind of stuff, is that -- this the same
18  relationship that JRK Residential Group has with
19  Stevens Pond Apartments Property, LLC?
20  A.  Yes.
21  Q.  Okay.  So same thing in terms of it's a
22  management contract with a management fee, correct?
23  A.  Yes.
24  Q.  Okay.  So do you -- as far as you know --

Page 27

1  if you were to say, you know, the head, if you will,
2  of One Webster, give me a name.
3      Is there a person who is the head, the
4  management of One Webster?
5      MS. McGEE-TUBB:  Objection.
6      THE WITNESS:  I don't think I understand
7  the question.
8  BY MR. SACHS:
9  Q.  Sure.
10      I mean, as far as One Webster Property
11  Owner, LLC, does it have a manager?
12  A.  No -- I don't know.  I don't know.
13  Q.  Okay.  And then the same thing with
14  Stevens -- Stevens Pond Apartments Property Owner,
15  LLC, does that have a manager?
16  A.  I don't know.
17  Q.  So as it relates to both One Webster and
18  Stevens Pond, are there people on site at those
19  properties who are actual employees of either One
20  Webster or Stevens Pond?
21  A.  I believe they're employees of JRK
22  Residential Group.
23  Q.  Are you aware whether either One Webster or
24  Stevens Pond has any employees of their own?

Page 28

1  A.  Not that I'm aware of.
2  Q.  All right.
3      And in Massachusetts, are there other
4  properties that JRK -- JRK Residential has a
5  management contract with?
6      MS. McGEE-TUBB:  Objection.  This is a
7  question I'm going to ask the witness not to answer
8  based on our objections to the deposition notices.
9      MR. SACHS:  Okay.
10      So I'm not asking for identification of
11  properties, just a simple question of whether there
12  are other entities.  If it's the same objection,
13  that's fine.  I just want to be clear about it.
14      MS. McGEE-TUBB:  You can ask the "yes" or
15  "no," question, but beyond that, beyond that, this
16  is beyond the scope.
17      MR. SACHS:  Okay.
18  Q.  So the simple question of other than One
19  Webster and Stevens Pond, are there other entities
20  in Massachusetts, residential apartments that JRK
21  Residential has a management contract with?
22  A.  Yes.
23  Q.  All right.
24      And -- all right.  We'll move on.

Page 29

1      All right.
2      So I want to now start getting -- and I'm
3  going to try to go through these pieces of paper as
4  quickly as possible.
5      And at this point, other than starting with
6  the last one, which we marked as -- as 1, I'm
7  actually going to go to what would be your packet,
8  Mr. Manzo, as Exhibit A, which will now become
9  Exhibit 2, if you will.
10      (Document marked as Manzo
11      Exhibit 2 for identification)
12      MR. SACHS:  Are you there, Mathilda?
13      MS. McGEE-TUBB:  I'm there, yes.
14      Mr. Manzo, does that make sense to you?
15      THE WITNESS:  Yeah, I have it.
16      MR. SACHS:  Okay.  All right.
17      So Exhibit A -- and Mr. Loos, this would
18  then be Exhibit 2 as far as we're going.
19  Q.  And Mr. Manzo, this is a document that was
20  produced by JRK.
21      Have you ever seen this before?
22  A.  Yes.
23  Q.  Okay.  And can you tell me what it is?
24  A.  It's a general ledger.

Page 30

1    Q.  Okay.  And what is a general ledger?
2       I'm a blue-collar kid from Jersey.  I don't
3    know much of this stuff, so -- all right.
4       A.  It just records the charges and payments of
5    the individual resident.
6       Q.  Okay.  And the one that we're looking at
7    that we just marked Exhibit 2, this is for the
8    Residences at Stevens Pond, correct?
9       A.  Yes.
10      Q.  All right.
11      And is that just another name for Stevens
12   Pond Owners, LLC?
13      A.  Yes.
14      Q.  Okay.  So from a legal standpoint, whether
15   it's the Residences at Stevens Pond or Stevens Pond
16   Property Owner, LLC, it's the same entity?
17      A.  Yes.
18      MS. McGEE-TUBB:  Objection.
19   BY MR. SACHS:
20      Q.  Was that a "yes"?
21      A.  Yes.
22      Q.  All right.
23      And I have -- despite the, you know, six
24   pages here, I have one question about this document.

Page 31

1       On the first page of it, in the upper
2    left-hand corner, prior to all the listings where it
3    says "326 Apartments," do you see that?
4       A.  Yes.
5       Q.  All right.
6       Is that a fair description of the number of
7    units at the Residences at Stevens Pond?
8       A.  Yes.
9       MR. SACHS:  All right.
10      Let's go to the next the exhibit, which
11   will be B in your packet, Mr. Manzo, it will now be
12   3.
13      (Document marked as Manzo
14      Exhibit 3 for identification)
15   BY MR. SACHS:
16      Q.  So just for clarity, JRK has produced a
17   number of what we'll call --
18      MR. SACHS:  Mathilda, tell me if this is
19   wrong.
20      Q.  -- exemplar leases for the time periods
21   that are that are at issue.  But rather than giving
22   you the entire lease for each one that I want to go
23   through, what I have given you is the first page of
24   the lease and then the Move Out Cleaning &

Page 32

1    Replacement Charges addendum, if you will, at the
2    end of it.
3       So if there's anything unclear as you're
4    looking at this, I just want you to know I've only
5    included the first page of the lease and the
6    attachment at the end.
7       Does that make sense to you?
8       A.  Yes.
9       Q.  Okay.
10      MS. McGEE-TUBB:  And so just to be clear,
11   your questions are only going to be the pages that
12   are included in these exhibits, right?
13      MR. SACHS:  No.  There will be ten trick
14   questions about the pages that are not here, I
15   swear.
16      MS. McGEE-TUBB:  I'm ready for those to
17   come.
18      MR. SACHS:  Sorry.  That's the Jersey in
19   me, you know.  Sorry.
20      No.  Yeah.
21      So -- and honestly, the questions are
22   really only going to be about the cleaning charge
23   thing at the back.  The front page is really just to
24   establish that this is the front page of the lease.

Page 33

1    That's it.
2       There's going to be no lease questions,
3    just addendum questions, because I figured it was
4    the least I could do, okay?
5       In any event, so what we've marked as
6    Exhibit 3, Mr. Manzo, this is a lease dated for
7    October 22nd, 2016, and it has an address of
8    Founders Way.
9       Do you know what property that relates to?
10      A.  Stevens Pond.
11      Q.  Okay.  All right.
12      So this is a Stevens Pond lease.
13      Is that a document that you're familiar
14   with?
15      A.  Yes.
16      Q.  Okay.  And the second page of this, which
17   is marked as JRK 602, is the Move Out Cleaning &
18   Replacement Charges.
19      Do you see that?
20      A.  Yes.
21      Q.  All right.
22      And that's a document you're familiar with?
23      A.  Yes.
24      Q.  Okay.

9 (Pages 30 - 33)

Page 34

1    And about, you know, a 16th of the way down
2    the page, there's a writing that starts with
3    "resident is required."
4        Do you see that?
5    A.  Yes.
6    Q.  All right.
7        It says:
8        "Resident is required to have the
9        apartment professionally cleaned and carpet
10       cleaned upon move out.  If the apartment is
11       not returned to us in this condition, the
12       following charges will be applied:"
13       Did I read that correctly?
14   A.  Yes.
15   Q.  All right.
16       And then that piece of paper lists out a
17   bunch of different charges for different types of
18   cleaning and painting, correct?
19   A.  Yes.
20       MS. McGEE-TUBB:  Objection.
21       MR. SACHS:  All right.
22       Moving onto the next exhibit, which is C in
23   your packet, which will be, what, 4 now, Mr. Loos?
24       THE REPORTER:  Yes.

Page 35

1        (Document marked as Manzo
2        Exhibit 4 for identification)
3    BY MR. SACHS:
4    Q.  And this -- and like I said, I don't want
5    to waste your time.  I will represent to you that
6    this is the same exact front page of a lease with
7    the same exact cleaning addendum; it's just for, you
8    know, a 2017 lease.
9        And my questions would be the same, that
10   does this exhibit contain the same language in the
11   cleaning, the move out and -- Move Out Cleaning &
12   Replacement Charges as the one I read previously?
13       MS. McGEE-TUBB:  Mr. Manzo, you can -- you
14   can take a moment to look at the document to answer
15   that question as well.
16       BY MR. SACHS:
17   Q.  Yes.  No, I wasn't trying not to have you
18   look at it.  All I'm saying is we don't need to
19   restate the same question for each of these
20   documents.  I just want you to take a look at it and
21   you can confirm for me whether it's the same
22   language.
23   A.  Yes, it is.
24       MR. SACHS:  And then the next exhibit,

Page 36

1    which will be D in your packet, which will be 5.
2        (Document marked as Manzo
3        Exhibit 5 for identification)
4    BY MR. SACHS:
5    Q.  This is also a Stevens Pond property lease
6    beginning in 2018.
7        Does that also have the same language in
8    the Move Out Cleaning & Replacement Charges?
9    A.  Yes.
10       MR. SACHS:  The next exhibit, which is E in
11   your packet, which will be 6.
12       (Document marked as Manzo
13       Exhibit 6 for identification)
14       MR. SACHS:  This is a 2019 lease, also for
15   Stevens Pond.
16   Q.  Does that have the same language that we've
17   been discussing in the Move Out Cleaning &
18   Replacement Charges piece?
19   A.  Yes.
20       MR. SACHS:  The next exhibit, F in your
21   packet, now 7 for purposes of the deposition.
22       (Document marked as Manzo
23       Exhibit 7 for identification)
24

Page 37

1    BY MR. SACHS:
2    Q.  This is a 2020 Stevens Pond lease.
3        Does this also have the same language in
4    the Move Out Cleaning & Replacement Charges?
5    A.  Yes.
6        MR. SACHS:  Okay.  And then Exhibit G,
7    which will now be Exhibit 8 for the deposition.
8        (Document marked as Manzo
9        Exhibit 8 for identification)
10   BY MR. SACHS:
11   Q.  This is a 2021 Stevens Pond lease.  And on
12   the Move Out Cleaning & Replacement Charges, do you
13   notice that the language is actually different than
14   the -- the others that we just went through?
15   A.  Yes.
16   Q.  All right.
17       And can you -- so as far as the difference,
18   I think it's the second sentence.  Whereas, the
19   earlier ones all had the sentence that said "if the
20   apartment is not returned to us in this condition,
21   the following charges will be applied," right?
22       MS. McGEE-TUBB:  Objection.
23       BY MR. SACHS:
24   Q.  Did I read that correctly?

Page 38

1    I can go back. I'm looking at Exhibit 7,
2  which is the same as the previous before it, the
3  language, that says:
4        "If the apartment is not returned to
5        us in this condition, the following charges
6        will be applied:"
7    Did I read that correct on Exhibit 7, which
8  was Exhibit F in your packet?
9    A. Are you asking me?
10   Q. Yes.
11   A. I'll reopen that and look.
12   And can you read it again? I had closed
13  the exhibit.
14   Q. Yeah. So it's just -- I'll read the whole
15  thing:
16        "Resident is required to have the
17        apartment professionally cleaned and carpet
18        cleaned upon move out. If the apartment is
19        not returned to us in this condition, the
20        following charges will be applied:"
21        Right? I read that correctly from
22  Exhibit 7, Exhibit F in your packet?
23   A. Yes.
24   Q. Okay. And then what we've marked as

Page 39

1  Exhibit 8, that says on the Move Out Cleaning &
2  Replacement Charges, it says:
3        "Resident must ensure the apartment is
4        cleaned before move out; this may require
5        the resident to have the apartment
6        professionally cleaned. The following
7        charges apply to apartments with damage or
8        cleanliness issues beyond normal wear and
9        tear:"
10       Do you agree that that is different than in
11  the previous leases that we read?
12   A. Yes.
13   Q. Okay. And do you know why that language
14  was changed in the 2021 lease?
15       MS. McGEE-TUBB: Objection.
16       You can answer, to the extent you know and
17  that wouldn't reveal any privileged communications.
18   BY MR. SACHS:
19   Q. Yeah. So I'm certainly not asking you to
20  tell me anything you've talked with your lawyer.
21  I'm just talking about, in the usual course of
22  business, do you know why that would have been
23  changed without reference to any legal
24  conversations?

Page 40

1    A. That more accurately reflects our policy
2  and procedure.
3    Q. Okay. And so when you say it more
4  accurately reflects your policy and procedure, in
5  2020, what was your policy and procedure as it
6  related to Move Out Cleaning & Replacement Charges?
7        MS. McGEE-TUBB: Objection.
8        Are you referring to a specific property?
9    BY MR. SACHS:
10   Q. Sorry. Yeah. We're on the Stevens Pond
11  one, so I'm just -- fair enough -- Stevens Pond.
12   A. Each move out was dealt on a case-by-case
13  basis with the property manager on site.
14   Q. Okay. And in -- let's just use 2020.
15       Who was the property manager on site at
16  Stevens Pond?
17   A. I don't know.
18   Q. So -- but was that -- so would the property
19  manager on site at Stevens Pond in 2020, that would
20  have been a JRK employee, correct?
21   A. Yes.
22   Q. Okay. So do you know if there was any
23  certain criterion that the property manager on site
24  at Stevens Pond would use to determine whether, you

Page 41

1  know, cleaning or other repairs were needed because
2  they were beyond normal wear and tear?
3    A. Our policy would be for them to walk the
4  apartment with the resident, or at least attempt to.
5  Sometimes the resident, you know, can't schedule or
6  can't make it, et cetera.
7    Q. Yes.
8    A. And would evaluate it for damages above
9  wear and tear, and discuss what would be charged to
10  the resident, obviously giving them an opportunity
11  to potentially mitigate those charges.
12   Q. Okay. So did -- and I'm just, for -- for
13  purposes of our discussion, you know, in the 2000 --
14  when did we start? 2016 is the time period -- 2016
15  to 2020 time frame, did Stevens Pond have, you know,
16  a definition of what "normal wear and tear" was when
17  it would do these move-out evaluations --
18  evaluations about whether work needed to be done?
19   A. It's done based on industry standard.
20   Q. Okay. And is -- you know, is there an
21  industry standard that Stevens Pond used as it
22  related to normal wear and tear? Like was it
23  published somewhere is my point.
24   A. It's a judgment call made by the property

Page 42

1  manager.
2      Q.  Okay.  Is that evaluation of, you know,
3  normal wear and tear something that you personally
4  have had to do in your job at JRK Residential for
5  Massachusetts properties at any time?
6      A.  No.
7      Q.  So as far as any evaluation of normal wear
8  and tear, that would fall to whoever the property
9  manager on site was at Stevens Pond at any given
10 time in the years of 2016 to 2020, correct?
11     A.  Correct.
12     Q.  And do you -- and I know I asked you
13 specifically about 2020.  But do you know, sitting
14 here today, the identities of any of the on-site
15 property managers at Stevens Pond between 2016 and
16 '20?
17     A.  I remember some of them, but not all of
18 them.
19     Q.  Okay.  Any names that can fall trippingly
20 off the tongue at this point or --
21     A.  Kristen Goshorn.
22     Q.  Do you know how to spell the last name?
23     A.  G-o-s-h-o-r-n.
24     Q.  Okay.  Anybody else you remember?

Page 43

1      A.  I believe Melissa Haberman.
2      Q.  And do you know whether JRK provided the --
3  you know, we'll just refer to them as the on-site
4  property managers at Stevens Pond -- provided them
5  with any training as it related to what is and what
6  is not normal wear and tear for purposes of charging
7  tenants at the time of move out?
8      A.  No.
9      MR. SACHS:  All right.
10     So I'm going to move on to Exhibit H, which
11 will be -- are we at 9 now, Mr. Loos?
12     THE REPORTER:  Yes.
13         (Document marked as Manzo
14         Exhibit 9 for identification)
15 BY MR. SACHS:
16     Q.  All right.
17     And now we're moving on to One Webster.
18     Well, before -- hang on a second.
19     Before I move on to this next exhibit, as
20 it relates to Stevens Pond in the 2016 to 2020 time
21 period, are you aware of how often tenants on move
22 out would be charged for -- and I'll take one
23 example -- for touch-up paint?  Do you know how
24 often that would happen?

Page 44

1      A.  No.
2      Q.  Okay.  Would you know how often they would
3  be charged for carpet cleaning?
4      A.  No.
5      Q.  But would Stevens Pond or JRK have records
6  that show all those charges that were sent to
7  tenants moving out in the 2016 to 2020 time period?
8      A.  Yes.  It was obviously a long time ago.  I
9  don't know if we have all of them, but we certainly
10 would have some of them.
11     Q.  So it would certainly be Stevens Pond, if
12 not JRK as the management arm, it would be either
13 Stevens Pond or JRK's policy to keep a record of
14 everybody they charged any move-out touch-up paint
15 or carpet cleaning or anything like that, correct?
16     A.  Yes.
17     MS. McGEE-TUBB:  Objection.
18 BY MR. SACHS:
19     Q.  Okay.  All right.
20     So Exhibit 9 --
21     MS. McGEE-TUBB:  Before you move on to One
22 Webster, we've been going almost an hour, not quite
23 an hour.  But if we want take to take a break at
24 around an hour point, is this a good time?

Page 45

1      MR. SACHS:  No.  That's fine.  Yeah.
2  That's fine.
3      MS. McGEE-TUBB:  Why don't we take a short
4  break just because it seems like a good pause point.
5  Just, you know, five or ten minutes.
6      MR. SACHS:  No.  We're changing entities.
7  I will not read anything into that.
8      MS. McGEE-TUBB:  I truly thought it was a
9  natural break.  Again, so we can go off record.
10     Thank you.
11     MR. SACHS:  Totally fine.
12     Ten minutes?
13     MS. McGEE-TUBB:  That's good.  Thanks.
14     MR. SACHS:  Awesome.  Thank you.
15     (Recess taken)
16 BY MR. SACHS:
17     Q.  On what in your packet, Mr. Manzo, was
18 Exhibit H, which should be 9 for the exhibit, and
19 that is a resident history report from One Webster.
20     Do you see that?
21     A.  I do.
22     MS. McGEE-TUBB:  I'm sorry.  I just want to
23 to be clear.
24     This is Exhibit H, which is now Exhibit 9?

12 (Pages 42 - 45)

Page 46

1    MR. SACHS:  9, yes.
2    MS. McGEE-TUBB:  Okay.  Thank you.
3    BY MR. SACHS:
4    Q.   And is this similar to the report we looked
5    at for -- for Stevens Pond earlier?
6    A.   Yes.
7    Q.   Okay.  And this document shows, on the
8    upper left-hand side, that One Webster has
9    121 units, correct?
10   A.   Yes.
11   MR. SACHS:  And now we're going to do the
12   same thing that we did with Stevens Pond as it
13   relates to One Webster and the -- the leases.
14   So Exhibit I, which will now be 10 for
15   purposes of the deposition --
16   (Document marked as Manzo
17   Exhibit 10 for identification)
18   MR. SACHS:  -- I'll represent is a 2000 --
19   a July 8th 2016, One Webster lease that has the Move
20   Out and Cleaning -- sorry, Move Out Cleaning &
21   Replacement Charges addendum similar -- well, strike
22   that.  Identical, if you will, if you agree, to the
23   one that was on the Stevens Pond leases.
24   Q.   Do you see that?

Page 47

1    MS. McGEE-TUBB:  Objection.
2    MR. SACHS:  Well, I'll -- all right.  I'll
3    ask it as a question rather than a statement.
4    Q.   Mr. Manzo, as it relates to what's been
5    marked as Exhibit 10, is the Move Out Cleaning &
6    Replacement Charges document, is that identical to
7    the one that was on the lease for 2016 to the
8    Stevens Pond property?
9    A.   I would have to compare them side by side.
10   Q.   Okay.  Let me just tell you which one is
11   which, then.
12   So the 2016 Stevens Pond is -- hang on a
13   second; my apologies -- is -- would be Exhibit B in
14   your packet, Exhibit 3 for purposes of the
15   deposition.
16   So just take a minute, look at that and let
17   me know if you can agree that it's the same addendum
18   as it relates to move out and cleaning.
19   MS. McGEE-TUBB:  Objection.
20   Are you asking him if they're the addendum
21   or -- I mean, there's a bunch of numbers on both of
22   those pages.  Are you asking him to compare the full
23   documents?
24   MR. SACHS:  I'm asking him to compare the

Page 48

1    language that starts with "resident is required"
2    that ends in the second sentence with "charges will
3    be applied" and whether that is the same.
4    THE WITNESS:  That is the same.
5    MR. SACHS:  And that doesn't include a
6    number.
7    THE WITNESS:  That language is the same.
8    BY MR. SACHS:
9    Q.   Okay.  All right.
10   So that language is the -- same for
11   both -- and this is just the 2016 lease.  And I
12   think with regard to Stevens Pond we went
13   through 2016, '17, '18, '19 and '20, and the
14   language was the same in all of those Move Out
15   Cleaning & Replacement Charges attachments, correct?
16   MS. McGEE-TUBB:  Objection.
17   MR. SACHS:  Well, I mean, if you recall.  I
18   mean, we can go back through them again, but --
19   THE WITNESS:  Can you just restate that,
20   please.
21   MR. SACHS:  Sure.
22   Q.   As it relates to what we went through, the
23   exhibits on the Stevens Pond property, we went
24   through a 2016 lease, '17 lease, '18 lease, '19

Page 49

1    lease, and a '20 lease -- and those all had the
2    identical language in the move out and cleaning --
3    Move Out Cleaning & Replacement Charges attachment,
4    correct?
5    MS. McGEE-TUBB:  Objection.
6    You can answer, if you remember.
7    THE WITNESS:  I know it change -- I don't
8    remember what year it changed, but correct.  At
9    least for the first couple of addendums.
10   BY MR. SACHS:
11   Q.   So it wasn't until the 2021 Stevens Pond
12   lease that we saw a change in the language, correct?
13   A.   Correct.
14   Q.   Okay.  All right.
15   So as it relates to both Stevens Pond and
16   One Webster, was it the policy of each Stevens Pond
17   and One Webster to charge tenants if the apartment
18   wasn't -- quote, unquote -- "professionally
19   cleaned"?
20   A.   No.
21   Q.   Okay.  What was the policy as it related to
22   professional cleaning for both One Webster and
23   Stevens Pond in the 2016 to 2020 date period?
24   A.   It was handled on a case-by-case basis with

13 (Pages 46 - 49)

Page 50

1    the property manager. And, you know, any charges
2    would have had to be above wear and tear.
3        Q.   Okay. And as it related -- we talked about
4    this before.
5            As it relates to wear and tear, there was
6    no training of those property managers as to what
7    wear and tear, normal wear and tear actually was,
8    correct?
9        MS. McGEE-TUBB: Objection.
10       THE WITNESS: It's industry standard.
11   They're professional property managers. They use
12   their experience to make that determination.
13       BY MR. SACHS:
14       Q.   Okay. So when you say -- and I may be
15   repeating myself.
16           But when you say "industry standard," is
17   there a specific industry standard publication or
18   any sort of writing that I can look to right now
19   that says, "This is the industry standard for what
20   is above and beyond normal wear and tear"?
21       A.   Not that I'm aware of.
22       Q.   Okay. And what about -- same question as
23   it relates to, you know, carpet cleaning.
24           Was it Stevens Pond and One Webster's

Page 51

1    policy, between 2016 and 2020, to charge tenants at
2    move out for the carpet cleaning?
3        A.   You would have to be more specific. It was
4    the policy to charge for excessive carpet damage --
5        Q.   Okay.
6        A.   -- where applicable.
7        Q.   So as it relates to the carpet cleaning,
8    you know, I think you said what was, you know,
9    excessive carpet cleaning that had to be done.
10           What would that mean?
11       MS. McGEE-TUBB: Objection.
12       BY MR. SACHS:
13       Q.   Or you can restate what you said because I
14   paraphrased it incorrectly.
15       A.   Any damage determined by the manager, and
16   hopefully the resident, during the final walk above
17   normal wear and tear would be charged back to the
18   resident.
19       Q.   So as it relates to carpets, what was
20   Stevens Pond and One Webster's policy as it related
21   to determining what was beyond normal wear and tear
22   for a carpet?
23       A.   It was a judgment call made by the property
24   manager based on the walk of that specific

Page 52

1    apartment.
2        Q.   Okay. And do you know what would be -- in
3    making that judgment call, what that -- that
4    property manager would consider?
5        A.   I mean, I think you're asking for examples.
6        Q.   Yeah.
7        A.   So, you know, pet damage, urine, staining,
8    things of that nature.
9        Q.   Okay. So -- so is it your testimony that
10   neither Stevens Pond nor One Webster charged tenants
11   at move out for carpet cleaning as a regular charge?
12       A.   I would have to review every single move
13   out.
14       Q.   Okay. So the -- so you would agree that
15   the only way to determine, you know, who was charged
16   for what at move out -- whether it was touch-up
17   paint, carpet cleaning or anything else -- would be
18   to review all the records of both Stevens Pond and
19   One Webster?
20       MS. McGEE-TUBB: Objection.
21       THE WITNESS: Yes. You would have to
22   really be there at that time to make that
23   determination.
24       MR. SACHS: Okay. All right.

Page 53

1            So moving on to the next exhibit, which is
2    Exhibit J in your packet, which will now be
3    Exhibit 11 for purposes of the deposition.
4            (Document marked as Manzo
5            Exhibit 11 for identification)
6        BY MR. SACHS:
7        Q.   This is a May 17, 2017, One Webster lease,
8    with a Move Out Cleaning & Replacement Charges
9    addendum.
10           Again, the same question. Is that the
11   identical language to the 2016 One Webster cleaning
12   addendum that we just looked at?
13       A.   Yes.
14       MR. SACHS: Moving to Exhibit K in your
15   packet, which will be Exhibit 12 for deposition.
16           (Document marked as Manzo
17           Exhibit 12 for identification)
18       BY MR. SACHS:
19       Q.   It's a May 2, 2018, One Webster lease,
20   front page, with the Move Out Cleaning & Replacement
21   Charges attachment.
22           Is that the same language as both the 2016
23   and '17 that we just looked at?
24       A.   Yes.

14 (Pages 50 - 53)

Page 54

1    Q. And I just want to be clear that the
2   language is very specific, right? It says:
3       "If the apartment is not returned to
4       us in this condition, the following charges
5       will be applied:"
6       "Will be applied," correct? Did I read
7   that correctly?
8    A. Yes.
9    Q. Okay. And as far as -- let's just take a
10  couple of examples.
11      Like painting, right? What -- what
12  determination was made into whether painting needed
13  to be done and charged to a tenant at the time of
14  move out?
15      MS. McGEE-TUBB: Objection.
16      THE WITNESS: Again, it would be subject to
17  the move out walk. The property manager, if they
18  saw holes in the wall, marks, damage, things that
19  are above normal wear and tear, would make a
20  determination as to what that cost the property and
21  bill it back to the resident.
22      BY MR. SACHS:
23   Q. Okay. So did -- did both Stevens and --
24  break it out if the policies are different -- but

Page 55

1   did both Stevens Pond and One Webster have a policy
2   that they would repaint every unit at the end of
3   every tenancy?
4    A. It depends. Units -- it depends on the
5   situation. Sometimes people break their lease after
6   a month and something like that wouldn't be
7   necessary.
8    Q. Okay. So let's -- let's just say it's a
9   normal one-year lease.
10      At the end of a one-year lease, would it be
11  Stevens Pond and One Webster's general policy to
12  repaint the entire unit at the end of that?
13   A. They would paint it as needed.
14   Q. Okay. And what goes into the -- the
15  calculation as to "as needed" for repainting an
16  entire unit?
17   A. It's a judgment call made by the property
18  manager.
19   Q. Okay. So you would agree that when someone
20  moves into an apartment, they generally hang
21  pictures, right?
22   A. Yes.
23   Q. They hang mirrors, correct?
24   A. We provide some mirrors, but they might.

Page 56

1    Q. Sure.
2       But people are generally putting nails in a
3   wall, right, when they move in to hang a picture or
4   something else, correct?
5    A. Yes.
6    Q. All right.
7       So you would agree that, you know, when
8   someone leaves and they've removed the nails and
9   there's a hole, that that hole is generally a normal
10  wear and tear of a tenancy, correct? Would you
11  agree with that?
12      MS. McGEE-TUBB: Objection.
13      THE WITNESS: I think it depends how they
14  hang it. There's more destructive ways to hang them
15  than other ways.
16      BY MR. SACHS:
17   Q. Okay.
18   A. But...
19   Q. Well, so let me ask you this:
20      What would you, as a representative of JRK,
21  consider "normal" for purposes of hanging a picture?
22      MS. McGEE-TUBB: Same objection.
23      THE WITNESS: Small nail --
24      MS. McGEE-TUBB: Go ahead. You can answer.

Page 57

1       THE WITNESS: Yeah. Personally, I would
2   consider a small nail hole.
3       BY MR. SACHS:
4    Q. Okay. Okay.
5       And is there any number of nail holes that
6   is -- would be excessive?
7       Let's say somebody had an obsession with
8   whatever, they hung 100 pictures and there were 100
9   nail holes.
10      Would you consider that beyond normal?
11   A. I think you need to use common sense when
12  evaluating it.
13   Q. Okay. And so -- but does that example, you
14  know, would you consider that beyond normal wear and
15  tear, 100 nails?
16   A. I don't think I would count the number of
17  nail holes. But if it took a long time to repair
18  them because they were everywhere, that would
19  certainly be in excess of normal.
20   Q. Okay. So in the -- the Move Out Cleaning &
21  Replacement Charges -- and we'll just look at the
22  one that we have in front of us, which is in
23  Exhibit 12, Exhibit K in your packet -- one of the
24  charges that will be applied says touch-up paint,

Page 58

1  $150 for a one bedroom.
2      Do you see that?
3  A.  Exhibit K?
4  Q.  Yeah.
5  A.  Yes.
6  Q.  All right.
7      And then it goes on.  Two bedroom is 200
8  bucks; three bedroom is 237.50; a three-bedroom
9  townhome is 300.
10      What does -- in the 2016 to 2020 time
11  period, did both Stevens Pond and One Webster
12  consider as touch-up paint?  When would touch-up
13  paint have to be done?
14      MS. McGEE-TUBB:  Objection.
15      THE WITNESS:  Touch-up paint is when you
16  don't have to paint every wall of an apartment.
17  BY MR. SACHS:
18  Q.  Okay.  And why would touch-up paint be
19  necessary?
20  A.  Marks on the wall.
21  Q.  Okay.  Anything else?
22  A.  Maybe grease stains in the kitchen.
23  Q.  Yeah.
24      So would you consider marks on the wall and

Page 59

1  grease stains in the kitchen to be beyond normal
2  wear and tear?
3  A.  It would depend on -- I would have to be in
4  the apartment.  I would have to be looking at it in
5  person.
6  Q.  Okay.  So all of these determinations as it
7  relates to any tenant would be fact specific related
8  to the tenant itself, or him or herself, or them,
9  whoever?
10  A.  Yes.
11  Q.  So is it -- are you saying that both
12  Stevens Pond and One Webster did not have a policy
13  where they would just automatically clean -- sorry,
14  charge for carpet cleaning, for instance, at the
15  time of a move out?
16  A.  Yes.
17  Q.  Okay.  Was there anything, as it related to
18  at the time of move out, where Stevens Pond or One
19  Webster did have a policy of automatically charging
20  tenants for any sort of cleaning or repair?
21  A.  No.
22      MR. SACHS:  All right.
23      Moving on to Exhibit L in your packet which
24  would be 13.

Page 60

1      (Document marked as Manzo
2      Exhibit 13 for identification)
3  BY MR. SACHS:
4  Q.  This is a 2019 One Webster lease.  Again,
5  just asking the same question about whether the
6  language in the Move Out Cleaning & Replacement
7  Charges is the same.
8  A.  Same language.
9      MR. SACHS:  Okay.  Moving on to Exhibit M
10  in your packet, Exhibit 14 for dep.
11      (Document marked as Manzo
12      Exhibit 14 for identification)
13  BY MR. SACHS:
14  Q.  This is a 2020 One Webster lease.
15      Same question about whether the language in
16  the Move Out Cleaning & Replacement Charges
17  attachment is the same.
18      And when I say "the same," I mean as the
19  '16, '17, '18 and '19 lease that we just looked at.
20  A.  It's the same.
21      MR. SACHS:  And then Exhibit N in your
22  packet, 15 for purposes of the deposition.
23      (Document marked as Manzo
24      Exhibit 15 for identification)

Page 61

1  BY MR. SACHS:
2  Q.  It is a January 2021 lease for One Webster,
3  and I believe this is the year that the language
4  does change.
5      So does this Move Out Cleaning &
6  Replacement Charges, does this have different
7  language than the '16, '17, '18, '19, and '20 leases
8  that we just looked at?
9  A.  Yes.
10  Q.  All right.
11      And, again, you don't recall why that
12  language was changed outside of any discussions with
13  your attorney, that kind of stuff?
14  A.  It better reflects our policy and
15  procedure.
16      MR. SACHS:  Just give me a second here.  I
17  might go out of order.
18      I want to go to what would be Exhibit R in
19  your packet, Mr. Manzo -- I'm just skipping a
20  couple -- which will be 16 for purposes of the
21  deposition.
22      (Document marked as Manzo
23      Exhibit 16 for identification)
24

16 (Pages 58 - 61)

Page 62

1    BY MR. SACHS:
2    Q.  Just let me know when you get there.
3    A.  I have it.
4    Q.  All right.
5        Are you familiar with this document at all?
6    A.  Yes.
7    Q.  Okay.  And don't tell me anything as it
8    relates to discussions with counsel or anything like
9    that, but when was the last time you reviewed this
10   document, which is entitled "Defendants' Stipulation
11   Regarding Leases"?
12   A.  This morning.
13   Q.  Okay.  And prior to this morning, had you
14   reviewed it at any time?
15   A.  I don't remember.
16   Q.  Do you know if you had any input when this
17   document was drafted?
18       MS. McGEE-TUBB:  Objection.
19   BY MR. SACHS:
20   Q.  Outside of discussion with counsel or
21   anything, did you ever review it?
22       So it's dated June 17th of 2021.
23       Do you know if you looked at it at any time
24   prior to June 17th, 2021?

Page 63

1    A.  I don't remember if I looked at this.
2    Q.  All right.
3        So -- but do you see where at Number 1 in
4    the stipulation it says:
5            "The exemplar apartment lease
6        contracts and accompanying addenda provided
7        for 2016 through 2021 for the Residences at
8        Stevens Pond are representative of the
9        leases and accompanying addenda of other
10       tenants at the Residences at Stevens
11       Pond..." for those years.
12       Would you agree that this stipulation is
13   correct; that, in fact, between 2016 and 2021, you
14   used the same leases as attachments for all your
15   tenants, correct?
16       MS. McGEE-TUBB:  Objection.
17       The -- there's more to that paragraph in
18   the stipulation that should be part of the question.
19       MR. SACHS:  I was really trying not to read
20   the whole thing.
21       MS. McGEE-TUBB:  I'm sorry, but you left
22   out the material part.
23       MR. SACHS:  Is there a material part in it?
24       All right.

Page 64

1        Well, all right.
2    Q.  So if you read Paragraph 1 -- and you can
3    read it to yourself -- would you agree that that
4    stipulation is correct as it relates to leases
5    provided for Stevens Pond between 2016 and 2021?
6    A.  Yes.
7    Q.  Okay.  And the same thing as it relates to
8    Paragraph 2 as for One Webster between 2016 and
9    2021?  Would you agree that that stipulation is also
10   correct?
11   A.  Yes.
12   Q.  Okay.  And as it relates to using the same
13   lease forms at both One Webster and Stevens Pond,
14   you would agree that just makes complete business
15   sense to use the same form for both properties,
16   correct?
17   A.  Yes.
18   Q.  All right.
19       And if you managed other properties, you'd
20   agree that you wouldn't use a different form, right?
21       MS. McGEE-TUBB:  Objection.
22       THE WITNESS:  I would have to -- it would
23   have to be a specific property.
24

Page 65

1    BY MR. SACHS:
2    Q.  So as far as other Massachusetts properties
3    that you do manage, do they use the same forms that
4    we went through here today as far as the lease and
5    the addenda?
6        MS. McGEE-TUBB:  Objection.
7        I'm going to instruct the witness not to
8    answer based on our objections to the deposition
9    notices.
10       MR. SACHS:  Okay.  All right.
11       So let's move to what's Exhibit O in your
12   packet, Mr. Manzo.  Which will be -- what are we,
13   Mr. Loos, what are we, at 17 now?
14       THE REPORTER:  Yes.
15       (Document marked as Manzo
16       Exhibit 17 for identification)
17       MR. SACHS:  You know, I'm really trying to
18   drag this out until Wintner gets here.  I don't know
19   how much longer I can wait.
20   Q.  Exhibit 17, Mr. Manzo, this is -- you know,
21   this is a particularly -- this is for Mr. Berger
22   who's one of the plaintiffs in this action.
23       Do you see his name on there?
24   A.  Yes.

Page 66

1    Q.  All right.
2        And this is a 2018 One Webster lease,
3    correct?
4    A.  Yes.
5    Q.  All right.
6        And you see that the Move Out Cleaning &
7    Replacement Charges, Mr. Berger's lease has the same
8    identical language to the other One Webster lease
9    that we looked at as an exemplar for 2018, correct?
10   A.  Yes.
11       MR. SACHS:  Moving on to what's Exhibit P
12   in your packet, 18 for purposes of depo.
13       (Document marked as Manzo
14       Exhibit 18 for identification)
15   BY MR. SACHS:
16   Q.  This is an August 17th, 2017, lease for one
17   of the other plaintiffs, Branda Peebles.
18       Do you see that?
19   A.  Yes.
20   Q.  And Ms. Peebles' lease is for the Stevens
21   Pond property, correct?
22   A.  Yes.
23   Q.  And you would agree the Move Out Cleaning &
24   Replacement Charges attachment to Ms. Peebles' lease

Page 67

1    has the same identical language to the 2018 exemplar
2    lease that we've looked at for Stevens Pond,
3    correct?
4    A.  Yes.
5        MR. SACHS:  And then moving on to Exhibit
6    Q, which is 19 for purposes of the depo.
7        (Document marked as Manzo
8        Exhibit 19 for identification)
9    BY MR. SACHS:
10   Q.  Do you recognize this document?
11   A.  Yes.
12   Q.  Okay.  And what do you recognize it to be?
13   A.  A Statement of Security Deposit, or SODA.
14   Q.  Yeah.
15       So is this -- so who would -- as far as
16   this document itself, which is marked as JRK 83, who
17   would prepare, back in August -- so it's dated
18   August 23, 2018.
19       Who would, at that time, have prepared this
20   document?
21   A.  The property manager.
22   Q.  And was -- in 2018, was that one of the two
23   people that you named, if you remember?
24   A.  I'm not certain.

Page 68

1    Q.  Okay.  So do you know how -- so this shows,
2    you know, the lease beginning and ending date, and
3    then it shows the amount of the security deposit.
4    There's some billing for utilities, and then it
5    shows new charges:  "Touch-up paint," $50, and
6    "carpet clean per lease," $65.
7        Do you know how that would have been
8    determined that both the touch-up paint and the
9    carpet cleaning where necessary for Ms. Peebles?
10   A.  It would have been walked by the property
11   manager, ideally with Ms. Peebles.
12   Q.  Yeah.
13       But would you agree that where it says
14   "carpet clean per lease" means that they just
15   charged her to clean the carpet because that's what
16   the lease said?
17       MS. McGEE-TUBB:  Objection.
18       THE WITNESS:  No.  That -- I think that's a
19   misnomer.
20       BY MR. SACHS:
21   Q.  Okay.  And when you say that, what do you
22   mean?
23   A.  That is -- that, in my opinion, is for
24   damage done to this carpet.

Page 69

1    Q.  Okay.  And is there anything on this piece
2    of paper, JRK 83, that notes what would have been,
3    you know, beyond normal wear and tear that required
4    carpet cleaning?
5    A.  Not on this piece of paper.
6    Q.  Okay.  Do you know if Ms. Peebles had a dog
7    or a cat?
8    A.  I don't.
9    Q.  So the only way to know ultimately why she
10   was charged for carpet cleaning would be to talk to
11   the actual property manager who made the decision to
12   make those charges, correct?
13   A.  In this case, we have the invoice from this
14   carpet cleaning, and the vendor charged us for
15   staining and other damages.
16   Q.  Okay.  So -- but that -- so are you --
17   so -- strike that.
18       MR. SACHS:  Mathilda, let me ask you, I'm
19   sorry, is that invoice something that was produced?
20   I just -- it's not in my brain right now.
21       MS. McGEE-TUBB:  Yes.
22       MR. SACHS:  Okay.  All right.
23   Q.  So as it relates to that invoice, is that
24   what you're telling me would be the only evidence of

18 (Pages 66 - 69)

1  what the condition of the carpet was?
2      A.  At the time, there was likely photos; but
3  this is from too long ago to -- I don't think we
4  were able to find them.
5      Q.  Yeah.
6          So does -- so this is Stevens Pond.
7          So does Stevens Pond itself have a
8  retention policy as it relates to photos or other
9  evidence used in determining move out cleaning
10 charges?
11     A.  No.  Most of these issues are resolved
12 relatively immediately after move out.  So they're
13 generally saved locally, but there's not a retention
14 policy.
15     Q.  Yeah.
16         So what about the touch-up paint that is
17 listed on Ms. Peebles' invoice here that is JRK 83?
18 Do you know what the touch-up paint was for and why
19 it was needed?
20     A.  Not without being in the apartment.
21     Q.  Okay.  And is that touch-up paint of $50,
22 that seems to be less than what's on the actual
23 addendum for a -- I don't know what size apartment
24 she had -- because it looked like the -- the minimum

1  charge was 150 bucks.
2          So was there -- did the property manager in
3  2018 have some sort of discretion to determine how
4  much should be charged?
5      A.  Yes.
6      Q.  Okay.  And as far as at both One Webster
7  and Stevens Pond, do you know how often in the 2016
8  to 2020 time period that touch-up paint charges were
9  charged back to tenants at move out?
10     A.  No.
11     Q.  Do you know if it happened or occurred
12 frequently?
13     A.  I would be speculating.
14     Q.  So sitting here today, you have no idea?
15     A.  No.
16         MR. SACHS:  All right.
17         Just let me look through my stuff here for
18 a second.
19     Q.  Do you -- so sitting here today, would you
20 know, at both Stevens Pond and One Webster, how
21 often tenants at move out were charged back for
22 cleaning, or touch-up paint, or anything else that
23 might be listed in the cleaning and move out
24 replacement charges?

1      A.  No.
2      Q.  Is -- is there a way to determine that
3  based on both Stevens Pond and One Webster's
4  documents?
5      A.  You would have to find as many of the SODAs
6  as you could.
7      Q.  Okay.  So -- and between 2016 and 2020, do
8  you still have all of those for One Webster and
9  Stevens Pond available in some electronic format?
10     A.  I don't know that we have all.  We
11 certainly would have a -- a reasonable portion of
12 them.
13     Q.  Okay.  Would both Stevens Pond and One
14 Webster have records, again for the 2016 to 2020
15 time period, for the amount of security deposit
16 monies that were withheld, you know, each year?
17         MS. McGEE-TUBB:  Objection.
18     BY MR. SACHS:
19     Q.  Let me just reask that.
20         So let's say, you know, if you -- in 2020,
21 you have a certain amount of leases that terminate.
22         Would there be a record of, for 2020, when
23 leases were terminating, the amount of security
24 deposit monies that both One Webster and Stevens

1  Pond would have withheld because of cleaning or
2  other repair issues?
3      A.  You would have to look at each SODA.  But
4  yes, you could do it that way.
5      Q.  Do you know, sitting here today, what
6  percentage of tenants at both One Webster and
7  Stevens Pond, in the 2016 to 2020 time period, had
8  any amount of their security deposit retained at
9  move out?
10     A.  No.
11         MS. McGEE-TUBB:  Objection.
12     BY MR. SACHS:
13     Q.  And, again, is there a way to determine
14 that based on the records of Stevens Pond and One
15 Webster?
16         MS. McGEE-TUBB:  Objection.
17         And with respect to this question, in
18 particular object to the scope beyond -- as it
19 pertains to security deposit deductions for reasons
20 other than the Move Out Cleaning & Repair Charges.
21 I think that's what you're trying to get at anyway,
22 but I want to make it clear that I'm instructing the
23 witness not to answer beyond those particular
24 categories of security deposit deductions.

19 (Pages 70 - 73)

Page 74

1    MR. SACHS:  Yeah.  And my question is to
2  the Move Out Cleaning & Replacement Charges stuff.
3    THE WITNESS:  I don't remember the question
4  anymore.
5  BY MR. SACHS:
6    Q.  I don't even remember what day it is,
7  Mr. Manzo --
8    A.  Yeah.
9    Q.  -- so don't feel bad about it.
10    So I think it was a question of what
11  percentage of tenants between 2016 and '20 at both
12  Stevens Pond and One Webster had any amount of their
13  security deposit retained by those entities because
14  of any issue on the Move Out Cleaning & Replacement
15  Charges addendum.
16    A.  No.
17    Q.  Okay.  And to the extent -- well, let me
18  ask you this:
19    Is that something that is determinable by
20  looking at the records of both Stevens Pond and One
21  Webster?
22    A.  Yes.  You would have to look at every SODA.
23    MR. SACHS:  Could you give me three minutes
24  just to go through stuff?  I'm just hoping that

Page 75

1  Wintner shows up.  That's it.
2    MS. McGEE-TUBB:  You are welcome to wrap
3  this up before he is able to come.
4    MR. SACHS:  I just want to go through a
5  couple of things real quick and I'll be right back.
6  Three minutes, that's all I need.
7    All right.
8    (Recess taken)
9  BY MR. SACHS:
10    Q.  So I just have a couple of more questions.
11    One of questions I want to ask you,
12  Mr. Manzo, as it relates to what was marked as
13  Exhibit 19, which was Exhibit Q in your pile, which
14  is the -- the security charge, the statement of
15  security deposit back to Ms. Peebles, do you know
16  whether she participated in a walk-through that
17  resulted in the charges on Exhibit 19?
18    A.  I don't.
19    Q.  Would it be -- well, strike that.
20    Was it One Webster and Stevens Pond's
21  policy to charge people part of their security
22  deposit even if they did not participate in a final
23  walk-through?
24    MS. McGEE-TUBB:  Objection.

Page 76

1    THE WITNESS:  It's unrelated.  The policy
2  is to charge for damages above reasonable wear and
3  tear.  We always hope that the resident will
4  participate in a final walk-through, but they don't
5  always.  They don't always do that.
6  BY MR. SACHS:
7    Q.  Okay.  And do you know how often moving out
8  tenants would participate -- again, in the 2016 to
9  2020 time frame -- participate in that final
10  walk-through that would result in charges or not
11  charges?
12    A.  No.
13    Q.  Was it -- as it relates to the lease that
14  we've been going through for both Stevens Pond and
15  One Webster for the 2016 to '20 period that had all
16  the identical language, was it Stevens Pond and One
17  Webster's intention to enforce the provisions of
18  that lease as it related to cleaning and other
19  charges at the end of a tenancy?
20    A.  No.
21    MS. McGEE-TUBB:  Objection.
22  BY MR. SACHS:
23    Q.  Did -- are there any occasions on which
24  you're aware that Stevens Pond would --

Page 77

1    MR. SACHS:  You know what?  Strike that.
2    I'm done.  So I'm done for -- yeah.  Sorry.
3  I just decided not to ask that.
4    So I'm done, suspending based on all the
5  stuff that we just talked about and the motion and
6  all that kind of stuff.
7    I guess, Mathilda, we've got to figure out
8  whether we need to move any deadlines and whatnot to
9  deal with this motion.
10    THE REPORTER:  Are we going to go off the
11  record?
12    MS. McGEE-TUBB:  Can we stay on for just
13  one minute.
14    THE REPORTER:  Sure.
15    MS. McGEE-TUBB:  Thank you.
16    MR. SACHS:  This is where she asks me to
17  give her my children, and I'm not doing it.
18    Well, actually, you can have them.
19    MS. McGEE-TUBB:  I've got my own, thanks.
20    Duly noted on your position on keeping the
21  deposition open.
22    It's our position that the deposition is --
23  is closed.  We produced a witness on the topics we
24  said that we would produce on, and those topics have

20 (Pages 74 - 77)

Page 78

1  been addressed today.
2      And then I also wanted --
3      MR. SACHS:  Sorry.  I'm just simply, you
4  know, reserving the suspension issue on the idea
5  that we've got this motion pending -- well, motion
6  to be pending.  And if a judge agrees with me that
7  we can get other testimony -- whether it's, you
8  know, Mr. Manzo or somebody else -- then somebody
9  else will be here.
10     MS. McGEE-TUBB:  Understood.
11     But we won't be coming back on the topics
12  that we've produced the witness on today, yeah.
13     MR. SACHS:  You will not be coming back on
14  the topics that you produced on today, subject to a
15  judge telling you that they have to answer the
16  questions that weren't answered.
17     MS. McGEE-TUBB:  I think I followed that.
18     Yep.  If a judge tells us we have to answer
19  the questions that we did not answer today, then,
20  yes, we will back and answer those questions.
21     MR. SACHS:  Yeah.  That's all.
22     MS. McGEE-TUBB:  Yes.  Exactly.
23     And then I also want to just put on the
24  record that the witness will read and sign.

Page 79

1      MR. SACHS:  Okay.  Yeah.
2      Just let me know, though, whatever you need
3  for timing or whatnot.
4      MS. McGEE-TUBB:  Yeah.
5      MR. SACHS:  30 days?
6      MS. McGEE-TUBB:  Yeah.  30 days should
7  be -- should be fine.  It was a two-hour deposition.
8      MR. SACHS:  That's fine.
9      THE REPORTER:  Copy, Ms. McGee-Tubb?
10     MS. McGEE-TUBB:  I'm sorry.
11     THE REPORTER:  Copy?
12     MS. McGEE-TUBB:  Yes.  Yes.  Thank you.
13     THE REPORTER:  Off the record?
14     MS. McGEE-TUBB:  I'm good to go off, yeah.
15         (Whereupon, the deposition was
16         suspended at 1:58 p.m.)
17
18
19
20
21
22
23
24

Page 80

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.                )
3      I, Alexander K. Loos, RDR and Notary Public in
4  and for the Commonwealth of Massachusetts, do hereby
5  certify that there came before me on the 10th day of
6  November, 2022, at 12:09 p.m., the person
7  hereinbefore named, who was by me duly sworn to
8  testify to the truth and nothing but the truth of
9  his knowledge touching and concerning the matters in
10  controversy in this cause; that he was thereupon
11  examined upon his oath, and his examination reduced
12  to typewriting under my direction; and that the
13  deposition is a true record of the testimony given
14  by the witness.  I further certify that I am neither
15  attorney or counsel for, nor related to or employed
16  by, any attorney or counsel employed by the parties
17  hereto or financially interested in the action.

18              ... ve hereunto set my hand
19              ...al this 22nd day of
20
21
22
23  Notary Public
24  Commission expires 5/5/28

Page 81

1  Mathilda McGee-Tubb, Esq.
2  Msmcgeetubb@mintz.com
3          November 22, 2022
4  RE:   Peebles, Et Al v. JRK Properties, Et Al
5      11/10/2022, Mr. Thomas L. Manzo (#5578320)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

21 (Pages 78 - 81)

Page 82

1  Peebles, Et Al v. JRK Properties, Et Al
2  Mr. Thomas L. Manzo (#5578320)
3           E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Mr. Thomas L. Manzo                    Date
25

Page 83

1  Peebles, Et Al v. JRK Properties, Et Al
2  Mr. Thomas L. Manzo (#5578320)
3        ACKNOWLEDGEMENT OF DEPONENT
4     I, Mr. Thomas L. Manzo, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Mr. Thomas L. Manzo                    Date
13 *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20____.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.