# Addendum of Housing Court Decisions

*Docket No.:* **17H84SC000079**
*Parties:* **CHARA E. LEE, Plaintiff VS. GRANT CALLENDER and KERRY CALLENDER, Defendants**
*Judge:* **/s/JEFFREY M. WINIK FIRST JUSTICE**
*Date:* **October 24, 2017**


CITY OF BOSTON DIVISION SMALL
FINDINGS OF FACT, RULINGS OF LAW AND ORDER OF JUDGMENT
Based upon all the credible testimony and evidence presented at trial, and the reasonable inferences drawn therefrom, the Court finds and rules as follows:
The plaintiff, Chara E. Lee, filed this small claim action seeking to recover damages after the defendants, Grant and Kerry Callender, deducted $846.81 from her security deposit that the plaintiff contends did not result from damage caused by her or her household members. After conducting a clerk's hearing, the clerk issued a ruling that in part favored the plaintiff. The clerk determined that under G.L. c. 186, § 15B the plaintiff was entitled to damages in the amount of $275.00 (representing expenditures that were improperly deducted from the plaintiff's security deposit). The clerk did not treble the amount awarded as is required by the statute. The defendants filed a timely appeal for a trial de novo.[1]
The security deposit statute, G.L. c. 186, §15B, imposes strict requirements that must be followed by every landlord who accepts a security deposit from a residential tenant. Section 4 requires that a landlord who has held the deposit in accordance with the provisions of the statute must "return to the tenant the security deposit or any balance thereof' within thirty days after the termination of occupancy. Section 4 further provides that the landlord is permitted to deduct from

---------------------------

[1]The parties signed a written waiver of the jury demand.

-1-

the security deposit only (i) unpaid rent which the tenant has not validly withheld or deducted, (ii) unpaid increases in real estate taxes which the tenant is obligated to pay and (iii) a reasonable amount necessary to pay for the repair of damage to the premises caused by the tenant, provided the landlord gives the tenant within the same thirty day period "an itemized list of damages, sworn to by the lessor or his agent under pains and penalties of perjury, itemizing in precise detail the nature of the damage and of the repairs necessary to correct the damage, and written evidence, such as thereof." Section 6 provides in relevant part that a landlord,

   shall forfeit his right to retain any portion of the security deposit for any reason . . . if he . . . (e) fails to return to the tenant the security deposit or balance thereof to which the tenant is entitled after deducting therefrom any sums in accordance with the provisions of this section, within thirty days after termination of the tenancy.

Finally, Section 7 provides that if the landlord fails to comply with Section 6 (e), the tenant "shall be awarded damages in an amount equal to three times the amount of the such security deposit or balance thereof

**Add. 001**

© 2024, Social Law Library. All Rights Reserved.

(emphasis added) . . . plus interest at the rate of five percent from the date when such payment became due, together with court costs and reasonable attorney's fees." See, Castenholz v. Caira, 21 Mass.App.Ct. 758 (1986).

This is not a case where the tenant is arguing that the landlord failed to comply with any of the procedural requirements of the security deposit statute (such as failure within thirty days after termination of the tenancy to account for the items of damage and/or return the amount the landlord determined to be the balance due). Rather, the tenant claims that - with respect to some of the items of damage identified in the landlord's verified statement prepared after the tenant vacated the premises — she was not responsible for the damage, and that the landlord should not have deducted the expenditures associated with repairing that damage from her security deposit. When faced with a factual dispute involving the specific items of damage, I read the phrase "balance thereof' set forth in Section 7 to mean that where the landlord has otherwise complied with the procedural requirements of the security deposit, but the court determines that the tenant did not cause some or all of the damage claimed by the landlord, a landlord will be liable to the tenant for treble the amount deducted from the security deposit for those items of damage that the court determines were not caused by the tenant.

Defendants Grant and Kerry Callender ("landlords") own the three-family residential building at 92 Waumbeck Street, in the Dorchester section of Boston. Plaintiff Chara E. Lee

-2-

("tenant") resided at 92 Waumbeck Street, Apartment 2, as a tenant (together with her three children) subject to the terms of a Section 8 lease. She occupied Apartment 2 from January 2016 until December 19, 2016. The apartment included three bedrooms, a living room, a kitchen and one bathroom.

At the inception of the tenancy the tenant (through the Quincy Housing Authority) gave the landlords a $1,800.00 security deposit. The parties signed an apartment conditions statement confirming that the apartment was in satisfactory condition as of December 31, 2016.

The landlords deposited and maintained the tenant's security deposit in compliance with the security deposit statute, G.L. c. 186, § 15B (3) (a). Upon agreement of the parties on December 19, 2016 the tenant vacated and voluntarily surrendered possession of the premises. The tenant was current with her rental obligations on the date she vacated the premises.

On or about January 18, 2017, the landlords sent the tenant a document entitled "Statement of Security Deposit." The documents reflects that the landlords were holding the $1,800.00 security deposit plus $4.69 in interest earned. From that amount the landlords deducted $959.58 for repair costs itemized in the statement. The deposit deduction statement was signed by the landlords under the pains and penalties of perjury and included estimates, bills, invoices or receipts indicating the actual or estimated cost for the labor associated with replacing blinds, painting or cleaning. The landlords returned $846.81 to the tenant and retained $959.58. The landlords stated that the tenant owed a $200.00 cleaning fee, but that amount was not deducted from the security deposit.

With respect to the amount deducted from the tenant's security deposit, I find that the following expenditures totaling $823.64 for repairs (material and labor) were properly deducted based upon damage (beyond reasonable wear and tear) attributable to the tenant:

1. Paint$51.00

**Add. 002**

2. Replace two interior doors$300.00
3. Repair damaged drywall (by entry door)$105.00
4. Repair damaged walls (kit and bdrm)$50.00

-3-

5. Replace damaged window (living room)$317.64[2]

I find that the tenant is not responsible for damage to the repair back porch screen ($15.94) or to the bi-fold closet door ($120.00). Therefore, I find that the landlords deducted $135.94 from the tenant's security deposit for damages that were not attributable to tenant caused conduct. The amount of the security deposit that was properly due the plaintiff was $976.36. In violation of G.L. c. 186, § 15B (6) (c) the landlords returned only $846.81. The balance of the tenant's security deposit wrongfully retained by the landlords totaled $129.65.
The landlords' failure to return the correct balance of the deposit within thirty days from the date the tenant vacated the premises constituted a violation of G.L. c. 186, § 15B (6).
For these reasons, in accordance with G.L. c. 186, §15B (7) the tenant is entitled to recover as damages treble the amount of $129.65 (the "balance thereof') improperly retained by the landlords. Under the terms of the statute the trebling of the "balance thereof' is not discretionary. Accordingly, the court awards the tenant damages in the amount of $388.95 ($129.65 x 3).
Finally, I find that at the time she vacated from Apartment 2 the tenant removed all of her belongings and left the apartment in broom clean condition. Accordingly, I rule that the tenant is not liable to the landlords for the $200.00 cleaning fee (which had not been deducted from the security deposit).

ORDER FOR JUDGMENT
Based upon all the credible testimony and evidence presented at trial in light of the governing law, it is ORDERED that:
    1.Judgment enters for the plaintiff on her G.L. c. 186, §15B claim in the amount of $388.95, plus statutory interest and $25.00 costs (filing fee).

---------------------------

    [2] I find credible the defendants' testimony that the window was damaged when the window was removed from the frame and pulled towards the inside of the apartment either during the plaintiff's tenancy or on the day that she vacated the premises.

-4-

2.Once the judgment becomes final, the Clerk-Magistrate is directed to disburse the small claims appeal bond of $300.00 ($275.00 plus $25.00 filing fee) to the plaintiff which amount shall be applied in partial satisfaction of the judgment.

SO ORDERED
/s/JEFFREY M. WINIK FIRST JUSTICE
October 24, 2017
cc:Chara E. Lee
Grant and Kerry Callender
Robert L. Lewis, Clerk Magistrate

**Add. 003**

© 2024, Social Law Library. All Rights Reserved.

*Docket No.:* **CIVIL ACTION NO. 10H84CV000709**
*Parties:* **KELLY GALLAGHER,[1] Plaintiffs VS. TYLER REALTY TRUST II, HADCO MANAGEMENT LLC, HADCO MANAGEMENT COMPANY, INC., and TYLER HUDSON LLC Defendants**
*Judge:* **/s/JEFFREY M. WINIK**
*Date:* **August 24, 2016**


CITY OF BOSTON DIVISION
FINDINGS OF FACT, RULINGS OF LAW AND ORDER OF JUDGMENT
    The plaintiff filed this civil action seeking to recover statutory damages alleging that the defendant failed to return her security deposit in compliance with the provisions of G.L. c. 186, § 15B. The defendants filed an answer in which they denied that they had violated the security deposit statute. The defendants' answer included a counterclaim for breach of the lease alleging that the plaintiff's son (who lived in the apartment) caused damage to the apartment and engaged in conduct that substantially interfered with the safety of other residents.
    Based upon all the credible testimony and evidence presented at trial, and the reasonable inferences drawn therefrom, the Court finds and rules as follows:

    Findings of Fact

    Defendant Tyler Realty Trust II (the "Trust") owns the residential rental property at 96 Tyler Street, in the Charlestown section of Boston. Defendant Hadco Management Co., Inc. ("Hadco") manages the property for the Trust.[2]
    On February 9, 2007 plaintiff Kelly Gallagher ("Gallagher") entered into a written lease with the Trust whereby Gallagher rented the two-bedroom penthouse apartment at 96 Tyler Street, Unit 8 ("Unit 8"). Gallagher rented Unit 8 for the purpose of providing housing for her

------------------------

    [1] The complaint named Joseph Gallagher as a co-plaintiff. Sadly, Joseph Gallagher died in 2014.
    [2] Defendants Tyler Hudson LLC and Hadco Management LLC are affiliated companies. For purposes of simplicity I shall refer to the defendants collectively as "Hadco."

                          -1-

son Joseph Gallagher ("Joseph") who at that time was a college student. Joseph occupied Unit 8 with a roommate, Storm Edward Garrison. Hadco acknowledged in writing that Joseph and his roommate could occupy Unit 8. The lease term commenced on February 10, 2007 for a term of eighteen (18) months. The lease term ended on August 31, 2008. The monthly rent was $1,500.00.
    At the inception of the lease term Gallagher gave the Trust a $1,500.00 security deposit. There is no dispute that the Trust provided Gallagher with a written security deposit receipt that stated that the security deposit would be held in a separate, interest bearing account at Mt. Washington Bank in Boston (Acct. No. 150011872). There is no dispute that Hadco deposited and maintained Gallagher's security deposit in this custodial security deposit account at Mt. Washington Bank.
    I find that at the inception of the tenancy in February 2007 Unit 8 was in good condition. The walls were newly painted; the hardwood floors were newly sanded, stained and coated with polyurethane; the appliances were new.

**Add. 004**

© 2021, Social Law Library. All Rights Reserved.

On February 26, 2007 Joseph signed an Apartment Condition Statement that confirmed Unit 8 was in good condition.

On March 9, 2007 Hadco sent Gallagher copies of the lease, security deposit receipt and statement of conditions form.

Gallagher and the Trust executed a new lease for Unit 8 in August 2008. The lease term commenced on September 1, 2008 and expired on July 31, 2009. The monthly rent was increased to $1,650.00. The security deposit was increased to $1,650.00. In all other respects the terms of the second lease were identical to the first lease. Gallagher gave the Trust an additional $150.00 to cover the additional security deposit. There is no dispute that Hadco deposited these funds in the existing custodial security deposit account at Mt. Washington Bank. Joseph and his roommate continued to reside in Unit 8 with Hadco's written approval during the second lease term.

The lease provide that the tenant (Lessee) shall at the end of the tenancy "deliver up the leased premises . . . in good, clean and tenantable order and condition, reasonable wear and tear excepted" (11 5) and that the tenant would be liable for money damages resulting from such breach of lease (¶11).

-2-

In June 2009 Joseph notified Hadco that his mother would not be renewing the lease. In a letter dated July 1, 2009 Hadco confirmed that Joseph would be vacating Unit 8 at the end of July and reminded him that the lease required that he leave Unit 8 "in the same condition it was when he moved in, except for normal wear and tear." Attached to the letter was a checklist of things the tenants would have to do to avoid chargeback costs. The letter informed Joseph that he should "repair/spackle any holes in the walls and repaint the walls to the original color (Color: Ben Moore Navajo; Paint Finish: Eggshell finish."

Joseph's father, Edward Gallagher ("Edward"), testified that he and Joseph cleaned the apartment and painted the walls, woodwork and doors before Joseph and his roommate vacated and surrendered possession of Unit 8 on July 31, 2009. Edward said he used a cream colored latex flat paint on the walls and a white semi-gloss paint on the woodwork. He further testified that he used neutral colored drop cloths to cover the floor when he painted. He testified that he did not use anything else to cover the floors. He testified that when Joseph vacated Unit 8 he did not observe any damage to the hardwood floors, patio screen door, blinds, window screens, entry door or baseboards. Edward identified photographs (Exhibit 7A-R) that he said were taken by his son after Edward had painted Unit 8 in July 2009. These photographs show an apartment that is clean and in good condition.

I find that Joseph took the series of photographs marked as Exhibit 7A-R. However, I find that the photographs were not taken in July 2009.

Andrea Hadaya ("Hadaya"), Hadco's managing director of property management, testified that she was in Unit 8 with Joseph in February 2007, shortly before he moved his belongings into the unit. She testified that she did not visit Unit 8 again until July 31, 2009, after Joseph had removed his belongings and vacated the unit. Hadaya testified that the pictures identified by Edward (Exhibit 7A-R) were not taken in July 2009. She testified that the pictures were taken in February 2007 and recorded the condition of Unit 8 immediately before Joseph and his roommate moved their belongings into the unit. She was able to date the photographs with certainty as having been taken in February 2007 because (1) Exhibit 7R (a photograph of the open oven) shows her orange handbag on the kitchen counter, (2) Exhibit 7M (a photograph of the unit hallway facing the front door) shows her coat hanging on a closet door, and (3) Exhibit 7M shows red rosin paper that as a normal management practice Hadco places on the floor of its

-3-

**Add. 005**

© 2021, Social Law Library. All Rights Reserved.

apartments before a new tenant moves his belongings into the unit (to protect the newly restored floors). I credit Hadaya's testimony that she was present at Unit 8 in February 2007 when Joseph took those photographs before he moved his belongings into the unit.

Accordingly, I find that the photographs taken by Joseph (Exhibit 7A-R) were not taken in July 2009 (as Edward Gallagher had testified). Edward did not account for the presence of Hayada's handbag, her coat or the red rosin paper that appear in the photographs. I find that the photographs marked as Exhibit 7A-R were taken by Joseph in February 2007 (before Joseph and his roommate moved their belongings into the unit) and accurately depict the condition of Unit 8 at the inception of the tenancy.

Hadaya inspected Unit 8 on July 31, 2009 immediately after Joseph had moved out. Hadaya testified that she observed the following conditions of damage and disrepair in Unit 8: the walls were covered with new splotchy, streaked paint that was a different color from the color on the walls at the inception of the tenancy in February 2007 (Benjamin Moore Navajo Eggshell Finish) and the new paint did not cover all of the original paint; a baseboard was damaged; the sliding patio door was broken; the screens were torn and covered with a mismatched patch; the front entry door was damaged; a window blind was cut; the hardwood floor was scratched and had a burn mark. These conditions are shown in a series of photographs that Hadaya took while in Unit 8 on July 31, 2009 (Exhibit 10: 1-24). I find that the photographs fairly and accurately show the condition of (and damages to) Unit 8 that Hadaya observed on July 31, 2009. I find that the damages shown in the photographs did not exist when Joseph and his roommate first moved their belongings into Unit 8 in February 2007. The damages occurred while Joseph and his roommate occupied Unit 8, sometime between February 2007 and July 31, 2009. I find that the conditions shown in the July 31, 2009 photographs depict damage to Unit 8 that was not the result of normal wear and tear. I find that the damages were caused by Joseph and his roommate (or their guests) during their tenancy. I find that the splotchy and streaked mismatched paint shown in Hadaya's photographs were applied to the walls and woodwork (by Edward) in late July 2009 before Joseph and his roommate vacated the unit. I find that the poor paint-job constituted damage beyond normal wear and tear that made it necessary for Hadco to repaint the apartment before a new tenant could take occupancy.

-4-

In a verified statement of damage dated August 28, 2009 Hadaya, acting on behalf of Hadco and the Trust, provided Gallagher with an itemized list of damage found in Unit 8 when Joseph vacated. Next to each item was listed the cost to repair the damage. Attached to the statement were photographs of the damage together with invoices showing the amount charged for labor and materials for each repair. The written statement set forth the amount of the security deposit held by Hadco ($1,650.00 plus $52.25 interest) and the cost of repairing or replacing the damage ($4,470.00). After deducting Gallagher's security deposit (and accrued interest) from the repair costs incurred by Hadco the statement set forth the net amount claimed due by Hadco, $2,767.00.

The statement of itemized damages included as an item of damage/repair an "emergency service call to re-code security system." The building at 96 Tyler Street has an intercom system. The system has a master numerical code that if entered correctly will allow authorized Hadco employees to open the front entry door lock. The same master numerical code is used to access the security systems at all of the buildings managed by Hadco. Hadco limits disclosure and use of the master numerical code to authorized Hadco employees. The tenants are not supposed to have access to or use the master numerical code.

Hadaya testified credibly that one evening in early March 2009 she came

**Add. 006**

© 2021, Social Law Library. All Rights Reserved.     

to 96 Tyler Street after she received a call from the police regarding a noise complaint. She saw a woman walk up to the building intercom and try to push the numbers on the access code pad. The front door did not open. Hadaya then observed Joseph lean out from his apartment window and call out the master numerical code numbers to the woman. There were other people standing in front of the building who were in a position to have heard Joseph call out the numbers. Hadaya, concerned that the security for all of the Hadco buildings had been compromised, ordered the security company that maintained the intercoms to reset the codes for 96 Tyler Street (and all of the other Hadco buildings). Hadco was charged $1,150.00 by the security company to recode the security system, and this amount was included in the statement of itemized damages presented to Gallagher.

-5-

Rulings of Law

Gallagher's Security Deposit Statute Claim.[3] The security deposit statute, G.L. c. 186, §15B, imposes strict requirements that must be followed by every landlord who accepts a security deposit from a residential tenant. The landlord forfeits his right to retain a security deposit for any reason where he has failed to comply with the statute, and upon demand, must promptly return the deposit to the tenant. See, Castenholz v. Caira, 21 Mass.App.Ct. 758 (1986). Section 3(a) requires that a landlord hold a residential tenants' security deposit "in a separate, interest-bearing account in a bank, located within the commonwealth under such terms as will place such deposit beyond the claim of creditors of the lessor . . ." Section 4 requires that a landlord who has held the deposit in accordance with the provisions of the statute must "return to the tenant the security deposit or any balance thereof' within thirty days after the termination of occupancy. Section 4 further provides that the landlord is permitted to deduct from the security deposit only (I) unpaid rent which the tenant has not validly withheld or deducted, (ii) unpaid increases in real estate taxes which the tenant is obligated to pay and (iii) a reasonable amount necessary to pay for the repair of damage to the premises caused by the tenant, provided the landlord gives the tenant within the same thirty day period "an itemized list of damages, sworn to by the lessor or his agent under pains and penalties of perjury, itemizing in precise detail the nature of the damage and of the repairs necessary to correct the damage, and written evidence, such as estimates, bills, invoices or receipts, indicating the actual or estimated cost thereof' (emphasis added). Section 6 provides in relevant part that a landlord,

shall forfeit his right to retain any portion of the security deposit for any reason . . . if he (a) fails to deposit such funds in an account as required by subsection 3 . . . (b) fails to furnish to the tenant within thirty days after the termination of the occupancy the itemized list of damages, if any, in compliance with the provisions of this section . . . or (e) fails to return to the tenant the security deposit or balance thereof to which the tenant is entitled after deducting therefrom any sums in accordance with the provisions of this section, within thirty days after termination of the tenancy.

Finally, Section 7 provides that if the landlord fails to comply with Section 6 (a) or (e), the tenant "shall be awarded damages in an amount equal to three times the amount of the such security

------------------------

[3] With respect to the plaintiffs Requests for Rulings the following are ALLOWED: #s 1, 3, 4, 5, 6, 7, 8 and 18. The following are DENIED: 9, 10,

**Add. 007**

© 2021, Social Law Library. All Rights Reserved.

11, 12, 13, 14, 15, 16 and 17.

-6-

deposit or balance thereof . . . plus interest at the rate of five percent from the date when such payment became due, together with court costs and reasonable attorney's fees."

I find and rule that at the inception of Gallagher's tenancy (and when the lease was renewed) Hadco and the Trust placed Gallagher's security deposit in a statutorily compliant custodial account in a Massachusetts bank (Mt. Washington Bank). I rule that Hadco and the Trust maintained this security deposit account in compliance with the provisions of G.L. c. 186, § 15B (3)(a) throughout the tenancy.

It is undisputed that Gallagher's tenancy ended on July 31, 2009 and that Hadco, acting on behalf of the Trust, provided Gallagher with a verified written statement of damages dated August 28, 2009. Hadco sent the statement to Gallagher within thirty days from the date Joseph vacated Unit 8. The statement provided Gallagher with an accurate accounting of the security deposit, accrued interest and the amount of repair expenses incurred by the Trust that Hadco deducted from the security deposit. The statement included a detailed itemized list of damages, written estimates, bills, invoices or receipts, indicating the actual or estimated cost of repairing each item. The list of damages and cost of repair was signed and sworn to by Hadaya under the pains and penalties of perjury. I rule as a matter of law that Hadco's written list of damages and costs or repair complied with the provisions of G.L. c. 186, § 15B (4).

The security deposit provides that the Trust was entitled to deduct from Gallagher's security deposit "a reasonable amount necessary to pay for the repair of damage to the premises caused by the tenant." I find and rule that Joseph and his roommate caused damage beyond reasonable wear and tear to the hardwood floors, patio screen door, window blinds, window screens, Unit 8 entry door and baseboard. I further find and rule that Edward's efforts to paint Unit 8 was inadequate and caused damage to the walls (streaked, blotchy and incomplete application of non-matching paint) beyond normal wear and tear. I find and rule that the amounts expended by Hadco on behalf of the Trust to repair these items of damage were fair and reasonable.

Joseph's unauthorized oral distribution of Hadco's master security code that controlled the front door lock to 96 Tyler Street was conduct that substantially interfered with the safety of the other residents of 96 Tyler Street. That substantial interference constituted a breach of ¶ 11 of the lease (lessee shall not "create any substantial interference with the . . . safety of . . . the

-7-

other occupants of the same or any other apartment . . ."); however Joseph's inappropriate conduct did not result in physical "damage to the premises caused by the tenant" within the meaning of G.L. c. 186, § 15B (4), and the protective action taken by Hadco to reset the master security code did not constitute a "the repair of damage to the premises." For that reason the cost incurred by Hadco to reset the master security code cannot be deducted from Gallagher's security deposit.

I find and rule that the Trust had the right to deduct a total of $3,320.00 from Gallaher's security deposit.[4] Since the cost to repair the physical damage to Unit 8 exceeded the amount of Gallagher's security deposit ($1,702.25) the Trust and Hadco were not obligated to return any portion of the security deposit to Gallagher.

Accordingly, I rule that neither the Trust nor Hadco engaged in any act or omission that constituted a violation of the security deposit statute,

**Add. 008**

© 2021, Social Law Library. All Rights Reserved.

G.L. c. 186 § 15B.

The Trusts's Breach of Contract Counterclaim. Under the terms of ¶ 22 of the lease Gallagher was obligated to keep and maintain Unit 8 in "good repair, order and condition as the same are at the beginning of the lease term "reasonable wear and tear and damage by unavoidable casualty only excepted"; and that "the lessee shall reimburse the lessor for the reasonable cost of such repairs in full, upon demand." Under the terms of ¶ 11 of the lease Gallagher agreed that the unit occupants would not "create any substantial interference with the . . . safety of . . . the other occupants of the same or any other apartment . . ." Finally, ¶ 5 of the lease addendum provided that Gallagher "shall be liable for all costs and reasonable attorney's fees incurred by the lessor in enforcing any provision of this Lease . . ."

I find and rule that at the end of the second lease term Gallagher did not deliver Unit 8 to the Trust in "good repair, order and condition as the same [were] at the beginning of the lease term. I find and rule that the floors, walls, doors, windows, screens and baseboards of Unit 8 were in good condition at the inception of Gallagher's tenancy and that the floors were freshly restored and the walls were freshly painted. I find and rule that during his occupancy at Unit 8 Joseph and his roommate damaged the floors, doors, windows, screens and baseboards, and that such damage extended well beyond what would have occurred through normal wear and tear. I

------------------------

[4] $4,470.00 (total amount of expenses set forth in the itemized list of damages) less $1,150.00 (the cost associated with re-coding the security system).

-8-

find and rule that Joseph and his father's efforts to repaint the walls to Unit 8 at the end of the second lease term were inadequate, and caused damage to the walls (streaked, blotchy and incomplete application of non-matching paint) beyond normal wear and tear.

Accordingly, I rule that Gallagher committed a material breach of 1122 of the lease. I find and rule that the amounts expended by Hadco on behalf of the Trust ($3,320.00) to repair the physical damage to Unit 8 caused by Joseph and his roommate were fair, reasonable and necessary to restore the unit to rentable condition.

I further find that Hadco did not authorize Gallagher or Joseph (or his roommate) to use or disseminate the non-public master security code for the building's front door entry system. It is obvious that Joseph obtained that master security code prior to March 2009 (it is unclear from the evidence how he obtained the code). Joseph should have known that his dissemination of that security code to anyone (especially non-residents) would compromise the security of the building lock system and thus the safety of the other residents of 96 Tyler Street. Joseph's unauthorized oral dissemination of Hadco's master security code (that was intended to be used only by authorized Hadco employees to open the front door lock to 96 Tyler Street) to nonresidents was conduct that substantially interfered with Hadco's management of the property and substantially interfered with the safety of the other residents of 96 Tyler Street. Joseph's conduct constituted a material breach of ¶ 11 of the lease for which Gallagher is liable. As a direct result of that breach of the lease the Trust suffered damage in the amount of $1,150.00 (the cost of resetting the security code for Hadco's front door entry systems).

Under the provisions of ¶ 5 of the lease addendum the Trust is entitled to recover from Gallagher all costs and reasonable attorney's fees it has incurred enforcing the provisions of the lease.

Accordingly, I rule that the Trust has established its counterclaim for

**Add. 009**

© 2021, Social Law Library. All Rights Reserved.

breach of contract and is entitled to damages in the net amount of $2,767.75 plus costs and a reasonable attorney's fee.[5]

------------------------

[5] The total amount of damages for breach of contract is $4,470.00 ($3,320.00 plus $1,150.00) less the amount of the security deposit retained by Hadco ($1,702.25) = $2,767.75.

-9-

INTERIM ORDER

Based upon all the credible testimony and evidence presented at trial in light of the governing law, it is ORDERED that:
1. Judgment shall enter for the defendants on the plaintiff's statutory security deposit claim under G.L. c. 186, § 15B;
2. Judgment shall enter for the defendants on its counterclaim for breach of lease with damages awarded in the net amount of $2,767.75 plus costs and a reasonable attorney's fee;
3. Within twenty (20) days from the date of this Interim Order, the defendants may file with this Court a motion for costs and a reasonable attorney's fee in accordance with the procedure prescribed in Yorke Mgmt. v. Castro, 406 Mass. 17, 20 (1989).
4. Final Judgment shall enter after costs and a reasonable attorney's fee are assessed.
SO ORDERED.
/s/JEFFREY M. WINIK
August 24, 2016

-10-

**Add. 010**

© 2021, Social Law Library. All Rights Reserved.

*Docket No.:* **CIVIL ACTION No. 14H84CV000395**
*Parties:* **DONALD KIEPERT and KAREN KIEPERT, Plaintiffs v. COCO RAYNES, Defendant**
*Judge:* **/S/MARYLOU MUIRHEAD**
*Date:* **June 13, 2016**


CITY OF BOSTON DIVISION
INTERIM ORDER
     This matter was before the court on May 10, 2016 with respect to the
parties' "Joint Motion to Authorize Case Stated Summary Adjudication." The
court will construe this as cross-motions for summary judgment. The parties
submitted a joint statement of facts, but neither party submitted a brief or
legal memorandum. After hearing and for the reasons set forth herein, the
court rules as follows.

BACKGROUND
     The Plaintiffs commenced this case in May 2014 seeking monetary damages
from the Defendant for breach of contract, breach of covenant of good faith
and fair dealing, unjust enrichment, G.L. c. 186, sec. 15B, 94C CMR 3.17(4)
[sic] and G.L. c. 93A. The return of service indicates that service was made
on the Defendant on June 4, 2014. The Defendant did not file an answer and
counterclaim until August 4, 2014.
     In her answer, the Defendant denied the allegations in the complaint
against her, asserting affirmative defenses and asserting counterclaims for
breach of contract, nuisance, unjust enrich-
                         -1-

ment, quantum meruit and indemnification. The Plaintiffs filed a response on
August 4, 2016, denying the allegations in the counterclaim and asserting
affirmative defenses.
     The Plaintiffs filed an amended complaint in December 2014. They
continued to allege breach of contract, breach of covenant of good faith and
fair dealing, unjust enrichment, G.L. c. 186, sec. 15B, 94C CMR 3.17(4)
[sic] and G.L. c. 93A, but added a claim for violation of G.L. c. 186 sec.
15B(1)(b). The Defendant answered in July 2015, reiterating her denial of
the allegations against her and re-asserting affirmative defenses and the
counterclaims asserted in her first answer. The Plaintiffs immediately
responded with an answer that differs somewhat from their original response
but not in a significant manner.
     Each party bears the burden to prove its claims and defenses.

II     STANDARD FOR SUMMARY JUDGMENT
     Summary judgment is granted where there are no issues of material fact
and when the moving party is entitled to judgment as a matter of law.
Mass.R.Civ.P. 56(c), Cassesso v Commissioner of Corrections, 390 Mass. 419,
422 (1983), Community National Bank v Dawes, 369 Mass. 550, 553 (1976). The
moving party bears the burden of demonstrating affirmatively the absence of
a triable issue and its entitlement to judgment as a matter of law. Pederson
v Time, Inc., 404 Mass. 14, 16 - 17 (1989). In viewing the record before it,
the court reviews "the evidence in the light most favorable to the nonmoving
party. Donaldson v Farrakhan, 436 Mass. 94, 96 (2002).
     The parties in this case rely on documents that are not in the form of
admissible evidence. Because the motion is a joint motion, the court can
only conclude that there are no evidentiary issues and any objection to the
documents presented by the parties is deemed to have been
                         -2-

waived.
                         **Add. 011**

© 2021, Social Law Library. All Rights Reserved.

III      MATTERS BEFORE THE COURT
    A.    Undisputed Relevant Facts
    The parties entered into a lease agreement (Exhibit "A") in December
2013 in which the Plaintiffs agreed to rent Unit A at 314 Dartmouth Street
in the Back Bay neighborhood of Boston. (the "Premises"). The agreed upon
rent was eleven thousand dollars a month. The term of the lease was for six
months, but the addendum, executed on the same day as the six month lease,
states that the lease term was three months with the ability to extend the
term on monthly basis through June. (Exhibit "A"). The Plaintiffs paid rent
in advance for the first and last month and security deposit each in the
amount of $11,000.00. (Joint Statement of Facts Regarding Motion to
Authorize Case Stated Summary Adjudication at paragraph 16).[1] The parties
do not dispute that on or about December 18, 2013 (the date on the lease and
addendum) the Defendant demanded and received rent for the months of
February and March 2014 in the form of two postdated checks, numbered 239
and 240, drawn of the account of Donald R. Kiepert at JP Morgan and
containing the words "February 2014 Rent" and "March 2014 Rent,"
respectively. (Joint Statement of Facts Regarding Motion to Authorize Case
Stated Summary Adjudication at paragraph 17 and Exhibit "C"). There is no
evidence that the postdated checks were not distributed to the Defendant in
a timely manner.
    The parties do not provide the court with any information regarding the
Defendant's

    ---------------------------

    [1] The Statement of Facts at paragraph 16 implies that Exhibit "B" is
    contains copies of three checks. It does not. Exhibit "B" is a copy of
    check number 1766 in the amount of $11,000.00 drawn on an account of
    Karen Kiepert at Cambridge Trust Company dated December 4, 2013 with the
    words "1st months [sic] rent" on the memo line and drawn to Keller
    Williams, as well as a copy of check number 1774 in the amount of
    $11,000.00 drawn on an account of Karen Kiepert at Cambridge Trust
    Company dated December 12, 2013 with the words "security deposit" on the
    memo line, also drawn to Keller Williams.
                    -3-

compliance with paragraph 2(a), (b) or 3(a) of G.L. c. 186, sec. 15B
relative to receipts for the last month's rent and security deposit and
other than acknowledging that the Defendant did place the security deposit
in an interest bearing account at the Cambridge Trust Savings Bank, there
was no information provided to the court relative to the terms of that
account, as required by G.L. c. 186, sec. 15B(3)(a), nor is that issue the
subject of the complaint.
    The Plaintiffs vacated the Premises on March 31, 2016. Thereafter, on
April 8 and 10, there was an e-mail exchange between real estate agents
relative to the return of the security deposit. (Exhibits "L," "M and "N").
On April 8, 2014, the Plaintiffs received a check in the amount of
$8,121.76, representing the return of the security deposit after the
deduction of utilities, cleaning service, bookkeeper's time.
    B.    Plaintiffs' Claims
    The Plaintiffs' Amended Complaint seeks monetary damages based on the
Defendant's breach of contract, breach of covenant of good faith and fair
dealing, unjust enrichment, violation of G.L. c. 186, sec. 15B with respect
to a security deposit and the acceptance of rent in advance of the tenancy,
violation of 94C CMR 3.17(4) [sic] and violation of G.L. c. 93A.
    (i) Breach of contract
    The facts as set forth by the parties fail to establish a prima facie
case to support the Plaintiffs' claim for breach of contract and the claim
is deemed to have been waived.
                    **Add. 012**

© 2021, Social Law Library. All Rights Reserved.                                    Page 2 of 5

(ii) Breach of covenant of good faith and fair dealing
    The facts as set forth by the parties fail to establish a prima facie case to support the Plaintiffs' claim for breach of covenant of good faith and fair dealing and the claim is deemed to have been waived.
                        -4-

    (iii) Unjust enrichment
    The facts as set forth by the parties fail to establish a prima facie case to support the Plaintiffs' claim for unjust enrichment and the claim is deemed to have been waived.
    (iv) Violation of G.L. c. 186, sec. 15B with respect to a security deposit
    As a matter of law, the Plaintiff were entitled to the return of the full amount of their security deposit upon vacation the Premises. G.L. c. 186, sec. 15B(4) permits a landlord to deduct only unpaid rent (which has not been validly withheld or deducted pursuant to the provisions of any special or general law), any unpaid increase in real estate taxes which the tenant is obligated to pay pursuant to a tax escalation clause which conforms to the requirements of section fifteen C; and / or a reasonable amount necessary to repair any damage caused to the dwelling unit by the tenant or any person under the tenant's control or on the premises with the tenant's consent, reasonable wear and tear excluded. In order to retain any portion of a security deposit to repair any damage caused to the dwelling unit by the tenant or any person under the tenant's control or on the premises with the tenant's consent, the landlord is required to provide to the tenant within such thirty days an itemized list of damages, sworn to by the lessor or his agent under pains and penalties of perjury, itemizing in precise detail the nature of the damage and of the repairs necessary to correct such damage, and written evidence, such as estimates, bills, invoices or receipts, indicating the actual or estimated cost thereof.
    The Defendant withheld a portion of the Plaintiffs' security deposit for a cleaning fee, time her assistant spent with respect to an issue with Comcast and final utility bills. (Exhibits "M" and "O").
    The Plaintiffs did not owe rent when they vacated the Premises. While they may have
                        -5-

owed utility payments, such payments are not "rent" as defined in paragraph "A" of the preamble to the lease and the language in paragraph 3 requiring the Defendants to pay for utilities does not make such payments rent. (Exhibit "A"). Utilities are a separate charge.
    Accepting without finding that the Plaintiffs are responsible for the cost of an accountant's time relative to her dealings with Comcast, the deduction of that cost is not permitted under the security deposit statue. For the same reason as the utility payments, the cost of the accountant's time is not rent. It does not represent an increase in real estate taxes and is not physical damage.
    While a landlord may be permitted to deduct the cost of cleaning the unit above and beyond reasonable wear and tear, there is no information before the court that the cleaning charge deducted from the Plaintiffs' security deposit was more than reasonable wear and tear.
    Finally, even if the deductions were permitted under the statute, the Defendant could not avail herself of that remedy as she did provide to the Plaintiffs with an itemized list of damages, sworn to by the Defendant or her agent under pains and penalties of perjury, setting forth in precise detail the nature of the damage and of the repairs necessary to correct such damage, and written evidence, such as estimates, bills, invoices or receipts, indicating the actual or estimated cost thereof.
    The Defendant was obligated to return the full amount of the Plaintiffs' security deposit. She did not; she retained $2,878.24. As a result of her failure to return the entire deposit, Judgment will enter for the Plaintiffs

**Add. 013**

© 2021, Social Law Library. All Rights Reserved.

on this claim for three times the amount retained $8,634.72, plus interest from April 30, 2014 through the date of this decision, costs and reasonable attorney's fees.

-6-

(v) Violation of G.L. c. 186, sec. 15B(b)(1)

In addition to the issues of security deposits and last month's rent, G.L. c. 186, sec. 15B (1)(b) prohibits a landlord from requiring a tenant or prospective tenant to pay more that rent for the first and last months of the tenancy and security deposit. The statute does not provide for damages and the Plaintiffs have not alleged or shown actual damages resulting from this violation.

Judgment will enter for the Plaintiffs on this claim, but the court declines to award damages.

(vi) Violation of Attorney General Regulations

The regulations of the Attorney General at 940 CMR 3.17 make such demand an unfair or deceptive trade practice under G.L. c. 93A. The sine qua non of a claim under c. 93A is that the defendant is engaged in trade or commerce. There was no evidence that the Defendant is engaged in the trade or commerce of renting residential real estate. (Joint Statement of Facts Regarding Motion to Authorize Case Stated Summary Adjudication at paragraph 6). She owns and lives at the Premises. (Joint Statement of Facts Regarding Motion to Authorize Case Stated Summary Adjudication at paragraph 1). At all times relevant hereto, the Defendant intended to return to the Premises. (Joint Statement of Facts Regarding Motion to Authorize Case Stated Summary Adjudication at paragraph 5). The court finds that the Defendant's primary objective in renting the Premises was personal not commercial and therefore was not engaged in trade or commerce with the Plaintiffs and is not liable to them under 940 CMR 3.17. Billings v Wilson, 397 Mass. 614 (1986); Young v Patukonis, 24 Mass.App.Ct. 154 (1987). Judgment will enter for the Defendant on this claim.

-7-

(vi) Violation of G.L. c. 93A

Because the court has found that the Defendant was not engaged in trade or commerce with the Plaintiffs, she is not liable under G.L. c. 93A and judgment will enter for the Defendant on this claim.

C.    Defendant's Claims

The Defendant's Answer and Answer to the Amended Complaint asserts counterclaims seeking monetary damages for breach of contract, nuisance, unjust enrichment, quantum meruit and indemnification.

(i) Breach of Contract

The facts as set forth by the parties fail to establish a prima facie case to support the Defendant's claim for breach of contract and the claim is deemed to have been waived.

(ii) Nuisance

The facts as set forth by the parties fail to establish a prima facie case to support the Defendant's claim for nuisance and the claim is deemed to have been waived.

(iii) Unjust Enrichment

The facts as set forth by the parties fail to establish a prima facie case to support the Defendant's claim for unjust enrichment and the claim is deemed to have been waived.

(iv) Quantum Meruit

The facts as set forth by the parties fail to establish a prima facie case to support the Defendant's claim for quantum meruit and the claim is deemed to have been waived.

(v) Indemnification

The facts as set forth by the parties fail to establish a prima facie case to support the De-

-8-

**Add. 014**

© 2021, Social Law Library. All Rights Reserved.

fendant's claim for indemnification and the claim is deemed to have been waived.

INTERIM ORDER
    Based upon the stipulations of the parties, in light of the governing law, it is ORDERED that
1.    The facts as set forth by the parties fail to establish a prima facie case to support the    Plaintiffs' claims of breach of contract, breach of the covenant of good faith and fair    dealing and unjust enrichment and those claims are deemed to have been waived.
2.    Judgment enter for the Plaintiffs on Count IV of the Amended Complaint, violation of    G.L. c. 186, sec. 15B with respect to the security deposit in the amount of $8,634.72    (representing three times the amount of the security deposit retained by the Defendant,    plus interest from April 30, 2014 through the date of this decision, costs and reasonable    attorney's fees. Within ten days from the date hereof, counsel for the Plaintiffs is to file a    motion for attorney's fees accompanied by an affidavit with respect to attorney's fees    incurred with respect to the claim prevailed upon, including details of the actual work    performed by the attorney, supported by detailed and contemporaneous time records to    document the hours spent on the case. Wojtkowski v Cade, 725 F.2d 127, 130-31 (1st    Cir.1984). Copies of the actual time records should be submitted. Grendel's Den, Inc. v    Larkin, 749 F.2d 945, 952 (1st Cir.1984).
                         -9-

3.    Judgment enter for the Plaintiffs with respect to their claim for violation of G.L. c. 186,    sec. 15B(b)(1), but there was no evidence of actual damage and the court declines to    award other damages.
4.    Judgment enter for the Defendant on Count V of the Amended Complaint, violation of    940 CMR 3.17.
5.    Judgment enter for the Defendant on Count VI of the Amended Complaint, violation of    G.L. c. 93A, as the Defendant is not engaged in trade or commerce.
6    Judgment enter for the Plaintiffs on Count VII of the Amended Complaint, violation of    G.L. c. 186, sec. 15B(1)(b), but the court declines to award damages.
7.    Judgment enter for the Defendant on the Plaintiffs' claims of violation of G.L. c. 93A    arising out of violation of 940 CMR 3.17, as the Defendant is not engaged in trade or    commerce.
8.    The facts as set forth by the parties fail to establish a prima facie case to support the    Defendant's claims of breach of contract, nuisance, unjust enrichment, quan turn meruit    and indemnification and those claims are deemed to have been waived.

SO ORDERED.
/S/MARYLOU MUIRHEAD
ASSOCIATE JUSTICE
June 13, 2016

cc:    Stephen P. Rahavy, Esquire
      Eugene R. Richard, Esquire
                  -10-

**Add. 015**

© 2021, Social Law Library. All Rights Reserved.

HOUSING COURT
STANLEY J. SLEPOY, Plaintiff v. MELISSA J. BICKFORD, Defendant

NORTHEAST


*Docket #*    **No. 09-SP-01679**

*Parties:*    **STANLEY J. SLEPOY, Plaintiff v. MELISSA J. BICKFORD, Defendant**


*Judge:*      **/s/David D. Kerman**
          **Associate Justice**

*Date:*       **July 27, 2009**

DECISION AND ORDER

    This troubled landlord tenant relationship began on August 16, 2008, under a "Massachusetts Residential Use and Occupancy Agreement" for shared occupancy of a single family house in Rowley.  The Agreement, which the landlord prepared, ran through June 30, 2009 [¶2], with rents at $1,700 per month [¶3], plus 50% of shared heating oil and electric utilities and "basic" cable TV and internet costs "estimated (on a budgeted basis) at $300.00 per month" [¶11].

    At the beginning of the relationship the landlord represented that the respective living quarters would be separated by walled-off doors and partitions and by the construction of a separate kitchen.  He also promised amenities including a deck, a swimming or wading pool, and conversion of a storage shed to a playhouse for the tenants' children.  The landlord did wall off one door, but segregated living quarters, separate kitchen, and the other amenities were never provided.  When the landlord rented basement space to a new tenant on April 24, 2009, he prevented her from putting her lawn chairs outdoors; instead, the landlord put the chairs in the storage shed in an effort to hide from the municipal authorities the number of people who were living there.

    Disagreements arose, between the landlord Stanley J. Slepoy and the tenants Craig A. Bickford and Melissa J. Bickford, between the landlord and the new tenant Janice M. Cheever, whose case against the landlord was adjudicated by agreement for judgment in Cheever v. Slepoy, N.E.Hsg.Ct. No. 09-CV-00110, on July 2, 2009, and between the landlord and a previous tenant Justin Washington, who lived at the premises from December 14, 2007, until February 14, 2009, whose case against the landlord was adjudicated by judgment in Washington v. Slepoy, Newburyport District Court No. 2009-22-SC-000416, on July 16, 2009.

    The disagreements resulted in the tenant's complaints about housing defects and conditions and about the landlord's behaviors to the Town of Rowley's building, health, police, and fire departments and enforcement officials.  Justin Washington requested a property inspection by the building department on April 16, 2009.  The current tenants complained to various municipal officials on May 18, 2009.

    1. Illegalities

**Add. 016**

© 2024, Social Law Library. All Rights Reserved.

Town officials inspected the premises on May 21, 2009. By letter dated May 28, 2009, the Inspector of Buildings gave the landlord formal written notice that the living arrangement was in violation of the town's zoning law, "Specifically, the existence of two or perhaps as many as three potential dwelling units contained within a permitted single family dwelling." The Inspector ordered the landlord to "cease and desist from this unapproved use and file plans with this office for corrective construction by June 12, 2009."

The living arrangement also amounted to an illicit, unlicensed lodging house in violation of Gen.L. c.140 §§22-32.

The landlord's "Massachusetts Residential Use and Occupancy Agreement" is unlawful also in several other respects:

Paragraph 3.A "Delinquent Rent" imposes a $15 per day "late charge" for "delinquent rent" that is "not paid on the 1st" day of the month; but "If Landlord receives the monthly rent by the 3rd day of the month, Landlord will waive the late charges for that month." Paragraph 23 "Late Charge" imposes an additional $90 "late fee" for rents that are not paid within 30 days of when due. The landlord charged and the tenants paid a $15 late fee under Paragraph 3.A on October 10, 2008. The landlord now seeks an award of cumulative late fees under both Paragraph 3.A and Paragraph 23. Paragraph 3.A is unlawful because Gen.L. c.186 §15B(1)(c) provides: "No lease or other rental agreement shall impose any interest or penalty for failure to pay rent until thirty days after such rent shall have been due." The landlord is not entitled to keep the $15 late fee that the landlord imposed and the tenants paid on October 10, 2008. Moreover, the tenants cannot be charged late fees under either Paragraph 3.A or Paragraph 23 because, as explained below, they are entitled to withhold their rent.

Paragraph 4 "Last Month's Rent" allows the Landlord at his discretion to "convert Last Month's Rent to a Security Deposit for any damage caused to the Premises during the term." Paragraph 4.B "Deductions" allows the Landlord to deduct for "Late charges" ¶4.B(2); "Costs of re-letting if Tenant is in default" ¶4.B(11); "Attorney fees and costs of court" ¶4.B(12); and "Other items Tenant is responsible to pay" ¶4.B(14). These provisions violate the Security Deposit Law, Gen.L. c.186 §15B(1)(b),(d), (2)(b), (3)(a), and (4). However, it does not appear that the Landlord attempted to enforce these provisions as might trigger either single or treble damage liability under §15B(6)(c),(e), (7).

Paragraph 12 "Maintenance, Repair and Rules" shifts normal maintenance and repair obligations from the landlord to the tenant, in violation of law. See, Boston Housing Authority v. Hemingway, 363 Mass. 184, 199, 293 N.E.2d 831, 843 (1973) (implied warranty of habitability, at least insofar as it is based on the State Sanitary Code or other regulations, cannot be waived); Leardi v. Brown, 394 Mass. 151, 156-157, 474 N.E.2d 1094, 1099-1100 (1985) (lease provisions purporting to disclaim, waive, and limit rights under habitability doctrine and state sanitary code were impermissible, deceptive, and unconscionable).

Paragraph 14 "Access by Landlord" allows the Landlord to enter the Premises "without notice" and to "Seize nonexempt property after default" ¶14.F. In Massachusetts a landlord has no right of distraint in a tenant's chattel property. See, Prescott F. Hall, Massachusetts Law of

**Add. 017**

©2024, Social Law Library. All Rights Reserved.

Landlord and Tenant (Adams & Wadsworth 4th ed. 1949), §238, p.268, citing Ex Parte Wait, 24 Mass. (7 Pick.) 100, 105 (1828); Potter v. Hall, 20 Mass. (3 Pick.) 368, 373 (1825).  The "without notice" and "Seize nonexempt property after default" provisions violate the statutory covenant of quiet enjoyment, Gen.L. c.186 §14.  See, Al-Ziab v. Mourgis, 424 Mass. 847, 679 N.E.2d 528 (1997).

Paragraph 20 "Quiet Enjoyment" conditions rights to quiet enjoyment "upon payment of all of the sums referred to herein as being payable by Tenant and Tenant's performance of all Tenant's agreements contained herein and Tenant's observance of all rules and regulations."  The implied covenant of quiet enjoyment is statutory, Gen.L. c.186 §14, and cannot be so waived, altered, or conditioned.  See, Al-Ziab v. Mourgis, 424 Mass. 847, 679 N.E.2d 528 (1997); Boston Housing Authority v. Hemingway, 363 Mass. 184, 199, 293 N.E.2d 831, 843 (1973); Leardi v. Brown, 394 Mass. 151, 156-157, 474 N.E.2d 1094, 1099-1100 (1985).

Paragraph 21 "Indemnification" denies the Landlord's liability "for any damage or injury of or to the Tenant, Tenant's family, guests, invitees, agents or employees or to any person entering the Premises" and requires the Tenant "to indemnify, defend and hold Landlord harmless from any and all claims or assertions of every kind and nature."  The provision is unlawful.  See, Gen.L. c.186 §§15, 15E, 15F, 19.  See, Leardi v. Brown, 394 Mass. 151, 474 N.E.2d 1094 (1985).

Paragraph 35 "Lead-Based Paint Disclosure" provides "The premises were constructed in 1991.  Therefore, no forms are required."  The provision violates the Lead Poisoning Prevention and Control Law, Gen.L. c.111 §197A(d).

2. Rent

The landlord claims increased rent in the amount of $2,500 for the month of July 2009 under Paragraph 16 of the Agreement.  He is not so entitled.

Paragraph 16 "Tenant's Hold Over" provides that if the tenant holds over "in possession of the Premises with the consent of Landlord" after expiration the 11.5 month term "a new tenancy from month-to-month shall be created" with rent increased to $2,500 per month.

I assume without deciding that the provision in Paragraph 16 for a rent increase of 47% by $800 from $1,700 to $2,500 per month constitutes a provision for liquidated damages rather than a penalty.  See, Cummings Properties, LLC v. National Communications Corp., 449 Mass. 490, 869 N.E.2d 617 (2007) (at least in the case of a commercial agreement between sophisticated parties, a contract provision reasonably establishing liquidated damages will be enforced so long as, at the time the contract was made, it is not so disproportionate to anticipated damages as to constitute a penalty); NPS, LLC v. Minihane, 451 Mass. 417, 886 N.E.2d 670 (2008) (same; in the case of an enforceable liquidated damages provision, mitigation of damages is irrelevant).

However, the landlord is not entitled to increased rent for the month of July 2009, for two reasons.  First, it is clear that the landlord, who issued a notice to quit on May 7, 2009, and who continues to seek possession by this summary action, does not consent to the tenants'

**Add. 018**

© 2024, Social Law Library. All Rights Reserved.

continued occupancy. The landlord says that he meant to say "without the consent of Landlord" and not "with the consent of Landlord" when he wrote his "Massachusetts Residential Use and Occupancy Agreement." But the landlord is bound by the term "with the consent" as contained in Paragraph 16.

Second, the landlord is bound by the written notice requirement in Paragraph ¶3.E "Rent Increases" which provides, "If this Use and Occupancy is renewed automatically on a month to month basis, Landlord may increase the rent during the renewal period by providing written notice to Tenant that becomes effective the month following the 30th day after the notice is provided." At trial, the landlord reluctantly conceded that he provided no such written notice.

     ***

On May 2, 2009, the tenants paid the landlord $400. According to his spreadsheet exhibit the landlord apportioned $300 to utility costs and $100 to rent that was due on May 1, 2009. On May 7, 2009, the landlord had his constable serve a "14 Day Notice to Quit for Nonpayment of Rent" that was dated May 6, 2009. The landlord's notice to quit claimed $1,300 rent plus $300 for shared utilities, which is not consistent with his spreadsheet apportionment.

Since May 2, 2009, the tenants have withheld all payments to the landlord.

Under Paragraph 11 of the Agreement the tenants were to pay the landlord $300 per month their estimated 50% share of heating oil, electric, and cable utilities, which the landlord was to provide and pay for. Notwithstanding the Agreement the tenants paid the costs of cable service, but the $300 per month "estimate" was never formally changed to take this into account. For the 8.5 month period ending April 30, 2009, fifty percent of the landlord's heating oil costs totaled $1,091.14; fifty percent of his electric utility costs totaled $529.59; fifty percent of the tenants' cable costs totaled $86.25. The average fifty percent monthly costs were $128.37 for oil, $62.30 for electric, and $34.50 for cable; the net average monthly cost to the landlord was $156.17, a little more than half the $300.00 per month "estimate" stated in Paragraph 11 of the Agreement.

As of April 30, 2009, the landlord was due monies in the total amount of $17,770.72 ($1,700.00 for last month's rent deposit, $14,450.00 for rent, $1,091.14 for shared heating oil, and $529.59 for shared electric utility costs). The tenants were entitled to credit for payments totaling $18,721.25 ($18,565.00 to the landlord, $86.25 for shared cable costs, and $70.00 for shared heating oil). The tenants had overpaid the landlord by $950.53 as of April 30, 2009. Another month's rent became due on May 1, 2009, but when the landlord issued his "14 Day Notice to Quit for Nonpayment of Rent" on May 7, 2009, the amount withheld by the tenants was $749.47, not $1,600.00.

3. Heat

Problems with the heat arose as early as January 29, 2009. Under Paragraph 11 "Utilities" of the "Residential Use and Occupancy Agreement" the landlord was to provide and pay for heating oil that was furnished by Emerson's Oil Service, Inc. and the tenants were to pay the landlord half those costs. However, the landlord did not perform his obligations, the

**Add. 019**

©2024, Social Law Library. All Rights Reserved.

heating furnace ran out of oil, and on January 29, 2009, it became necessary for the tenants to buy $140 worth of fuel oil from another supplier, Eaton Oil.

At trial on July 2, 2009, the landlord claimed (and offered a spreadsheet exhibit showing) that it was he who paid Eaton $165 for the oil delivery on January 29, 2009.  But the landlord has no receipt or invoice; and the $165 amount which the landlord claimed he paid is more than the $140 amount shown by the tenants' Eaton Oil "Pd CASH" invoice.  Then at trial on July 9, 2009, the landlord claimed instead (and offered a changed spreadsheet exhibit showing) that he had reimbursed the tenants $140 for the oil delivered by Eaton.  But the $140 amount would have been twice the amount of the landlord's share.  I find that neither of the landlord's claims is true.  I find instead that the tenants paid $140 to Eaton Oil on January 29, 2009; that the landlord paid nothing; and that the tenants are now entitled to reimbursement for half their $140 out-of-pocket heating oil expense.

        ***

On May 2, 2009, the landlord shut off the heat.  The lack of heat adversely affected the tenants, but did not affect the landlord, who by that time had begun living at his friend's house in Swampscott.

The tenants called the landlord on May 16, 2009, to complain that there was no heat (and also no hot water).  The tenants complained to the municipal authorities on May 18, 2009.

The landlord claims that the tenant herself shut off the heat on May 16, 2009.  He also claims that the tenant repeatedly turned the burner switch off and on, causing damage to the furnace and boiler.  He seeks $125.00 reimbursement for "extra cleaning" and "extra service call" by Emerson Oil Service, Inc. on May 18, 2009. He also seeks $189.96 for "routine cleaning/service" on October 24, 2008.

The landlord's denials that he turned off the heat (and his claim that the tenant did so) are flatly contradicted by his admissions that he made to the Rowley police.  Police officer Matthew Ziev testified in court on July 23, 2009, credibly so, that he was called to the house at 9:30 p.m. on the evening of July 2, 2009; that the temperature inside the house was 60 degrees Fahrenheit; that he spoke with the tenant, who has four children ages 1, 7, 8 and 13, living with her, who stated that she had not had any heat in her residence since May 2, 2009, and that the landlord had shut off the heat in her residence.  The officer then spoke with the landlord who stated that he had shut the heat off on May 2, 2009.  The officer advised the landlord that he was risking a criminal charge under the "Wrongful Acts of a Landlord" law, especially given the weather over the recent month, and that he was in contempt of the court order, which states that utilities are not to be tampered with.  The landlord's testimony to the contrary is not credible.

The landlord's shutting off the heat on May 2, 2009, was unlawful, as the State Sanitary Code, 105 C.M.R. §410.201, "Temperature Requirements" requires: "The owner shall provide heat in every habitable room and every room containing a toilet, shower, or bathtub to at least 68°F (20° C) between 7:00 A.M. and 11:00 P.M. and at least 64°F (17° C) between 11:01 P.M. and 6:59 A.M. every day other than during the period from June 15th

**Add. 020**

©2024, Social Law Library. All Rights Reserved.

to September 15th ...."

The Quiet Enjoyment Law, Gen.L. c.186 §14, "Wrongful acts of landlord; premises used for dwelling or residential purposes; utilities, services, quiet enjoyment; penalties; remedies; waiver" provides:

Any lessor or landlord of any building or part thereof occupied for dwelling purposes, other than a room or rooms in a hotel, but including a manufactured home or land therefor, who is required by law or by the express or implied terms of any contract or lease or tenancy at will to furnish water, hot water, heat, light, power, gas, elevator service, telephone service, janitor service or
refrigeration service to any occupant of such building or part thereof, who willfully or intentionally fails to furnish such water, hot water, heat, light, power, gas, elevator service, telephone service, janitor service or refrigeration service at any time when the same is necessary to the proper or customary use of such building or part thereof, or any lessor or landlord who directly or indirectly interferes with the furnishing by another of such utilities or services, or who transfers the responsibility for payment for any utility services to the occupant without his knowledge or consent, or
any lessor or landlord who directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant, or who attempts to regain possession of such premises by force without benefit of judicial process, shall be punished by a fine of not less than twenty-five dollars nor more than three hundred dollars, or by imprisonment for not more than six months.  Any person who commits any act in violation of this section shall also be liable for actual and consequential damages or three month's rent, whichever is greater, and the costs of the action, including a reasonable attorney's fee, all of which may be applied in setoff to or in recoupment against any claim for rent owed or owing.  The superior and district courts shall have jurisdiction in equity to restrain violations of this section.  The provisions of section eighteen of chapter one hundred and eighty-six and section two A of chapter two hundred and thirty-nine shall apply to any act taken as a reprisal against any person for reporting or proceeding against violations of this section.  Any waiver of this provision in any lease or other rental agreement, except with respect to any restriction on the provision of a service specified in this section imposed by the United States or any agency thereof or the commonwealth or any agency or political subdivision thereof and not resulting from the acts or omissions of the landlord or lessor, and except for interruptions of any specified service during the time required to perform necessary repairs to apparatus necessary for the delivery of said service or interruptions resulting from natural causes beyond the control of the lessor or landlord, shall be void and unenforceable.

The tenants are entitled to triple rent damages of $5,100 under the Quiet Enjoyment Law, Gen.L. c.186 §14, for the landlord's shutting off the heat on May 2, 2009.

Because the landlord shut off the heat in reprisal and retaliation against the tenants for the report and request for a property inspection that was made on their behalf by Justin Washington on April 16, 2009, the tenants are additionally entitled to single rent damages of $1,700 under the Retaliation Law, Gen.L. c.186 §18.  See, Ianello v. Court Management Corp., 400 Mass. 321, 509 N.E.2d 1 (1987).

**Add. 021**

©2024, Social Law Library. All Rights Reserved.

The landlord's wrongful act also breached the implied warranty of habitability, but the habitability and quiet enjoyment damages are duplicative, and the evidence shows no amount of actual damages sustained by the tenants greater than three months' rent.

The landlord is not entitled to $125.00 for "extra cleaning" and "extra service call" on May 18, 2009, or to $189.96 for "routine cleaning/service" on October 24, 2008.

4. Behaviors

After shutting off the heat on May 2, 2009, the landlord embarked on an almost continuous, months long campaign of intrusions, intimidation, and bullying behavior that he directed towards the tenants, towards the tenants' children, and towards the tenants' babysitter and guest, in an effort to force them out of the house.

As mentioned above, the tenants complained to the landlord on May 16, 2009, that there was no heat and no hot water, and they complained to municipal enforcement officials on May 18, 2009, about housing defects and conditions and about the landlord's behaviors.

Town officials inspected the property on May 21, 2009, and by letter dated May 28, 2009, the Inspector of Buildings formally notified the landlord that the shared living arrangement was in violation of the zoning law, ordering that the landlord "cease and desist from this unapproved use and file plans with this office for corrective construction by June 12, 2009."

On May 25, 2009, the tenant complained to the police about the landlord's intrusions, and about his aggressive demeanor and intimidating behavior. On the next day, May 26, 2009, the tenant complained to the police about the landlord's bullying behavior towards her 9 year old son, by facial glares, and by taking pictures of the child through the windows. On May 30, 2009, the tenants again complained to the landlord and then to the fire department about no heat and about defective heating equipment.

On June 11, 2009, I heard the landlord's motion that he had filed on June 10, 2009, and issued an order requiring that the tenants allow the landlord access to the premises. The hearing was held and the order was issued in the tenant's absence upon the landlord's representation that he had given the tenants notice of the motion and of the hearing on June 6, 2009. However, the tenants had no such prior notice; the landlord's representation that he had given notice was false.

On June 17, 2009, the tenant complained to the police about the landlord's intrusions and that he put her and her 18 month old child in fear. When the police inquired that day, the landlord stated that because of the June 11, 2009, order "he is now a co-occupant of the home" and he adamantly stated that "he has every right to enter the dwelling when he wanted to because of the new order."

On June 20, 2009, the tenant complained to the police about the landlord's repeated bullying behavior towards the tenants' 9 year old son, this time by whispering in the child's ear while he was on the computer, despite the tenants' prior demand (and the landlord's

**Add. 022**

© 2024, Social Law Library. All Rights Reserved.

agreement) that the landlord have "no contact" with the tenants' children.

On June 25, 2009, on the tenants' motion filed on June 17, 2009, for clarification of the June 11, 2009, order allowing the landlord access to the premises, a detailed stipulation was negotiated with the help of a housing specialist, which after a hearing I approved as a court order. Among other things, the stipulated order required the landlord to give advance notice of his arrivals; limited his arrivals and departures to between the hours of 6:00 a.m. and 12:00 midnight; limited his access once in the house to areas not occupied by the tenants; prohibited the parties from having unnecessary contact with each other; prohibited all contact with family members or guests; and provided that "No party shall disturb any utilities."

On the afternoon of same day, June 25, 2009, the landlord violated the stipulated court order.  He arrived at the house, without prior notice, and engaged in bullying behavior directed towards the tenants' children.  Because of the landlord's conduct and continued presence, and because their parents were not then at home, the children, Andrea Bickford (13 years old), John Bickford (9 years old), Emily Bickford (7 years old), and Hannah Bickford (18 months old), found it necessary to lock themselves in a bedroom inside the house, for a period of from three to four hours until their parents returned home.

On the following day, June 26, 2009, the former tenant Justin Washington, who was a friend, babysitter and guest, visited the current tenants.  The landlord ordered the tenants' guest off the property and then sent him a certified letter threatening "criminal trespassing" charges if he returned.

On the evening of the first day of trial, July 2, 2009, the police responded to the tenants' complaints that the landlord had intruded into the tenants' living quarters and refused to leave, in violation of the court order of June 25, 2009.  The landlord took the position that the stipulated order was no longer in effect because it stated "This agreement shall remain in force until the day of trial."  (As mentioned above, when the police arrived, the tenants complained about no heat, the temperature was then 60 degrees Fahrenheit, and the landlord admitted to the police officer that he had shut the heat off on May 2, 2009.)

At trial on July 2, 2009, and again on July 9, 2009, I informed the landlord that he had no right to interfere with the tenants' rights to have guests.  Nevertheless, on July 16, 2009, the landlord complained to the police, seeking to have charges pressed, that Justin Washington was visiting the tenants in violation of his "no trespass letter"; two days later on July 18, 2009, the landlord delivered to the police a copy of the "no trespass" letter.

On July 17, 2009, Janice Cheever's adult son John Avagianos reported to the police that he was concerned about his mother's safety because the landlord had called him and threatened "that if [he] was seen at #17 Dodge Rd. that he has the right to smash his head with a baseball bat if he so desired."  (Earlier, on June 24, 2009, or June 25, 2009, the landlord had accused John Avagianos of driving across the lawn with a truck and had forbidden him from coming onto the property.)  The police spoke to the landlord who denied making any call.  At trial the landlord

**Add. 023**

©2024, Social Law Library. All Rights Reserved.

submitted his mobile telephone record to show that he made no outgoing call on July 17, 2009, to the complainant's telephone number identified in the police report.  But the landlord's telephone number identified in the police report is a number different from the landlord's mobile telephone number.  I make no finding whether the landlord in fact made the threat, as the accusation is serious, sharply disputed, supported only by hearsay evidence, and such a finding is not necessary to a decision in this case (which involves only the Bickfords).

On the afternoon of the same day, July 17, 2009, Janice Cheever and Melissa Bickford both filed motions returnable July 23, 2009, seeking stay-away orders and other relief against the landlord.

On the following day, July 18, 2009, the landlord engaged the tenants in a confrontation at the post office.  The police who investigated noted that according to the post office employees the landlord started the conflict.

On July 23, 2009, the tenants' motions were heard, on a consolidated basis.  Further, the trial of the instant case was re-opened, as the landlord had submitted on July 14, 2009, ex parte without notice to the tenants, a memorandum and additional exhibits.  On July 23, 2009, police officer Matthew Ziev and the parties testified and submitted additional documentary evidence.

At the conclusion of the hearing on July 23, 2009, I ordered, with the landlord's assent, that he stay away from the tenants, their children, and their guests, and from the subject premises at 27 Dodge Road, Rowley, pending further order.

\* \* \*

The evidence in this case overwhelmingly shows that the landlord violated the tenants' rights to quiet enjoyment. I credit the factual accuracy of the statements contained in the police reports, which, although factually disputed by the landlord, were received in evidence without hearsay or other objection as to admissibility.  I also credit the truth of the tenants' testimony, which in all material respects is consistent with the police records.  The testimony of the landlord, on the other hand, which is in important respects contradictory, and in other respects evasive, is entitled to little credit and belief.

By his repeated intrusions, aggressive demeanor, intimidating behavior, and bullying conduct in May, June, and July 2009, towards the tenants, towards their children, and towards their guest, the landlord violated the tenants' rights to quiet enjoyment in violation of the Quiet Enjoyment Law, Gen.L. c.186 §14.

Especially egregious was the landlord's stalking behavior that he maliciously directed towards the tenants' children.  There can be no doubt in this case that, by his intrusions, intimidations, and bullying conduct, which lasted for months on an almost continual basis, the landlord caused the tenants serious and substantial injury in the peaceful enjoyment of their home.

I note that even apart from this most egregious conduct, the landlord's expulsion of the tenants' guest violated the tenants' rights to quiet enjoyment.  See, Aponte v. Brancic, Hampden Hsg.Ct. No. 02-CV-

**Add. 024**

00087 (Fein, J., October 26, 2004). See also, State v. DeCoster, 653 A.2d 891, 893-894 (Me. 1995); Branish v. NHP Property Management, 694 A.2d 1106, 1107 (Pa..Super. 1997); Ashley Court Enterprises v. Whittaker, 249 N.J. Super. 552, 558, 592 A.2d 1228, 1231 (App.Div. 1991); Folgueras v. Hassle, 331 F. Supp. 615, 625 (W.D.Mich. 1971).

The landlord had no right to exclude the tenants' guest from the premises, and he certainly had no right to threaten charges of criminal trespass. See, Commonwealth v. Nelson, 74 Mass.App. 629, 909 N.E.2d 42 (2009) (tenants' guest could not be could not be convicted of criminal trespass); Commonwealth v. Richardson, 313 Mass. 632, 48 N.E.2d 678, 146 ALR 648 (1943) (tenants' invitees could not be excluded by landlord; Jehovah's Witnesses who had been afforded the opportunity to enter by tenants over the landlord's objection could not be convicted of criminal trespass). See also, Commonwealth v. Hood, 389 Mass. 581, 589, 452 N.E.2d 188, 194 (1983) ("A tenant has a right to admit any visitor"); Nyer v. Munoz-Mendoza, 385 Mass. 184, 430 N.E.2d 1214 (1982) (landlord's prohibition of posting of signs by tenant intruded on tenant's property rights). Accord, State v. Dixon, 169 Vt. 15, 18, 725 A.2d 920, 922-923 (1999) (an invited guest of tenant is a licensee, not a trespasser, and cannot be convicted of trespass; landlord may not prevent invitees or licensees of a tenant from entering the tenant's premises through the common areas); Brown v. Kisner, 192 Miss. 746, 6 So.2d 611 (1942) (in banc) (tenant's guest could not be convicted of criminal trespass; suit against manager for malicious prosecution of criminal trespass action upheld).

The tenants are entitled to triple rent damages of $5,100 under the Quiet Enjoyment Law, Gen.L. c.186 §14, for the landlord's bullying behavior directed to the tenants, to the tenants' children, and to the tenants' guest. See, Simon v. Solomon, 385 Mass. 91, 99-104, 431 N.E.2d 556, 563-566 (1982); Cruz Management Co., Inc. v. Thomas, 417 Mass. 782, 788-790, 633 N.E.2d 390, 394-395 (1994); Al-Ziab v. Mourgis, 424 Mass. 847, 679 N.E.2d 528 (1997).

Because the landlord's bullying conduct was in reprisal and retaliation against the tenants for their complaints about violations of law which they made to the municipal police, fire, health, and building departments and enforcement officials, the tenants are additionally entitled to single rent damages of $1,700 under the Retaliation Law, Gen.L. c.186 §18. See, Ianello v. Court Management Corp., 400 Mass. 321, 509 N.E.2d 1 (1987).

The landlord's wrongful acts also constituted a contempt of the stipulated order issued on June 25, 2009. However, the contempt and quiet enjoyment damages are also duplicative, and the evidence shows no amount of actual damages sustained by the tenants greater than three months' rent.

5. Conclusions

1. The landlord is entitled to $19,550 rents at $1,700 per month for 11.5 months from the beginning of the tenants' occupancy on August 16, 2008, through July 31, 2009.

2. The landlord is not entitled to increased rent for July 2009.

3. The landlord is not entitled to the $15 "late fee" which the

**Add. 025**

© 2024, Social Law Library. All Rights Reserved.

landlord imposed and the tenants paid on October 10, 2008.

4. The tenants are entitled to credit for $18,965 their total aggregate payments made to the landlord (which includes the tenants' $1,700 last month's rent deposit).

5. The landlord is entitled to $1,201.14 half the heating oil costs paid to Emerson's Oil Service, Inc., as shown by his invoices in evidence.

6. The landlord is not entitled to $165 as claimed at trial on July 2, 2009, or to $140 as claimed at trial on July 9, 2009, for the heating oil that was provided by Eaton Oil at the tenants' request on an emergency basis on January 29, 2009, for which the landlord did not pay.

7. The landlord is not entitled to $125 for "extra service call" on May 18, 2009, or to $189.96 for "routine cleaning/service" on October 24, 2008.

8. The tenants are entitled to $70 half the cost of heating fuel oil which they paid to Eaton Oil on an emergency basis on January 29, 2009.

9. The landlord is entitled to $647.28 half the electric utility costs paid to the Rowley Light Department as shown by the "payment summary" showing charges from September 3, 2008, to June 8, 2009. There is no support in the "payment summary" for charges of $129.32 for July 8, 2009, or of $84.69 for July 31, 2009, and the landlord does not provide other evidence substantiating his claim for those items.

10. The tenants are entitled to $189.75 half the "basic" TV and internet cable costs which they paid to Comcast at $69 per month for the 5.5 month period from February 17, 2009, through July 31, 2009.

11. I make no finding as to liability of the landlord (or of the tenants) for cable costs incurred earlier than February 17, 2009, which according to the parties were paid by the previous occupant Justin Washington.

12. The tenants are entitled to triple rent damages of $5,100 under the Quiet Enjoyment Law, Gen.L. c.186 §14, for the landlord's shutting off heat on May 2, 2009.

13. The tenants are entitled to single rent damages of $1,700 under the Retaliation Law, Gen.L. c.186 §18, for the landlord's reprisal and retaliation against the tenants because of the complaint and request for property inspection made to the building department on the tenants' behalf by Justin Washington on April 16, 2009.

14. The tenants are entitled to triple rent damages of $5,100 under the Quiet Enjoyment Law, Gen.L. c.186 §14, for the landlord's bullying behavior to the tenants, to their children, and to their guest, in May, June, and July 2009.

15. The tenants are entitled to single rent damages of $1,700 under the Retaliation Law, Gen.L. c.186 §18, for the landlord's reprisal and retaliation against the tenants because of their complaints to municipal

**Add. 026**

©2024, Social Law Library. All Rights Reserved.

police, fire, health and building departments
and enforcement officials.

16. The landlord is not entitled to possession of the premises under Gen.L. c.239 §2A and §8A.


ORDER

1. Judgment shall enter on behalf of the tenants dismissing the landlord's complaint and for money damages in the sum of $9,726.33.

2. Consistent with the Town of Rowley's "cease and desist" zoning law enforcement order issued on May 28, 2009, the landlord may not resume occupancy at the 27 Dodge Road, Rowley, premises, for the duration of the tenants' occupancy.

3. The order issued on July 23, 2009, shall remain in full force and effect. The landlord shall stay away, 100 yards at least, from the tenants, from the tenants' children, and from their guests, and from the 27 Dodge Road, Rowley, premises, for the duration of the tenants' occupancy.

4. The Clerk shall communicate this order to the Town of Rowley Police Department.




End Of Decision

**Add. 027**

© 2024, Social Law Library. All Rights Reserved.